***Diem***

***v.***

***Travelers Personal Insurance Company***

---

Jeff Diem

September 19, 2022

---

Confidential

AB Litigation
SERVICES

216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-02664-REB-KLM

JEFF DIEM,

Plaintiff,

v.

TRAVELERS PERSONAL INSURANCE COMPANY,

Defendant

---

DEPOSITION OF JEFF DIEM

September 19, 2022

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

Pursuant to Notice and the Federal Rules of Civil Procedure, the deposition of JEFF DIEM, taken by Defendant, was held at 999 18th Street, Suite 1765N, Denver, Colorado 80202, on Monday, September 19, 2022, at 10:21 a.m., before Jason T. Meadors, RPR, CRR, CRC.



APPEARANCES

ANDREW C. QUISENBERRY, ESQ.
Bachus & Schanker, LLC
101 West Colfax Avenue, Suite 650
Denver, Colorado 80202
(303)893-9800
Andrew.Quisenberry@coloradolaw.net
For the Plaintiff

EDWARD C. DENBY, ESQ.
Clyde & Co US, LLP
999 18th Street, Suite 1765N
Denver, Colorado 80202
(303)301-8950
Edward.Denby@clydeco.us
For the Defendant



TABLE OF CONTENTS


| EXAMINATION | | Page |
|---|---|---|
| BY MR. DENBY | | 8 |
| REQUESTED PORTIONS OF TESTIMONY | | Page |
| Request for document production | | 71, 105, 116, 140, 223, 261, 290 |
| EXHIBITS | | Page |
| Diem Exhibit 1 | Plaintiff's Responses to Defendant's Second Set of Written Discovery Requests | 53 |
| Diem Exhibit 2 | City and County of Denver Roofing and Siding Permit Re: Roof Pro Inc. | 64 |
| Diem Exhibit 3 | City and County of Denver Plumbing Permit Re: Kings Plumbing, Inc. | 66 |
| Diem Exhibit 4 | 6/27/19 All County Denver Metro Property Management Exclusive Rental Agreement | 72 |
| Diem Exhibit 5 | 11/24/21 All County Denver Metro Property Management Exclusive Rental Agreement | 72 |
| Diem Exhibit 6 | 7/6/20 Water Damage Sewer/Sump Backup Claim | 92 |
| Diem Exhibit 7 | 9/14/21 Email to Diem Re: Claim | 95 |
| Diem Exhibit 8 | 7/14/20 Invoice from Highwater Plumbing and Heating, LLC | 98 |
| Diem Exhibit 9 | 9/23/20 Invoice from Highwater Plumbing and Heating, LLC | 102 |




TABLE OF CONTENTS (Continued)


| EXHIBITS (Continued) | | Page |
|---|---|---|
| Diem Exhibit 10 | 1/21/21 Invoice from Highwater Plumbing and Heating, LLC | 110 |
| Diem Exhibit 11 | Ductworks Proposal to Elkmont Construction | 112 |
| Diem Exhibit 12 | Email Re: Claim Breakdown Detail Restoration/Service/Remodel | 123 |
| Diem Exhibit 13 | 8/7/20 SingleTrack Electric Estimate and Proposal to Elkmont Construction | 130 |
| Diem Exhibit 14 | 12/15/20 Email to Diem from Office Re: Elkmont Rental Photographs | 140 |
| Diem Exhibit 15 | 9/14/21 Email to Diem Re: File Cabinet Document Attach-Claim Number IHN8570 | 148 |
| Diem Exhibit 16 | 9/9/20 Letter to Diem from Travelers Re: Claim Number IHN8570 | 151 |
| Diem Exhibit 17 | 9/2/20 Gmail to Napolitan Re: 4563 N. Elm Ct. Plumbing Permit | 158 |
| Diem Exhibit 18 | 9/3/20 Email Chain Re: 4563 N. Elm Ct. Plumbing Permit | 163 |
| Diem Exhibit 19 | 9/9/20 Email from Diem to Richardson re: Travelers Claim #IHN8570-Diem - Attachment of Claim Payments.xlsx | 165 |
| Diem Exhibit 20 | 9/16/20 Email from Diem to Richardson Re: FW: Travelers Claim #IHN8570 - Diem with Attachments | 169 |
| Diem Exhibit 21 | 9/22/20 Email from Diem to Richardson Re: Fwd: File Cabinet Document Attach - Claim Number IHN8570 | 173 |


Confidential

TABLE OF CONTENTS (Continued)

EXHIBITS (Continued)


| | | Page |
|---|---|---|
| Diem Exhibit 22 | 9/22/20 Travelers Breakdown of Policy Coverage - Water Damage - Sewer/Sump Backup | 174 |
| Diem Exhibit 23 | 9/22/20 Letter to Diem from Sicheri Re: 4565 Elm Ct. Denver, Colorado | 183 |
| Diem Exhibit 24 | 9/25/20 Travelers Policy Breakdown for Claim - Water Damage - Sewer/ Sump Backup | 185 |
| Diem Exhibit 25 | 7/9/20 Metropolitan Drain Cleaning LLC, Invoice # 4693 | 191 |
| Diem Exhibit 26 | 7/22/20 Email Re: 4563 Elm Ct 80211 Estimate Address Correction | 198 |
| Diem Exhibit 27 | 8/7/19 Metropolitan Drain Cleaning LLC, Invoice #4081 | 207 |
| Diem Exhibit 28 | 12/4/20 Proposal from 1387 Conifer Trail, Elizabeth, Colorado for Diem | 210 |
| Diem Exhibit 29 | 7/6/20 Denver Flood and Fire LLC Estimate for 4565 Elm Ct. Denver, Colorado | 215 |
| Diem Exhibit 30 | 7/6/20 Denver Flood and Fire LLC Estimate for 4565 Elm Ct. Denver, Colorado | 217 |
| Diem Exhibit 31 | 9/25/20 Sub-Contractor/Trade Partner Agreement | 219 |
| Diem Exhibit 32 | 9/23/20 Precision Homes Agreement Drawings and Photographs | 224 |
| Diem Exhibit 33 | Precision Homes of Colorado Approval of Proposal/Payment/ Contract | 224 |
| Diem Exhibit 34 | 6/10/21 5280 Projects LLC Invoice #0035 | 227 |




TABLE OF CONTENTS (Continued)

EXHIBITS (Continued)


| | | Page |
|---|---|---|
| Diem Exhibit 35 | 8/5/21 5280 Projects LLC Invoice #0058 | 228 |
| Diem Exhibit 36 | 9/2/21 5280 Projects LLC Invoice #0066 | 228 |
| Diem Exhibit 37 | 4/16/22 K&D Development Proposal | 230 |
| Diem Exhibit 38 | 10/16/22 Bellator Claims Resolution, LLC - Public Adjustor Contract | 235 |
| Diem Exhibit 39 | 7/14/20 Diem - Restoration/Service/Remodel | 239 |
| Diem Exhibit 40 | 10/20/20 Diem Update | 243 |
| Diem Exhibit 41 | 11/11/20 Email Re: Colorado Warranty of Habitability Act | 247 |
| Diem Exhibit 42 | Bellator Claims Resolution, LLC Re: Estimate Sewage | 249 |
| Diem Exhibit 43 | Bellator Claims Resolution, LLC Re: Estimate Water Damage | 253 |
| Diem Exhibit 44 | 1/15/21 Email from Sicheri Re: Comprehensive Report of Water Loss Damage | 255 |
| Diem Exhibit 45 | Plaintiff's Supplemental Damages Disclosure | 258 |
| Diem Exhibit 46 | Diem Code References - Code Summary Docs, Denver 2018 IRC Screenshot.jpg | 261 |
| Diem Exhibit 47 | 7/29/11 Comfort Home Inspections Confidential Inspection Report 4563 Elm Court, Denver, Colorado | 267 |
| Diem Exhibit 48 | Complaint and Jury Demand | 280 |




TABLE OF CONTENTS (Continued)

EXHIBITS (Continued)


| | | Page |
|---|---|---|
| Diem Exhibit 49 | Plaintiff's Responses to Defendant's First Set of Written Discovery | 286 |
| Diem Exhibit 50 | Email Chain between Diem, Richardson and Sicheri re: Claim Number #IHN8570 | 295 |




JEFF DIEM,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. DENBY:

**Q Good morning, Mr. Diem. My name is Edward Denby, and I'm an attorney for Travelers Personal Insurance Company.**

**Have you ever given a deposition before?**

A No.

**Q And do you understand what a deposition is?**

A Tell me, please.

**Q So a deposition is essentially just a question technique where, examination technique, whereby I'll ask you some questions. This is your opportunity to, you know, essentially say what you have to say about the claim, the lawsuit, and anything else that you know, your position with respect to that.**

**When I ask you some questions, your attorney may have an objection. If your attorney does object, please wait to answer until we've resolved the objection.**

**Also, since we do have a court reporter here that's taking down your testimony, he can only listen to one of us at the same time. So please try to wait until I finish asking my questions before you begin to**

Confidential

answer. Similarly, since he can only take down verbal answers, so please try to avoid nonverbal cues, nodding your head, saying uh-huh, you know, so on and so forth.
You know, if there's any question that I ask that you don't understand, please just let me know. I'll be glad to rephrase it any way that I can.
The most important things is that we have your testimony be accurate, so I want to make sure if you answer my questions that you do understand what I'm asking you.
A Okay.
Q And just as a reminder, the court reporter has sworn you in, so you are under oath, and that means you have an obligation to tell the truth today.
A Okay.
Q If you need to take a break at all, please just let me know. The only thing I'll ask if I do have a question pending that you do answer the question that's pending before we take the break. Does make sense?
A Yes.
Q Okay. And please state your name for the record.
A Jeffrey Diem.
Q What is your date of birth?



A 5/4/85.
Q And what is your telephone number?
A (248)563-3267.
Q What is your Social Security Number, last four digits only on the record, please?
A You want all the --
Q You can read the whole thing to me, but to protect your security, he's only going to put the last four digits on the record.
A ***-**-8218.
Q Are you currently married?
A Yes.
Q To whom?
A Sara Kribble [phonetic].
Q And how long have you been married?
A August of last year. '21.
Q And do you have any children?
A No.
Q And where do you currently reside?
A 12180 West 18th Drive, Lakewood, Colorado, 80215.
Q How long have you lived there?
A September 2015, approximately.
Q Okay. I'm just going to backtrack a little bit. What did you do to prepare for this deposition



today?
A I reviewed the documents and spoke with Mr. Quisenberry.
Q Okay. And when you say you reviewed the documents, what documents did you review?
A A lot of them.
Q Okay. Did you review any of the -- your discovery responses to Travelers discovery requests?
A I don't believe so.
Q Did you review the allegations of the Complaint?
A Yes.
Q Have you ever served in the military?
A No.
Q What is your education background?
A I've got a -- you want all my colleges that I went to?
Q Just take me through your education background.
A Sure. So I spent some time at Western Michigan University. Michigan State University. And then I finished at the University of Denver.
Q And was that for your undergrad?
A Yes.
Q What did you major in?



A I have a business degree with an emphasis in real estate construction management.
Q And when did you graduate?
A 2009.
Q Did you have any post-undergrad education?
A Like a master's or anything like that?
Q Yes.
A No.
Q Any other education, certifications, training, that you received after -- sorry. Have you received any other certifications of training or licenses after you received your undergraduate degree?
A I have a Colorado Real Estate license. I think that's about all you're looking for.
Q Do you have any, say, background in construction?
A Yes.
Q What background do you have?
A Just general knowledge from university or an internship or just working on houses, things like that.
Q Do you have any licenses, certifications, anything in terms of, you know, contracting?
A No.
Q Are you an estimator?
A For insurance restoration, yes.

Confidential

**Q And could you just -- how did you get into that?**
A I used to own a Paul Davis Restoration franchise. It was specifically Paul Davis Emergency Services.
**Q And how did you get into that business?**
A The franchise?
**Q Well, estimating in general, then after that, the franchise.**
A Start with the franchise, because that precedes the estimating.
**Q Okay.**
A So I had the franchise for a number of years, shut that down. And then a friend of mine who used to work with me at Paul Davis. When I say worked with me, he did some kitchen tear-outs and stuff for me, his own separate business. He asked me to work with him on some fires that he was referred. Did that. Got those approved, just because I have the background in estimating knowledge, fire, water restoration, things like that, then I started my estimating business afterwards.
**Q Okay. Do you have any certifications or training in estimating?**
A I've taken an Xactimate class but I don't have any, like, certifications or anything like that, no.



**Q I'd just like to talk a little bit more about the Paul Davis business. You said that was a franchise?**
A Yes.
**Q What was your position in the franchise?**
A I owned it.
**Q How did you become the owner?**
A I bought it.
**Q How did the opportunity to buy into the franchise arise?**
A Are you looking for how I got the money for it --
**Q No, essentially, how you got into that business.**
A What interested me in it?
**Q Yes. What brought you to the business?**
A Got it. I was working for a different company at the time, not restorations, but something else, and then I just didn't have any opportunity for growth. And so I come from a family business owner, so wanted to own a business, and that interested me. I like homes. I like being in homes. I like construction. And that was at the time of the floods up in Boulder. So I volunteered to do some work on houses up in Boulder and that got me interested in more and so I purchased the franchise.



**Q Okay. And when did you purchase the franchise?**
A Purchase is approximately 2013. Somewhere in there.
**Q Are you still operating that franchise today?**
A No.
**Q When did you cease operating it?**
A I want to say it was 2017.
**Q And why did you stop operating the franchise?**
A Oh, I just couldn't run it profitably.
**Q Did you have any partners?**
A No.
**Q I'd just like to jump back. You had mentioned the opportunity to own the Paul Davis franchise arose while you were employed somewhere else. What were you employed in when the Paul Davis opportunity arose?**
A I worked for Javelin Solutions, and we were basically a real estate consultant company for franchises, finding office, retail, and restaurant locations for them all over the country.
**Q How long did you work there?**



A About three years.
**Q Do you know the dates?**
A Not the exact dates, no.
**Q Was that your first position after you graduated from undergraduate school?**
A First professional position.
**Q Okay. Was there anything else that you did between undergraduate, obtaining your undergraduate degree and the Javelin Solutions position?**
A In terms of work?
**Q Yes.**
A Worked in a bike shop.
**Q What shop?**
A Tread. Tread Bicycle Outfitters.
**Q And I'm sorry if I -- why did you leave Javelin?**
A It was myself, a couple of co-workers and the owners. There was just no upward momentum.
**Q Okay. And after you closed the -- I shouldn't -- and you spoke about this a little bit. You said that Paul Davis, you provided emergency services?**
A Uh-huh.
**Q Is that restoration work?**
A You have mitigation services, which is

Confidential

preventing further damage. So you have, you know, water check, dry-out, cleaning up fires, things like that. And then you have restoration, which is putting it back together. Some people do use that interchangeably.

**Q Okay.**

A That's why I hesitated with it. My business solely focused with the mitigation of cleaning up the water, sewer, whatever it may be, and making it ready for somebody else to do the reconstruction, restoration.

**Q And what was your role within the business?**

A Everything, when you're the owner.

**Q Okay. Did you actually, physically, do any of the mitigation work?**

A Oh, yeah.

**Q How many employees did you have?**

A At the most, if I include myself, Tim, Mitch, and -- maybe four of us, including myself. We sometimes had some part-timers too.

**Q And did you ever subcontract any work to other entities on behalf of Paul Davis? Someone brought in a job. Was there -- was there ever an instance where you needed to subcontract that or bring in a third party to assist with it?**



A Third parties, yeah, were sometimes used.

**Q What type of third party did you engage?**

A We would sometimes use an asbestos testing company. Sometimes a mold testing company. Sometimes those are the same. Sometimes I would hire it out for a specialist to remove cabinetry, things like that.

If the job was too large, we would sometime hire out a labor group to come in and help with the supervision. Sometimes some plumbers.

**Q And did you have a set list of vendors or tradesmen that you used when you did have to bring in these third parties?**

A What do you mean by set list?

**Q Did you have, let's say, a go-to list, of preferred vendors? A preferred plumber, a preferred asbestos guy, a preferred mold guy. Or was it here's this job, let's go find whoever is available?**

A The first time around is usually figure it as you go. And then from there, when you find the good ones, you keep using them over and over.

**Q Okay. And do you remember any of the companies that you used?**

A Some.

**Q Were any of the companies that you used where you provided services as Paul Davis, did you use those**



**companies with respect to the property damage at the house that we're discussing today?**

A Give me a minute to think.

K&D. Which did some of the upstairs work to kind of get it ready to re-rent. K&D did that. K&D, at that point, it was the same owner, different company, he would help me with the kitchen removals, stuff like that.

The gentleman that removed the pile of debris in the back yard, he would sometimes do, like, our junk removal or debris removal or sometimes bring in the demo labor.

John, who was the plumber that worked with this, I don't recall if I used him on projects. However, we did -- he did refer us projects every now and then.

To my recollection, that's probably it.

**Q Okay. And after you shut down Paul Davis, have you been employed since then?**

A Yes.

**Q How have you been employed?**

A For a short span of time, I started a -- tried to start a contracting company with a friend of mine, and then COVID hit, so that took care of that before it really got far. And then I started my



estimating company. And then I had my rental houses for quite a while. And I also have a software company that I'm working on that it's all set up entity-wise, but we haven't launched the software yet.

**Q Okay. I'd first like to ask you a few questions about the contracting company. What was the name of the contracting company?**

A The one that did the work upstairs that was the same owner?

**Q I apologize. Let me ask that a little more specifically. What was the name of the contracting company that you formed after terminating the Paul Davis franchise?**

A Oh, I forgot an employment. Hold on a second. Go back. I spent a little bit of time at Alpha Graphics franchise in franchise sales.

**Q And when were you employed by Alpha Graphics?**

A Oh, approximately June to October of 2019.

**Q Okay. And why did you leave Alpha Graphics?**

A It was not good there.

**Q Have you been employed by any other companies since you left Alpha Graphics?**

A I employ myself as a W-2, but not another separate company.

**Q Okay. And going back to the contracting**

Confidential

**company that you formed after Paul Davis, what was the name of that company?**
A I didn't form it after Paul Davis. Alpha Graphics came first. After Alpha Graphics, I formed the contracting company.
**Q Okay. Do you remember when that was formed?**
A I don't know.
**Q That's all right.**
A You were going to ask me the name of it?
**Q Yes.**
A Elkmont Construction.
**Q What type of entity is it?**
A It was an, LLC.
**Q Were you the sole member?**
A No.
**Q Who were the other members?**
A Mario Mendoza.
**Q What's your relationship with Mr. Mendoza?**
A We're friends.
**Q Were you guys equal owners?**
A If memory serves me right, yes. I'd have to go back and look.
**Q What was the purpose of forming Elkmont?**
A We wanted to do basement remodels.
**Q Did you have any other -- did you have**



**employees?**
A No.
**Q Did Elkmont ever perform any basement remodels while it was operating?**
A No.
**Q Did it perform any services for any sort of third party for money while it was operating?**
A We never landed any jobs, no.
**Q Okay. Did you use Elkmont as part of -- let me rephrase that.**
**In communicating with contractors and subcontractors with respect to the claim that is the subject of your lawsuit, did you. . . did you ever use Elkmont to facilitate that?**
THE WITNESS: May I borrow a piece of paper, please?
MR. QUISENBERRY: Yes.
THE WITNESS: And a pen, if I could. I want to answer that, but I just thought of something.
**Q (By Mr. Denby) Okay.**
A Thanks.
Okay. Go ahead. If you could rephrase that.
MR. DENBY: Could you read take back for me real quick and then rephrase it?
THE REPORTER: Sure.



"In communicating with contractors and subcontractors with respect to the claim that is the subject of your lawsuit, did you ever use Elkmont to facilitate that?"
A Can you give me an example, please?
**Q (By Mr. Denby) Sure. So did you ever obtain any proposals, estimates, through the name Elkmont Construction instead of Jeffrey Diem?**
A For that, yes, I believe I did a couple of them.
**Q Did you use Elkmont in any other matters with respect to the claim?**
A So -- ask that one more time, please.
**Q Did you use Elkmont in any other matters with respect to the claim?**
A Can you give me an example?
**Q So communicating through -- communicating as Elkmont instead of communicating with someone as Jeffrey Diem. You know.**
A Not that I recall, no.
**Q Okay. Was Elkmont paid any money with respect to the claim?**
A Not that I recall, no.
**Q Did Elkmont make any payments to contractors or subcontractors with respect to the claim?**



A Not that I recall, no. If I say, not that I recall, and no, how does it work, actually?
**Q I'll leave that to your attorney.**
A I just realized I said both at the same time.
MR. QUISENBERRY: I'm not going to answer right here.
**Q (By Mr. Denby) If you don't recall, I would try to limit your answer to saying, I don't recall.**
A Okay.
**Q Because that makes your answer somewhat ambiguous. It could be construed as you essentially saying, No, and, I don't know.**
A Okay. I'll go back to saying I don't recall.
**Q And is that the same for the prior question that I asked as well?**
A Yes.
**Q Okay.**
A May I go back to one of your questions about income in between?
**Q Of course.**
A I did do a -- it was supposed to be a fix-and-flip. It lost money, but I did try to do a fix-and-flip somewhere between the time frames of -- and that was through the Elkmont name also.
**Q Okay. Was that project successful?**

A Oh, no.
Q What happened?
A It lost money.
Q Was it just a bad economic deal or -- can you elaborate on why it lost money?
A Market shifted right around the time I listed it, just enough where it didn't sell in the time frame I needed it to, so I just ended up losing money on it.
Q Okay. And did you shut down Elkmont? Let me rephrase that.
Did you officially notify the State that you would no longer be doing business with Elkmont?
A Elkmont Construction was dissolved. The LLC has been used a few times, and now it is used for my estimating company.
Q Okay. So essentially, the -- you continue using the name, but the purpose of the business changed?
A Correct.
Q Gotcha. When did you switch from the contracting to estimating line of work?
A I'd have to go back and look at it. I don't know off the top of my head.
Q Is Mr. Mendoza involved with Elkmont -- Elkmont's estimating work?


A No.
Q It's just you?
A Just me. At a sole owner, yes. I do have an employee.
Q What's your employee's name?
A Kevin.
Q Last name?
A M-a-r-d-e-g-i-a-n. He's actually a 1099 contractor.
Q How long has Kevin worked for you or been a contractor for you?
A March or April, something like that.
Q And when did you start the estimating line of business?
A I'd have to go back and look. I'm not sure.
Q Was it in 2022?
A No, it was prior to that.
Q Do you remember if it was before or after COVID? Before or after COVID started, I should say.
A It was because of COVID.
Q Okay.
A So needing to diversify, do something for an income. So somewhere during that.
Q And have you been successful in obtaining estimating jobs?


A To my standards, yes.
Q What types of jobs do you do?
A We prepare estimates and invoices for -- I'm going to use restoration companies to encompass mitigation and restorations both. But for water damage, fires, some hurricanes, roofing, some exteriors, trauma cleanup, asbestos work, so a lot of home calamities.
Q Okay. And so in your estimating experience, is that experience you learned on the job?
A No.
Q Where else did you learn?
A A lot of it is just knowing or experimenting or learning from others when they have done it as well.
Q So you have no estimating certifications or licenses?
A I personally don't, no.
Q Does your employee, Mr. Mardegian? If I said that correctly?
A Mardegian.
Q Mardegian.
A My understanding is, no, he doesn't.
Q And are you still operating the estimating line of Elkmont's business today?
A Yes.


Q Did Elkmont charge any services with respect to the claim that you have submitted today?
A Charge?
Q Did it charge any money for any services with respect to this claim?
A Like, back and forth?
Q Yes, just to anyone.
A No.
Q Or to you?
A No.
Q I believe you also said that you had a rental company?
A Correct.
Q What's the name of your rental company?
A Diem Investments, LLC.
Q Are you the sole member of that LLC?
A Yes.
Q How long has Diem Investments operated?
A Approximately 2011.
Q And what is the purpose of Diem Investments?
A Holding rental properties.
Q How many rental properties does Diem Investments hold?
A Two physical buildings.
Q What are those buildings?

Confidential

A 4650 Beech Court. The other building has two addresses. It's 4565 and 4563 Elm Court.
**Q How long have you owned the building at 4650 Beech Court?**
A At Beech Court? Approximately 2012.
**Q Actually, I should rephrase that. Do you own that property personally or does Diem Investments own the property?**
A I don't recall which -- how the title is held.
**Q Have you rented the Beech Court property continuously since 2012?**
A Continuously, since I lived there?
**Q Do you reside at the Beech Court property?**
A For a period of time, yeah, I resided there.
**Q Okay. When did you reside there?**
A Approximately 2012 to 2015-ish.
**Q After you ceased residing there, did you start renting it?**
A Yes.
**Q How have you rented it continuously since then?**
A Define continuously.
**Q I'll say for a period of no more than six months of vacancy.**



A Oh, yeah.
**Q And is that property currently leased?**
A Yes. According to my property manager, it's currently leased, yes.
**Q And is that a one or two-unit house?**
A That's a single unit.
**Q When did you purchase the property at Elm Court?**
A Approximately September of 2011.
**Q And have you rented that property since you purchased it?**
A I live in it -- like the Beech Court, but then it was rented since then, yes.
**Q Okay. And what period did you live there from?**
A Approximately 2011 to 2012, when I moved to the Beech Court house.
**Q After you moved to the Beech Court house, did you rent at the Elm Court continuously?**
A Up until the loss that we're talking about, assuming your six-month --
**Q Yes.**
A Yes.
**Q And was Diem Investments, LLC, involved in this claim at all?**



A I don't know.
**Q Did you use Diem Investments, LLC, for any other purpose other than real estate holding?**
A No.
**Q Okay. Lastly, I believe you said that you're in the process of starting a software company?**
A Yes.
**Q What's the name of that company?**
A LEVLR, L-E-V-L-R, LLC.
**Q What is the purpose of the company?**
A It's a software for the restoration industry.
**Q What type of software?**
A To aid in estimating comparisons.
**Q Did you create that software?**
A Physically code it?
**Q Yes.**
A No.
**Q Who created the software?**
A A company in Oklahoma.
**Q Did you contract with them to create that software for you or was it a preexisting product?**
A I contracted for them to create it.
**Q When did that happen?**
A When did the contract get signed for that?
**Q Yes.**



A I'm not actually sure. It's been a while.
**Q Have they created the software yet?**
A It is not done.
**Q Do you have any partners in this venture? Excuse me. Let me rephrase that. It's an LLC.**
**Are there any other members?**
A I'm not sure how to best describe this, so I just will. I own LEVLR, LLC. My wife and I own the holding company to LEVLR. She has 50 percent of the shares. I have 50 percent of the shares.
**Q What's the name of the holding company?**
A Oh, that's a good question. I actually don't remember.
**Q Okay. Do you use that holding company for anything other than just operating LEVLR?**
A No.
**Q And you said that software has not been created yet, correct?**
A It is in the process of being created, correct.
**Q Did you have any input into the creation process?**
A What do you mean?
**Q Did you provide any sort of ideas, suggestions, as to how the software should be coded,**

Confidential

based upon your estimating background or your experience in estimating?

A How it should be coded, no. That's up to coders. How it should function, yes.

Q Okay. Could you elaborate on that a little bit?

A What is it you're looking to know? The software hasn't been released yet, so I'm trying to --

Q I guess it's more in terms of, you know, what information you gave them in terms of, say, or if you're looking at -- if you're preparing an estimate, how -- what information you gave to them.

So did you provide say, you know, the way things are done in Xactimate and ask them to prepare a program that would prepare an estimate similar to Xactimate? You know, how they generate numbers and everything, you know, that way?

Q How familiar are you with insurance estimating and how it works?

A I'm familiar with what I read.

Q Okay.

A It does not create estimates. That's why you have software such as Xactimate. What it does is, it compares two estimates, one to another, to look for differences.



Q Okay. So almost like a price variation? Would that be an accurate way to describe it?

A It could be price. It could be description. It could be quantity. But it's looking for variations.

Q Okay.

A It's not actually an estimating software.

MR. QUISENBERRY: And just so the record is clear, if you have any concern about intellectual property --

A I'm getting that.

MR. QUISENBERRY: We can go back and designate a section of the record confidential so there are no concerns.

THE WITNESS: That's what I'm trying to --

MR. DENBY: Absolutely. If there's any confidentiality concerns here, I will work with counsel for that. This is just going into the background and how it goes into the case a little bit, so. . .

THE WITNESS: If you could, because normally, I have people sign NDAs, and I don't think that's happening right now.

MR. QUISENBERRY: Yes, but we have a protective order for the case. Anything you think is confidential, we can go back and I think agree on a lot of this.



THE WITNESS: Yes, thank you.

MR. DENBY: And if we don't, we can make sure we have a protective order put in place for this deposition transcript and line of questioning so no one in the public will be able to get it.

THE WITNESS: Thank you.

MR. QUISENBERRY: Sure.

MR. DENBY: Can you read back that question, please? I'm sorry. I think we started talking about the concerns and didn't get an answer.

MR. QUISENBERRY: Yes.

THE REPORTER: "Okay. So almost like a price variation? Would that be an accurate way to describe it?

"Answer: It could be price. It could be description. It could be quantity. But it's looking for variations."

Q (By Mr. Denby) Did you use any of the, I guess, principles or ideas that form the basis for the LEVLR software in preparing the estimates that you created for your claim?

A Could you rephrase that, please? Go ahead, sorry.

Q Yes. So did you use any of the principles that you would have given to the Oklahoma company to



create the software? So whatever, you know, as you kind of just went into that, they would use to create the software, did you use any of those same principles or estimating guidelines in preparing the estimates that you did -- that you created in this case?

A I'm sorry. Could you try again? Because I'm not sure the question you're asking flows with how LEVLR is designed to work.

Q Let me backtrack, actually, and go a little. . .

So with respect to LEVLR and your input with the software and what you wanted them to create for you, could you tell me exactly, you know, how you -- what -- how did you want them to create the software? What are the parameters for that?

A What the end work product needs to be?

Q Not what -- essentially, how the software is to be designed to enable estimating.

A It doesn't estimate, though.

Q Okay. It's just variations.

A Correct.

Q So how is it used to determine the variations?

A You have the -- usually, two estimates. One from the contractor. One from the adjuster. In order

Confidential

to make the processing faster, smoother, whatever, you need to compare the two. Oftentimes, contractors will look at the adjuster version and say, The adjuster approved this, this, and this. We need to have X, Y, and Z. That takes a lot of time.

You're looking through the estimate for all these different items and these variations. LEVLR is an automated system to find those variations and point them out to the user as to where those variations are. It's not an estimating tool.

**Q Thank you for clarifying that.**

A Yes.

**Q So since it wasn't created yet, then is it -- any of these printouts, anything happen with LEVLR, have any relevancy to the claim here?**

A Not at all. It's not even released.

**Q Okay. Do you have any licenses aside from a driver's license?**

A My real estate license.

**Q Okay. And what year did you obtain that?**

A It's been a while. I want to say somewhere between 2011 and 2013.

**Q Okay. Are you licensed in any states besides Colorado?**

A No.



**Q Have you ever been involved in any other civil litigation, other than this lawsuit?**

A No. And you just reminded me. Sorry to keep going back to the income, because you keep -- there's other things. I did sell one condo around COVID time, something like that.

**Q Which business did you do that through?**

A I worked -- I hung my license at A Better Way Realty at that time, so I went through them.

**Q Were you an independent contractor for Better Way?**

A I believe I was.

**Q Do you remember what years you worked for Better Way?**

A No. I wasn't there very long.

**Q Okay. And when did you acquire the Elm Court property that is at issue in this lawsuit?**

A Fall of 2011, I believe.

**Q And at some point, did you transfer ownership of the property to Diem Investments?**

A Likely.

**Q And when did you start renting the Elm Court property?**

A The lower unit was rented just after we finished work on it. And the upper unit, I lived in it



with a roommate.

**Q What year did you start renting the lower unit?**

A Fall of 2011, I believe.

**Q What work was performed on it at that time?**

A You want a list of every last detail or --

**Q To the best that you can recollect of, you know, what you did.**

A After it was purchased.

**Q Yes.**

A What's the time frame you're looking for? Because I've had that house 10 years.

**Q Okay. So you just testified that you started renting the lower unit after work was completed.**

A Correct.

**Q So I'd like to start with at least that first segment of work. What work was done that preceded the rental of the unit?**

A Painted it. Put windows into it. Carpet. Did the floors. Some minor handyman-type work, you know, hang a door, a closet door, something like that.

I had new combustion air ducts run into the basement for the furnace and water heaters. We added -- or changed the hose bib to the outside. Had the stair rails welded more securely. Changed some



light fixtures, some outlets.

Some -- oh, what else have we done? I think we replaced a faucet in the lower level.

**Q Okay. With respect to the change in the light fixtures, did you do that work yourself?**

A I don't remember if I did it or if I had somebody else.

**Q Do you remember where in the house the light fixtures that were fixed were located?**

A Upstairs bedrooms. Both of them. One in the upstairs bathroom. One in the basement bathroom. One in the basement kitchen and one in the basement bedroom.

**Q And what did the fixture entail?**

A Pull out the old one and putting in the new one.

**Q Any change in wiring or anything like that?**

A Not that I recall.

**Q What did changing the outlets entail?**

A Changing the outlets.

**Q And can you tell me exactly --**

A Taking out the old one and putting in a new one.

**Q Do you pull any wiring when you did that?**

A I don't know who did it. I don't know -- if

Confidential

it wasn't me, I don't know what was done per se.
Q Okay. And same, when you changed the faucets in the lower level, does that involve changing anything with the plumbing or simply a swapping of facets in and out?
A I don't know what they did other than replace the faucets.
Q Do you remember who you used?
A That one, for the faucet in the basement, I believe that was Philip Mendoza.
Q And why did you change the light fixtures?
A Oh, they were just old and nasty.
Q Any issues with them?
A Old and nasty.
Q Okay. Any functionality issues?
A I don't remember.
Q And when you first purchased the home, were there any issues with anything inside the house? Any of the systems?
A The house was built in the '40s. I mean, what do you mean?
Q So when you first purchased it in 2011, were there any issues with the electrical systems?
A Not that we noticed.
Q Did you do an inspection?



A Yes.
Q Did you take any pictures when you first purchased the house?
A Did I? I don't recall.
Q Do you remember if an electrician performed an inspection before you purchased the house?
A I don't remember.
Q Were there any issues with the plumbing when you first purchased the house?
A No. When you say issues, just to be sure we're all on the same page, like functionality, things like that?
Q Functionality is -- yes, functionality, so if there's issues with the way the water is running, pressure with the water, leaks.
A We didn't have any issues at the time. We did have the sewer line partially replaced.
Q When was that replaced?
A I believe -- it was either just before or just after I closed.
Q Why was it replaced?
A Something was wrong with the line that needed to be replaced. I don't remember exactly what.
Q Do you remember the location of the issue with the sewer line?



A Approximately.
Q Where was it?
A Somewhere between the street and before the front -- quite a bit before the front porch. So just in the front yard. I remember he had to dig up part of the street and replace part of the sidewalk.
Q What prompted the sewer line replacement?
A One of the inspections came back that it was -- needs to be replaced.
Q Was it called -- do you know if the sewer line was causing issues with the house such that the inspection determined it needed to be replaced?
A I don't know if it was causing issues with the house. I just know they said, you should replace it.
Q Okay. And I'm sorry. You said that you lived in the upper unit after you purchased the property?
A Uh-huh. Yes.
Q When did you first reside in the upper unit?
A Fall of 2011.
Q How long did you live there for?
A Approximately a year.
Q Did anyone else live there with you?
A Yes.



Q Who lived there with you?
A Upstairs was Alex Stevens.
Q Was that a roommate?
A Yes.
Q Did anyone else live upstairs with you?
A Not upstairs, no.
Q Who was the downstairs tenant?
A Frank. I had more than one went through in the point in time that I lived there. Frank was one of them.
Q And why did you move out of the upper unit?
A I bought the Beech Court house.
Q Did you start renting the upper unit after you purchased the Beech Court house?
A Yes.
Q Do you remember when you started renting the upper unit?
A Approximately the same time I moved to the Beech Court house.
Q And that was, I believe you said, a year after fall of 2011, correct?
A Yes.
Q Okay.
A I bought Beech in 2012, so yes.
Q Okay. And how much have you rented -- sorry,

Confidential

**let me rephrase that.**
**Since you've rented the lower unit, have you charged the same amount of rent?**
A No.
**Q How much did you initially charge?**
A I don't remember.
**Q How much were you charging for the lower unit at the time that the incident happened on, I believe it is, July 6th of 2020?**
A I don't know.
**Q Does anyone manage that for you?**
A Yes.
**Q Who does that?**
A All County Denver Metro.
**Q And what do they do for you in terms of managing your property?**
A Collect the rents. Make sure it's in reasonable condition. They do inspections from time to time. Deal with any tenant problems, if they don't pay rent. The project manager, property management stuff.
**Q Do they do anything with respect to repairs or renovations that were -- sorry, repairs or renovation work or maintenance that may be required?**
A Sometimes.
**Q And when would they be involved with that?**



A If they either, A, notice it, or there's a maintenance request or, B, I notice it and make that request.
**Q How long have you utilized All County?**
A Several years. I can't remember exactly when.
**Q And does All County typically perform inspections prior to a new tenant moving in?**
A My understanding is yes.
**Q And were you ever present for any of these inspections?**
A No.
**Q Do they also inspect the premises after tenants vacant the property?**
A I believe so.
**Q Do you perform any independent inspections of the Elm Court premises as owner?**
A Sometimes. I don't go into the units as they're occupied. But sometimes I'll drive by or do an exterior, you know, take a look around, sort of thing.
**Q Okay. So if a repair was required for this property, would All County involve you or would you -- how did that work?**
A Situationally dependent.
**Q Okay. Let's start, I guess, let's start with**



**the situation at hand, I guess. In this situation with the burst drain waste vent pipe -- sorry, cracked, I believe -- how was All County involved with this loss?**
A They really weren't. I made them aware of it.
**Q Okay. So if you could give me an example, have they been involved in repairs in the past?**
A For example, in either of the houses, if a light fixture breaks or if a toilet is clogged or there's a leaking -- when I say leak, like a running toilet, that sort of thing.
They will send me an email and say, Hey, we have this going on. Would you like to have us repair it? Would you like to have it done yourself? They leave the option to you, that sort of thing.
**Q Okay. So if you were to take them up on their offer to repair it, would they utilize their own tradesmen or do you have any input in that process?**
A Situationally dependent. I've known a lot of people throughout my history in Denver, so I tend to use people that I know. But if I don't have somebody and they do, they do it.
**Q Okay. I just wasn't sure if it was one of those things they say, Hey, we've got this issue, do you want us to handle it? They take, you know, they**



**take the ball and run with it and it's kind of out of your hands. You have no clue -- I shouldn't say no clue.**
**They're the ones who control who's being used, versus, they say, Would you like to handle this? And then if you take control, then it's on you to obtain the vendors and communicate with them?**
A It goes both ways.
**Q Okay. So really, it depends on the situation and what the issue is.**
A Yes, correct.
**Q Okay. And do you remember -- sorry. Just jumping back here.**
**After you started renting the upper unit, have you charged the same amounts of rent for that?**
A No.
**Q Do you remember what you first started charging?**
A I charged my roommate when I first lived there. It was somewhere between 6- and 800 a month. I don't remember exactly what else.
**Q And after you no longer lived there, and presumably, a new tenant had moved in, do you remember what the rent for that was?**
A No.

Q Do you remember what the rent was for the upper unit on July 6th, 2020?
A No.
Q Was the upper unit rented on July 6th, 2020?
A You said the upper unit?
Q Yes.
A Yes.
Q Who lived there?
A I believe her name was Maren.
Q And when the loss first happened, was the upper unit affected by it at all?
A Not that I was aware of.
Q Did Maren vacate the premises at all after the loss?
A After the loss occurred, yes.
Q Do you remember when?
A Fall.
Q Why did she vacate the premises?
A At that point in time, I believe that it was her lease had been up. I believe she was month to month. This is what I'm remembering from the property manager. So she was moving to another state.
Q After she moved out, did you put the unit back on the rental market?
A No.



Q Why not?
A I couldn't.
Q Why not?
A Furnaces weren't in there.
Q And why weren't the furnaces in there?
A Because the furnaces had been approved to be removed in order to repair the loss. And due to a disagreement and scope, the furnaces had still been pulled out. We couldn't put them back until we repaired whatever needed to be repaired. So therefore, the house couldn't be rented.
Q Okay. But there was nothing with respect to the condition of the house that caused the tenant to vacate the premises?
A At that -- rephrase that, if you could, please.
Q So when the tenant vacated the premises in, I believe, you said fall because her lease was up, there was nothing actually with respect to the condition of the property that then caused her to vacate the premises?
A Upstairs.
Q Yes.
A It is likely that she knew about the furnaces being gone, so we would have had a problem moving



forward into the winter. However, because she was already leaving, from my recollection, to go to a different state, it was not an issue at that time.
Q Did you ever have any discussions with her about the furnace and the potential impact it might have on the heating of the upper unit?
A Oh, I don't remember that.
Q Were you ever able to eventually re-let the upper unit?
A Yes.
Q When was that?
A Approximately fall of last year.
Q How much did you charge in rent when you re-let that unit?
A I don't know.
Q Did you raise the price of the rent from the prior tenant?
A I'm not sure.
Q Would you have any basis to raise the rent to the property?
A Possibly.
Q What could that be?
A Market conditions.
Q If I told you that the price went up a hundred dollars between when the tenant vacated in the



fall of 2011 -- sorry, 2020 and the time that the premises were re-let that you raised the rent by a hundred dollars, would that seem accurate?
A I'd have to check the lease.
Q And is the lower unit currently rented?
A No.
Q How long has that been vacant?
A Since the date of loss. Since prior to the date of loss.
Q Why did that tenant vacate that -- the lower unit?
A He wasn't paying his rent.
Q Did he vacate on his own or did you have to initiate eviction proceedings?
A We did not initiate eviction proceedings. This was a COVID thing. He claimed COVID and hardship and things like that, so he was back on his rent. So we made an agreement with him, if you leave on your own accord, we won't charge you your back rent.
Q Do you remember when he vacated the premises?
A Not exactly, no.
Q Was it prior to the date of loss on July 6th, 2020?
A Yeah.
Q Do you know about how long before the date of

loss?
A No.
Q Did you inspect the lower unit or the -- did you inspect the lower unit at all at any time between when the tenant vacated the premises and the date of loss?
A Between that, I don't recall, no.
Q Did you perform any repairs or maintenance work at the property yourself?
A That property? Myself? No. It's been a very long time. I have in the past.
Q What type of work did you perform there in the past?
A Usually just painting, cleaning. I rehung a door once.
Q Did you ever perform any electrical work there yourself?
A I may have replaced a light at one point in time early on. That's what we already talked about.
Q Take this a little out of order, but. . .
MR. DENBY: If you could just mark this as Exhibit 1, please.
(Exhibit 1 marked.)
Q (By Mr. Denby) Okay. So I'm just going to show you what has been marked as Exhibit 1. This is a



copy of Plaintiff's Responses to Travelers Second Set of Written Discovery Requests.
Have you ever seen this document before?
A (Examines an exhibit.) I believe so. It's got my name on it.
Q Okay. And I'm going to just direct your attention to the second to last page. That's a Verification. And although -- yes. Although it looks electronic, is that your signature?
A Yes.
Q Okay. In that case, I'm going to draw your attention to the interrogatories. I'd specifically like to draw your attention to interrogatory number 7, which is on page 3.
A Number 7?
Q Sorry, 17.
A Oh, okay.
Q On page 3.
A Uh-huh.
Q And if you'd just take some time to review that, and the response.
A (Examines an exhibit.) Okay.
Q Okay. So for the purpose of this question, I'm just going to focus on the electrical part down there. I'd just like to start with the first sentence.



Can you please just elaborate a little bit on what you had to do to remove a hot tub from the upstairs room in 2013?
A Right. There was a hot tub in the back room of the house when I purchased it. It never functioned that I had it. I never turned it on. But, yes, there was a hot tub.
Q Where in the house was it?
A Off of the back room, off one of the second bedrooms.
Q And what did you have to do to remove it from the electrical system?
A I didn't remove it. I had someone else do it.
Q Do you remember who did that for you?
A I don't, no.
Q Were there ever any issues with the electrical system after that person removed the hot tub?
A No. It was on a separate -- it was a small subpanel in that room it was disconnected from.
Q Okay. I'm going to draw your attention now to the third sentence, in 2014. Could you just explain what is the installation -- what work -- what was the installation of a J box in the basement?



A Over the dryer area, there was some wire that was improper. I purchased the house with that, so I had it put properly into a J box, junction box.
Q Did someone perform that for you?
A Yeah.
Q Do you remember who did that?
A No.
Q Were there ever any issues with the electrical system before that J box was put in?
A Not that I'm aware of.
Q And were there ever any issues with the electrical system after that J box was put in?
A Not that I'm aware of.
Q Okay. Just very briefly, with respect to the plumbing. I'll draw your attention just to the -- make it the last three sentences, I guess. Where you talk about Metropolitan Drain Cleaning. So what did Metropolitan Drain Cleaning do you for on an annual basis?
A He would run a snake down the main line to clean it. And then he would also, on occasion, run a camera down there as well.
Q Did he ever do any work with respect to the drain waste vent pipe?
A Only when he replaced it after it broke.

Confidential

Q No work on it prior to the date of loss?
A No.
Q And then also, what was the issue with the water pressure downstairs?
A This is the same tenant that wasn't paying his rent. He was complaining that the water pressure was too low.
Q And did you call anyone in to investigate that?
A John.
Q What was John's findings?
A Initially, he had said that it would be the aerator that was clogged. So fairly normal. The water pressure to the house, I believe -- I would have to check his report -- I believe he said was fine. And then he had said something like the supply line eventually would probably need to be replaced due to some corrosion in there.
Q And was this supply line distinguishable from the drain waste vent pipe?
A Yes.
THE WITNESS: I assume this goes to you?
THE REPORTER: Eventually.
THE WITNESS: Okay.
Q (By Mr. Denby) All right. And after you



purchased the house, did you perform -- after you purchased the house, did you personally inspect the property?
A Define inspected.
Q Did you walk through it and observe the conditions of the fixtures and various things within the house?
A After purchase?
Q Before purchase.
A Before purchase. Cursory, yes.
Q Did anyone ever notify you of any issues with the electrical system prior to purchasing the house?
A Anything that would alerted me would have been in my property inspection.
Q Okay. We'll take a look at that when we take a break, since it has not been produced previously. And I'll follow up on that later on if there's anything. . .
After the property was purchased, did you physically walk through and perform an inspection?
A After it was purchased?
Q Yes.
A Define inspection, though.
Q Did you walk through and visually observe the condition of the property?



A Yes.
Q Did you test the appliances?
A The appliances?
Q Turn on the water to make sure it's running. Flush the toilet.
A Oh, when you say appliances, I'm thinking stove and refrigerator and things. You're talking plumbing.
Q Utilities.
A Okay.
Q I guess anything. When you went in, did you test the appliances, flick the lights to see if it worked, turn on the water to see if it ran?
A Quite likely.
Q Were there any issues at that time?
A That I remember, no.
Q Do you know when the property was built?
A Either 1941 or 1949. Beech was built one of those two. Therefore, Elm was built the other one.
Q And when you purchased the property, did you do any -- did you do any research to see if the property was compliant with the electrical code?
A No.
Q Did you do any research to see if it was compliant with the plumbing code?



A No.
Q Did you ask anyone?
A No.
Q And that -- sorry. Did you ask anyone with respect to both the electrical and the plumbing, just to make that clear.
A Not that I'm aware of, no.
Q Who did you purchase the property from?
A The person?
Q Yes.
A I believe his name is Cipriano Greco [phonetic].
Q And aside from some of the repairs that we discussed already, do you if there -- since you purchased the property, were there any changes in occupancy performed -- sorry.
Let me rephrase that. Since you purchased the property, has any work been performed to change the occupancy of the building?
A No.
Q Do you know if at any time prior to your purchase any work was done to change the occupancy from a single-family to two-family?
A I don't know how it ended up the way it did.
Q When you purchased the property, was the

Confidential

lower unit occupiable?
A The way it was purchased, yes.
Q Could someone have gone in and rented it that day and lived down there that day?
A Yes.
Q Okay. Did you use a realtor when you purchased the home?
A Yes.
Q Who did you use?
A Her name was Emily Ching.
Q Do you know if she purchased any inspections as part of the purchase of the property?
A The realtor?
Q Yes.
A Realtors don't do that.
Q Do you know if she did, though?
A Not that I know of, no.
Q And did you take any photographs of the property after you first purchased it?
A How far after?
Q Let's say within the first year.
A I took some photos, sure, to list it.
Q Did you ever take any photos of the electrical or plumbing components?
A Not intentionally. It may have been in a



photo, but not intentionally.
Q Were you aware of any potential electrical code issues prior to the date of loss?
A I wasn't aware of any.
Q Were you aware of any plumbing code issues prior to the date of loss?
A I wasn't aware of any.
Q And since the time you first acquired the property, have you had insurance on the property through any company other than Travelers?
A Yes.
Q What other insurers did you have?
A I'd have to go from my list. I don't remember them off the top of my head. I've had several.
Q Okay. Did you ever make any other claims, any claims, related to the property with any of those other insurance companies?
A There was one for the roof.
Q And what happened to the roof?
A The hailstorm that ripped through Denver in, I think it was, 2017.
Q And what was the nature of your claim?
A Hail.
Q Was it -- and what happened?



A Oh, it was that big hail storm in Denver that went through.
Q Sorry. I know that was a bad question.
What was the result of the claim?
A What was done?
Q Yes.
A New roof and whatever else needed to be done with the roof. New gutters.
Q So it was a full replacement instead of a repair?
A Full replacement. New gutters. There were probably some code upgrades for it just due to the age. I think that was it.
Q And do you know when -- with respect to that hailstorm and the roofer replacement, do you know if a permit needed to be pulled --
A Yes.
Q -- for that work?
A Yeah.
Q Were you involved in that process at all?
A No.
Q Do you remember who you used?
A I don't remember his name. No, not off the top of my head.
MR. DENBY: Could you premark this as



Exhibit 2, please.
(Exhibit 2 marked.)
MR. DENBY: Off the record.
(Off the record.)
MR. DENBY: Back on the record.
THE WITNESS: (Examines an exhibit.)
Q (By Mr. Denby) So I'm now showing you what has been marked as Exhibit 2. This is a copy of the City and County of Denver Roofing and Siding Permit.
Have you seen this document before?
A Yes.
Q How have you seen it?
A I was provided the permits in the final stuff.
Q Okay. And when you look at this permit under the authorization section -- sorry. When you look at the permit under the Building Comment section, do you see that there's some coding listed there?
A Oh. (Examines an exhibit.) Yes.
Q And do you know what that code means?
A This -- this stuff right here (indicating)?
Q Yes.
A The two layers? I'm not a roofer, but I'm familiar with it.
Q Do you know why the code is referenced in the

Confidential

**Building Comment section of the permit?**
A No.
**Q Do you know what that code entails?**
A I'm not a roofer.
**Q Okay. Since the -- as far as you're aware, since the code is -- since there is code reflected on this permit, would that be a requirement of this job, that the work comply with that code?**
A So, yes, you have to comply with code. There isn't actually a code number listed here.
**Q Okay. Do you know why that might be?**
A I do not.
**Q Do you know how the -- just generally how the City and County of Denver, why it details the information that it does?**
A My understanding, again, not a roofer. My understanding is Denver takes the IRC, which is the International Residential Code, 2015 is what they were using here, and Denver does have the -- opportunity is not the word -- jurisdiction that they want to, to go beyond the code if they choose to.
**Q Okay.**
A That may be what's here. That may be not. I'm not sure.
**Q Do you know what the relevancy of referencing**



**this code on the permit is?**
A No.
**Q Since the code -- do you know that since this code is referenced on the permit, was there an inspection required after the work was completed to make sure that the code was complied with?**
A Again, there's not a code listed here, though.
**Q Well, it says the 2015 IRC.**
A Right. That's a whole code book.
**Q So generally, were any inspections performed after the work was repaired to see if there was any compliance with the IRC?**
A I mean, to me, it looks like there was a final inspection done on the 24th of the final roof. It says, Final Permit on there.
**Q Could you just refer for the record to where you are looking?**
A This is page 3.
**Q Okay. Thank you. Now, I'm also just going to show you what we'll mark as Exhibit 3.**
(Exhibit 3 marked.)
**Q (By Mr. Denby) Could you just take a look at that document?**
A (Examines an exhibit.) Uh-huh. Yes.



**Q So I'd first like to draw your attention to the contract or permitting section on page 1. Who is Kings Plumbing?**
A I actually don't know. That was somebody who John worked with.
**Q Okay. You did not retain Kings Plumbing?**
A No, I retained John.
**Q Okay. Did you ever have any communications with anyone from Kings Plumbing?**
A I had one once to get him to finish the permit and be done.
**Q And what was the nature of that conversation?**
A Mostly that we needed to finish the plumbing project and get it approved and move on.
**Q Do you know if Kings Plumbing was involved in any extent beyond procurement of the permit?**
A I don't know.
**Q Did you ever pay Kings Plumbing any money for work that they performed on your property?**
A Not that I recall.
**Q Did you ever have any discussions with Mr. Fullerton about Kings Plumbing?**
A Some.
**Q What were these -- the nature and extent of those conversations?**



A Mostly along the lines that Kings Plumbing pulled the permit.
**Q Okay. Did he ever tell you, though, what his relationship with Kings Plumbing was?**
A Not entirely, no.
**Q When you say not entirely? What do you mean? Did he give you some indication of his relationship or --**
A I knew that he had a working relationship with him, some sort of business thing where they -- where he does the permit for him.
**Q Okay. So next, I'd like to just draw your attention to the Authorization section where it says, Building Code Use. You would agree that there's nothing reflected there?**
A (Examines an exhibit.) I don't agree with that.
**Q Well, is there something written there on your version?**
A Where it says Building Comments? Is that where you're looking?
**Q No, Authorization, Building Code Use.**
A Oh, I'm sorry. This right here (indicating).
**Q Yes.**

Confidential

A Correct, that box is empty.
Q And then jumping down to the one you were just talking about, in the Building Comments section, there are some comments detailed in there?
A Correct.
Q Do you know what that's in reference to?
A These, I do not.
Q Okay. So you don't know if the PERCRS 30-45 is a plumbing code?
A I do not.
Q Okay. And also I'd also just like to note, if you look at the General Information section, it says that the use of the building is a single-family residence? Do you have any understanding as to why the property is listed as a single-family residence?
A No idea.
Q And I'm going to draw your attention now to the STAT code in the second column from the bottom. Do you know what that STAT code means?
A I do not, no.
Q Okay. And if you could now just take a -- move over to page 2, please.
A Uh-huh.
Q Sorry. First, in your mind -- in your opinion, is there any distinction between a repair and replace versus a remodel?



A Can you give me some context?
Q I guess my question would be, you know, do you have any knowledge of why page 2 of this form listed the scope of work as a remodel and why page 1 list the class of work as a repair and replace?
A Could you show me what it says on the front side here?
Q Yes. So if you're looking at page 1 under the Building Comments, right there?
A Yes.
Q And then if you go on to page 2?
A Okay.
Q It's this box right here (indicating) above all the text.
A Got it. I see it, and I don't know why it states like that.
Q And from your experience as an estimator, is there a difference between a repair and replace versus a remodel?
A This has nothing to do with how I estimate for insurance work, either. Very different.
Q Okay. I guess in terms of an estimate, though, if an estimate were to be prepared for something -- withdrawn.



A Okay.
Q And then, I guess, just lastly, looking at this permit, would you agree that there's no inspector sign-off on page 2?
A There isn't.
Q And then if you look to page 3, similarly, there's also no inspection date, inspection type, status, inspector, or result comment listed?
A There isn't.
Q Do you have any idea why that might be?
A I need to go back and check. There may be another final one.
Q Okay.
A This may just be an error because I was told that it was finaled out.
Q If there was a final one, would you have produced that in this lawsuit?
A If I had known about it or had it, yeah. It could be just an error.
Q Okay. I didn't think I saw a final one when I reviewed it.
MR. DENBY: So Counsel, to the extent you guys have anything in your file, if there is a final version of this, I will respectfully request that you produce it.



MR. QUISENBERRY: Sure thing.
MR. DENBY: Okay. If we could take a five-minute break.
MR. QUISENBERRY: Sure.
THE REPORTER: Good for me.
(Recess from 11:44 a.m. to 11:56 a.m.)
(Exhibits 4 and 5 marked.)
Q (By Mr. Denby) Mr. Diem, you've just been handed what has been marked Exhibits 4 and 5. These are copies of Lease Agreements dated June 27th, 2019 and November 24th, 2021, respectively.
Have you seen these documents before?
A Yes.
Q Are you familiar with them?
A Not terribly.
Q And what are they?
A These appear to be leases for the -- check here -- upper units.
Q Okay. And so I'd first just like to draw your attention, on page 1 of Exhibit 4. That's the lease dated June 27th, 2019.
A Yes.
Q I'd like to draw your attention to section 4, please, and I'd just like to ask, that document reflects the lease that was in effect at that time was

Confidential

Page 73

$1,795, correct?
A Appears to be so.
Q Okay. And then if you would just please look at Exhibit 5. That is the lease dated November 4th, 2021. Is this the first lease that was in effect after -- for the upper unit after the incident?
A Exhibit 5 is, yes.
Q Okay. So that would have been the first time that you re-let the upper unit after the incident?
A Correct. Yes.
Q If you could please take a look at section 4.
A Uh-huh.
Q Section 4 for the November 24th, 2021 lease indicates that rent is $1,895, correct?
A Yes.
Q So this lease is for a hundred dollars more than the lease that was in effect prior to the loss?
A Appears to be so.
Q Do you recall why you raised the price of the rent by a hundred dollars?
A I didn't raise it so much as we agreed to. The property management and I had a discussion and this is what the rent should be.
Q So this was the property management company's idea to raise this rent?

Page 74

A Correct. Yes.
Q Okay. Prior to the date of loss, you had never been paid rent for the upper unit in the amount of $1,895 a month?
A Say that again, please.
Q So before the date of loss, July 6th, 2020, you had never been paid $1,895 in rent for the upper unit?
A I don't recall. I'd have to look at the other leases to verify it.
Q Okay. Well, if you look at Exhibit 4, I'd just draw your attention to Section 3. That lease notes that it was in effect from June 29, 2019, to June 30th, 2020?
A Sure.
Q So the end date for that lease would have been roughly eight days before the loss?
A This is eight days before, give or take. Okay.
Q So did you enter into any other leases for the upper unit in between June 30th, 2020, and the date of loss?
A I did not enter into a new lease. However, we extended their lease. I don't remember if it was month to month or however we did it, but they had

Page 75

extended it.
Q Okay. And if that lease had been extended, the terms of that -- the terms of the lease would have been continued such that the monthly rent would have been $1,795?
A Not necessarily. It depends on whatever the agreement was, whatever is in this lease or whatever they had agreed to.
Q Do you have any documents demonstrating that any month to month extensions of the lease were negotiated at a higher rent than in this lease agreement?
A In front of me, not -- I don't believe so. You may have something that I provided, but --
Q Are you aware of the existence of any documents to that effect?
A Off the top of my head, no, given what I'm aware that I have.
Q Okay. Thank you.
A Uh-huh.
Q Okay. So with respect to the incident that is the subject of this lawsuit, how did you find out about the crack in the drain waste vent pipe?
A I suspected I had a problem and I saw the ground under the drywall there, called John Napolitan,

Page 76

to figure out what's in that wall, causing it, and that is when he opened up and found a pipe with the crack in it.
Q What did you see on the ground by the drywall?
A Like a black sludgy substance.
Q And was it on the ground? On the ground and the drywall, both?
A Mostly on the ground.
Q How big was the area of sludge?
A I don't remember how big it was.
Q If you had to describe it, I guess, would it have been, trying to find something for reference here, would it have been the whole area? Did it take up the whole ground in front of the drywall? Was a portion of the drywall --
A No, no. It was approximately maybe the size of the top of this laptop here (indicating).
Q And when you reference the size of the top of the laptop, are you referencing the length of the laptop from side to side or top to bottom?
A Somewhat -- within this area, it would fit.
Q Like a pool of sludge that would have fit within the diameter of the top of counsel's laptop?
A From my recollection, it has been two-plus

Confidential

years now, so I'm doing the best I can.
**Q Okay. And you describe it as a black sludgy substance. Was it sewage or something else?**
A Well, I'm not a hygienist, so I couldn't tell you what it is.
**Q Well, did it smell like sewage?**
A It didn't smell like sewage. No, it didn't smell like much of anything.
**Q Okay. Was there any sewage that spilled from the pipe?**
A Not that I'm aware of.
**Q And what prompted you to go over to the house the day that you found the issue?**
A So I forgot what his name was, the lower-level tenant that wasn't paying his rent had moved out, and because he wasn't paying the rent and he was a little odd, wanted to be sure he hadn't done any damage to the property or anything like that.
**Q Do you recall what time of day it was that you were over at the house?**
A The sun was shining. I don't know.
**Q Was anyone else present when you found the sludge and the issue?**
A It was only me.
**Q What did you do upon finding it?**



A Called, I believe, I had called John, the plumber, was my first call. I had called the insurance company, Travelers, as well. And I may have called the property manager. That, I don't quite remember.
**Q Okay. When you called the plumber, what did you tell him?**
A I had something on the floor here. It's been two years. But I had something on the floor. We need to open the wall and figure out what's causing this.
**Q And what made you think you needed to open the wall?**
A You couldn't see anything else otherwise.
**Q Okay. So there was just sludge on the ground, and that was just kind of it?**
A There was sludge on the ground. I've owned the house for a long time. I know where the plumbing is in these walls, to some degree, so I knew, Hey, somewhere in this wall, I have a pipe that carries drainage from upstairs to downstairs. It's approximately here (indicating). We need to figure it out.
**Q Okay. Did you take any photographs of the sludge that was on the ground?**
A I don't remember.
**Q And what did John tell you when you spoke to**



**him?**
A On the phone?
**Q Yes.**
A That he'd come out and take a look.
**Q How quickly did he come out to look at it?**
A Very quickly, and within -- it may have been same day. May have been within a day or two. But it was quick.
**Q Okay. Before we go over that, I'd just like to ask a few questions about your call with Travelers. Do you remember who you spoke to when you reported the issue to Travelers?**
A No. It was just whoever does their intake.
**Q And what did you tell them?**
A That I had a leaky pipe or something in the house, and we needed to start a claim.
**Q And what did Travelers tell you?**
A They initiated a claim. It's been two-something years. I don't know the exact words anymore.
**Q Aside from that area that we just discussed in front of the drywall, was there any noticeable seepage, sludge, or other damage to any other areas of the lower unit?**
A Not, not the lower unit, no.



**Q Did you notice anything to the upper unit?**
A No.
**Q So I guess at that time, the only visible damage was what you saw on the floor. Anything else would have been within the wall?**
A Yes.
**Q And when John first came, when Mr. Napolitan first came to visit the property, what did he do?**
A I don't believe I was at the property when he did, but he opened the wall and he found the cracked pipe and replaced it with a new PVC section.
**Q What did he do with the pipe?**
A Left it there. The broken one, right?
**Q Yes.**
A He left it there.
**Q Did he have any determination as to what may have caused it to crack?**
A No. I shouldn't say no. I didn't ask. He didn't tell me. It wasn't a conversation point.
**Q Did you view the pipe after he removed it from the wall?**
A Yes.
**Q And could you describe what the crack looked like?**
A It was a crack, about length of the section

Confidential

that he removed (indicating).
**Q And you said that after -- you said in removing the pipe, he reinstalled PVC pipe?**
A Correct.
**Q Do you know what he did? So, for example, was it just a patch job on the section of the DWV that he removed or did he put any additional piping, PVC piping, in?**
A He only replaced what needed to be replaced to make a successful repair.
**Q Okay. So after that was patched, was the DWV pipe, would it work? Let me rephrase that question.**
**After John installed the PVC pipe, was the -- would the pipe have returned to functionality?**
A I'm not a plumber, but it held water just fine and air couldn't move through it. I didn't have any leaking issues that I was aware of.
**Q And do you know how DWV pipe works?**
A The plastic material, what it's designed for in.
**Q What it's designed for?**
A To a degree, yes.
**Q And what is that?**
A Drain waste vent, my understanding, is the vertical stack that goes usually from your building



drain through your roof, penetration there, and it will recept waste from either your toilets, sinks, whatever. And then bring it down to your building drain and has to be ventilated to the atmosphere through your roof in order to let air in.
Like, if you put your finger over a straw, nothing comes out, because there's no air. You remove your finger, the water comes out, because you're letting air through. That type of thing.
**Q Okay. And after Mr. Napolitan repaired the pipe with PVC, what was the next step? What did you do after that?**
A I don't know my exact order of operations, but I did call Denver Flood and Fire to take care of the mitigation efforts, to clean up the sludge, any potential mold that was found, things like that.
**Q Okay. Did anyone refer you to Denver Flood and Fire?**
A No, I knew him from my Paul Davis days.
**Q Okay.**
A I don't -- yeah. I know from my Paul Davis days.
**Q And who at Denver Flood and Fire are you talking about?**
A Joey Hermann.



**Q Was there anyone else at Denver Flood and Fire that you worked with?**
A Not directly, no.
**Q How long have you known Joey Hermann?**
A Since my Paul Davis days. I don't remember the exact year I was introduced to him.
**Q Did Joey perform work for you? Is Joey the only vendor you used at Paul Davis?**
A No, we tended to refer work back and forth, if I got too busy or he got too busy, like, overflow.
**Q And what was the point in contacting Joey?**
A The point?
**Q The purpose. What were you seeking him for?**
A Well, I have a duty to mitigate my loss, so if I have a wet, damaged, potentially mold house, I need to get that properly taken care of. And so my phone call to Joey, since he does that line of work.
**Q And that was my next question. What is his line of work?**
A Water restoration.
**Q What was the extent of water damage in the property?**
A It was the two walls, I'm going to call it a wet wall, when it was wet, but also, that's where the main plumbing for the house went through. So on one



side, you had the utility room, the other side, the bathroom, so that one wall, both sides were wet. And as he discovered more, there was suspected microbial growth from the bathroom into the kitchen on the other side of the bathroom.
**Q And did Joey have a plan for dealing with that?**
A What do you mean by plan?
**Q Did he come up with a -- you know, a proposal, a suggested course of action, for, you know, taking care of the damage that you just described?**
A Yeah, I mean, a lot of it is kind of ad hoc. You find your damage and chase it. So you don't quite know with water damage what you're going to get until you get into it and you know what it is.
**Q And do you remember about how long it was before Joey first inspected the property?**
A No, I don't.
**Q What did he do the first time he inspected the property?**
A I believe he did an inspection, and then I don't remember if he got to start it right away or if we got ahold of the adjuster first to get approval for it. But he started when he could.
**Q And let me backtrack. Did you do any**

Confidential

**Q mitigation work on your own before you contacted either Joey or John?**

A No, I'm out of that business.

**Q Okay. And you can't recall if Joey commenced doing mitigation work prior to notifying Travelers?**

A I notified Travelers before Joey began. I don't recall if he got the approval from the adjuster to just go ahead and begin or if they agreed on a scope of work first. That part, I don't remember.

**Q Okay. And what did Joey tell you about the mitigation work that needed to be performed?**

A In terms of?

**Q Just what he needed to do. How much damage you were looking at. The extent of mitigation that was required.**

A Not a lot. I mean, I could visually see when he come back and take a look at things, like, what was going on with it. So he could explain it, but because I've been in the industry, I knew what I was looking at.

**Q Understood. But he did explain to you what mitigation steps he was going to take?**

A Yeah.

**Q Do you remember what those were?**

A A lot of it is demolition of the affected



materials. Clean it. Have to vacuum it if it's necessary. And antimicrobial actions that sort of process.

**Q And did you coordinate with Travelers about any of that work, obtaining approval for any of that work?**

A To some degree. Some of it was, we did what we needed to do. And if things grew in scope, like, I recall they found additional material on the ceiling that needed to be removed. We got approvals for say additional asbestos testing before that could proceed. So when it was reasonable to get additional approvals, we did.

**Q And after you gave Travelers notice of the loss, how long did it take Travelers to inspect the property?**

A No one came to inspect it, initially.

**Q Did they perform a virtual inspection?**

A They did a virtual inspection.

**Q So would you consider that an inspection, nonetheless?**

A A type of inspection.

**Q Okay. So how long after you provided the notice, did Travelers send someone to perform that virtual inspection?**



A I couldn't estimate.

**Q If I told you it was performed on July 13th, would you say that the amount of time between date of loss and the July 13th virtual inspection was reasonable?**

A From my experience in initial contact within -- if those number of days are correct, yeah, I would say that's probably reasonable for an initial contact.

**Q Okay. And if I were to tell you that a follow-up virtual inspection was also performed on July 29th, would you say that's a reasonable amount of time between the initial inspection and any follow up correspondence regarding supplements to get back out there and perform an additional one?**

A That's contextual. I'd have to see what proceeded that in order to see if it was reasonable or not.

**Q Would you say, you know, at least 16 days is not an unreasonable time in and of itself?**

A I won't answer it like that without context. I can't.

**Q If you were communicating with Travelers regarding the initial results of the initial inspection and were taking the position that additional**



**supplements were required that might not have been reflected in an initial estimate and you were communicating with the carrier about that, and that's what prompted the follow-up inspection, would you then say that, you know, 16 days is a reasonable time to conduct a follow-up inspection?**

A Without the actual context, I can't nail down the 16 days. It's arbitrary.

**Q Okay. So going back to the first virtual inspection, who was that performed by?**

A Brian Head, I believe his last name was.

**Q Okay. And had you been in contact with Mr. Head regarding your claim prior to the virtual inspection?**

A I may have had an introductory phone call or email or something to say, this is who I am and we're going to do the inspection this day, this sort of thing.

**Q And why was the inspection done virtually?**

A COVID. That's my assumption, is COVID.

**Q Were you -- and you were physically present at the property?**

A I was, yes.

**Q Was anyone else there present with you?**

A No.

Confidential

**Q And how was the inspection -- how did you facilitate the virtual inspection?**
A There was an app he had me download on my phone that I believe was from -- it's some sort of Verisk or Xactware product that I logged in with that I logged into that and then he would ask me to go to different places and he could virtually snap photos on my phone.
**Q Okay. And can you take me through what he did in that virtual inspection?**
A I'll do the best I can from what I remember. Quick introduction at the front door. Showed him the area of the loss in the bottom of the house. He wanted to see the pipe that was still on-site. Looked at the damage that was initially there.
We had agreed on a initial scope. I believe -- that may have actually been before Joey got there, now that I think about it. And we agreed on an initial scope of work, and he said, paraphrasing, Go ahead and proceed. Like, Go ahead.
**Q And do you remember what the initial scope that you agreed upon was?**
A It was -- all of it, no. I don't.
**Q Whatever you can remember.**
A Pulled the furnaces. Remove the wall that



was damaged. Pull out the vanity and the toilet. And I believe the tile floor as well.
**Q And why was that work necessary?**
A I'm sorry?
**Q And why was all of that necessary?**
A Because all those materials were affected with whatever that sludgy substance was.
**Q Okay. So the -- where was the vanity located?**
A The opposite side of the wall. So remember, when I'm saying the wet wall?
**Q Yes.**
A You have the utility room and the furnace and the walk -- oh, you said, remove the water heaters too. That stuff's all on one side. The toilet and the vanity were immediately on the other side of that wall.
**Q Okay. So going back to when you first saw the damage, first noticed the damage, I know we had spoke, I guess, from about -- I guess from your vantage point when you were facing the area where the pipe would have been inside the drywall, were there other areas of the house that you then went through and saw sludge, on the date of loss?**
A I looked around, like, the bathroom side, and I didn't see any.



**Q Okay. So the only area you saw it on the date of loss was that location we previously discussed, in front of the drywall?**
A Correct.
**Q Okay. So then when you testified that the vanity and the bathroom were affected by the sludge, was that sludge -- did additional sludge appear later on?**
A No. When the plumber had opened a section of that wall from the utility room side, you could see the inside of the drywall in the bathroom, and you could see that it was affected from the back side.
**Q Okay. So essentially, by cutting open that hole in the, I guess, the wall, for lack of a better word, in the bathroom side, that allowed sludge to come through -- is that accurate?**
A No, no, no. So we accessed -- when I say we, John, plumber John, accessed the wall to do repair from the utility room side to see what sort of damage was in there and accessed it because why tear apart a bathroom if you don't have to. So he was going through that side.
When you open that part of the wall, you can now see the back side of the drywall that is finishing the front side of the bathroom. So you could then see



the back side of that drywall through the wall and go, This is affected and needs to be removed.
**Q Prior to doing that, was there any indication that it was affecting the bathroom at all?**
A Not that I saw.
**Q And how long was the virtual inspection?**
A I don't know.
**Q And what happened after the inspection concluded?**
A We proceeded. I can't remember if Joey had begun before or after, but we continued with the work. Like, Brian seemed satisfied with what he saw so far.
**Q Okay. And did Brian issue any estimates or payments after the initial inspection?**
A I believe he did.
MR. DENBY: Can you mark this as 6, please. Thank you.
(Exhibit 6 marked.)
**Q (By Mr. Denby) Would you please take a look at what's been marked as Exhibit 6.**
A (Examines an exhibit.) Okay.
**Q So this is an estimate prepared by Travelers. Have you ever seen this document before?**
A I believe so.
**Q How have you seen it?**

Page 93

A What do you mean by how?
**Q How are you familiar with it? Was it sent to you?**
A Oh, it would have been sent to me. Emailed.
**Q Okay. And did you review this estimate when you first received it?**
A Yes. I would've.
**Q And did Travelers issue payment for the net claim issued on page 8 of the estimate?**
A I don't recall how much they issued me, but Brian did issue at least a check, if I remember right.
**Q After payment -- after the payment was issued with respect to this estimate, did you ever ask that Travelers consider any additional information?**
A Yes.
**Q What information did you ask that they consider?**
A I'd have to get my dates straight, but if this is the one that was sent just after the virtual inspection -- let's see -- a couple of days after, I believe there were further ones done with, like, some additional ceiling to be removed and additional work to be done by Denver Flood and Fire also.
**Q Okay. At the time this estimate was issued, did you think that there was anything unreasonable about it?**

Page 94

A At the time, I honestly don't remember.
**Q Okay. Do you think that it's unreasonable now?**
A I can't answer that two years later. I mean, the scope has changed entirely.
**Q And how is that?**
A I mean, this isn't even -- this is not what Joey had billed for. We had additional areas of the scope, say, for example, detach, reset water heater. I understand why he had that in here. However, we had a bid item that he paid, like, here's how much the plumber actually charged. Says something else here. So this isn't even applicable to 2022.
**Q Okay. I should rephrase.**
**With everything you know now, looking back on this claim, at the time that this estimate was issued, was there anything unreasonable with it?**
A It's been so long, I don't remember.
**Q Okay. All right. Thank you.**
A Uh-huh.
**Q And now, kind of just discussed, we did indicate that Joey had requested supplement -- that Travelers consider supplemental information?**
A If memory serves me right, yeah.

Page 95

**Q Did Travelers ever issue a supplemental estimate or payment after the first document we just went through?**
A There have been multiple payments made. I don't remember exactly where Joey's payment was within that per se.
**Q Okay. I'm now going to show you -- sorry. If we could mark this as Exhibit 7.**
**This is an email and attached to it is an estimate from Travelers. If you could just briefly review --**
A I don't have it.
(Exhibit 7 marked.)
A (Examines an exhibit.) Okay.
**Q (By Mr. Denby) Are you familiar with that document?**
A Pretty much.
**Q Have you seen it before?**
A Yes.
**Q What is it?**
A This, I believe, is an updated version of Exhibit 6.
**Q It would be a revised or a supplemental estimate?**
A Correct.

Page 96

**Q And do you remember what prompted this additional estimate to be generated?**
A This would be based upon Joey's submission for, I believe, additional funds. That's where it says, like, Bid Item in there. That would be for Joey's component of it.
**Q Okay. And just, you know there's a lot of bid items in there, so without detailing each one, if you could specifically say, you know, what type of work Joey had submitted -- what type of bid items Joey submitted that would have required the supplementation?**
A Whatever additional mitigation efforts were found, he would need to submit his additional estimate and -- and I believe that's what these bid items are signifying on here.
**Q Okay.**
A So instead of, say, Brian having -- he has line item 1 on Exhibit 6, Equipment setup, takedown, monitoring, four hours. He just -- it had the same line and heading, but instead of saying four hours, here's the dollar cost per unit, it just says, See bid item, meaning it's included in whatever Joey submitted.
**Q Okay. And do you think there's anything unreasonable about this estimate?**
A I'd have to check the timing of the event,

but I had alerted Brian to, that I was underpaid for, at least, the asbestos testing fees.
Q How were you underpaid for those?
A What happened is, these are Xactimate prices. Xactimate is a software that the insurance industry typically uses. The actual pricing and cost that I incurred exceeded what this dollar amount was.
I believe the -- either the furnaces or water heaters were both getting removed also. I had told him about it.
Q Okay. And did you submit any sort of estimates or proposals to Travelers detailing what the -- what you believe the cost would have been?
A The dates, I don't recall. But, yes, anything to substantiate what the dollar amount that I'm asking for was, yeah, submitted.
Q Was it submitted prior to Travelers submitting this estimate?
A No. Travelers submitted it prior to me actually getting those invoices back from the worker that did it.
Q Okay. So after you received this invoice, you would have -- did you follow up with Travelers and say --
A Correct.



Q Okay.
A And this is what I need to substantiate this.
Q And what did you provide them at that time to substantiate the additional incurred charges that you were seeking?
A If I recall, it was the actual invoices.
Q Do you remember which company invoices?
A It would be Highwater Plumbing & Heating for the furnaces and water heaters and it would have been Environmental Excellence for the asbestos testing.
Q Okay. And before I jump to talk about Highwater a little bit, did Travelers issue the additional payment noted on the last, page 9, of this estimate?
A Did they issue it? If I recall, they did. The actual check was mailed?
Q Yes.
A I believe they did.
Q Okay. Let me quickly go on a tangent, since we talked about Highwater, and I'd like to briefly ask you a few questions about them. And then we'll jump back to some more of these Travelers estimates.
MR. DENBY: Off the record.
(Off the record.)
(Recess 12:38 p.m. to 1:08 p.m.)



(Exhibit 8 marked.)
Q (By Mr. Denby) I'm just showing you what has been marked as Exhibit 8. Have you seen this document before?
A Yes.
Q What is it?
A It's an invoice for removing two furnaces, two water heaters, move one of the water heaters away from the wall, tape up the flue vent.
Q And was this one of the supplemental charges that was submitted to Travelers after the first estimate was issued?
A Correct. I believe it was. This was submitted though.
Q Okay. And earlier you were testifying there were a few items that Travelers had underpaid. Is this bill one of those that you believe was not properly paid?
A This was one of them, yeah.
Q Okay. And what is your basis for believing it wasn't properly paid?
A So we go to --
Q And if you could just try to testify --
A Can I look at this (indicating)?
Q I'd prefer if you try to testify from memory.



A Okay. Reask your question.
Q It was just, what about -- what was your basis for believing that bill was underpaid?
A So Brian submitted his version to me, based upon Xactimate prices. And this is the actual price of cost to do that work.
Q Okay. And why did the furnaces have to be pulled?
A Because they were both, two furnaces, they were both on the side of the wall that was damaged that had to be removed and cleaned out and mitigated.
Q Okay. And it was not possible to, I guess, remove them and keep them installed at a different location?
A No. That's what we did with the water heater.
Q Okay. Since you brought that up, would you mind elaborating what you did with the water heater?
A In order to keep the tenant upstairs comfortable as long as we could, we had one of the water heaters -- we had both water heaters pulled out so we could access that wall. One of the water heaters was reset up so it was possible to do that further out, so she still had running hot water.
Q Okay. So was there a reason that you were no

Confidential

longer able to provide her with the running water come, I believe, September 2020?
A (No response.)
Q Do you recall advising Travelers that Colorado has a statute regarding the warrant of habitability and that since the weather was getting cold, you were no longer able to have the tenant living upstairs due to the lack of heat?
A Yes. You were asking about the water heater.
Q I apologize.
A That's okay.
Q On the proffer, do you recall ever informing Travelers of the warranty of habitability and ability needing to heat the upstairs apartment?
A That, I do, yes.
Q Okay. I'm sorry. Did you ever previously replace the furnaces?
A No.
Q Did you ever previously replace the water heater?
A Both water heaters, yes. The two.
Q Do you recall when that was?
A January 2014, I believe.
Q And why were they replaced?
A Just age.



Q Okay. Did you have to pull any permits to replace the heaters?
A Did I have to? I don't know.
Q Do you recall if any were pulled?
A I don't believe they were.
Q Okay.
MR. DENBY: If we could just please mark this as Exhibit 9.
(Exhibit 9 marked.)
THE WITNESS: (Examines an exhibit.) Okay.
Q (By Mr. Denby) Okay. I'm showing you what is Exhibit 9. Have you ever seen this document before?
A Yes.
Q Let me clarify for the record first. Exhibit 9 is a four-page exhibit. The first page consists of an estimate. The second and third pages consists of a proposal. The fourth page consists of additional terms and conditions.
Have you seen this document before?
A Yeah.
Q How have you seen it?
A Mike Hessel, who's written on here, provided it to me.
Q Okay. And who is Mike Hessel?
A I believe he's the owner of Highwater.



Q Have you worked with him prior to this damage claim?
A Yes.
Q Was that in your capacity at Paul Davis?
A Yes.
Q Okay. And did you reach out to Highwater with respect to this claim?
A Yes.
Q And the estimate that we are looking at on page 1, was this work ever performed?
A No.
Q Why not?
A This would have been outside the scope of work from the claim. And so while the ceiling was open already due to necessary reasons, I was thinking about having a duct moved. But I never actually had it done.
Q Okay. If you could jump to page 2, please, that proposal that's dated August 10th, 2020.
A Yes.
Q So we previously looked at Exhibit 8, which was the bill for the pulling the furnaces and the water heaters?
A Correct.
Q Was the rest of the work detailed in this proposal performed?



A Not all of it, no.
Q What was not performed?
A Let me clarify. Performed by him or performed at all?
Q We'll take both of those. So first, let's do, performed by him?
A Okay. What was performed by him is he did eventually reset two of the water -- I'm sorry, two of the furnaces. He also -- no, he only did the furnaces.
Q Okay. Was there a reason why he didn't do the other work detailed there?
A Yeah, he does -- so he'll do both plumbing and heating. John Napolitan of Metropolitan Plumbing was going to do the plumbing work himself because John doesn't do HVAC, I kept Highwater doing HVAC, I kept John Napolitan doing plumbing.
Q Okay. And did you ever end up signing this proposal?
A This particular one, I don't think I did. But -- I don't think so. I'm not entirely sure, but I don't think so.
Q Do you recall ever receiving a bill for the work detailed in this proposal aside from the one we've previously looked at marked as Exhibit 8?
A If memory serves me, I think I submitted one

Confidential

only for the actual furnaces being reset.
**Q Okay. And that would be for the exhibit we just looked at?**
A No, this is for the removal.
**Q Okay. Thanks.**
A Uh-huh.
**Q I'd just note for the record that to the extent what's been produced if you to do invoices regarding the resetting of it, we'd just request that you produce it.**
**So out of just -- I apologize.**
**Out of the work detailed in that proposal, is it accurate to say that the only thing that was performed was resetting of the furnaces?**
A Clarify, because work has been done to satisfy this, but by different people at different times.
**Q Let me get into question 2, that we were just talking about earlier.**
A Okay.
**Q So outside of Highwater, has anyone performed any of the work detailed in this scope at the property?**
A Not entirely, because John Napolitan put back one water heater at this point and not two.
**Q Why did he only put back one at that time?**



A I believe it was because we couldn't agree on a scope of work, so therefore, having one unit upstairs was sufficient to have one water heater.
**Q And that would have been around August 2020?**
A When it was completed?
**Q When he reset just the one.**
A No, he couldn't reset that water heater until all the plumbing had been replaced. So it's been a long time since.
**Q Okay. Sorry. Maybe, to keep the unit upstairs operating, when was that reconnected so that, you know, I believe you said that, if I remember correctly, it was the water heater that was able to be connected?**
A Correct.
**Q Reconnected. Moved but reconnected?**
A So it was moved and reconnected for Maren, that tenant, to use. However, once she vacated, it was removed again, because there was nobody living there.
**Q Okay.**
A So that way, the rest of the plumbing could be replaced in order to make it rehabitable for any new tenant coming upstairs.
**Q Was anything done with respect to the other furnace at any time between the point when the first**



**one was reset and the upstairs tenant left?**
A Could you -- ask that one more time. I just may not track it.
**Q Yes. Did you do anything with the other furnace in the interim time between when John reset the one so the upstairs can keep operating and when she left? Or did they just kind of sit there unconnected?**
A I think we're getting confused with water heater and furnaces.
**Q Let me rephrase.**
A Sorry.
**Q You're fine. With respect to the furnace --**
A Okay.
**Q In between the time when John reset the furnace so that he could provide -- so that the upstairs unit could continue to have services and the time that the upstairs tenant moved out, did anything happen to the other furnace? Or was it just essentially sitting, disconnected?**
A I think by furnace you mean water heater. We had two furnaces, two water heaters. I think your question is, did John do anything with the water heater, the second one that was pulled out.
**Q Okay.**
A Is that what your --



**Q So just to clarify your earlier testimony, the furnaces, both of those were removed, one of the water heaters was reconnected?**
A Correct.
**Q So I am talking about the water heater.**
A Okay. Could you rephrase you question, then?
**Q So with respect to the water heater, while one water heater was reset so the upstairs tenant could continue to have heat, was the other -- did anything happen with the other water heater in the interim or did they just remain disconnected?**
A It was set aside and eventually trashed, because John and I were thinking when we go back and redo it, we'll just do one larger 50-gallon water heater instead of a 40 and a 30 and just have to pay more gas and stuff like that. It would just be more efficient to have one the next go round.
**Q Okay. And did you ultimately upgrade the water heater as you just testified?**
A I don't think I bought anything bigger, better, fancier, anything like that. I think it was the one that we pulled out.
**Q Was the second one ever reinstalled?**
A No.
**Q Why not?**

Confidential

A From what I just said. We were planning, if memory serves me, to go to 50-gallon water heater because a 40, and a 30, is 70. In that house, he was saying, a 50 would have been sufficient and it's easier to plumb in that way.

So we were going to get rid of both of them later on, at my expense or whatever, and just replace one 50, instead of having two.

**Q Currently, though, the house only has one water heater?**

A Correct.

**Q And is that situated for the upstairs unit?**

A It'll serve both, I believe, at this current point in time.

**Q And what changed that is now capable of serving both units?**

A It always was. So the way it initially was set up, is you had two water heaters serving one common plumbing system throughout the house. And that's why this whole thing kind of goes on, is because it's one plumbing system with two water heaters serving them commonly.

**Q Okay.**

A Does that make sense?

**Q Yes.**



MR. DENBY: If you could please just mark this as Exhibit 10.

(Exhibit 10 marked.)

**Q (By Mr. Denby) If you could just take a look at that when you've had a chance?**

A Yes.

**Q Do you recognize that document?**

A Yes.

**Q How do you recognize it?**

A Highwater Plumbing & Heating gave it to me.

**Q And why did they give it to you?**

A So after the furnaces in the basement were reinstalled, I don't recall the duration of time between them, one of them wasn't firing. And so this is the invoice for them to replace a gas value on one of them so they could operate.

**Q Do you know what caused the gas valve to not operate?**

A No, I don't.

**Q Was it something related to the incident or technical --**

A I think it was just bad timing.

**Q Okay.**

A Yeah.

**Q So would you say this bill is related to the**



**claim?**

A This one (indicating)?

**Q Yes.**

A No.

**Q Was this ever submitted for reimbursement?**

A I don't believe it was.

**Q And just with respect to the bottom portion regarding payment, they have the box for Account checked off. Would you just explain, do you have an account with Highwater --**

A No, they just do whatever. Sometimes -- even give them cash. Or this is usually his wife's going to call me to get my credit card number at the end of the day. I carry my credit cards with me, usually.

**Q Okay. So it's nothing related to, like, an ongoing line of business with respect to back in the Paul Davis days or anything --**

A Oh, no, not at all. This is a just a -- a card reader thing that I'm aware of.

**Q Okay. All right. Give me one second, please.**

**So before we started talking about Highwater, we had been going through just your communications with Travelers regarding the claim and the inspections that they had performed. We had recently just finished off**



**with Travelers, the second estimate that they had issued.**

**So I'd first just like to ask you a question about another vendor that you may have retained.**

MR. DENBY: If you could please mark this as, I think, 11.

(Exhibit 11 marked.)

**Q (By Mr. Denby) Would you please just review that?**

A (Examines an exhibit.) Uh-huh.

**Q Do you recognize that document?**

A Yes.

**Q How do you recognize it?**

A This was a proposal that I'd requested from Ductworks.

**Q And why did you request that proposal?**

A And this was never cleaned, by the way. But the idea was, when the sludge was found and things opened up, stuff like that, we didn't know for sure if any of the furnace blowers had been operating at all and for how long, the air there by -- you may have possible contaminants into the duct work. So this was a proposal to have the ducts cleaned prior to finishing the work.

**Q Okay. And why did it end up being not**

Confidential

**necessary?**
A I'm not saying it's not necessary. We haven't gotten that far with the work on any of this yet, so why continue.
**Q Okay. And I guess, going on a little tangent again, what's the current status of the project and the renovations?**
A So the basement unit, the -- the plumbing has been replaced to satisfy the permit that was pulled. The bathroom has been pretty much gutted. The kitchen had been demo'd. And then we had done some additional work at the same time out of my own pocket. The idea being if we were doing, like, the bathroom and part of the kitchen, might as well update the rest of the units.
So I was kind of keeping track of that. So I had purchased some extra items for that, but nothing had gotten installed or done. So it's pretty much a gutted bathroom, partially gutted kitchen, floors, and plumbing that doesn't work.
**Q Functioning electrical system?**
A As far as I know.
**Q What's the status of the upper unit? Was all work completed?**
A To make it rentable? Yeah.



**Q Yes. When you say to make it rentable, is there an additional criteria you're looking to meet beyond making it rentable?**
A Well, so when the plumber did his work to make everything functioning, he had to add some holes to the upstairs unit to gain access to different areas to connect the pipe and stuff like that. So the holes were patched. A vanity was destroyed in the process, so that was replaced, and patched and painted as necessary for it.
**Q And had the upper unit been leased by the tenant whom we discussed earlier, upper unit still being leased by Kyle Berteau and Nicole Baldwin? B-e-r-t-e-a-u.**
A I believe so. I've never met them.
**Q Okay. As far as you know, since it's been re-let, the tenant hasn't changed.**
A Correct.
**Q Let's go back to the ductwork. Do you plan on having that work performed?**
A If we -- so if everything worked out and I could have all this thing put together properly, yeah, I'd do it, because I don't know what sort of contamination may have got in there.
**Q And when did you complete the repairs to make**



**the upper unit rentable?**
A Sometime in October or November of last year. Actually, it may have been earlier.
**Q What remains to be done to make the lower unit rentable?**
A Well, we'd have to figure out the electrical issues, figure, you know, go back through that. Rebuild the bathroom. Rebuild the kitchen. I'd have to go back and finish the work that I had started in the living room and the bedroom, also.
**Q And what's the current plan -- do you have a current plan for completing those renovations?**
A Like a timeline?
**Q Yes, a timeline or --**
A No.
**Q Is the plan for completing the renovations contingent on this lawsuit?**
A Yes.
**Q Okay. How much money have you spent out-of-pocket on the renovations so far?**
A Including my HELOC or just my own money or. . .
**Q Are you responsible for reimbursing the HELOC?**
A Yes.



**Q Then all together.**
A Off the top of my head, over a hundred thousand.
**Q Did you make the payments -- did you make these payments personally or via Diem Investments or Elkmont Construction?**
A Wouldn't be Elkmont Construction. What do you mean payments to?
**Q So the hundred thousand dollars out-of-pocket expenses you've made for any vendor, tradesman, contractor, that has billed you. Did you pay that person as Jeffrey Diem? Did you pay them from Diem Investments, LLC?**
A Probably a little bit of both.
**Q Okay. Do you have records detailing what you would have paid, you know, for lack of a better word, under each hat?**
A It could probably be found.
**Q Okay. I'll just also note for the record, Counsel, to the extent you have any further documentations demonstrating, you know, plaintiff's out-of-pocket expenses, we'd request that you supply same. I don't recall seeing canceled checks. Or maybe, online receipts made via credit card.**
MR. QUISENBERRY: Sure.

Confidential

Q (By Mr. Denby) Okay. So after Travelers made the second payment -- issued the second estimate and supplemental payment that we discussed earlier with respect to Exhibit 7, which was the estimate that has a printed date on the bottom of July 30th, 2020, what happened with the claim after that?
A A lot of things have happened after that. I believe some were around that time. I don't know the exact timeline. Brian was transferred to go work on a hurricane.
Q Okay. And what happened after he was transferred to go on the hurricane?
A I was left with no adjuster and no internal -- anything, really. No point of contact.
Q Did Brian say anything to you in his last communication about when he was leaving to work on the hurricane about your claim?
A There's an email -- in one of the emails, I don't remember which one, I believe it said that the claim was closed, something like that. You'll need to contact Travelers, something or other, to have it reassigned.
Q Okay. And what did you do, you know, at that point upon him being reassigned?
A I called Travelers's main phone number.



Q And did they reassign your claim to someone?
A Not immediately.
Q Why not? Or, do you know what happened?
A It got stuck in claim purgatory. I don't know.
Q Do you remember who you talked to when you requested to be assigned to another adjuster?
A Not off the top of my head. It may be in there, the lady that I talked to.
Q Okay. When you first made contact with the next adjuster, do you remember who that individual was?
A Not off the top of my head.
Q Does the name Jason Mostek ring a bell?
A I was thinking Mostek in my head, but it may have been someone else's supervisor. Yes, it does.
Q And do you recall what Mr. Mostek reached out to you regarding the claim or did you have to contact him?
A I believe I contacted Travelers first. Someone then reached out to me. I don't remember the dates or exact order of operations, but it had been some time that had passed.
Q Okay. And when you first spoke to Mr. Mostek, what did you discuss?



A Pretty much where we were at currently. This is all going from memory here. Where we were currently at. I believe I may have had an additional proposal to send him or some other information, and that he would be in contact with me, something along those lines. I know there's an email somewhere with it.
Q And at that point, what was your position with respect to payments on your claim? Did you feel that there was additional benefits outstanding?
A There were additional benefits outstanding, yes, and just getting the actual claim payments as well as my loss of use was becoming difficult.
Q And how was -- excuse me.
How was it becoming difficult?
A I had checks in the mail to the wrong property more than once.
Q And where were they mailed to?
A The Elm Court property.
Q And how many checks were mailed to the Elm Court property?
A Off the top of my head, if I recall properly, three.
Q Were those checks ever -- was a stop order ever issued on any of those checks?
A At least one of them was.



Q For the one that the stop order was issued on, was the check reissued?
A I believe so.
Q And did you cash it?
A If it was reissued, yes.
Q For the two that the stop orders were not issued on, what did you do with them?
A I believe they cashed.
Q How did you get them?
A What do you mean, how did I get them?
Q How did you obtain the checks? Did you pick them up from the Elm Court property? Did the tenants forward them?
A Yes, I went there, there were piles of mail in there, and Oh, here's a check.
Q Okay. And was Mr. Mostek the one that reissued the check?
A I don't know.
Q Did Mr. Mostek ever perform an inspection of your property?
A I don't believe he did.
Q Did Mr. Mostek ever issue any estimates?
A I don't recall.
Q How long was Mr. Mostek the adjuster for your claim?

A Not long. I don't know exactly how long, but he quit.
**Q Was the claim reassigned after that?**
A Yes.
**Q Do you know why it was reassigned from Mr. Mostek to another adjuster?**
A It was just reassigned.
**Q Do you recall when about that was?**
A No.
**Q Do you know if the adjuster it was reassigned to, what his name was?**
A I believe it was Tyler.
**Q Tyler Horan?**
A No, that's the guy's boss. It was Justin.
**Q Okay. Justin and -- let me state it for --**
A Go ahead. Sorry.
**Q You could say it and I'll spell it for the record?**
A I'm going to guess, "Scherry" or Sicheri.
**Q Sicheri. S-i-c-h-e-r-i. One of those pronunciations.**
A Yeah.
**Q So when the claim was reassigned to Mr. Sicheri, did you reach out to him, or did he contact you?**



A I don't remember exactly how that worked.
**Q And did you speak with Mr. Sicheri about the estimates that had been previously prepared?**
A I believe so.
**Q And do you recall the extent of that conversation?**
A Approximately what date are we talking?
**Q So this would be, I guess, from when Mr. Sicheri was assigned to the claim through September 9, 2020.**
A Remind me when he was assigned, please.
**Q Sure. Hold on a second.**
**So I'll represent that based on my claim notes, it looks like Mr. Sicheri's first written note regarding the claim was on August 18th, 2020.**
A Okay. Somewhere in there, and I can't remember if it was Mostek or Sicheri, I had presented another estimate to properly work through this house, and so I had worked -- tried to work with Justin to -- not Justin. Justin Sicheri?
**Q Yes.**
A Thank you. I'm getting confused. Work with him on reviewing the other estimates that were submitted.
**Q Okay. And you said that you prepared an**



**estimate?**
A Correct.
MR. DENBY: If we could please mark this as Exhibit 12.
(Exhibit 12 marked.)
MR. DENBY: Let the record reflect that Exhibit 12 is a 15-page estimate.
THE WITNESS: (Examines an exhibit.) All right.
**Q (By Mr. Denby) Okay. Do you recognize this document?**
A I do.
**Q How do you recognize it?**
A I created it.
**Q Okay. And when did you create it?**
A June, July, 2020, somewhere in there.
**Q If you look at the first page on the date entered, July 14th, 2020, would that be an accurate reflection of date you created it?**
A It could be somewhere around it. The reason I say about, is because it may have been started on a certain date and worked through and made it to the finalized date, sort of thing.
**Q Okay. Related to that, then, if you look at the bottom of page 2, you'll see that there's the date,**



**August 13th, 2020, printed?**
A Yes.
**Q Do you know what that date signifies?**
A I'd have to check my Xactimate knowledge with it. My understanding is, I believe that's the last time it was exported.
**Q Okay.**
A That's, like, a time stamp sort of thing, but I could be a little off.
**Q And did you submit this estimate to Travelers?**
A Yes.
**Q Who did you submit it to?**
A I don't remember who the first person was to get it.
**Q And what does this estimate -- what is this estimate for?**
A When this was created, this would have been based upon the damage that we could see post-Denver Flood and Fire doing their mitigation, what it would probably take to put the basement back together again properly.
**Q And what was it based upon?**
A So the plumber that had come out and said, Hey, the plumbing needs to be done, X, Y, and Z to make

it proper. And then I had an electrician come in and say, Hey, the electrical needs to be done in this way to be brought up to code again as well. And this also includes for the HVAC being put back in as well. This is all before that ever happened.
**Q Okay. What plumber was this estimate -- what plumber's opinion did you base this estimate on?**
A This was off of Metropolitan Drain Cleaning.
**Q John Napolitan?**
A Yes.
**Q What electrician's opinion did you base this estimate off of?**
A This would have been from SingleTrack Electric.
**Q And who was the HVAC company?**
A Highwater.
**Q Okay. And did you rely on any documents from Metropolitan, SingleTrack, or Highwater when you prepared this estimate?**
A No, that's why there's plumbers and electricians.
**Q Okay. I wasn't sure if you used any of their bids or estimates that they might have prepared in putting this together.**
A I'm sorry. I misunderstood. I thought you


meant, did they give me any supporting documents. No. Did I base this on their documents they submitted to me?
**Q Yes.**
A Yes, I did.
**Q For Metropolitan, which documents would that have been based on?**
A He submitted a bid to me for $14,000. And others.
**Q Was that it?**
A From Highwater -- not Highwater, from John, yes.
**Q Okay. What about SingleTrack?**
A They had given me one based on what they could see at the time. So they had one.
**Q And for the HVAC, was that based on one of the Highwater documents we previously discussed or was there something else?**
A I believe it was this proposal here. No, it's based upon Exhibit 9.
**Q Okay. And just looking at this exhibit, you determined that you believe the replacement cost value was $41,156.79?**
A I'm not going to say I determined the value of it. I'm not an adjuster. I was using the Xactimate


pricing in this pricing area to result in that number.
**Q Okay. So your use of the Xactimate resulted in a replacement cost value of $41,156.79?**
A Correct.
**Q Okay. And how do you go about using the Xactimate values? How does that process work?**
A Xactimate is a well-known -- am I explaining this to you as probably knows about it, or a total layperson?
**Q Explain as if I know nothing.**
A Okay. So Xactimate is a software for the insurance restoration industry. It's a cost estimator. It's just a tool that has averages of prices to do given tasks in a given market. Like you'll see here, you know, Colorado CODEX, and the July year on there in the price list. Based on your price list and tax rate, you can take Xactimate's figures for a given task and create an estimate.
Now, it's only an average. They go out and average to different companies throughout the year in different markets, Hey, what do you charge for this task. Some will be higher and some will be lower. So it's not exactly accurate. This will be your price. This is just the average.
**Q Okay. And did you anticipate preparing**


**another estimate with respect to any other damages or repairs that you were claiming?**
A Subsequent to this?
**Q Yes.**
A When I created this?
**Q So when you created this -- let me rephrase that, actually.**
**When you created this estimate, was it -- did this estimate reflect all of the damages that you were seeking?**
A At this point in time, yes.
**Q Okay. And when did that change?**
A So we had a meeting on-site with John Napolitan, Justin, and Tyler, to which they said, Go ahead and pull the permits, begin. After we began that process, the electrician, although we hadn't pulled permits for it yet, we did the plumbing first.
The electrician went in and realized that the electrical that he saw and created this estimate seen here as line 5 was a much larger scope.
**Q Okay. And did you ever end up preparing a subsequent estimate, then?**
A Yes.
**Q Okay. I'll get to that in one second. I just want to stay on this report while we're here.**

Confidential

And jumping to the -- this would be page 8.
A Okay.
Q What was your basis for determining overhead and profit?
A So there is a standardization within the industry that overhead and profit, if you're going to use a general contractor for this work, that overhead and profit is justified. There is a standard to some degree, although it's really not based on anything, is 10 percent. And 10 percent, there's a lot of debate on whether it's actually justified or not, and who does it, but it's commonly accepted, so we won't protest that.
Q Okay. And at what point did your electrician advise that he disagreed with the scope on line 5?
A It was actually a different electrician.
Q What was the name of that electrician?
A That would have been Marcus at Promise Electric.
Q Why did you obtain a quote from him in addition to SingleTrack?
A SingleTrack never gave me a proposal. The guy disappeared on me. So after not being able to get ahold of the guy at SingleTrack, I went ahead and called Promise Electric.



Q So SingleTrack never provided you any sort of estimate or proposal?
A Nothing other than something verbal. That was about it. I don't remember what it was at that point.
MR. DENBY: Can you please mark this as -- losing track today -- 13.
(Exhibit 13 marked.)
MR. DENBY: Okay. Let the record reflect that Exhibit 13 is a three-page -- it's three pages consisting of an estimate and proposal, page 1; invoice is page 2; and a credit memo is page 3.
Q (By Mr. Denby) Do you recognize that document?
A I do.
Q How do you recognize it?
A SingleTrack Electric provided it to me.
Q And when did they provide it to you?
A Well, this one says, 8/7/2020.
Q And why did they provide it to you?
A So I needed a proposal to figure out how much it would be to redo the basement electrical. Because at that point in time, we thought it was all separate from the upstairs, based on having two electrical boxes. So this was for that purpose.



Q Did SingleTrack ever perform any work for you?
A Just what was on here.
Q And when you say here, could you just --
A Sorry, the Invoice 8889.
MR. DENBY: Okay. Let the record reflect that Mr. Diem was referring to the document Bates labeled SingleTrack 000005.
Q (By Mr. Denby) And looking at that document, Mr. Diem, what work did he perform on that page? On that invoice, rather?
A It doesn't say exactly. They noticed that, you know, according to this, there's some issues with the wiring in both panels, exposed wiring in the basement, electrical not up to code. They did a couple little things, because they had pulled down some wires to check stuff. They made that safe and then put it back, and as it says here, Upon my request is to stop work and reassess.
Q Why did you ask that they stop work?
A Because this 4475 would not be the scope of work anymore. We had to figure out what the new scope of work would be.
Q And I'm sorry. You said 4475?
A $4,475, their initial estimate would no



longer be valid.
Q Okay. And it was no longer valid why?
A Because the scope of work was entirely different than what we had expected.
Q Okay. And why was it different?
A According to this invoice, they found issues of wiring in both panels, illegal and exposed wiring, and electrical is not up to current code.
Q Okay. I think I got it. So essentially, the issues noted -- you're saying that the issues noted in the description on the invoice, SingleTrack, 0005, that arose and essentially made the work listed on the estimate and proposal Bates labeled as Diem 000054, that changed the scope. Did I repeat that accurately?
A I believe so. This estimate here (indicating), estimate number 3498 is what was put into Exhibit 12 based upon what was then current with our knowledge.
Q Okay.
A Does that help?
Q Yes.
A Okay.
Q So I'd like to talk a little bit about what they note on the notations on the invoice, SingleTrack -005.

Confidential

A Invoice -005 -- oh, on the bottom.
Q So it says, Found multiple issues of wiring in both panels, crisscross wires.
Do you know what that is referring to?
A I don't know specifically, no.
Q Were you aware of any issues with the wiring in the panels before the date of loss?
A The only thing I knew about was in my Inspection Report. But I believe that had been fixed or addressed. But I believe -- I'd always been under the impression, I had two panels, one upstairs and one downstairs, hence that's why it was isolated.
MR. DENBY: Can you read back my question? I'm sorry.
THE REPORTER: "Were you aware of any issues with the wiring in the panels before the date of loss?"
MR. DENBY: And the answer too, please.
THE REPORTER: The answer?
MR. DENBY: Yes, please.
THE REPORTER: "The only thing I knew about was in my Inspection Report. But I believe that had been fixed or addressed. But I believe -- I'd always been under the impression, I had two panels, one upstairs and one downstairs, hence that's why it was isolated."



Q (By Mr. Denby) Okay. And what would have been in the Inspection Report that you felt may have been previously fixed?
A It just mentioned something if there were like two feeder wires coming out of one breaker.
Q And as far as you're aware, is that a code-related issue?
A It might be. I'm not sure.
Q Looking at the next line. All the illegal and exposed wiring in basement. Do you know what that refers to?
A I actually don't know.
Q Are you not aware of any illegal wiring that was present in the basement at any time up through the date of loss or the date that SingleTrack would have been in the property?
A Illegal wiring? No.
Q Do you know what he means by illegal wiring?
A He had seen -- I believe what he was referring to, is there an old electrical panel by the dryer that was being used as a junction box. I don't think he liked the way it looked. But there was a -- not a -- almost like a bookshelf pushed right up against it.
It's never been functioning. It's more or



less been abandoned other than having wires running through it since I bought it, so it was never an issue.
Q Okay. It was in that condition since you purchased the property?
A Yes.
Q Did you ever do anything to try and rectify it or fix it prior to the date of loss?
A Never needed to. The only thing that was done, was near it, was where I mentioned that junction box that was installed?
Q Yes.
A That was in that area that I had work done. I had the electrician do it.
Q The next line says that, All electrical is not up to current NEC code. Do you know what that refers to?
A No. I don't know what it says.
Q Do you know what the NEC code is?
A National Electric Code.
Q Did you ever have any discussion with -- well, whoever the person from SingleTrack regarding the code that was not up to NEC code, the code that was not compliant with NEC code?
A He didn't cite any specific code, other than there were many.



Q Did he tell you, rather than -- although he didn't cite the code, did he give you any indication as to what electrical components these noncompliant -- might be noncompliant?
A They said that Denver would require a rewiring perhaps to bring it up to proper code. So where it says, Reassess at a later date, he was supposed to get with his boss and figure out what was to be done and a price to do so.
Q And were any of those code issues that required -- were any of the issues that were purportedly require rewiring caused by the drain waste vent pipe crack?
A Directly?
Q Yes.
A Directly, no. Indirectly, yes.
Q And why do you believe indirectly?
A When I say indirectly, do you remember when I said that wet wall?
Q Yes.
A Okay. So that wall, figuratively, literally, was wet. 2 by 6 wall. All of the main plumbing went through that wall. A substantially amount of electric also went through that wall. And so when the electric -- sorry, when the approval was given to

Confidential

remove and replace that wall, you have to remove and replace a significant amount of plumbing, therefore, electrical also, because you can't have it hanging there. It doesn't work because it's threaded through holes in the wall. That would have triggered, according to the electrician, the rewiring and replumbing.

**Q So was it the plumber's or the electrician's opinion that the -- sorry.**
**So did the plumber advise you that the code needed to be upgraded -- the plumbing needed to be upgraded to meet code?**

A Yeah.

**Q Did the electrician advise you that the electrical system needed to be upgraded to meet code?**

A Yes.

**Q Did you ever independently determine that they cooperated between them for either of those systems?**

A That is independent. They're independent plumbers and electricians.

**Q Using your own knowledge of contracting and not withstanding their opinions, did you think code upgrades were required?**

A So that's beyond my expertise. That's why I



hire a plumber and an electrician.

**Q Did you ever send any email to anyone indicating certain code sections that you thought were applicable or inapplicable?**

A Oh, yes.

**Q So what makes you capable of opining on those opinions in that context, on the code in that context?**

A If I'm told, Hey, this doesn't meet a code, I can go looking for a code that would work for it. But I'm not trained or an expert enough to know off the top of my head, because I see this, I need to have it because of that code. If somebody says, Hey, these codes are off, I do know enough to go back to a current code book and say, This is what I'm seeing. Therefore, this would be applicable.

**Q Okay.**

A Does that help?

**Q Yes.**

A Okay.

**Q Did anyone outside of the plumber or electrician ever advise that code upgrades were required?**

A There was a second electrician who helped.

**Q Who was the second electrician?**

A Promise Electric.



**Q And did he also believe that code upgrades were required?**

A Yes.

**Q Did anyone besides the two electricians or plumber ever advise you that upgrades were required?**

A No.

**Q Did anyone, from, say, building officials from the City and County of Denver say that code upgrades were required?**

A That's not what they do.

**Q But did anyone ever say that?**

A From the City of Denver, no.

**Q And did any local County building officials ever opine that any of the code upgrades were required?**

A No.

**Q Did you ever receive any documents from any Denver or County building officials say that code upgrades were required?**

A No.

**Q Did you ever see any document saying that the property was subject to a code enforcement action?**

A No.

**Q Did anyone ever inspect the property after repairs were done for compliance with any code?**

A I believe that the plumbing one was. It's



not signed off on, but I do believe that was done.

**Q Okay.**

A Any codes at all, ever?

**Q No, just the codes that were -- the electrical and plumbing code.**

A I believe the plumbing one did get a final. I don't know why that one's not in there, but I believe that one did.

MR. DENBY: Okay. I'll again reiterate if you guys have in it the records, please produce that for us.

**Q (By Mr. Denby) And this is going to be Exhibit 14, please.**

(Exhibit 14 marked.)

**Q (By Mr. Denby) Just while we're still kind of talking about SingleTrack and the electric, do you recognize this document?**

A Give me a second.

MR. DENBY: Let me note for the record that this document is -- this is an eight-page document consisting of a one-page email followed by seven photographs.

THE WITNESS: (Examines an exhibit.) Yes. I remember this document.

**Q (By Mr. Denby) Okay. And how are you**

Confidential

**familiar with this document?**
A So Noelle works or worked for SingleTrack Electric. I had been emailing, looking for information, substantiation. That's what this is.
**Q Okay. And what is she telling you in this email?**
A She says, The meters are illegal. No bypass. Both panels had multiple circuits combining the units. All circuits are crisscrossed. 90 percent of the wiring ran illegally and plumbing pipe, concrete, stapled to walls --
THE REPORTER: Slow down, please.
THE WITNESS: Oh, I'm sorry.
A -- stapled on exterior walls, which is illegal as well. There is no GFCI protection throughout. Asterisk.
This is the information my electrician gave me. I'm not sure if I understand it all. Maybe Rob -- he's the owner -- could shed a little more light on this.
**Q (By Mr. Denby) Okay. And when you read that, how do you interpret that?**
A That it's a bit of hearsay between an electrician and a VP who has no knowledge of the home.
**Q Well, aside from the legal conclusion**



**regarding hearsay, looking at the content of that message, what is she saying, essentially, about the -- what is she informing you about the electric? Because that email is directed to you.**
A Sure. There's significant issues with the electrical that need to be addressed in order to make it legal.
**Q And were those issues caused by the cracked drain waste vent pipe?**
A Directly, no. Indirectly, yes.
**Q Were all of these -- did these issues precede or exist prior to the incident with the drain waste vent pipe?**
A I wouldn't have a way of knowing.
**Q Well, if they weren't caused directly by the crack of the drain waste vent pipe, how else would they exist?**
A Well, they may have been existing, but I would have no way of knowing it.
**Q Okay. And when you purchased the property, no one ever performed an inspection to see if the electrical was up to code?**
A Whatever is in my Inspection Report is what I have.
**Q Okay. And I'm just going to ask a few**



**questions --**
A Sure.
**Q -- about these pictures --**
A Yeah, yeah.
**Q -- to the extent you know.**
A Uh-huh.
**Q If you could take a look at picture number 1. Do you know what that is?**
A Junction box.
**Q Is the pipe that -- does that PVC pipe have anything to do with the replacement for the DWV or is that something different?**
A That is the newly replaced DWV, yes.
**Q Okay. And looking at that junction box, do you know if that's the condition that it was in when you purchased prior to the date of loss?**
A It is not.
**Q What happened to it to make it look like that?**
A This was -- junction box was previous to this electrician showing up, was on the ceiling with a cover on it.
**Q Okay. And how did it get off the ceiling?**
A When they started work, based upon this here (indicating), this is one of the first things they dug



into, started dissecting, seeing where things were at. So they took it off the ceiling. You can actually see the screw sticking out of it and then they noticed some things in this particular J box, left it, and took the photo.
**Q Okay. Is there anything else that that photo depicts or sees regarding the junction box? Is there anything you can discern about it?**
A No.
**Q Just looking at picture 2, do you know what that is?**
A Yes.
**Q What is it?**
A As to top left corner is approximately the laundry room. This is when they are starting to do the excavation for the new underground waste. The 220 armored line that you see come running through the photo there, that was running to the kitchen.
Unbeknownst to us, that was underneath the bathtub at that time that had to come out in order to access the plumbing. So we had no idea what was back there until after this bathtub was removed.
**Q Okay. If we go to picture 3, please. What does that depict?**
A These were -- you remember when I said, there

Confidential

was an abandoned electrical box there? They pulled the covers off, then pulled the wires out to kind of inspect and this is what was there. I knew those panels were there because they had the covers on them, but because they had been abandoned, I'm not an electrician, I had no reason to open them, plus the cabinet, bookcase sort of thing, was in front of them.

**Q Okay. Do you know why they opened them?**

A Because they were tasked with figuring out the electrical issues, so they followed the wires and opened things up.

**Q Okay. But the junction, was the junction box functioning at that time? Because you used the term abandoned?**

A I'm sorry. They were abandoned for use -- let me rephrase. They were previously, I think, fuse boxes, predating circuit boxes. So they were abandoned as fuse boxes and looking to be used now as junction boxes.

**Q Okay. Go to picture 5. Would those be the same boxes in picture 3 but before they removed them or is that something different?**

A I'm sorry. What are you looking at?

**Q Next page, picture 5?**

A Thank you.



**Q Would that be the same --**

A No.

**Q -- junction box depicted in 3?**

A They are not.

**Q Okay. Is that a different location?**

A These are circuit breaker panels. These are the active circuit breaker panels that she was talking about.

**Q And do you know why those are depicted in the picture?**

A Yes. Her letter stated that they have multiple circuits combining units. Combining both units.

**Q Do you know what she means by that?**

A When I bought the house, my understanding was one panel's for the basement, one panel's for the upstairs. Apparently, they're sharing. I didn't know that.

**Q Okay. And just briefly, if you could look at the next page, picture 6. If you could describe what that depicts, please?**

A This is looking at the kitchen. This is the armored cable and the 220 volt that runs from the utility room, it runs underneath the bathtub and was hidden by the bathtub through to the kitchen and that



was inside a cabinet at the time. And that cabinet was removed as well.

**Q And do you know who performed that work?**

A Which work?

**Q The removal of the cabinet?**

A Denver Flood and Fire.

**Q And finally, if you could just quickly look at the last picture. Please tell me what that depicts?**

A Number 7?

**Q Yes.**

A I think it's the same as number 2.

**Q Could you repeat for the record what that is?**

A I'm reasonably confident number 7 is the same as number 2.

**Q And just again, number 2 is? What's number 2 again?**

A Oh, what is this of?

**Q Yes.**

A This is where you can see the armored conduit and 220 running from the laundry underneath where the bathtub was into the kitchen.

**Q If Mr. Sicheri was assigned to your claim, do you know if a -- was an additional estimate ever issued?**



A I believe so.

**Q Just letting you know, I'll show you this will be marked as Exhibit 15. This is an email, a two-page email followed by an estimate that has a completed date of August 28th, 2020 on it.**

(Exhibit 15 marked.)

**Q (By Mr. Denby) If you could just take a minute and peruse through that, please.**

A Uh-huh. (Examines an exhibit.)

MR. DENBY: Off the record?

MR. QUISENBERRY: Yes.

(Off the record.)

MR. DENBY: We can go back on.

**Q (By Mr. Denby) Do you recognize the document that has been marked as Exhibit --**

A Yes.

**Q How do you recognize it?**

A Justin sent this back to me.

**Q Do you recall when you received it?**

A When I received it, it says September 14th on here.

**Q Actually, just going to clarify. That's the date that it says the email was archived, September 14th, 2021.**

A Oh, excuse me.

Confidential

Q No problem. That's why I wanted to see if you had any independent recollection of when you received it.
A I'm sorry. No, I don't. It doesn't say on there.
Q If look down, you note that your email to him below that was sent on September 11th, 2020?
A Yes.
Q Okay. And if you'd take a look at Mr. Sicheri's email to you. He notes that the estimate has been submitted in response to your -- supplemental items and that payment was issued for items 1 and 3, but a payment was not issued for item 2.
Do you disagree with the position that Travelers took in that?
A Can I go back and look at this? The other exhibits or not?
Q I'd prefer if you could just try to answer it just off the email and what he said in there.
A In that case, from my recollection, no, I do not agree with him.
Q And why not?
A I don't believe he had fully taken into account my full estimate scope I had given him and was cherry-picking what he wanted to and then just added it



back to his estimate, which is attached here.
Q Okay. Why do you believe -- do you believe that item 2 should have been included in his estimate?
A I don't know what item 2 was.
Q I believe, if you take a look at your email, page 2 of your email, that would be Travelers 890. At the top, it lists three items.
A I'm sorry. 890. Okay.
Yes. What I'm thinking about, is he referring to this or an actual line in a previous estimate. I believe he's referring to my email back. Payment was issued in accordance with the estimate from line item 1 and 3. And then he's saying 2 was not included because it was not directly damaged and would not be covered under ordinance of law.
Q And you disagree with that?
A Yes.
Q And why do you disagree with that?
A Because we'd had a whole discussion at the property about how these would be covered items and to go ahead and proceed with the pulling of permits and the reconstruction.
Q And looking at the estimate, if you can turn to page 10, please.
A Uh-huh. Yes.



Q So this notes at this point that the Travelers's position was that the replacement cost value was $19,981.18. Do you recall if you ever received any supplemental payments in response to this estimate?
A I don't recall. I've received many payments.
Q Okay. And do you ever recall receiving -- shortly after receiving this estimate, do you recall ever receiving a letter from Travelers providing you with their position on coverage?
A After this email?
Q Yes.
A I -- I don't recall, no.
Q Okay.
MR. DENBY: Can you please just mark this as 16.
(Exhibit 16 marked.)
Q (By Mr. Denby) Could you just take a look at that document.
A (Examines an exhibit.) Okay.
Q Do you recognize this document?
A Not well, no.
Q Have you seen it before?
A Likely.
Q Do you recall how you may have seen it?



A I probably had this mailed to me.
Q And do you recall what the basis of the point of this letter is?
A This particular one, I think, was a partial denial and explanation of noncoverage. I believe this was sent -- and my dates could be a little off. But I believe this was sent a little bit after we had submitted for permits. And I had talked to Frank and gotten that whole thing rolling.
Q Okay. And do you understand the position articulated by Travelers in the letter?
A Not well, no.
Q What don't you understand?
A I do not understand why, after going through this level of -- I should not be asking you this as if you are from Travelers.
My -- I do not understand quite why this was sent if we had already gone through the whole process of approvals and inspections and go ahead with permits and things like that.
Q Okay. Aside from that not understanding why it was sent, do you understand the substance of the letter itself?
A Give me a moment.
Q Sure.

Confidential

A (Examines an exhibit.) Yes. I understand it.
**Q And why -- what is the basis of Travelers's position?**
A They were saying it was not covered now because of water escaped and faulty workmanship and that we have in here, quoting policy language. For exclusions.
**Q Do you disagree with that position?**
A Yes.
**Q Why do you disagree with it?**
A So -- give me a moment while I go through it.
We had talked about -- okay, so you have small rust or corrosion. That was never brought up. The only thing of rot that was brought up during an on-site inspection adjusting was entirely by the plumber of a bottom plate of a 2 by 6 wall. Totally understandable. We never had any discussion as to any other rotting materials and coverage still appeared to be getting extended.
Then you also have the code upgrade, and we had met on-site to which we showed to them, Hey, when you remove this wall, all this electrical and all this plumbing has to come out, which they both understood and said, Go ahead and pull the permits for it. To



come back and say, Hey, this is now not covered, came as a total surprise.
**Q Does this letter specifically state that the code items are denied?**
A (Examines an exhibit.) I'm not aware. I don't see it in here, saying that they are denied.
**Q Travelers -- do you recall at any point after seeing this letter, that Travelers had requested information from you, from the City of Denver, or the County, showing that there was an code enforcement action or that -- something driving the code upgrades?**
A They requested before sending this.
**Q When did they request it?**
A We had met on-site, Tyler, Justin, myself, and John, the plumber, to show them everything that was going on. And they said go ahead and pull the permits.
We went ahead and pulled the permit first for plumbing, because plumbing goes first, electrical can snake around plumbing, things like that. And Justin came back with an email and he said, We need a red flag or red tag inspection, neither of which actually exists. He was looking for the City to come in and say exactly what wouldn't be acceptable by code. Cities don't do that.
So because of my relationship with Mario,



former business partner, he works for Home Builders, he got me in contact with Frank Gonzales who is the chief plumbing inspector for the City of Denver. I called him. He said it is not something they will do. However, on a slow day, he will send one of his people out to do this sort of inspection, all verbal, nothing written, give Justin my phone number and we'll set it up. I set up Justin with the phone number and the email, told him what happened, and not too long later, I got the denial.
**Q Did any inspection ever occur by Mr. Gonzales or anyone on the staff?**
A Never happened.
**Q So although Mr. Gonzales stated that he -- that they don't provide these red tag inspections -- withdrawn.**
**Did you ever personally meet with Mr. Gonzales?**
A No.
**Q Spoke to him over the phone?**
A No. That one time, yes.
**Q When did you speak with him?**
A Whatever the approximate date was in that email. I don't know.
**Q Do you remember about how long that**



**conversation was?**
A Brief.
**Q Did you discuss the plumbing permit with him at all?**
A I don't recall if I got into specifics. I just knew I needed to get this done to make Justin happy, Can we make this happen, sort of thing.
**Q Did Mr. Gonzales ask what your basis of believing what the code upgrades were?**
A No, not that I recall.
**Q Was there any discussion about -- was there any -- was there any other discussion regarding the code with Mr. Gonzales aside from his alleged statement that they do not provide a red tag inspection sheet?**
A As to specific codes or anything?
**Q Yes.**
A Not that I recall.
**Q Did you ever ask him if he put anything in writing regarding the code upgrades that your plumber and electrician say were required?**
A I did not.
**Q Why not?**
A I'm not going to argue with a chief plumbing inspector of Denver when he's offering me a favor.
**Q And what did you tell Travelers -- did you**

Confidential

**inform Travelers of your conversation with**
**Mr. Gonzales?**
A Via email.
**Q What did you tell them?**
A I told Justin, to paraphrase, that this is not normal, however, I did get ahold of the chief inspector in Denver and he offered to do this. I gave him his phone number, offered to set it up, and it never happened.
**Q And those discussions regarding the code or ordinances related documents continue after the issuance of this September 9th letter?**
A I believe I pushed it a little bit. I don't recall how hard, though.
**Q Did you ever speak with an insurance agent regarding the code-related dispute?**
A If you're referring to me talking to Brian, yes, I brought in my agent. I don't remember exactly what the conversation was, though.
**Q Okay. Do you recall Brian ever -- if Brian ever provided you any opinion as to what -- as to Travelers' claim handling?**
A He gave me his opinion.
**Q What was it?**
A It wasn't something I agreed with.



**Q Why didn't you agree with it? Well, first of all, what was his opinion?**
A It appeared to me that he was stating Travelers won't do anything wrong. They'll pay you what they owe you, and that's about it. That's a paraphrase.
**Q And why did you disagree with that?**
A I'm aware of how agents partially have their income, which is based upon loss ratios and keeping them to a minimum.
**Q So you think he was lying to you?**
A I don't think he was lying. I think he was giving his own opinion.
**Q Do you think that opinion was skewed by the fact that he was compensated by -- he might receive compensation from an insurance company?**
A I don't think it was skewed so much as he wasn't a party to the claim nor -- that I am aware of, nor was he necessarily aware of how involved it had become. So I think mostly from an outsider's perspective, he may have been brought into something that was bigger and more complex than he was aware of.
**Q Okay. Actually, before we get to the emails with Mr. Richardson, since I have these here, if we could mark this, please. I believe this is 17.**



(Exhibit 17 marked.)
MR. DENBY: Let the record reflect that Exhibit 17 is a nine-page document, consisting of emails Bates labeled as Diem 001061 through Diem 001069.
THE WITNESS: (Examines an exhibit.) Okay.
**Q (By Mr. Denby) So just going back to our conversation earlier, we were discussing the letter issued by Travelers dated September 9th. You had indicated that Justin may have reached out to you prior to that. If you could just take a look at there email. Do you recognize this email?**
A Yes.
**Q How do you recognize it?**
A It's a combination of emails between me and Justin, John, it looks like Brian's on here as well.
**Q Okay. And if you could just take a look at the first page. Is that the email that you were referring to by Justin whereby he requested that you have the City inspect and provide documentation on the code enforcement upgrades?**
A Give me a second, please.
(Examines an exhibit.) It's a combination of emails, actually. That first one, and it goes into the next page also.



**Q And on the next page, what part are you referring to?**
A So you have the email from September 2nd, 8:48 a.m., John asking Justin for clarification, and then Justin providing clarification to that further on.
**Q Okay. That actually looks like -- looks like, actually, if you look at page 2, the email at the bottom is the first email from Justin. John responded to that. And then Justin responded on page 1.**
A I think you're correct, yes, as I'm -- backwards.
**Q No, no problem. There's other ones that goes the other way.**
A Yes, because this goes on to talk about permitting as well.
**Q Okay.**
A So I guess if you would look at these emails. Wednesday, September 2nd, on page 2. And then again on page 3 at the bottom of 2:15. John again sends an email saying that he needs the City enforced code information for the affected areas.
What happened after that?
A So we had had that on-site inspection to which they said, Go ahead and pull permits. We understand what's going on. John pulled permits, sent

Confidential

Page 161

them to them as requested, and then got this back. So this is where things really come off the rails.

**Q Okay. And when you say came off the rails, what was your response to this?**

A I was angry.

**Q And did you -- what was your next course of action?**

A I believe I looked at my policy language, because I saw this email here which says, This is not my rule or any internal company policy. I talked to -- I emailed Brian here about this where I'm saying, herein, short of hiring a PA, any suggestions? This is where Brian didn't really do a whole lot. That's where -- yeah, and I was quite unhappy at this point. Did what was asked.

Got the phone number of Frank Gonzales because this sort of thing doesn't actually exist, which he confirmed. I tried to play ball, and then I get met with my -- whatever Exhibit 16 is called.

**Q Okay. And did you ever speak with Justin -- following this letter, did you ever have a verbal conversation with Justin where you explained your disagreement about his position?**

A I don't recall.

**Q Did you ever inform him that Mr. Gonzales**

Page 162

**said that the red tag inspection sheet does not exist?**

A My email here on September 9th.

**Q And what happened after that?**

A Not long after, I got this denial letter.

**Q What was your response to the denial?**

A Anger.

**Q And you believe that that letter denied coverage for the code-related upgrades in addition to the wear and tear and rot-related issues that was noted?**

A We didn't have any discussion about the rot-related items other than the bottom plate of the 2 by 6.

**Q Okay. I'm saying it's your position that that letter denies coverage for anything based on the code as well?**

A All I'm stating is things came to a complete grinding standstill after this.

**Q All right. So while this was going on, as I think I mentioned before, you had some discussions with Brian Richardson, your agent, regarding this, correct?**

A Brief, but yes.

**Q And you believe -- and you were not happy, you testified, with Mr. Richardson's opinion on the claim?**

Page 163

A I wasn't happy with it, no.

**Q Okay. And why weren't you happy with it?**

A As an agent that wrote the policy, I know from experience, agents do have some pull and some sway with how policies can be handled. I mean, they're writing the things. So I was hoping for a little bit more involvement on his end.

MR. DENBY: Gotcha. I'm going to show you, if we could mark this as Exhibit 18, please.

(Exhibit 18 marked.)

**Q (By Mr. Denby) Please just take a look at that document for me.**

MR. DENBY: I'll note for the record that this is a seven-page document, Bates labeled as Foundations 37, to Foundations 43.

A (Examines an exhibit.) Okay.

**Q (By Mr. Denby) Do you recognize this document?**

A Yes.

**Q How do you recognize it?**

A It's an email discussion between me and Brian.

**Q Okay. I'm going to draw your attention to the bottom of page 1. Looking at the second paragraph, which is just two sentences. Did Mr. Richardson inform**

Page 164

**you this Travelers -- he believed that Travelers was not in the wrong in their position with respect to the documentation of code?**

A He says, Happy to guide you through this quickly, but they are not in the wrong.

**Q So that was his position to you?**

A His opinion.

**Q And does he also say that the policy language supersedes anything he may have said?**

A It does.

**Q Okay. And I'll just draw your attention to your email in response to that. Did you also state in response that you understand what's written in the policy is what goes?**

A Yeah. Hold on a second. Do I actually say that? Give me a second.

**Q I may have interpreted -- edited the policy part --**

A I say here, I fully understand what's written is what goes. I'm not saying what's written in the policy. However, I do find that he focuses his damages only on 9a.3.

**Q Okay. But with respect to the prior sentence, you were referring to the policy there?**

A It's been over two years. I don't quite

remember exactly what I was referring.
Q Was there anything else you would have been referring to?
A It's been over two years.
Q So you don't know?
A No.
MR. DENBY: Okay. If we could mark this as, I believe, 19, please.
(Exhibit 19 marked.)
Q (By Mr. Denby) Please just take a look at this email for me.
A (Examines an exhibit.) Okay.
Q Okay. So in looking at this email, does this email also reflect that Mr. Richardson advises you that Travelers told him they would not be paying for wear and tear and since the code upgrades relate to the property, they don't cover, they aren't paying for those items either?
A That's the first sentence, correct.
Q And did you further advise that he was -- he advises you that Travelers isn't going to pay for upgrades just because your plumber says they're required by code. That needs to be stated in writing by the City? That would be in the bottom paragraph?
A Yes, I'm just reading it through.



Q Okay.
A That's what he wrote. It's different from our meeting, though.
Q But that's what Mr. Richardson expressed to you --
A Yes. Yes.
Q Okay. Did he also express that Travelers wouldn't pay for damages to the pipe unless the damage was covered by a covered peril?
A Where are you reading that?
Q Sentence or two down from where we just were.
A (Examines an exhibit.) In black?
Q Yes.
A I'm sorry. Where are you looking?
Q Right after the --
A Oh, I'm sorry.
Q So if the only -- sorry. The sentence right before that. I also know they aren't?
A I also know they aren't going to pay for the pipes unless the damage to the pipe was caused by a covered peril. Period.
Q Did you ever have any verbal conversation with Mr. Richardson about the subjects detailed in this email?
A I don't remember. No. I'm not sure.



Q Do you ever recall expressing to him that you were disappointed or disagreed with his position?
A I mean, I have this here in red, so other than that, which is written, I don't remember.
Q Did you ever express any trepidation as to his position based on his role as an agent?
A Based on his role as an agent?
Q Yes.
A Other than what's written here, I don't recall ever questioning his role as an agent.
Q Okay. And I'll just also -- he further noted that no coverage extensions would apply because the root cause is not covered; is that correct?
A Where are you reading that?
Q The only black sentence in the middle of the top paragraph on page 2.
A Oh, page 2. I'm sorry.
(Examines an exhibit.) I see that.
Q And do you have any reason to disagree with that?
A I mean, I wrote in here, Why are we not looking into 9a.3?
Q And why do you believe they should have looked in 9a.3?
A I don't have it in front of me, but my



recollection it's the section that deals with code upgrades as it's related to actual -- well, he wrote here -- if it was because of the covered peril or if it was proximate to it, that sort of thing.
Q Okay. And why do you believe that applies?
A So my nonlawyer interpretation was, from what I had read, and I'm just going to go into this one here. Where did I see it?
That section had something to do with, if you have a covered loss and you have something that needs to be done, code upgrade, even though it wasn't damaged due to the covered loss, it would be still be covered. Which is what we were talking about with the electrical and plumbing, because of what was in that wall that needed to be removed.
Q Okay. If you could also go quickly to page 3, please. This is just a general question that pertains to testimony before.
You had noted here, Given my background, I am more then capable of writing my own work scope and I have access to the industry tool Xactimate.
Just going off your prior testimony, is that based on just your experience, estimating experience, your experience at Paul Davis, just kind of everything we've talked about?

A All of the above goes together. I mean, you have myself, who knows this part of the industry and owns the house versus an adjuster who has spent not a very long time at the house, how much information can they glean, especially doing virtual?

**Q That being said, though, all of the electrical and -- you were unaware of any of the electrical or plumbing coding issues prior to the date of loss, correct?**

A Correct. They weren't made apparent to me.

**Q Okay.**

MR. DENBY: If you could please mark this as 20.

(Exhibit 20 marked.)

THE WITNESS: (Examines an exhibit.)

**Q (By Mr. Denby) Have you reviewed the document?**

A Yeah, the first couple of pages. The rest is part of another chain.

**Q Do you recognize this document?**

A A bit, yes.

**Q How do you recognize it?**

A It's some correspondence between Brian and myself, still.

**Q Okay. And I'd just like to draw your attention to the email on the first page, the emails on the first page dated September 16th. Do you see that -- do you recall that you asked Brian if they aren't going to pay for -- sorry.**

**Do you recall if Brian asked you, If you know that they aren't going to pay for the pipes, what do you want him to do for you?**



A Never heard back, If you know they aren't going to pay for the pipes themselves, what do -- I never said they were going to pay for the pipes or not pay for the pipes. That's what we were trying to clarify.

**Q So you're saying, I guess, is that statement by him a misstatement?**

A I'm not sure quite what he was saying, but I was never under the impression, that, no, they're not going to pay for the pipe.

**Q Okay.**

A We were still in limbo with that.

**Q If you go just up to your response there.**

A 2/20. Okay.

**Q Pretty much all you said was, you asked him to hold off on taking issue and following up with Travelers to see how they would respond? Why did you ask him not to take any further action?**



A Because I was already dealing with Justin on getting the previous scope done that was sent to Justin and to him. I didn't want to get too many things going at once and blow up too many areas of attention. I was trying to get Justin's attention on one thing at a time, and let's focus and see if we can work our way through this here.

**Q Okay. Did you ask Mr. Richardson to push Travelers to reconsider their coverage decision?**

A I don't recall asking him that.

**Q If you could also just take a look at page 2. Please just review Mr. Richardson's email dated September 10th.**

A (Examines an exhibit.) Okay.

**Q In that email, does Mr. Richardson essentially -- do you disagree with Mr. Richardson's position in that email?**

A Yes.

**Q Why?**

A So I understand what he'd be saying if this was due to wear and tear. The DWV that was replaced, I paid for, because that was what was damaged as the cause of loss. However, the pipes that needed to come out were not being removed due to wear and tear. Neither was the, necessarily, the electrical. They were being removed because the wall was approved to get removed and rebuilt.



In order to do that, you trigger the code upgrade to have to replace all those items. This has nothing to do with wear and tear. Everybody keeps trying to say that it is.

**Q Is there a reason that your response to him didn't indicate that and only said that it's missing line items and lacks detail?**

A Just a second. 2:41. My email back to him asks -- this is the 16th. I think at this point, it's just frustration. Just not going back and reading, not going back and -- I was interpreting this as not taking the time to understand it.

**Q Okay. So was it fair to say that since you had used the word frustrated, that you were getting done with these emails at that point with Mr. Richardson?**

A I didn't necessarily see help coming my way, so I was kind of exiting from that.

**Q So there was really no reason to fully flesh out and argue your position back. You were just kind of go, letting it fizzle out.**

A Correct.

**Q Okay. So in between the issuance of**

Confidential

Travelers letter dated -- sorry. Let me rephrase that.
After Travelers issued the letter dated September 9th, did you ever receive any -- did you ever receive any additional estimates from Travelers?
A Which letter are you referring to?
Q The letter dated September 9th, the explanation, the partial denial?
A Okay. So I got that in my head. And I'm sorry. What did you ask me after that?
Q So after that, did you ever have any follow-up with Travelers regarding any additional supplemental to estimates?
A I think there may have been some.
Q Did you recall ever receive any additional estimates?
A Not off the top of my head. Is something coming?
Q So I'm now going to show you, which I guess would be Exhibit 20.
THE REPORTER: 21.
MR. DENBY: 21. Thank you.
(Exhibit 21 marked.)
THE WITNESS: (Examines an exhibit.)
MR. DENBY: Off the record.
(Recess from 2:54 p.m. to 3:07 p.m.)



Q (By Mr. Denby) All right. So we need two exhibits here for this. If you could please mark -- this is 22?
THE REPORTER: Yes.
(Off the record.)
Q (By Mr. Denby) So we're staying on Exhibit 21 right now. And I'm going to also introduce and marking Exhibit 22, because I'll ask you some questions about this as soon as we get through 21. They go hand in hand.
(Exhibit 22 marked.)
THE WITNESS: (Examines an exhibit.) Okay.
Q (By Mr. Denby) So first, I'd like to draw your attention to Exhibit 21, at the bottom of page 1.
Do you recall receiving that email from Justin Sicheri?
A Yes.
Q And what did that email say?
A For the most part, he would not be paying for my loss of use on the upper unit to winterize it, and that he was going to discontinue the loss of use that he owed to me.
Q And do you know why Travelers would not pay you for the loss of use of the property?
A Based on what he said or --



Q Based on what he said.
A He said they don't owe for it. He said that that should not have been done.
Q And at any point in the claim process, did you decide that you weren't going to proceed with either mitigation or repairs due to the disagreement with Travelers regarding scope?
A Mitigation was completed.
Q So after mitigation was completed, did you advise Travelers that you weren't going to proceed with any repairs due to the disagreement regarding scope and the potential of out-of-pocket expenses?
A We did repairs that we could, and we reached a point where we could proceed with the electrical or plumbing because that was the logical next step in the repairs process. And that's where our stalemate is.
Q And why didn't you continue this repair of the electrical or plumbing regardless?
A Because I don't have tens of thousands of dollars lying around to do it.
May I rephrase that?
I don't have tens of thousands of dollars lying around that I choose to use for that.
Q And did you ever have to winterize the upper unit?



A No.
Q Why not?
A The water heater had been drained because the furnaces were out, the water heater was disconnected. There was no water in the system, anyway.
Q And what does winterize mean?
A Commonly, you would drain the water out of a low point, turn off the water, and then fill any drains with an antifreeze solution.
Q So is that essentially the inside version of what people do with their hoses in the winter?
A What you do with your hoses in the winter is a portion of what you would do, yeah.
Q Yes, I guess there's no stuff going out.
A Yeah.
Q Gotcha. So now, in Justin's email, did you disagree with why he said the fair rental value, the loss of use, was not being provided?
A Did I disagree with it? Yes.
Q And what about his position did you disagree with?
A He states here that the time frame is based on a standard timing to mitigate and make repairs for such a loss which is three months and he added an additional one month.

Confidential

Q And what do you disagree with?
A My policy, as I understood it, said 12 months from, I believe, date of loss, I'm not entirely sure, or X number of dollars. It didn't give a stipulation as to number of months based upon an adjuster's thinking on how long it should take to do anything.
Q Did you ever have any discussions about how long the repairs would take?
A Yes, well -- go ahead.
Q Sorry. Let me withdraw that question.
Prior to dealing with Justin, did you ever advise anyone at Travelers that the repairs would only take three or four months?
A Never that -- never that I recall.
Q Do you recall anyone from Travelers asking you how long the anticipated repairs would take?
A Not off the top of my head, no.
Q And just to clarify, the anticipated repairs following the completion of the mitigation.
A Say that again? I'm sorry.
Q Just to clarify, that would be the completion of repairs following mitigation.
A Correct. I don't remember being asked that nor do I remember saying, Here's how long I think it would take.



Q Okay. And with respect to the coverage for the FRV or under the policy or the loss of use of the premises, you testified that it was your understanding that you either got a certain amount of months or a certain dollar -- a certain dollar value coverage; is that correct?
A I'm sorry. What is FRV?
Q That's fair rental value.
A Yes. My understanding was, based on what I was reading in my policy, that I would get either X number of months or until you maxed out your coverage for it.
Q Do you know how much your loss of use or FRV is for?
A I believe it's somewhere between 23- and 26,000, somewhere in there.
Q And do you know how much the policy limit was for FRV?
A That's what I'm saying. I believe the policy is between 23- and 26,000.
Q Okay.
A What was your question? I'll try to answer that.
Q Could you read back my question, please?
(Off the record.)



THE REPORTER: "And do you know how much the policy limit was for FRV?"
Q (By Mr. Denby) And did you answer that question?
A That's when I said, I believe it was 23- or 26,000.
Q And do you believe that your claim falls within the policy limits?
A At this point now?
Q The money that you're seeking right now. Do you believe that it's within -- the money that you're seeking for loss of use, do you believe it's within the policy limits?
A As of today?
Q Yes.
A No, it exceeds it.
Q Okay. Do you believe that you're entitled to the amount that exceeds the policy limits?
A Yes.
Q Why?
A Why?
Q Yes.
A The thing has been sitting without being able to be used or rented for two years now.
Q But if the policy only provides a certain



amount of coverage, why do you think you should get more than that if it hasn't been used?
A There was a good faith effort on mine to come to some sort of reasonable, in any opinion, resolution of it that was delayed and denied and not considered.
Q And did anything -- following the receipt of the email in Exhibit 21, did you advise Travelers that you believe the determination regarding your loss of use was incorrect?
A Did I go back to Justin and tell him that?
Q Yes.
A I don't recall.
Q Was there any reason you might not have?
A I'm getting frustrated at this point.
Q So you just didn't want to deal with him?
A We were getting nowhere. I'm providing leases, Colorado Warranty Habitability Act. I'm complying with everything I'm being asked for and I'm being met with arbitrary requests and No, we won't do it. We're just getting nowhere.
Q So you were frustrated.
A Yes.
Q Okay. And I'd just like to just quickly draw your attention to Exhibit 22. That was just the estimate that we just marked.

Confidential

A Okay.
**Q If you could please -- do you recall receiving this document?**
A Give me a moment, please.
**Q Sure. Feel free to review it as you need.**
A (Examines an exhibit.) I somewhat remember this document, yes, this estimate.
**Q And do you know what this additional estimate was issued for?**
A So something that stood out with Brian's email is still on it. I believe this was Justin's attempt at trying to go through my estimate that I'd been submitting since -- I can't go back through that. But for many months now, 8/13, it's on top and I can see it, and try to get through it, but he's still not addressing my estimates that I sent to him. You see mostly this just says, Validation, Validation, Bid Item, Validation.
**Q Was there anything in this that he did address or provide additional reimbursement for?**
A I'd have to go through there in more detail and compare them to the others.
**Q Do you recall receiving additional payments as indicated -- well, any additional following, with this estimate?**



A It's possible that this one sent an updated submission for payment with the last loss of use and then whatever else he deemed was necessary with this. I don't remember how much or when it was sent out.
**Q Okay. And do you have any dispute as to the amount that Travelers had paid -- sorry, let me rephrase it.**
**Did you dispute that Travelers. . .**
**Do you dispute that Travelers has issued payments as reflected by the estimates?**
A Can you rephrase it?
**Q So the dollar values that are detailed in these various estimates, do you dispute that Travelers has paid the actual amounts in here?**
A May I paraphrase that to make sure I'm understanding?
**Q Yes.**
A So what you're saying, the amount that Travelers says they paid me, have I received those and do I dispute not receiving those?
**Q Exactly.**
A My understanding is that what they have said they paid me, they paid me.
**Q Okay. Well, just to follow up on the line of questioning before, so we can lock this in right here.**



**We had talked about the leases and I think we established that the prior lease was for 1,795 and subsequent to being able to re-let the upper unit, it increased to 1895?**
A Yes.
**Q Just -- no. If you could just take a look at page 4 of Exhibit 21. Second paragraph, line 2.**
A Yes.
**Q Just confirm that that's also what you stated to the adjuster?**
A Yes. However, when I stated 1895 versus actually leasing it for 1895, this is based on what we listed for -- that was proving we could get it.
**Q Okay. And ultimately, though, when that unit became re-let, that was the rate at which it was re-let.**
A Correct.
**Q Okay.**
A I was basically showing him that we are trying to do something here.
**Q Okay. So also just going to show you, we premark -- if we could mark this as 22, please.**
THE REPORTER: 23.
MR. DENBY: Yes, sorry.
(Exhibit 23 marked.)



THE WITNESS: (Examines an exhibit.) Okay.
**Q (By Mr. Denby) Do you recall receiving that letter?**
A Not really, but I'm sure I did.
**Q Do you recognize it at all?**
A Yeah.
**Q Is it addressed to you?**
A Yeah.
**Q And having reviewed it, do you have any recollection of receiving this letter?**
A Not really, but I'm sure it was.
**Q And do you recall if you ever followed up with Travelers about this letter?**
A I don't remember if I did or didn't.
**Q And the letter indicates that, If anything changes during this loss of use period, request that you notify Travelers.**
**Did anything change during that time period?**
A Define "change."
**Q With respect to the units that you were claiming the loss of use for?**
A I had been very clear the entire time of when tenants had moved out; when I couldn't re-rent things; when furnaces were pulled; when I had loss of use. They were updated on the entire process.

Confidential

Q And was the upstairs tenant moved out by this date?
A This date is the 22nd of --
Q 2020.
A I'd have to go back and check the leases and move-out, because she was on a month-to-month.
Q Okay. And subsequent to receiving that letter, do you recall ever receiving an additional estimate from Travelers?
A Versus the exhibit you just sent me?
Q Yes.
A Another one?
Q Another one.
A It's certainly possible at this point.
Q Okay. Well, just -- I will introduce this as Exhibit. . .
THE REPORTER: 24.
MR. DENBY: Thank you.
(Exhibit 24 marked.)
THE WITNESS: (Examines an exhibit.)
Q (By Mr. Denby) So have you taken a look at it?
A Yes.
Q Do you recall ever receiving that document?
A I'm sure I did. They all start looking



pretty similar.
Q Okay. And for this line of questioning, I will allow you to take a look at the last estimate we reviewed?
A Thank you.
Q Just for going through the updates, if you have side by side of the -- at least the page 11 -- well, page 11 of the current one, the Summary of Dwellings listing all the payments. If you have any trouble recalling the estimate --
A Recalling the estimate.
Q -- you could, at least, you know, help yourself that way.
A Yeah. (Examines exhibits.) Okay.
Q Okay. So if you look at the Exhibit 24, which I just handed you versus the prior estimate, would you agree that Exhibit 24 is for -- is an increased claim amount?
A Yes.
Q And do you recall why that amount was increased?
A No, I'd have to go through these one line at a time.
Q Okay. Do you recall ever making the claim for the replacement of medicine cabinets?



A Yes, I think I saw a note in one of the earlier ones.
Q Okay. Do you believe that the medicine cabinets should have been covered as a part of the loss?
A You know, I don't remember quite what it was at the time. I believe that they fell apart, basically, when it was pulled off the wall.
Q Okay.
A And I think we just said, We won't replace it. And I don't remember quite what happened, but I believe there was a brief discussion about it somewhere.
Q Okay. And do you also remember making a claim to have some painting done with respect to the door slabs or windows or door frames?
A Which room?
Q Just generally at that time.
A Can't answer without knowing which room. I can -- if you tell me which page I can tell you which room.
Q Looks like kitchen and the -- I think this is the family room?
A Okay. Which page?
Q I'm looking at page 9 and 10 because that's



where the line items are.
A So line 9 is standard room at the bottom. If you go to 10, we see --
Q Is that a subroom?
A Yes, but on this one, I've got -- if I go to page 10, I've got a hall and a kitchen here. Are we looking at 24 or 23, by the way?
Q I'm looking at 24. You don't need to look at 23 right now.
A I'm not.
Q Okay. Yes, 23, I was just showing just for the amounts?
A Yeah, I got that. On kitchen, I don't see paint door slab. Page 10, hallway, don't see that either.
Q Do you know what it would mean by seal/prime and paint surface area twice, line 15?
A Yes.
Q What does that refer to?
A That means prime -- in this case, it would be prime the walls and the ceiling, so you get to prime the walls, two coats of paint, and then two colors, be the wall and the ceiling.
Q Okay. For the kitchen, if you just look at, for the previous page, I think it's line 111.

Confidential

A Yes.
Q The seal/prime and paint the walls twice?
A Uh-huh.
Q How is that related to the loss?
A The kitchen was affected. In the photos we looked at from the electrician, you can see where the wall was pulled out between the kitchen and -- they were adjacent to each other, the bathroom and kitchen. That wall was approved to be removed due to suspected microbial growth. Therefore, you have to paint the kitchen to make it look, you know, uniform.
MR. DENBY: Let's go off the record for one second.
(Recess from 3:30 p.m. to 3:35 p.m.)
MR. DENBY: On the record.
Q (By Mr. Denby) Now that we've gone through the estimates that Travelers has prepared, do you think that anything -- do you believe that any of Travelers's estimates -- I'm sorry, any of Travelers's inspections of your property were in any way inadequate or improper?
A Yes.
Q Which inspection, and how?
A I don't think each inspection was necessarily improper. They could do whatever they needed to do to



make what they thought was a proper estimate. The estimate they provided based upon their inspections was inadequate.
MR. DENBY: I'm sorry. Could you read that back?
THE REPORTER: "Now that we've gone through the estimates that Travelers has prepared, do you think that anything -- do you believe that any of Travelers's estimates -- I'm sorry, any of Travelers's inspections of your property were in any way inadequate or improper?"
Q (By Mr. Denby) Okay. And why do you believe that the estimate was inadequate?
A It didn't actually encompass the scope of work it would take to take the home back to its preloss condition.
Q And what was insufficient about the scope in your opinion?
A We didn't account for the code upgrade of the water and the electrical.
Q Anything else?
A There may have been more. That is what -- the primary focus has been because everything else kind of revolved around that.
Q I believe you said that John Napolitan was



the first person that you contacted -- well, first contractor, I should say, that you contacted with respect to the claim?
A Yes.
Q How many times did John inspect the property?
A Define "inspection."
Q Visual inspection, any sort of testing of any plumbing devices, going there, being on-site to write up an estimate?
A In what time frame?
Q At any time between when you reported the loss and July 30th, 2021.
A I mean, he did the work-out, so he was in there regularly.
Q Okay. And if you could take me through what John did -- when he first came to the property, what did he do?
A When the claim was filed?
Q Yes.
A He replaced the broken section of the DWV.
Q And when did he do that?
A Not long after the loss. I don't know the exact date.
MR. DENBY: If you could please mark this as 25.



(Off the record.)
(Exhibit 25 marked.)
Q (By Mr. Denby) If you could please just take a look at what has been marked Exhibit 25.
MR. DENBY: I'll note for the record that this is an 11-page document consisting of invoices from Metropolitan Drain Cleaning, LLC, with nonconsecutive Bates numbers.
A (Examines an exhibit.) Okay.
Q (By Mr. Denby) So looking at the first page, would that reflect the initial work that was done at the property as a result of the loss?
A Yes.
Q And can you explain what that work -- what the description of work means?
A Line by line or in general?
Q So I'll draw your attention to -- when he says, Removed deteriorated section with lengthy enormous cracks, that's referring to the DWV pipe?
A Yes.
Q And the 3-inch PVC, that would reflect the width of the pipe that he replaced it with?
A Yes. You mean diameter, by the way, not length.
Q Okay. Sorry. I said width. But I think

Confidential

you're still right, anyway. Diameter is probably more appropriate.
A Yeah.
Q And then on page 2.
A Okay.
Q He notes, Lavatory and toilet -- Bruce removed lavatory and toilet. What floor did that occur on?
A This is the basement. This is the other side of that wall.
Q Okay. And that would be the same for the bathtub removal?
A Yes.
Q And did the lavatory, toilet, or bathtub have any sludge as a result of the -- did they get contaminated or dirty in any way as a result of the incident?
A Not that I recall, because I didn't look at them, either.
Q Do you know why they needed to be removed?
A Yes. When we had opened the back side of that wall, remember, we said that it had to come out because there was suspected mold growth in it, so that was attached to that wall. When you removed that wall, these items had to be pulled out.



Q Okay. If you could now jump to the third page, which is an estimate dated 7/20.
A Yeah.
Q Again, he says, the second line, Code upgrade for work to be performed July and August 2020?
A Yes.
Q What is he referring to?
A This is the estimate scope of work that I had requested from him to put together to submit to Travelers for the code upgrade.
Q Okay. So based on this estimate, John -- Metropolitan Drain Cleaning was saying that the code upgrade for the plumbing cost $14,100?
A Correct. This is not all code upgrade. It's everything to finish it off and be compliant with code.
Q Okay. And if you look at -- this is under the Description, it talks about installing new PEX and some copper including connecting the two-tank system and install new main shutoff and pressure reducer.
Do you know what that's referring to?
A Give me a second, if you could. This is under Important, correct?
Q Above Important.
A Oh, thank you.



(Examines an exhibit.) Yes, so new PEXs. That's the plastic-type pipe that was commonly used to replace the preexisting galvanized that would have to come out. Main shutoff and pressure reducer.
I don't recall exactly why he needed to do that. Were those the two questions to be answered?
Q Yes, essentially, what that's referring to. What type of work he's --
A Oh, I'm sorry. The main shutoff is at the -- in coming from the City and the pressure reducer is, I believe, required by Denver to make sure the pressure is not too high for the house.
Q And did that have -- the note -- the notation about the pressure reducer. Is that related to the previous pressure issues that the plumbing system experienced?
A No, because if anything, the pressure tested at 90. It should be around 57.
Q So what is the significance of that?
A The pressure was high, if anything, coming into the house.
Q What was the pressure prior to the loss -- when John previously serviced the plumbing system before the date of loss, were the issues that it was too low instead of too high?



A The tenant complained that it was too low.
Q Oh, okay.
A I don't know if it was actually too low or not. I'd have to go through the documents. But this indicates that the pressure was higher than it should be.
Q Okay. Now looking to the section Important?
A Uh-huh.
Q He says, Almost all of both supply and DWV is out of code and/or undersized.
Did he ever explain to you why it's out of code?
A Didn't necessarily need to. I could understand by looking at it what he was showing me.
Q And could you explain what he showed you or how you understood that it was out of code?
A The existing -- some of the existing waste was too small in diameter. It was current, maybe, when it was installed, who knows when, but it's no longer current. And then the supply side was a mixture of galvanized and copper, and you can't tie the two together and you can't -- it's not common now to still use galvanized or anything like that. So they don't -- they don't play well.
Q Okay. And looking down, that kind of

continues, I believe, into the next section, then. Is that what he's referring to when he discusses IPC Section 605?
A Yes, IPC is International Plumbing Code.
Q And do you understand what he's referring to there with respect to the galvanized pipe?
A Correct. He's saying that you can use it to replace existing, but not for repair. If you are replacing an entire thing, you might be able to use it, but you can't repair those sections which is galvanized, and there was enough of it there that it would basically be a whole replacement versus a repair.
Q Okay. So if it's -- just make sure I have that straight. If it was a whole replacement, galvanized is okay. If it's a partial, then you can't use galvanized? Is that --
A I'm not sure where the delineation is, but galvanized is no longer commonly used, by my understanding, with plumbers. So most everything now is PEXs or sometimes copper.
Q Okay. And he's saying -- was it Mr. Napolitan's position that the whole plumbing system needed to be upgraded?
A Yes.
Q So if the whole plumbing system needed to be



upgraded why wouldn't galvanized pipe be permissible?
A Because finding a plumber that knows how to use it. Number one, I don't know if Denver allows it, but number two, the costs to install it are probably far higher than current PEXs anyway, if they know how to use it.
Q Okay. But there's nothing, essentially, aside from economic factors, there's nothing from prohibiting it from being used, if the entire thing is to be replaced, correct?
A I can't answer that. I don't know. I'd have to actually talk to an inspector and see what is permissible within Denver or not.
Q Okay. I'm just going to show you an email.
MR. DENBY: If we can mark this, please. I think we're at 26 now.
(Exhibit 26 marked.)
THE WITNESS: (Examines an exhibit.) Okay.
Q (By Mr. Denby) Do you recognize that email?
A Yes.
Q How do you recognize it?
A I wrote it.
Q So looking at your email on the bottom dated July 24th at 6:35 p.m.
A Yes.



Q You have a comment regarding a conversation with the Denver inspector.
A Uh-huh.
Q They're saying galvy is permissible. However, it cannot be -- I think that's supposed to be "reused."
A Yes, it is.
Q What did you mean by that?
A So it appeared that I called the Denver inspector to ask him, this may have been Frank, I'm not sure, to ask if galvanized pipe is permissible. It sounds like, yes, you could put in new, and this is back two years, so it sounds like you could use galvanized pipe. But you can't reuse it. So I can't remove galvanized pipe and replace it with the exact same pipe. That would not be permissible.
Q When you say replace with the exact same pipe, do you mean putting the removed pipe back in as long as it is still functional or sub -- like a like kind of pipe --
A No, the exact same pipe --
Q Okay. I just want to be sure --
A What I removed cannot be replaced with the exactly same pipe. That's what I'm saying here.
Q So if you took out 10 feet of galvanized pipe



and you cut out 2 feet of it, you couldn't put that back in. But if you had 10 feet of new galvanized pipe, you could theoretically use that?
A Correct.
Q Okay. And then I just note, in the second sentence, you reference that you attached a number of codes which throw wrenches into the waste lines? Do you remember what you were referring to?
A Yeah. So remember when I said I knew enough to find the codes once it was brought up to me that something was not up to code? I was helping John with, Hey, these codes are what are not up to code that we can frame it up to the adjuster.
Because he knew it was not up to code, but stating this code or that code or of whatever, I gave him a little help with that.
Q Okay.
A Because I had the code book.
Q Well, now did you go about giving him the code section?
A I had the code book.
Q And what experience do you have interpreting the code book?
A I took a codes class in college and I use them a little bit in estimating here and there to know

Confidential

if they're applicable to some degree or not.
Q What codes class did you take in college?
A Codes? At Michigan State. I couldn't tell you the class number or anything like that.
Q Was that in the context of your major, or was it an elective --
A Construction management, yeah.
Q But you don't have any sort of certifications or anything with respect to code? Interpreting code?
A No, that's why I'm giving it to John. You're the plumber. You see if it's applicable to you.
Q And do you recall what code -- what code sections you referred John to?
A Off the top of my head, no.
Q Do you recall having a discussion with John about your code suggestion?
A A discussion? We had a phone conversation, yeah.
Q And what was his position on, you know, your opinion regarding the code permissions you said were applicable?
A Well, mostly, it was he gave me, Here's what I think is wrong. Like say, for example, it was undersized plumbing. I could go back and look. Okay, code says you have to have this as your minimum say,



DWV or something like that. He says, Okay, this is the diameter that was there, now I can verify, yes, undersized.
Q Okay. And is there anything in the code that actually, I guess, helps with application of these sections so that as you're reviewing them, you can understand how they would be applied to your claim?
A What do you mean?
Q So say you read a particular code section. Short of just general background knowledge as to what it's talking about, how do you understand how to actually apply it or if it's relevant?
A Well, as far as the plumbing code and knowing what I know about that and working with a plumber, I know what needs to be done. That's how we apply it.
Q So if you look at John's estimate, third page, Bates labeled 244 at the bottom, do you know what IPC Section 605 is?
A No, not without looking it up.
Q Okay. And finally, do you know what it means by Venting is salvageable?
A Hold on a second.
(Examines an exhibit.) Yes. So we didn't want to go too nuts and just rip everything out. Everything that could be salvageable, we wanted to



leave. So drain waste vent is a vent and it's drain waste. So anything that's liquid and below, we replaced for continuity. Anything that only held air and above from the upstairs up through the roofs, we wouldn't have to start making roof -- or penetration through that. We left that alone.
Q Okay. And if you skip to the next two pages, please. There's page 1 and 2, 955 and 956. That's an invoice?
A Yeah.
Q What is that invoice for?
A Got the wrong address on it. I can tell you that. So it should say the correct address. It says Beech Court and it should say Elm Court on there if that's referring to.
Q Oh I'm sorry -- what's he referring to?
A Oh, I'm sorry. It's got all that prep time, phone conversations, working with -- pulling permits, time to go get permits, things like that. Permit fees. Got the permit on there. Wednesday, he dug out the underground piping so that we could remove that. Got rid of -- looks like some pipes. Broke up some concrete.
Couldn't tie -- he was always looking for where can we tie onto existing to minimize the overall



expense of this thing, so where he could boot new to existing underground. So he was trying to find that, and then they were removing cast iron that was underground and had some material costs in here.
Q Okay. And then if you just jump to page 957. I'm going to go through these kind of generally. There's about one, two, three, four, five -- there's six invoices from Metropolitan Drain ranging from January 7th, 2021, to July 30th of 2021.
A Okay.
Q So first, had Mr. Napolitan performed any work for you since July 30th, 2021?
A Yes. He was back there. He did his angle running of the main line scope and cleaning it out.
Q Okay. Not related to the claim, though?
A Not that I'm aware of.
Q Okay. And just starting with the invoice dated January 7th, 2021. This one notes a couple of days of work. What was he doing?
A Which day?
Q Starting on -- I see what you're saying. It doesn't gave a date at the top. Yes, withdrawn.
I'll draw your attention, please, to page 960. It's the third from last.
A Okay.



SAMPLE

Q On Thursday, 4/15/21, there's a notation, The pipe had radial crack.
A Okay. Sorry. Continue. I was just looking.
Q Pipe had radial crack. Replaces with PVC. What is that referring to?
A Hold on a second.
(Examines an exhibit.) So underground, under the kitchen, you had cast iron underground that ran towards the bathroom. They were always trying to test existing parts of pipe to see whatever we could save, we would save. So each time they had a section they thought was good, they'd put a test ball in it, pressurize, and find that this isn't going to work.
That's not going to work, because when you have a pressure test for permitting, you have to put a pressure ball in the stack and fill the whole thing with water, so it can't leak at all. So they're doing that ahead of time to see what can happen. So that may not have been leaking prior to it, necessarily.
We don't know for sure. It was leaking as they were testing it. Therefore, it had been replaced per new code.
Q Okay. So there's no way to discern whether that's a preexisting crack or something they may have caused in the course of testing?



A There's no way to know. It's underground.
Q Okay. And in looking at these estimates, these invoices, any of the work detailed in there upgrades from the system that you previously had in place?
A Define upgrade.
Q So there's some notes about, especially if you look further into the invoices, second to last page -- well, the last page, second to last page, regarding the showers and the -- where is it -- new shower faucet valve, new shower faucet seats and springs, installing new, customer-supplied, two-handled faucet, finish upstairs.
So was any of the stuff that was installed, like, an upgrade or. . .
A Let me go through this. So the box for the laundry was improperly vented. Since they were working on all that plumbing surrounding and touching the laundry, they couldn't leave it unvented. It wouldn't pass inspection.
As to the shower faucet valves, that was in -- that was in the basement. So the idea there was to, again, save some costs. So when he turned things on again, it was leaking. I said, Hey -- because you can't have leaks in the plumbing system, right? They



can't approve it.
So I said, Would you go ahead and replace the shower seats and springs which is cheaper than replacing the whole thing. That didn't work, so we had to replace the entire shower system to keep it from leaking.
Q Okay.
MR. DENBY: Please mark this as 26. 27.
(Exhibit 27 marked.)
MR. DENBY: Let the record reflect that Exhibit 27 is a five-page document Bates labeled Diem 1536 through Diem 1540.
THE WITNESS: (Examines an exhibit.) All right.
Q (By Mr. Denby) So this is -- I'm going to direct your attention to the second page. That's an invoice dated October 8th, 2018 -- 2019.
A Uh-huh.
Q The bottom line says, Lines are galvy and need to be swapped out. Do you recall having a conversation with Mr. Napolitan at that time about any issues with the material the piping was made out of and whether any code upgrade was required?
A Yeah. So this goes back to that tenant complaining about the low water pressure. This is when



he went back in and inspected, and, Okay, we knew we had -- improving the flow. And then saying, Okay, your lines are galvanized. Eventually, they need to be swapped out.
Q And did he ever discuss the code implications of galvanized pipe versus nongalvanized pipe and when you could and couldn't use it?
A Not at that time, because it was existing.
Q Well, if it was -- is galvanized -- withdrawn.
If you could also just draw your attention to the second to last page. That's a document labeled 1539.
A Okay.
Q So with respect to this note, again, he says, I recommend that the lavatory walls and kitchen get opened and the galvanized pipe be removed to be replaced by PEX or copper. This should be done when there are not tenants living there. This type of project can often turn into a bigger job.
A Uh-huh.
Q So it seems clear on October 27, 2019, that the plumbing system required substantial upgrades. Is that correct?
A Doesn't say within what time frame, though.

Confidential

He's making me aware, yes, it should be done. He's not saying when it needs to be done. It still functions.
Q And would that system be in compliance with code?
A At this point in time?
Q Yes.
A If you were to -- so that's a tricky question. Would it be. . . at the current time, no, it wouldn't have been in compliance with the code.
Q Okay. So essentially, there were issues with the plumbing being code-compliant prior to the date of loss.
A Potentially, yes.
Q Okay. And then if you just look at the last page, please.
A Uh-huh.
Q This would be the -- depending on how you characterize the address, the fourth paragraph, starting with Water Pressure?
A Oh, okay. Yeah.
Q He notes that, The water pressure was in the mid-90s. I believe before you testified that the tenant had complained the water pressure was too low, correct?
A Correct.



Q Is this invoice reflecting repairs to the -- reflecting repairs that he made to the water pressure, or is this a diagnostic test that he just found high water pressure?
A Just diagnostic.
Q Okay. So I guess although the tenant complained of low water pressure, this invoice would reflect that on November 4th, 2019, John Napolitan actually found out that the plumbing had high water pressure.
A Correct. And he indicated that he cleaned the aerators and flushed the stops the previous trip.
Q What was the effect of that?
A It would have opened up and allowed more water pressure to come through.
Q Okay.
MR. DENBY: Please mark this as 28.
(Exhibit 28 marked.)
(Off the record.)
THE WITNESS: (Examines an exhibit.)
Q (By Mr. Denby) Do you recognize that document?
A Yeah.
Q How do you recognize it?
A I believe this is the one from Promise



Electric, although it doesn't say on here.
Q I'll represent that I took it from your production, that it was based on Bates labels that you guys cited regarding documents from Promise in your expert disclosures.
A Okay.
Q So I apologize if you said this: Is this the estimate that you state that Promise prepared with respect to the electrical code upgrades?
A Correct.
Q Okay. Did they ever perform this work?
A No.
Q Has anyone ever performed any electrical code upgrade work?
A Not code upgrade work, no.
Q What electrical work was performed?
A Just whatever -- what time frame, by the way?
Q What electrical work would have been performed subsequent to the date of loss, so July 9th, 2020, to, let's use, choose February 2021, when you retained Bellator.
A I had an exterior light fixture swapped out on the basement unit, and I had a switch and a light fixture replaced in a basement bedroom.
Q Were either of those related to the loss?



A No.
Q Were any bills submitted to Travelers for those?
A Not that I'm aware of.
Q And did you ask Promise Electric to perform -- to prepare an estimate of the electrical upgrade required for the entire house?
A Yes.
Q And did you accompany them while they inspected the house?
A Mostly.
Q Did you provide any opinions of what needs to be upgraded?
A A bit, yes.
Q What did you tell them?
A I let Promise Electric know what Travis had told me so he could be aware of it and went in there, trying to figure out what needed to be done, if anything.
Q And I guess, just looking at their estimate, on page 3 of the living room, it notes that there is a smoke/carbon detector.
A Uh-huh.
Q How is that related to the loss?
A So my understanding is, current Denver code

Confidential

requires hard-wired smoke/carbon monoxide detectors in various locations. I don't have any of that wiring there. I have CO/smoke detectors but they are all battery operated. That is not permissible, so when you do a rewire, you have to add the circuitry for that.
**Q Okay. So that's something that would have existed prior to the date of loss?**
A What existed?
**Q The carbon monoxide detectors in the house not being hard-wired?**
A Not hard-wired. They would have existed, correct.
**Q So you had the battery ones prior to the date of loss?**
A Correct. They'd be compliant with that.
**Q Okay. And is that the same for smoke detectors?**
A Yeah, they're usually the same unit at this point.
**Q Oh, okay. And then for the exterior, on page 4, you note that there are new surface meters and subpanels?**
A Hold on. Let me get there. Okay.
**Q How is that related to the loss?**
A So my understanding is, the -- as it was


explained to me, the existing panels that are there are over a stairway. And they are not allowed to be over a stairway. So they have to be removed somewhere appropriate. With that, you would trigger new subpanels and new meters.
**Q Okay. That's also something that existed prior to the date of loss?**
A Where they exist now? Yeah.
**Q Yes. And just, I'll draw your attention to page 5. It references, The removal of insulation from the attic before work could start?**
A Yes.
**Q What was done in the attic with respect to the electrical work or what was proposed to be done in the attic with respect to the electrical work such that that was included there?**
A So it has old blown insulation in there, and in order to rewire the property, they have to go into the attic to drop new wires. They can't do that with the existing insulation there. It has to be removed, so they have clear access all the way around, and nobody falls through a ceiling or anything like that, and they can drop the wires in.
**Q Okay. So that's something that existed in the house prior to the date of loss?**


A Correct.
**Q I'll also just note. He notes that, All receptacles will be the standard type and not decora. What is that?**
A Where are you looking?
**Q Page 5 of the estimate and the fourth line.**
A Oh, no idea.
**Q Would you think that that had anything to do with electrical work, based on the description?**
A I mean, it says switches. Switches are electrical.
**Q I'm talking about the fourth one, All receptacles will be standard.**
A They're standard. I'm not sure what's decora.
**Q What's a receptacle?**
A (Indicating).
**Q Just wanted to make sure it wasn't referring to a trash receptacle --**
A Oh, I get it. Your typical outlet.
**Q Okay. Just like to quickly talk about the scope of work performed by Denver Flood and Fire.**
MR. DENBY: 29, please.
(Exhibit 29 marked.)
THE WITNESS: (Examines an exhibit.) Okay.


**Q (By Mr. Denby) So the first document says that it's, A revised estimate. Have you seen that before?**
A This document (indicating)? Hold on a second.
(Examines an exhibit.) I believe this is the second version that has -- I'd have to go through this. I believe this is the second version that has -- I'd have to go through this. I believe this is the second version that Joey submitted to Brian.
**Q And is this for the mitigation efforts?**
A Correct.
**Q And do you recall what was updated about this estimate than the first estimate that was submitted to Travelers?**
A Do you want me to go through this and double-check or --
**Q No, if you remember offhand.**
A Offhand, I believe this includes the ceiling drywall in the lower bathroom and the kitchen drywall removal of the cabinets on that wall, that sort of items.
**Q And is it your -- was this -- was this estimate paid in full?**
A Yes.

Confidential

**Q And after Mr. Hermann created this estimate, do you recall if he ever created another revised estimate?**
A No, not off the top of my head.
**Q Before I jump through that, do you agree with the amounts detailed in this section by Mr. Hermann?**
A I didn't agree or disagree. This was his scope to work out with Travelers.
**Q Okay. Did you think -- well, do you think it should have been higher?**
A I didn't really get into it all.
MR. DENBY: 30, please.
(Exhibit 30 marked.)
THE WITNESS: (Examines an exhibit.) Okay. All right.
**Q (By Mr. Denby) Okay. So this is just an additional estimate that Mr. Hermann prepared? Looks like from the printed date or at least the export date on the bottom, it was done about two weeks after the prior estimate.**
A Yeah, I see what you're saying.
**Q Do you know why this estimate was prepared?**
A No.
**Q Do you ever recall having any conversations with Mr. Hermann about this estimate?**



A I'd have to go through this estimate and compare it to Exhibit 29. Because the amounts are different also.
**Q Do you remember, I guess, just generally with respect to mitigation efforts, were there continuing conversations with Travelers for supplements or additional work that was uncovered as Mr. Hermann's work continued?**
A There were some that he had with me that I knew about. If there were side conversations, I'm not aware of them.
**Q Okay. And what were those conversations with you?**
A Mostly, he said to me, Hey, if he found something in the ceiling, we had to do additional asbestos testing and that we realized that the kitchen wall was affected also.
**Q Okay. Could that be one of the bases for the additional estimate?**
A Oh, yes. I've just got to figure out dates and stuff.
**Q And did you work with Mr. Hermann in determining what were the necessary mitigation efforts?**
A We talked about it, yeah.
**Q Did you ever provide any insider opinion**



**based on your prior experience running the Paul Davis as to what you believed should be done?**
A Probably.
**Q Did Mr. Hermann listen to your advice or did he pretty much control the show?**
A We've always had a good working relationship, so it wasn't a real discernible, You should do this and you should do that. We just had a conversation.
**Q Okay. And do you know if -- do you believe that this estimate was paid?**
A These are not two separate estimates. The final amount was paid.
**Q Okay. So do you believe that, I guess, the supplemental amounts added to the mitigation per this estimate was paid?**
A Whatever he invoiced me for, I paid him.
**Q Okay. Do you believe it was paid by Travelers or do you believe that Travelers owes any money with respect for the mitigation work?**
A I think Travelers paid me to pay Joe, and I don't think there was any left for mitigation.
**Q Okay.**
MR. DENBY: 31, please.
(Exhibit 31 marked.)
A Okay.



**Q (By Mr. Denby) All right. So Exhibit 31, if you'd just take a look at that. The main page I'd like you to focus your attention on is Exhibit A, Diem 10, but obviously, you can feel free to review anything that you'd like.**
A All right.
**Q Do you recognize this document?**
A Yes.
**Q How do you recognize it?**
A I made it.
**Q You prepared this document?**
A Yes.
**Q And what was the purpose of preparing it?**
A So we had the ongoing restoration work, and at the same time as I had talked about earlier, there were going to be other items done during the reconstruction work to bring the rest of it up to date so I could rewrite all of it nicely and whatnot. This were the other items that were going to be done by -- yes, Perez Carpentry.
**Q And when you say other items, what would you encompass in that description?**
A It says here, Remove existing carpet from the bedroom and family room. Vinyl flooring. Some wall panels. Remove and replace the furnace door. Remove

Page 221

existing baseboards. Installed, it should be four window sills, not seals. Three blinds. This part was related to the claim. Demo this section -- I'm sorry, it was not.

Hold on. Demo wall section framing and door -- oh, we were going to -- I had a closet. They were going to increase the size of the closet. Frame new door opening. That was for that. Replace door hardware at the linen closet. Frame a 2 by 6 wall. That's the one that's for the claim, that wet wall, that's to reframe that. Replace the bathroom door and clean up.

**Q Okay. And with respect to the framing wall, what is your understanding as to Travelers's position for replacement of damage to the framing wall?**

A Just the wall?

**Q Yes.**

A So based on my conversation with Justin and Tyler, my understanding was that the wall was not a problem. The bottom plate that was rotted out, they likely wouldn't cover and they were going to go check on that.

**Q Okay. And looking at Exhibit A, this Statement of Work, would you agree that some of this work is related to some things unrelated to the cracked DWV pipe?**

A Unrelated to it? Yes.

**Q Have you sought reimbursement for all the work listed on here?**

A To Travelers?

**Q Yes.**

A Just the ones that pertained to the project.

**Q Okay. Do you know when -- well, when you submitted the claim, do you know if it was itemized and informed Travelers that although this contract was submitted you were only seeking payment for a portion of services in here?**

A Could you rephrase that?

**Q Yes. So there's, you know, a ton of work listed on this Exhibit A for $2,290. So if you submitted this contract to Travelers, did you at any point say to Travelers, Hey, this Exhibit A includes work that is unrelated to the loss. The only things that I'm seeking compensation for with respect to the claim is the framing of the 2 by 6 wall.**

A I don't recall submitting this to Travelers.

**Q Okay. Was the work actually ever performed by Perez?**

A Some of it. Not all of it.

**Q What was performed and not performed to the**

Page 222

Page 223

**extent you can remember?**

A May I borrow that pen?

MR. QUISENBERRY: Yes.

A Remove existing carpet from bedroom, family room, that was done. Remove existing vinyl floor and wall panels from kitchen, that was done. Remove existing entry door, that was done. Furnace door, not done. Existing baseboard, done. Window, or it should say sills, was done. Window blinds, I don't remember. Demo wall such to frame a new door opening in bedroom, that was done. Frame new door for the bypass door, that was done. Replace door hardware for the linen closet, that was done. Framing the wall in the bathroom, that was done. Replace bathroom door, not done. Cleanup, not done.

**Q Okay. And I'll just draw your attention down to Mechanical at the very bottom?**

A Yes.

**Q Was that -- Install cheap paneling luan. What does that refer to?**

A So it was originally drywall on that side of the wall. This is just a less expensive paneling type that goes over it without, like, the mud and the expense of doing all of that and the labor to get things done faster.

Page 224

**Q Okay. Do you recall how much you ended up paying Perez for the work that they performed?**

A Off the top of my head, no.

**Q Okay.**

MR. DENBY: Counsel, similar to before, if there's any documents reflecting whatever was paid to on Perez. I don't think I saw anything in there. If you think I've missed it, you know, please just refer me to the page that's the oversight.

MR. QUISENBERRY: Okay.

**Q (By Mr. Denby) All right. And how did you find out about Perez?**

A He was somebody that used to work for Mario. Mario Mendoza.

**Q So did Mario refer you to him or did you just know him already?**

A Mario referred me to him.

MR. DENBY: Okay. If you could please just mark both of these, I guess, as Exhibit 32 and 33. The first one is this one for Precision Homes and the other one is a proposal to distinguish them.

(Exhibits 32 and 33 marked.)

THE WITNESS: Okay.

**Q (By Mr. Denby) Okay. So I'm going to briefly go through these, starting with the document**

marked Exhibit 32.
What is Precision Homes?
A They're a cabinet/countertop fabricator off of Federal.
Q And why did you retain them?
A I was going to have new cabinets made and they were going to do the cabinets/vanity/countertops, that stuff.
Q Did they ever perform work for you?
A I have the cabinets. They're in the garage, but nothing was ever installed.
Q And why were you having the cabinets redone?
A So the cabinet on the wet wall was approved to get removed. I was going to have it replaced, because it was destroyed during the mitigation process.
Q Did that require them, I guess, changing the other cabinets as well?
A So there was one cabinet there initially. I was going to add another one for the wall and just pay for it.
Q Okay. Have you submitted any bills from Precision Homes to Travelers for reimbursement?
A Not that I recall.
Q Okay. And just draw your attention now to the other document. This is a combination of, I guess,



payment receipts and proposal approvals from Precision.
A Uh-huh.
Q So just very quickly, was it necessary to -- well, I'm sorry.
So what is this estimate for? I'm sorry. What is this proposal for?
A 33 here (indicating)?
Q Yes.
A Looks like we have a countertop remnant. Some new countertops. Cutting out a kitchen sink and template that. And there's a sink bowl here for a vanity as well.
Q Was that damaged because of the cracked DWV pipe?
A So the bathroom vanity, I can't remember, it may have been. It may not have been. Either way, I was going to replace it and just pay for it. And the kitchen, remember, we just talked about the cabinets were damaged and replaced, so I was going to replace the cabinets with them and just pay the difference in cost.
Q Okay. And with respect to the first proposal here, which is Bates labeled Diem 62 to 64 and says that they required payment in the amount of 979.93.
Did you submit this proposal to Travelers for



reimbursement?
A I don't believe I did.
Q Okay. Going to the next page, the next proposal in the document. So just, was the work detailed on Diem 966 to 970 ever performed?
A Let me get there.
I have possession of the cabinetry. I'm not sure if the hardware is there. I haven't opened the boxes. They're still in the garage.
Q When you say you have possession of the cabinetry, you're referring to the material?
A Yes.
Q Okay. Have you paid this bill?
A Yeah.
Q And did you submit this to Travelers for reimbursement?
A Not that I recall.
Q And looking, just finally, at Diem 971. The last five pages. What is this proposal for?
A This is for the vanity in the bathroom.
Q Was this work performed?
A Installation, no. I think I have it in the garage also.
Q Okay. Have you paid this bill?
A Yeah.



Q And did you submit it to Travelers for reimbursement?
A Not that I recall.
MR. DENBY: 34.
(Exhibit 34 marked.)
MR. DENBY: Since I'm going to roll into it, might as well give you 35 and 36. See if you can have them in advance more.
(Exhibits 35 and 36 marked.)
THE WITNESS: (Examines an exhibit.) All right.
Q (By Mr. Denby) Okay. So starting with the document marked Exhibit 34, Diem 1532 to Diem 1533. Who is 5280 Projects, LLC?
A Handyman I know.
Q Who is the handyman?
A Trevor Bana.
Q Have you worked with 5280 Projects before?
A Yeah.
Q Was that in context with your work at Paul Davis?
A No.
Q How have you worked with 5280 Projects before?
A How? He's done just random odds and ends

Confidential

around my house and the current house.
Q Okay. So he's just a handyman?
A Yeah.
Q Okay. And what is the purpose of this invoice?
A This one was to install gutter extensions or downspout extensions on the downspouts around my house.
Q Did it have anything to do with the loss we're discussing today?
A No, not at all.
Q Do you know if this was submitted to Travelers for payment?
A No, I wouldn't.
Q So if it was, it's something that shouldn't be reimbursed?
A Yes.
Q Jumping down now to 35 -- well, 35 -- getting ahead of myself. Pretty much the same questions. What was this invoice for?
A 35 was just to regrout some of the upstairs bathtubs so I could re-rent.
Q Okay. Do you consider that related to the loss?
A No.
Q Do you know if this was submitted to



Travelers?
A No, I don't believe I did.
Q If it was, should it be reimbursed?
A No.
Q And finally, jumping to number 36. What was this invoice for?
A This is a light on the back of the house.
Q And would you say that's --
A Same questions, that I would? No.
Q Not related to the date of loss?
A No.
Q Wouldn't submit it for reimbursement?
A No.
MR. DENBY: 37, please.
(Exhibit 37 marked.)
Q (By Mr. Denby) Please take a moment to just review that.
A (Examines an exhibit.) Yes.
Q I believe you testified briefly about K&D Development's involvement with the claim before, but can you just re-advise, who is K&D Development?
A They're a contractor that I know. I worked with them before.
Q And did you work with them through your prior job at Paul Davis?



A The owner, yes. It was not this company, though.
Q And who is the owner of K&D?
A Kurtis, K-u-r-t-i-s. And then his wife is Damaris, D-a-m-a-r-i-s?
Q (By Mr. Denby) Yes.
A Thank you.
Q And looks like the last name is R-e-e-m-e.
A Yes.
Q And why did you contact K&D Development with respect to this claim?
A So after the plumbing was done, there were a number of items in the upstairs that needed to be patched and repainted, holes in the drywall. So that and plus some other items.
Q And did they perform the work?
A Yes.
Q Do you believe that all this work is related to the loss?
A No.
Q Do you believe that any of it is related to the loss?
A Yes.
Q Which part of it do you believe is related to the loss?



A Install access panel over plumbing access. Drywall patching. Provide and install new bathroom vanity.
Let's see. Install new baseboard trim. Paint bathroom. Paint wall where plumbing access panel is located in the dining room.
I would say that is it.
Q Okay. Do you know if this invoice was submitted to Travelers for payment?
A This was not.
Q Do you plan on submitting it for payment?
A No, I've kept track of the parts that were applicable myself.
Q Have you submitted the parts that were applicable for payment?
A No.
Q Why not?
A Because we're in a stalemate and we're sitting here.
Q And the work was performed, correct?
A Yes.
Q All of it?
A Double-check.
(Examines an exhibit.) Yeah, they did it all.

Confidential

Page 233

MR. DENBY: Okay. Off the record.
(Recess from 4:38 p.m. to 4:42 p.m.)
MR. DENBY: Back on the record.
**Q (By Mr. Denby) All right. Did there come a point in the claim, the adjuster and adjustment of the claim that you retained a public adjuster?**
A Yes.
**Q Who was the public adjuster?**
A Taylor Grant.
**Q And what was his company?**
A Bellator Claims.
**Q How did you find out about him?**
A He was a referral from K&D.
**Q Who at K&D referred him to you?**
A Kurtis.
**Q And did you have any discussion with Kurtis about Bellator and the services they provided?**
A No. I knew K&D on previous claims where they had used Bellator. I knew Bellator with K&D.
**Q Had you ever worked with Bellator before in any context prior to the date of loss?**
A I believe I worked a fire loss -- I didn't work directly with him, but I believe at least one of the fire losses that I did, he ended up with.
**Q And that fire loss that you did -- when you**

Page 234

**say that, do you mean through Paul Davis?**
A No, I estimated through my estimating company for K&D, and K&D referred it to Bellator. Pretty sure that's how it worked.
**Q Do you remember when that was?**
A When it got referred or when I did the claim?
**Q When you did the claim with Bellator, the fire loss.**
A I didn't do it with Bellator. I just did the fire claim itself, gave it to K&D and walked away from it. I don't know when they gave it to Bellator.
**Q Okay. Did you have any interaction or communication with Bellator as part of that claim?**
A I may have. I don't really remember, but I may have.
**Q If you did have those conversations, would it have been with respect to the estimate that you prepared?**
A Yeah.
**Q Did Bellator ever ask you the basis for how you determined the values stated in your estimate?**
A Not that I recall.
**Q Did you ever have any discussions with Bellator about how overhead and profit is determined for the estimates that you prepare?**

Page 235

A Not that I remember.
**Q And when did you retain Bellator?**
A That's a good question. I don't know. I want to say fall of '21, somewhere in there.
**Q Fall of '21 or '20? Just considering that the date of loss was July 2020.**
A Oh, that's a good question. If it was last year -- you know, I don't remember.
**Q And what was the basis -- what was the nature of your agreement with Bellator with respect to this claim?**
A That he'd try to get some traction and movement out of this. Approval isn't the right answer, but try to get some sort of compensation for it and finish it out.
**Q And what were the terms of your agreement?**
A I don't remember. I'd have to go back and check what they were with him.
MR. DENBY: 38.
(Exhibit 38 marked.)
**Q (By Mr. Denby) Please review the document that's been presented to you. I'll note for the record that Exhibit 38 is a three-page document consisting of Bellator Claims Resolution Public Adjustor Contract, Bates labeled Diem 16 through Diem 18.**

Page 236

A (Examines an exhibit.) It was fall of 2020.
**Q Do you recognize that document?**
A Yes.
**Q Sorry if you're still reviewing it.**
A No, you're good.
**Q How do you recognize it?**
A This is what Taylor presented me and I signed.
**Q Okay. And that's your signature on page 3?**
A Yes.
**Q And having reviewed this document, do you recall what the terms of your agreement with Bellator were?**
A I do now.
**Q What are they?**
A 25 percent of new money collected not to exceed 10 percent of all net settlements or payments recovered from the insurance company, through any method, including adjustment, mediation, appraisal, arbitration, or lawsuit.
**Q And what is your understanding of that provision?**
A He would get 25 percent of anything new, not to exceed 10 percent of the whole.
**Q Okay.**

A I can give you an example with math but my math isn't very good.
Q If you want to put a rough hypothetical in there.
A So my understanding is, if there's a hundred thousand dollars of new money, he would be entitled to $25,000, not to exceed 10 percent. So, therefore, if the amount was a hundred thousand dollars, he'd receive 10 grand.
Q Thank you. Has Bellator received anything for services for what was provided you with respect to this claim?
A Not that I remember, no.
Q And do you know how Bellator calculates their fee?
A Other than what may be in here, I don't know.
Q Would you think it's appropriate that Bellator prepared an estimate, and that estimate was -- essentially included its PI fee in it?
A It's fine.
Q Do you think that -- so you think it's appropriate for -- that a public adjuster can submit an estimate and that estimate can also, in addition to the replacement or actual cost value for the property damage, that the public adjuster can bill for his



adjustment services and that the insurance carrier should have to pay that?
A I don't get involved in how an adjuster makes their money.
Q Okay. And when was the first time that you speak to Taylor Grant?
A First time ever?
Q Let me rephrase that. With respect to this claim.
A I don't recall the exact date. It was prior to this execution, though.
Q Do you remember about how long before that you had reached out to him?
A I really don't know.
Q Okay. And how frequently did you interact with Mr. Grant regarding the adjustment of your claim once you retained Bellator?
A They tried to do it about once a week, initially.
Q And how were those conversations -- well, how were those updates provided? Was it a verbal conversation? An email?
A I believe a phone call.
Q Okay. And after you retained Bellator, what did they do for you?



A Actually, I believe every two weeks was what their updates were.
Q Okay.
A What did they do for me? Well, the intention was to recover a settlement. I know they -- we had worked on a subsequent estimate to be submitted. He sent a demand letter. I don't know if it was more than that. He attempted to get in contact with Travelers. I know he spoke with somebody over at Travelers with not much success and basically, my understanding is he was ghosted and from there, it was a referral to an attorney.
Q Okay. And so I'm going to jump back a little bit. You had referenced an estimate. Did you ever end up preparing a second estimate with respect to the claim?
A A second?
Q Yes.
A There's been many versions. I don't know which number it is.
Q I guess that would be a version prepared -- well, using the date on the bottom of the printed page, it looks like it would have been exported December 8th, 2020.
A Sounds about right.



MR. DENBY: Okay. If we could mark this as 39, please.
(Exhibit 39 marked.)
THE WITNESS: (Examines an exhibit.) Okay.
Q (By Mr. Denby) Do you recognize this document?
A Yes.
Q What is it?
A This, I believe, is the estimate that I completed based upon -- basically, the work that needed to be done upstairs and downstairs with the plumbing, the electrical, that I'm pretty sure this is the version I submitted to Taylor's company.
Q Okay. So this would basically be an estimate to restore the property back to preloss condition, in your opinion.
A Correct.
Q And I'm just going to note, so you believe that amount is at a replacement cost value of $133,300.03.
A Correct, for this version.
Q Okay. Do you recall if you prepared any versions after this?
A Yes.
Q Did any of those versions include updated

Confidential

amounts that you allege is the amount of repairs or consistent with this number?

A Oh, there's another one.

Q And how much do you believe is at issue in that one?

A 160-something.

Q Does that include loss of rent?

A No -- I don't believe it does include loss of rent.

Q Okay. Well, we'll get to that.

A I'd have to -- I'd have to really look back through it, because it's been a while.

Q And why did you prepare -- I apologize if I just asked. Why did you prepare this estimate?

A This one (indicating)?

Q Yes.

A You have the Travelers versions from before that took into account basement wiring only. Once we realized the entire house needed to get rewired, this is what it would take to rewire the entire house.

Q Okay. And sorry. I'm just going to draw your attention to page 32, Diem 12 -- 1216.

On this estimate, you have a line for permitting at 1 percent plus 5 percent -- point 5 percent administration?



A Correct.

Q Could you explain why that's appropriate?

A So you're going to have to pull further permits for any of the work that needs to be done. This is a best-guess estimate as to what it would take to do it for permits fees and time it takes to go sit at City and County of Denver to wait.

Q Okay. And I apologize. Was this the overhead and profit for this estimate prepared similarly as your prior estimates, 10 and 10?

A This one has 10 plus a cumulative profit. I'd have to go back and look at what the other ones are. It's slightly more than 10, 10.

Q And why do you use a cumulative profit?

A So a cumulative, as I understand Xactimate works, a cumulative puts it top of taxes. Typically, what happens in the construction industry, is the restoration company is expected to front the money. So therefore, there is a cost fronting the capital. This is a fee for your capital to be employed.

Q Okay. And then I guess just with respect to overhead, is that your best estimate as to what it might be?

A Well, I stuck with the usual 10 and 10 plus cumulative on there.



Q Overhead?

A I believe it is. Yeah. Doesn't come out quite like that. I'm not quite sure how I got that, but it's somewhere right around there.

Q Okay.

MR. DENBY: I believe, 40.

(Exhibit 40 marked.)

Q (By Mr. Denby) Please just take a quick look at that.

A Uh-huh. (Examines an exhibit.)

Q So in the second sentence -- first, do you recognize that document?

A Yeah.

Q How do you recognize it?

A I wrote it to Taylor.

Q And in the second sentence of this email where you reference, The existing electrical needs to be redone. What are you referring to?

A So this is going back to some of those photos that we showed that the electrical boxes were above the stairs. You're basically at the nerve center of the home, so when you have to redo all that stuff to be code-compliant, that's the entire house.

Q Okay. So that's stuff that were code issues that existed prior to the date of loss?



A I wasn't aware of code issues but they existed prior to the date of loss.

Q Correct. Those issues would have existed prior to the date of loss.

A Yes.

Q Okay. And why were you of the belief that it would piss Travelers off?

A Because everything else I've done up to this date have pissed Travelers off, and I've now been excommunicated. So it's a little bit of emotion here.

Q And on the bottom, you just note that the claim got just bigger for you/us?

A Yes.

Q Going back to what we talked about earlier with respect to this payment?

A Uh-huh.

Q So it's pretty much your understanding that the more money you seek, the more money he gets paid.

A Well, yes. That's how the business transaction works.

Q Okay. Sorry. Last thing. You say, The electrician is happy to meet for us -- with us for an inspection when it's time.

Who are you referring to?

A That would have been Marcus at Promise.

Confidential

Q Okay. Would it surprise you if Marcus had advised me that he knows nothing about this claim and only provided you an electrical estimate?
A Surprise me, versus, like, claim? What do you mean?
Q So you're aware, we subpoenaed Mr. Guerra for a deposition. In response to that, he sent me an email indicating -- questioning why he continues to receive information about this and stating, I know nothing -- "nothing at all" in caps -- about any of this. I went over there to give an electrical estimate and that was it.
A Uh-huh.
Q So going back on that, if Mr. Guerra only provided the estimate, what else did he do?
A He didn't do anything other than an estimate.
MR. DENBY: So then -- can you read back my question from two questions ago?
THE REPORTER: Sure.
MR. DENBY: Please? Sorry about that.
THE REPORTER: "You say, The electrician is happy to meet for us -- with us for an inspection when it's time."
"Who are you referring to?"



Do you want the one --
MR. DENBY: That's perfect.
Q (By Mr. Denby) So if you're testifying that Mr. Guerra stated he would meet with you for an inspection with it's time, when Mr. Guerra is telling me that all he did was provide an estimate, is he being dishonest with me?
MR. QUISENBERRY: Object to the form. You can answer.
Q (By Mr. Denby) To the extent that you know.
A To the extent that I know, my intention was to not cloud his vision with what needed to be done, so I left it open as to, Hey, this is what I want to do. What needs to be done? Was my recollection of it.
I don't recall if I told him it was an insurance claim or not. But I don't necessarily think that would change how he viewed how he does his job either.
Q I'm asking, did he do anything more, though, than provide the estimate? Or was his input strictly limited to generating an estimate for you and after that, he had no involvement in the claim?
A I haven't had any involvement with him since.
Q Okay. So he hasn't performed any work for



you?
A No.
Q I believe you testified earlier, did you provide Mr. -- sorry. You testified earlier that you had provided, I believe, the plumber with some code?
A Yes. Yes.
Q Did you also provide Mr. Grant with any information as to what code sections you believed were applicable?
A To Grant at Bellator?
Q Yes.
A I believe I may have.
Q Okay. Do you remember what code sections you may have provided him?
A Out of the plumbing and electrical probably, but I don't recall exactly which ones.
MR. DENBY: 41, please.
(Exhibit 41 marked.)
Q (By Mr. Denby) If you could just briefly review that.
A (Examines an exhibit.) Okay.
Q I'm just looking at the email on page 2, which is Bates 1103, email dated Wednesday, November 11th. Particularly, just -- so the third paragraph, there's -- you advise Bellator that's some



old wiring had already been removed where the new framing was installed and that the electrician removed it, prior to realizing how large of a scope would be required.
Which electrician are you referring to?
A That was the one from SingleTrack Electric when he was working on that initial 4,000 something dollar scope. He had started digging into it, remember when that J box was hanging down and we're going, Hey, this is bigger than it should have been. This is referring to that.
Q Okay. And then would you say that's what prompted his supplemental, I guess, estimate or proposal as to the cost to -- withdrawn. Sorry about that.
A That's okay.
Q Okay. So as you were saying, after he realized the issue with the J box, how did the scope change? Or what did he realize about a change in scope?
A That the scope would change because the electric boxes and panels were not the way we assumed they were, and there was wiring that needed to be done. That's when I was trying to get a scope from SingleTrack Electric, which never happened. So then I

Confidential

reached out to Marcus at Promise Electric to try to get some sort of scope so I had something to work with.
**Q Okay. It might be a little hard to see it. So to the extent you can't opine on it, I don't want you to try and guess. But looking at the images below and attachments, just generally, they all seem to be titled wiring.**
**What does that show?**
A The top two photos, the top middle photos, that shows where a wall was removed. There's framing that used to be there. It shows where wiring would have gone through that wall that cannot be replaced in a wall without starting to disconnect, reconnect, and rewire.
**Q Okay.**
A They cut the frame out from around the wiring.
**Q Okay.**
MR. DENBY: 42, please.
(Exhibit 42 marked.)
THE WITNESS: (Examines an exhibit.) Okay.
**Q (By Mr. Denby) Do you recognize that document?**
A Yeah.
**Q What is it?**



A It should be substantially the same as the other one. The other exhibit.
**Q And what was the other exhibit?**
A It has some changes to it, but it's 39.
**Q And what documents? What are you looking at?**
A The Bellator Claims version of the estimate.
**Q And when you say the estimate, is that the one you prepared?**
A Yeah.
**Q Okay. And just briefly looking at this estimate, I'll note this one has an export date of 12/14/20, apparently. Going to page 33.**
**Do you agree with Bellator's determination that's replacement cost value of the claim is 168,000 -- well, do you agree with this estimate's determination that the replacement cost value is $168,521.49?**
A When this was created, yes.
**Q Okay. And looking at this estimate, there's a 4,300 -- 4,313.97 charge for permits. Do you have any information as to how that was ascertained?**
A I believe he had -- he, Taylor, had requested that I should probably boost that up a little bit, because of permitting fees. I don't remember his exact reason why, but I believe that was part of his



advising.
**Q Okay. And the next line. What is a PIA fee?**
A Great question.
**Q Okay. Because it doesn't seem -- I can't -- do you have any discernible -- sorry. Let me rephrase that.**
**Is there any conceivable reason that he could be adding an additional $14,000 in that you can think of?**
A Is it conceivable? Sure. Do I know what it's actually there for? No.
**Q Have you ever heard the term PIA before?**
A Not that I can recall.
**Q And I'll also just note with respect to this estimate, Overhead and Profit. Are you able to discern what percentage he calculated?**
A No. It did go up, and this goes back to where I said I don't get involved in how they get paid. I don't get involved -- like, if this is something he wanted changed, I went ahead with it. He's a licensed insurance adjuster. I'm out.
**Q No, I'm trying to understand what is substantially different in this estimate versus the one that you prepared that's causing it to be $35,000 more than Exhibit 39.**



A Yeah, I don't disagree with you. I haven't gone through the substance of the individual line items. Yes, there are changes here. I do recall having conversations about overhead and profit. PIA fee, I don't actually know what the acronym stands for. Yeah.
**Q Okay. If this estimate sought reimbursement for things outside of costs related to the work or to fix the property related to the claims, would you think that's appropriate?**
A Yes.
**Q Why?**
A After going through a reasonably, in my opinion, for two years now, yeah. I mean, if I had to involve this level of effort, I have a current Travelers claim now opened at another house that has gone 180 degrees differently than this. So to me, yeah, this would be justifiable.
**Q Even if that had nothing to do with the cost that it would take to repair your property under the policy?**
A Yeah.
**Q Are you aware that the public adjuster cannot submit charges to an insurance company for charges that would not be incurred?**

Confidential

A No, I didn't know.
Q Okay. And just while we have this open, if you could keep that open. I just want to jump to the other one you prepared.
A You're still looking at this one (indicating)?
Q That is --
A 42?
Q Yes.
A Okay.
Q The one with the 12/14 -- sorry.
A 714.
Q So now 43, please?
Just for the record, I'm going to note that this is another Bellator Claims estimate that has an export date of 1/5/2021 printed on the bottom. It is Bates labeled as Diem 1106 through Diem 1162.
(Exhibit 43 marked.)
Q (By Mr. Denby) So what I'd like to ask you to do right now, is if you could have the Summary for Dwelling pages open, which is both pages -- on page 33 of the respective exhibits.
A You said 33?
Q Yes.
A Okay.



Q Did you have any communications with Bellator after it prepared the first estimate, I think, which is Exhibit 42?
A (Examines exhibits.) I may have, but I'm becoming a little confused. Why do you ask?
Q Did you have any communications about the amount that Bellator determined was necessary -- withdrawn.
Did you have any communications about the replacement cost value as determined by Bellator in the first estimate that they prepared?
A So I think these are slightly backwards, actually, because the way -- no, I don't label these this way. This is my numbering sequence.
Q What are you referring to for the numbering sequence?
A I have within my own estimating company a way that I create estimates, and this one looks like it, and this one (indicating) doesn't look like it. So I'm curious where you're with this, if you don't mind rephrasing please.
Q And by that, do you mean the Jeff Diem at the bottom, the one having a 3 next to it than the other having nothing next to it?
A It has an underscore, correct.



Q And I'm guessing, do you use the number to detail the earlier version or -- I'm sorry, the number detailing the later version, rather?
A The number should detail a later version.
Q Okay. I'll keep it general for right now, because I'm going to move into the copy that was submitted to Travelers, anyway.
But with respect to these two estimates, my question is: Did you ever have any communications with Bellator regarding any changes to the estimate that they prepared?
A I don't remember.
Q Okay. And do you know why the estimate -- the second estimate, which we just introduced as 43, do you have any idea why the overhead and profit might have been less?
A Not off the top of my head.
Q Because the overhead and profit is less on the second estimate despite the fact that the subtotal is higher, correct?
A The subtotal is slightly higher. Your O&P is less. I'd actually have to see in Xactimate what the percentages are that are input.
Q Okay. I'm just going to very briefly introduce this because this is a copy of the Bellator



estimate that was sent to Travelers.
MR. DENBY: 44, please.
(Exhibit 44 marked.)
THE WITNESS: (Examines exhibits.) All right.
Q (By Mr. Denby) All right. So just very briefly. Do you recognize this document?
A Honestly, I'm not sure. I may have had a copy of this.
Q Okay. And just very briefly, starting on page 4 of Diem 22.
A Uh-huh.
Q All electrical that must be brought up to grade?
A Uh-huh.
Q Is that referencing the same box that we spoke about earlier?
A We've talked about several boxes. Could you be more specific?
Q In that case, do you know why he says this box needs to be brought up to grade, brought up to code?
A So this is the one where I said there were two abandoned fuse boxes, junction boxes. This is the photo of that.

Confidential

Q How about the photo on the bottom? Do you have any understanding as to why that photo depicts -- why that bathroom plumbing needs to be brought up to code?
A Frankly, I don't know. This is the upstairs plumbing as it was being replumbed for that toilet.
Q Switching to the next page, please.
The photo at the top, do you have any understanding as to why Bellator would have stated that the plumbing in that picture needs to be brought up to code?
A So this is the upstairs bathroom as it was being opened. They were replacing, you can see, they're starting to snake the plastic lines in. I think that's what he's getting at, we need to put new plumbing in to get it up to code. You can see the galvanized lines in the bottom corner as well.
Q Okay. Switch to the next page, please, the photo on the bottom. Similar question, do you have any understanding as to why Bellator would have stated that bathroom plumbing needs to be brought up to code based on that photo?
A This is plumbing as it's currently being brought up to code. This is work in progress.
Q Okay. And if you could just now jump to Diem



58. That's page 33 of the estimate that we previously went over.
A Yes.
Q So this is the copy of the estimate that was submitted to Travelers by Bellator. Do you agree with Bellator's position that the replacement cost value is $163,624.88 before you factor in the deductible?
A At this point in time, if that's what he had written, yeah, I did at that point in time.
Q Okay. Because similarly, I guess -- well, let's have this guy.
Do you recall in the course of this lawsuit ever having been asked to submit something called a Supplemental Damages Exclusion?
A May I have the document?
(Exhibit 45 marked.)
A (Examines an exhibits.) Okay.
Q (By Mr. Denby) Do you recognize this document?
A Yes.
Q How do you recognize it?
A I had completed it with Mr. Quisenberry.
Q Okay. And I'd just like to note, if you note from this document, it indicates the amount that plaintiff is claiming is necessary for repairs of the



property is $163,624.88, as reflected in the January 5th, 2021 estimate prepared by Bellator Claims, correct?
A That's what this one said.
Q I'm talking about the Supplemental Damages disclosure on page 1. If you look under Insurance Contract Damages.
A Okay.
Q So based on this document, it's accurate to say that plaintiff's position in this lawsuit is that the amount necessary for repairs to the property is the $163,624.88 as detailed in the January 5th, 2021 estimate prepared by Bellator.
A I'm sorry. I heard all that, but what was the question part of it?
Q Just that it is correct that it is plaintiff's position that your damages are as detailed in Bellator's estimate and as stated in this disclosure document?
A At that point in time, yes.
Q Has that changed?
A I really don't know. I'm kind of seeing where you're going with this, so I'm answering properly.
Q Oh, no. I'm just merely trying to find out.



Essentially, you guys provided this document in the lawsuit. You said your damages on the building are $163,624.88.
A Correct.
Q Which you base off of Bellator's January 5th, 2021 estimate?
A Correct.
Q So my question is: Are you still maintaining to this day that that is a correct position, that money you're seeking for the building in this lawsuit is as reflected in that disclosure?
A Not only that, no.
Q Well, I'm talking about the building. Just the building. That's all I want to talk about right now, is the building, not the loss of use. I know you have a second portion on there, loss of use.
A Okay. Yes, and this is what I was talking about for that, correct.
Q Yes. I'm separating this out and just focusing on the building with respect to Bellator's statement.
A Got it. Sorry. I was reading ahead. Okay.
Q No problem. So just to clarify, your position to this date remains that your damages with respect to the building are the amounts as detailed in

Bellator's January 5th, 2021 estimate, which was that the total amount necessary for the repairs was $163,624.88. Travelers paid 21,527.02 and that you're owed $142,097.86 for the repairs. Or has that changed?
A I'd say it's changed.
Q Okay. Well, in that case, we'll just make a record, Counsel, if you'd make a supplemental damages disclosure and to the extent you rely on any additional documents that haven't been previously produced or, you know, relied upon and the basis of the disclosure, that that be produced.
THE WITNESS: I may ask him a question? No? Okay.
MR. QUISENBERRY: No. Yes, we'll produce that if it changed.
MR. DENBY: All right. Thank you.
Q (By Mr. Denby) So I guess, you know, going back to the time you prepared this damages disclosure, then, at that time, your position was that you were adopting Bellator's estimate.
A At that point in time, correct. Yes.
Q Okay. Has anyone from Bellator ever offered you any financial compensation with respect to the claim?
A No.



Q How about any contractors?
A Like a kickback sort of thing?
Q Yes, kickback or any sort of money whatsoever to sign up with him or --
A No.
(Exhibit 46 marked.)
THE WITNESS: (Examines an exhibit.) Okay.
Q (By Mr. Denby) Okay. Do you recognize this document?
A Yeah.
Q How do you recognize it?
A I wrote this to Taylor.
Q And why did you write this email?
A To help him with the code -- code book information.
Q And how did you go about preparing the information that you conveyed in this email?
A What was my method?
Q Yes.
A So based upon either my understanding of the home itself or my interactions with the plumber or the electrician, I was then able to go through the code book, because as I say, I can go that direction, but not the other, and figure out what code may have been violated and then advise Taylor.



Q Okay. And would you say -- how certain are you with your review of the code book in terms of -- how certain are you when you reviewed the code book that the sections of code you identified here are correct?
A I mean, I am not a licensed contractor or whatever. I know more than most, but could I be wrong? Sure.
Q Would you say it was a best guess, based on review of the code?
A Yeah.
Q Okay. So just a couple quick questions.
On page 2, which is Bates marked Bellator 1390, look at the first section, P 2502 regarding Additions and Removals -- I'm sorry, Additions, Alterations, or Repairs.
A Uh-huh.
Q You indicated that you had enough wrong with your existing system that you would be required to upgrade everything.
A Correct.
Q When did you determine that?
A I didn't determine that. I was told that by SingleTrack Electric.
Q So SingleTrack was the one who said that you



had these issues with your system?
A Correct. They were the ones that told me that.
Q So prior to SingleTrack telling you that, were you aware of any issues with your electric system or plumbing system?
A Electrical system, none that I was aware of. The plumbing system, nothing other than what was disclosed by John or something like that.
Q Okay. We talked earlier, too, about the maximum pressure.
A Uh-huh.
Q I believe there was a note on one of the invoices about how he had to do some retesting and the pressure was high, in the high 80s or 90s?
A Uh-huh.
Q In here, it says that plumber -- withdrawn.
And did anyone ever -- did you ever speak with anyone about any of the opinions that you put in here regarding the code? Did you ever go over it with Bellator?
A What do you mean by, go over it with Bellator? I sent it to him.
Q Did you ever have a discussion about these code sections and their potential applicability?

Confidential

A I don't recall having a discussion with him, no.
**Q Did anyone ever tell you that they thought you were correct?**
A I had a discussion about codes with John Napolitan, but it wasn't necessarily about this particular email that I remember.
**Q Okay. And did anyone ever provide you anything in writing indicating that these code sections might apply?**
A No.
**Q And did any City or County official ever provide you any notice that you had to become compliant with the code sections detailed in this email?**
A No.
(Off the record.)
**Q (By Mr. Denby) Do you think that Bellator has any experience or knowledge that enables it to opine on code issues?**
A Oh, I don't know that info.
**Q Do you know what Tyler Grant's background is aside from being a PA?**
A No, not really.
**Q Do you know if he has any other licenses or certifications?**



A Not that I'm aware of.
**Q And what happened to Bellator? Did they ever submit anything additional to Travelers?**
A I'm not sure what all documents they submitted.
**Q Did they keep you in the loop as to their -- the status of any demands made on Travelers?**
A Yeah, they did usually, like biweekly every two-weeks, phone calls for a while. I believe he sent a demand letter. And then he had had a -- I don't know if it was email or phone conversations with, I believe it was Gabe over at Travelers, to try to get some sort of resolution.
**Q And was there any resolution?**
A None that I'm aware of.
**Q And what did Bellator do after that?**
A Referred me to an attorney.
**Q Okay. Bellator was the one who referred you to the attorney?**
A Yes, I believe that was how it went.
**Q Okay. Have you had any contact with Bellator since they referred you to the attorney?**
A Minimal.
**Q What was the extent of that contact?**
A Some of it was just updates with this and



some of it was he's aware of my LEVLR software project, so I was giving him updates of that here and there.
MR. DENBY: Off the record real quick.
(Recess from 5:33 p.m. to 5:39 p.m.)
MR. DENBY: If we could go back on the record, then, please.
Let's have this marked as 46 -- 47.
(Exhibit 47 marked.)
MR. DENBY: Just for the record, I'd like to note that I'm reviewing with plaintiff's counsel what has been produced in the deposition today as a confidential Inspection Report created by Comfort Homes Inspection Services, Incorporated.
This document was previously not produced in discovery, as Counsel has indicated, the document was password protected and could not be shared electronically. The document has not been Bates stamped yet. However, we would request that if you do take a paper copy that supplemental disclosure could be made so that it is in the party's respective disclosures.
And by reserving our right just to follow up with respect to any potential questioning that we might have been able to, you know, figure out on the fly here today with what's just been produced.



**Q (By Mr. Denby) All right. So Mr. Diem, I'd like to draw your attention to page 4, please.**
A Okay.
**Q So the Inspection Report, and this was done in, look like it's dated July 29th, 2011. Do you see the systems regarding Electrical Systems -- the spot regarding Electrical Systems?**
A Yeah.
**Q The report seems to advise that one or more breakers are serving two circuits and could create a fire hazard. Do you remember ever being advised of that when you purchased the property?**
A I mean, I've got the Inspection Report, so yeah.
**Q So you were aware. Did you do anything to rectify that at any point between the date when you purchased the property and the date of loss?**
A Maybe. I'm not sure. It's been a long time.
**Q If you did, what would there be to establish that?**
A What do you mean?
**Q If you did do anything to try to rectify that issue noted there regarding the circuits, what evidence would there be of that?**
A There may be evidence, there may not be. So

Confidential



for example if I hired an electrician, I may have a receipt for it or if a handyman type person may have done it, there may not be a receipt for it. So I don't remember if it was done --

**Q So you just have no clue.**

A Exactly.

**Q With respect to the outlets, it notes that numerous -- they recommend having a licensed electrician establish a ground to replace the outlets with two-pronged receptacles and that numerous outlets are dead.**

**Did you ever have anything done prior -- subsequent to purchasing the property and prior to the date of loss to fix that?**

A So after I had bought the property before move-in, yeah, we had done some of these items. I don't recall exactly, but I don't recall having any electrical issues with my tenants.

**Q Okay. And the next line down, did you ever do anything to rectify that junction box prior to the date of loss?**

A Yeah, that's the one that was hanging down, from the electrician. That was up in the ceiling and we had covered that.

**Q Okay. Was the covering -- how did you cover**



**it?**

A Piece of metal designed for a 4 by 4 J box.

**Q And what was the purpose of covering it?**

A Code requirement. They have to be covered.

**Q Okay. And is it your position that the manner in which you covered it would have been code-compliant?**

A Yeah.

**Q Okay. With respect to the plumbing system.**

A Okay.

**Q They recommended having the main drain line scoped to ensure there were no cracks, bellies, or brakes. Did you ever have that performed?**

A Yeah, we had the partial sewer line replacement.

**Q What about the scoping of the remainder of the lines?**

A One, that was how we knew it was broken. And two, John Napolitan does it with some regularity, ongoing.

**Q And on the next page, is the use of duct tape on a water heater code-compliant?**

A No.

**Q Did you do anything to fix that prior to the date of loss?**



A It had been repaired at some point in time, and then John went back and worked on some other flue stuff, too, if I remember.

**Q Washing machine hose should not be used as a permanent plumbing line on a water heater? Did you do anything to redo that?**

A Yeah. We did not have the water heater anymore. That's why the duct tape is gone. We had the water heaters replaced anyway.

**Q I'll just note on page 9 and page 10. This is similar to what I just asked you about. The report notes the electrical systems that require attention.**

**Did you do anything to address any of the issues detailed there prior to the date of loss?**

A Well, let me go through it. We've got main power panel, circuitry, GFCI protected outlets. The main kitchen upstairs had GFCI. The one downstairs had GFCIs, and we added them to the basement bathrooms. The upper kitchen says it does not have them.

I'm pretty darn sure it does, actually. I don't recall if I replaced them or not, but I'm pretty sure it does.

**Q Okay.**

A And the basement, I'm pretty sure, has them also.



**Q And under Laundry, it says, Dryer ventilation. It just references connecting to a through-the-wall vent is recommended.**

A Uh-huh.

**Q Is that a different type of in-wall vent than the DWV pipe?**

A Entirely different.

**Q Okay. I'll draw your attention to page 24.**

A Okay.

**Q In the first paragraph, the report states that, It is recommended that every -- that every electrical deficiency recommended upgrade should be regarded as a latent hazard and should be serviced as soon as possible, along with evaluation and certification of the entire system as safe by a licensed contractor.**

**Therefore it is essential that any recommendations that we make for service or upgrade should be completed before the close of escrow because an electrician could reveal additional deficiencies or recommend additional upgrades for which we disclaim any responsibility.**

**Did you do any of the repairs recommended prior to escrow?**

A Did I make any of these repairs prior to

escrow?
Q Yes. The repairs suggested by this report. Did you make them prior to escrow?
A No, it would have been impossible.
Q Why would it have been impossible?
A It was an occupied home. There were tenants living there.
Q Do you know why they suggested it in the report, then?
A Probably to cover their rear.
Q I'll just note on page 27 reflected the plumbing system. The report says that at some point, the galvanized piping will need to be replaced.
A Uh-huh.
Q Did you ever have any galvanized piping replaced prior to the date of loss?
A Small section of it.
Q Where?
A It was in the basement bathroom leading over to the kitchen.
Q Different pipe than the one at issue here today?
A Yeah, this is supply line. We're talking about the DWV.
Q That's what I'm asking. I want to make sure



it was to a different pipe.
A A hundred percent different.
Q Okay. And when did you first have John Napolitan scope the drain lines?
A Couldn't tell you. It's been years.
Q Has he done that -- is that something he's done for you annually? Biennially?
A Usually annually, yeah, or I've had other companies sometimes do it before I met John.
Q Do you remember the first time you had the drain systems scoped after purchasing the property?
A I mean, I had it done -- would have been done just after they replaced the pipe to be sure it was done properly.
Q And which pipe?
A The one in the -- in the street, I believe they did it just after.
Q Okay. Sorry. I wasn't sure which pipe you were --
A No, that's okay.
Q So who first mentioned that code may be an issue?
A For?
Q The electrical and plumbing?
A Oh, that we knew we had a problem with the



electrical?
Q Just that -- when did you find -- who first told you that code might become an issue with respect to the plumbing or electrical code?
A I had a feeling on my own it might be a thing with the plumbing, and it was Travis over at SingleTrack Electric about the electric.
Q Okay. And when the work for the upper unit was completed, did anyone inspect that?
A What K&D did?
Q Yeah.
A I went through it to verify before I paid them.
Q Were there any inspections by the County or City?
A It wasn't code-related items. It was patching drywall.
Q Were there any permits issued besides for that plumbing permit?
A At any time?
Q Let me rephrase that. Have permits been issued at any time since the date of the claim through present day?
A Other than the plumbing permit, no.
Q Okay. And other than removing the hot tub we



talked about before, did you ever attempt to perform any self-repairs to the electrical system?
A Me?
Q Yes.
A I may have replaced one light in the basement once. Oh, I did one in the basement and one in the upstairs bathroom.
Q Did you ever try to do anything wiring-related?
A No, I don't -- no.
Q Do you know why the water heaters were replaced in 2014?
A Age.
Q Did that require a permit?
A Did it require? I don't know. I didn't pull one.
Q I meant to ask you about this previously with respect to the change of occupancy. But do you know if the house was always a two-family property?
A I don't know.
Q It was always a two-family property as long as you had it, though?
A I bought it like this, yes.
Q Okay. Have you had any other losses -- any other losses or claims that have occurred at the

Confidential

property since the date of loss?
A At that house, no.
Q And do you have any other insurance in effect covering this property for the date of loss? Or is Travelers the only policy you had?
A At that point, Travelers was the only one.
Q Okay. Do you feel that Travelers's communications with you during the claim were reasonable?
A No.
Q Why not?
A Numerous delays in terms of communication. Lack of continuity between adjusters. Lack of even acknowledgment of sending the information over. Ghosting Taylor, from what I've been told. Closing the claim at least once when it clearly wasn't done.
Q Was the framing wall ever replaced?
A That wet wall we've been talking about?
Q Yes, in the basement.
A Yes.
Q Do you think it's reasonable as to ask Travelers to reupgrade the code plumbing and electric when the code issues were in place prior to the incident?
MR. QUISENBERRY: Object to the form.



A Restate that?
Q (By Mr. Denby) Do you think it's reasonable to ask Travelers to repair the upgrades in electrical and plumbing issues in the home when those weren't caused by the incident?
A Yes.
Q Why?
A My interpretation of that policy is, even if it wasn't caused by the damage, if you had to replace something as a part of that loss to make it whole again, you have your maximum amount of whatever my policy limit was for that.
Q Okay. And you believe that's the case regardless of any damage that might have been preexisting or code violations at were -- sorry.
Any electrical damage or plumbing damages that were code violations that were preexisting the date of loss?
A Correct.
Q If you hadn't received any proceeds from Travelers for this claim, would you have prepared the same estimate and scope of damage?
A What do you mean?
Q If you were uninsured.
A If I was uninsured, I would just get it fixed



and figure out a way to do it or sell it.
Q And would you have prepared the same scope, then, if you were paying out of pocket for that?
A No, it's an entirely different process estimating for retail purposes versus insurance purposes, so I would not have done it the same way.
Q And why the difference?
A The majority of retail contractors do not understand how Xactimate's and the level of detail, how it works. They will just say, Replace kitchen cabinets. This is how much it costs. Whereas Xactimate for example will say, Replace countertop, replace cabinets, replace toe kick, replace -- or detach and reset plumbing, sink, garbage disposal.
There's just a level of detail that most retail contractors don't need, so they'll just say, Here's how much it costs to do this, but with much less detail and go that route.
Q Okay. And while the claim was being adjusted did anyone tell you your policy had an appraisal provision?
A Not that I'm aware of.
Q No one never mentioned invoking the appraisal provision?
A No, not that I remember.



Q When was the last time you spoke with anyone at Travelers regarding this claim?
A Prior to giving it to Bellator.
Q Who was that person that you spoke to?
A I don't recall having -- I don't remember the last phone call I had. The last transmission of information would have been an email made to probably Justin or Tyler.
Q And what would have been the basis of that communication?
A It's probably above those emails that I have behind me. I don't remember.
MR. DENBY: Okay. Sorry, Counsel. Bear with me one second. Copy of the Complaint. This is ECF document 3.
(Off the record.)
(Exhibit 48 marked.)
Q (By Mr. Denby) Mr. Diem, take a look through it, but obviously, once you've finished reviewing it, please let me know if you've seen this document before?
A I have.
Q And how do you recognize it?
A This is a document I prepared with Mr. Quisenberry.

Confidential

Q And did you prepare it before it was filed?
A Yes.
Q So with respect to -- sorry. Bear with me one moment.
So with respect to your testimony earlier regarding the Bellator estimate and whether you were still abiding by it, I draw your attention to paragraph 67 of the Complaint, which is on page 7 of 9.
A Okay.
Q So in there, you allege that upon information and belief the costs to repair the property has increased due to inflation and other factors?
A Yes.
Q Do you have any documentation or -- any documentation demonstrating how you believe the cost of the property has increased from the amounts in the Bellator estimate to that statement?
A How much inflation is currently going on and how that would affect this?
Q Yes, sir. Do you know how you calculated that?
A I haven't calculated to the current date, no.
Q Okay. That's -- is it fair to say that's more of a hypothetical or abstract damage? It hasn't be made concrete yet?



A It has not been made concrete yet because it's still ongoing.
Q Okay. And how would you go about figuring out inflation?
A The most succinct way of doing it would be changing the price list in Xactimate to make it something more current.
Q Okay. And what other factors are you referring to?
A I'm sorry?
Q You said the price has increased due to inflation and other factors. What are the other factors?
A That, I'm not quite sure.
Q Okay. I'm just going to take you through the causes of action real quick.
A Uh-huh.
Q How do you believe Travelers has breached the policy?
A My understanding of it is, number one, the stipulation of how code upgrades are paid and when. You have your loss of use and how that's paid.
Could you say your question one more time, please?
Q I think it was just -- what was the basis for



your belief that Travelers breached the policy?
A Delay of payments. We have the lack of continuity between adjusters. Lack of even acknowledgment of existence of the estimates that I had prepared. Ghosting -- sorry, could be a little late in the day. Ghosting Taylor as well.
Q Okay. And with respect to the third cause -- I'm sorry, the second cause of action, to the extent you haven't -- getting late.
For the second cause of action, what is your basis for believing that statutory -- Travelers unreasonably delayed and/or denied your claim?
A Well, delayed, how long has it taken and still ongoing. How many adjusters have I had and how many days went by between adjusters days or weeks of communication. We still don't have a full-pay out other than what they believe is their full payout. We don't have any sort of agreement on it.
Q And why do you believe their basis for denial was unreasonable, then?
A There appears to me to be a confusion between the reason the pipes and electrical need to be replaced due to cause of loss versus -- sorry, not cause of loss -- due to a degradation or anything like that.
When reality was, in my opinion, is that that



wall was approved to be removed. You cannot rebuild that wall without removing and replacing the light up there without triggering the requirements of the code upgrade.
Q Okay. And with respect to your third cause of action, paragraph 91, what basis do you have for your belief that Travelers acted with reckless disregard of denying coverage?
A So I don't personally have the understanding of how the law works to say, This is reckless, or whatnot. However, when an insurance adjuster says, Hey, do this in terms to get this red flag, tagged, whatever you want to call it, which is not normal, find a way to make it happen.
And then have, within hours, a partial denial letter come your way without any sort of warning or explanation, reasonable explanation, as to why. To me, that's what your bad faith is.
Q Okay. I'd just like to apologize, actually, the document that you're referring to, can you look at the first page for me?
A Yes.
Q At the top it should have a document number. Is it 3 or 1-1?
A This here is 1-1.

Confidential

**Q That makes sense. I had copies for everybody and I accidentally used the attachment instead of the one that -- you know, they refile it separately, once you remove.**

MR. DENBY: So to clarify for the record, this is the exact same document. Feel free to obviously look, if you just want to confirm, Counsel, it's what's been filed on the ECF. Since I was looking at document 3, I think it would be best if we had that version marked as Exhibit 48. Would you agree?

MR. QUISENBERRY: Yes. I agree.

**Q (By Mr. Denby) Mr. Diem, if you'd like to quickly compare them so you know I'm referencing the same Complaint. I just don't want us to be operating under different documents --**

A Sure.

**Q -- even though they're the exact same thing.**

A They're formatted just slightly differently.

(Examines an exhibit.)

Oh, I think I have two of them. That might be why they felt different.

**Q Yes, I had three stacks of them and I gave you the full stack and I kept the full stack of the other one.**

A Yes, it felt thicker than this one. What do



you want me to do with this one?

**Q You can give me everything back. I'll get rid it of, we'll keep the one we use as an exhibit, and we'll go with that.**

THE WITNESS: This goes to you?

THE REPORTER: Yes.

**Q (By Mr. Denby) Sorry about that.**

(Off the record.)

(Exhibit 48 re-marked.)

(Exhibit 49 marked.)

THE WITNESS: (Examines an exhibit.)

**Q (By Mr. Denby) So Mr. Diem, I'm just going to briefly draw your attention to what's -- sorry, what's the number?**

THE REPORTER: 49.

**Q (By Mr. Denby) What's been marked as Exhibit 49. This is a copy of Plaintiff's Responses to Travelers's First Set of Written Discovery. I'd like to first like to draw your attention to the interrogatories, beginning on interrogatory number 5.**

**Actually, withdraw on that one.**

**We can go to interrogatory number 6, please.**

A Okay.

**Q In just looking at your response -- at least, these were served back on February 24th. Does that**



**response remain accurate today?**

A The question says, Has any property referred to in your answer to interrogatory 3 been repaired?

**Q Yes, number 6. And then your response starts on the beginning of page 11.**

A Okay. So I'm in the right place. What is your question?

**Q Is that still an accurate answer? Or has anything changed since then?**

A As relates to the claim, this is it.

(Examines an exhibit.)

**Q Okay. Nothing else has been done other than those three detailed items?**

A Correct.

**Q And we talked about this a little bit before, but with respect to your answer to interrogatory number 7, identifying all persons who conducted an inspection of the damage.**

A Uh-huh.

**Q So with respect to Promise Electric, you note on there that this includes upgrades. However, a lot of it is still necessary due to code issues.**

A little more than midway through page 12?

A Correct.

**Q And when we discussed the estimate from**



**Promise Electric before for the electric work related to code --**

A Uh-huh.

**Q -- for 23,000. Did you seek full -- are you seeking full reimbursement of that bill from Travelers or is there anything to distinguish from the upgrades?**

A So as I talked about it, I didn't disclose a lot to him about being insurance versus anything else. Because I wanted him to be unbiased, if you will, because I've had some contractors in the past, as soon as they think it's insurance, they inflate the price. So I just wanted it to be fair.

So when it just said 23,000, I was not able to then go back to him, at least in my mind, to say, Can you break this out for this and this reason. So there are items on there that, yes, I can probably say that they aren't necessarily part of the claim.

**Q Okay. And the same goes with Perez Carpentry?**

A Yeah, and that's noted there. That's why -- that one is at least broken out so I could figure out exactly what goes to where for accounting purposes.

**Q Okay. And then just with respect to the note underneath to Ductworks. Was there a reason why you obtained that one through Elkmont instead of**

Confidential

individually?
A I knew Chris Gann [phonetic] through when I had my Paul Davis franchise, and they give a better discount, at least my understanding is, when a company's doing it. And so because I was starting my construction company at the time, I wanted to get my account set up with them. It seemed to just make more sense to do that.
Q Okay. And we had previously discussed that earlier.
I may have talked about this before. I apologize. May 2017 hailstorm. You got a permit to replace the roof for that, right?
A Yeah.
Q Was there any code involved in that?
A I believe so. We have the document behind us.
Q Well, with respect to the code, though. . .
All right. So I believe that was when we were speaking with respect to Exhibit 2. So for that permit, it noted the IRC.
A Correct.
Q So as we discussed earlier with respect to the plumbing permit, did it reference any code provision?



A I'd have to go look.
Q Do you want to look at my copy?
A Thank you.
(Examines an exhibit.) I'm not sure what the items are here, so --
Q Okay. Thank you.
A Uh-huh.
Q And just since we spoke about this earlier, I'd like to update this for this response as well. Please look at interrogatory number 13.
A (Examines an exhibit.)
Q This is the interrogatory, Please identify the amounts and factual basis of damages you claim for the breach of cause of action.
Your response referenced document 27 and 27-1, which was your Supplemental Damages Disclosure based on the Bellator January 5th, 2021 estimate.
A Okay.
Q As we've discussed earlier, I believe you had testified that you are no longer sticking to that estimate and you believe that your damages are higher, correct?
A Correct.
Q In that case, we'll just respectfully request that if you're going to take that position that you



serve an amended response to interrogatory number 13, further detailing that basis.
And I apologize if this is a little duplicative of my prior question regarding the complaint and the reckless conduct. But I'd just like to draw your attention to -- actually, withdrawn. That's surprising.
And just lastly, with respect to this document, I'll just draw you to question -- interrogatory number 4 on page 4.
And I'll just ask, is there anything additional that you believe forms the basis of your claim that you have not articulated in your response?
A (Examines an exhibit.) No, this seems to be long enough and all there.
Q Okay. And just also, just to jump back, I'd like to draw your attention to Exhibit 1 once more. That was the Plaintiff's Responses to Defendant's Second Set of Discovery Requests.
A What page, please?
Q So let's start at --
MR. QUISENBERRY: Exhibit 1.
THE WITNESS: Oh, am I in the wrong document?
MR. QUISENBERRY: Yes.
THE WITNESS: That's why. Thank you.



MR. QUISENBERRY: Yes.
Q (By Mr. Denby) If you could please draw your attention to page 5 under the Requests for Admissions.
A Okay.
Q So just number 1. Is that an accurate response?
A Correct.
Q Is number 2 an accurate response?
A Correct.
Q Is number 3 an accurate response?
A Correct.
Q Is number 4 an accurate response?
A I -- I don't know. So, yes, it is accurate the way it is.
Q The response is accurate that you don't --
A Correct. Yes.
Q Okay. And number 6. Is that an accurate response?
A Without going back and double-checking it, yes.
MR. DENBY: Okay. Off the record.
(Recess from 6:20 p.m. to 6:28 p.m.)
MR. DENBY: Go back on the record, please.
Q (By Mr. Denby) All right, Mr. Diem. Just a few more questions for you. I'm sorry.

Condensed

**Q How old is the house again or how old was the house when you purchased it?**
A My memory isn't good. It was either built in '41 or '49.
**Q And due to the age of the house, were you anticipating that there were going to be any issue with the property at some point?**
A You buy any house, there's going to be issues with it.
**Q In this case, would you anticipate more issues because of the age of the house?**
A It's a house. I anticipate any house is going to have issues. I've had others.
**Q Okay. So you weren't planning for anything to go wrong with the house due to its age?**
A It's a rental property. So I always plan on stuff going wrong with them. The older it gets, the more goes wrong. It's just a matter of course.
**Q Okay. So essentially, just as a rental property, knowing the age of it, you expect that something's going to happen at some point.**
A Same as any house, but yeah.
**Q Okay. And just going back to your discussions with Brian Richardson, did Mr. Richardson ever advise you to try and get the property repaired as quickly as possible despite your dispute with Travelers?**



A I'm pretty sure he did.
**Q And what did you do in response to that?**
A I did the best I could with what I could.
**Q And I believe we talked about this before, but you did the mitigation as promptly as possible?**
A I'm obligated to do the mitigation as quickly as possible, yes.
**Q After the mitigation was complete, how promptly did you proceed with repairs?**
A As quickly as I could with what funds were available to me.
**Q Do you think it would have been feasible to repair the property in the time frame allotted by Travelers?**
A They never provided me a time frame.
**Q With respect to the four months of loss of use, their rental value coverage that they paid, do you believe that the repairs would have been able to be completed within that time?**
A What repairs?
**Q The repairs that you believe were necessary for the property? Taking everything else out, do you believe the property would have been able to be repaired in that time frame?**



A No.
**Q Why not?**
A It's -- if you were to do the entire scope that we had submitted through Bellator, four months would not have been enough.
**Q How long do you believe it would have taken?**
A Best guess, assuming that everything was approved, permitting went quickly through Denver. Denver has been difficult, from what I've heard. Inspections were approved, all materials were available, because don't forget this is COVID and we have all sorts of problems getting materials. And getting labor was somewhat of a challenge, too, at times. I'm guessing six months.
**Q Okay. And do you recall ever telling Mr. Richardson that you do not think that the Travelers -- that the coverage was bad coverage or that you were disagreeing with the out of pocket?**
A When you say out of pocket.
**Q I'll have to show you, since it's in your email. This --**
A Sure. I figured.
MR. DENBY: If you could please mark it as our last exhibit for the day: This will be Exhibit 50.



(Off the record.)
(Exhibit 50 marked.)
**Q (By Mr. Denby) And feel free to briefly review it. I'd like to draw your attention to the paragraph on the bottom, the small paragraph on the bottom of the first page.**
A (Examines an exhibit.) So I have not seen this top email before.
**Q Okay. I'm not asking you about that, though. The question I have is -- which was produced through your counsel, though --**
A Okay.
**Q The question I have is just with respect to your response sent on September 22nd, 2020. The bottom paragraph --**
A Oh, I'm sorry. Long day.
(Examines an exhibit.)
**Q Please let me know when you've finished reviewing it?**
A Almost there.
**Q Okay.**
A Okay. Go ahead.
**Q So my question is: Do you disagree that on September 22nd, 2020, you said you were not saying this was bad coverage or that you were disagreeing with the**

out of pocket?

A When I say it is not bad coverage, correct. I didn't have an agreement that the coverage as written was bad. I would say the issue was how they were interpreting the policy that I purchased.

In terms of the out-of-pocket expense, obviously, there's a deductible, and I knew that, okay, if I'm going to -- like I said before, if I'm going to do some additional upgrades around the house, that's out of my pocket. That's what I'm referring to by out of my pocket with this.

**Q Okay. So you're only referring, that out of pocket in there, you're really stating that refers to out-of-pocket expenses that relate to upgrades that you would not consider as part of your claim, not any out-of-pocket expenses in general?**

A Correct. I paid for a policy to cover what I thought was reasonably covered.

**Q And do you recall having this conversation with Brian Richardson as detailed in this email?**

A It was an email exchange. It wasn't like a phone call conversation. But yes.

**Q Did you ever have any follow-up verbal communication about the topics covered in this email?**

A I don't remember.



**Q Did you ever push back on him once and disagree with -- I'll draw your attention to the next page.**

**Did you ever verbally or via email identify, you know, tell Mr. Richardson that you disagree with the position that he was taking?**

A (Examines an exhibit.) You mean subsequent to his 3054 reply?

**Q Yes. At any time after that, did you send him an email saying you disagree. You don't think his position was an accurate reflection of what's going on, verbally, or in any other form?**

A I honestly don't remember.

MR. DENBY: Okay. Give me one second and I think. . .

**Q (By Mr. Denby) Did Bellator ever make you a promise that they would get Travelers to pay for the electrical or plumbing upgrades?**

A A promise?

**Q Or say that they would get it done?**

A I don't know.

MR. DENBY: I have no further questions. That concludes this deposition.

MR. QUISENBERRY: No questions for plaintiff today. Read and sign and electronic copy of all the



exhibits.

MR. DENBY: Off the record.

(Off the record.)

MR. QUISENBERRY: We'll review the deposition and designate the parts about LEVLR confidential, subject to the protective order, assuming we have one in place, and if not, we'll enter one.

MR. DENBY: Agreed.

THE WITNESS: Thank you.

MR. DENBY: No problem. Off the record.

That concludes the deposition.

(Deposition adjourned at 6:38 p.m.)

* * *



I, JEFF DIEM, do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets, if any, constitute a true and complete record of my testimony.

_______________________
Signature of Deponent
( ) No amendments
( ) Amendments attached

Acknowledged before me this ______ day of ____________, 20___.

Notary Public: ______________________
My Commission expires: _______________
Seal:

Confidential

REPORTER CERTIFICATE

I, JASON T. MEADORS, Registered Professional Reporter, Certified Realtime Reporter, Certified Realtime Captioner, appointed to take the deposition of

JEFF DIEM,

certify that prior to the deposition the witness was sworn by me to tell the truth; that the deposition was taken by me at 999 18th Street, Suite 1765N, Denver, Colorado, on September 19, 2022.

I certify that the proceedings were reduced to typewritten form by computer-aided transcription consisting of 301 pages herein; that the foregoing is an accurate transcript of the proceedings.

I certify that I am not related to, employed by, of counsel to any party or attorney herein, nor interested in the outcome of this litigation.

I further certify review of the transcript was requested.

Attested to by me this September 28, 2022.

______________________________
Jason T. Meadors, RPR, CRR, CRC
My commission expires
January 27, 2025

Re: Diem v. Travelers Personal Insurance Company
Reporter: JM
Proofer: SLM



AB LITIGATION SERVICES
216 - 16th Street, Suite 600
Denver, Colorado 80202
September 28, 2022
ANDREW C. QUISENBERRY, ESQ.
Bachus & Schanker, LLC
101 West Colfax Avenue, Suite 650
Denver, Colorado 80202

Re: Deposition of JEFF DIEM
Diem v. Travelers Personal Insurance Company
Civil Action No. 1:21-cv-02664-REB-KLM

The aforementioned deposition is ready for reading and signing. Please attend to this matter by following BOTH of the items indicated below:

_____ Call 303-296-0017 and arrange with us to read and sign the deposition in our office
_XXX_ Have the deponent read your copy and sign the signature page and amendment sheets, if applicable; the signature page is attached
_____ Read the enclosed copy of the deposition and sign the signature page and amendment sheets, if applicable; the signature page is attached
_XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
_____ By _______ due to a trial date of________

Please be sure the original signature page and amendment sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and returned to AB Litigation Services for filing with the original deposition. A copy of these changes should also be forwarded to counsel of record. Thank you.

AB LITIGATION SERVICES

cc: All Counsel



AB LITIGATION SERVICES
216 - 16th Street, Suite 600
Denver, Colorado 80202

JEFF DIEM
September 19, 2022
Diem v. Travelers Personal Insurance Company
Civil Action No. 1:21-cv-02664-REB-KLM

The original deposition transcript was filed with Edward C. Denby, Esq. on approximately the 28th day of September, 2022.

_____ Signature waived
_____ Signature not requested
_____ Unsigned; signed signature page and amendment sheets, if any, to be filed at trial
_XXX_ Unsigned; original amendment sheets and/or signature pages should be forwarded to AB Llitigation Services, to be filed in the envelope attached to the sealed original.

Thank you.

AB LITIGATION SERVICES

cc: All Counsel



- AMENDMENT SHEET -

Deposition of JEFF DIEM

September 19, 2022

Diem v. Travelers Personal Insurance Company

Civil Action No. 1:21-cv-02664-REB-KLM

The deponent wishes to make the following changes in the testimony as originally given:

| Page | Line | Should Read | Reason |
|---|---|---|---|
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |
| ____ | ____ | ____________________ | __________ |

Signature of Deponent: ____________________

Acknowledged before me this ____ day of _________,

20___.

(seal) Notary's signature ________________

My commission expires______________

Confidential

## Exhibits


**EXHIBIT 1** 3:10 53:22,23,25 291:17, 22

**EXHIBIT 2** 3:12 64:1,2,8 289:20

**EXHIBIT 3** 3:14 66:21,22

**EXHIBIT 4** 3:16 72:20 74:11

**EXHIBIT 5** 3:18 73:4,7

**EXHIBIT 6** 3:20 92:18,20 95:22 96:18

**EXHIBIT 7** 3:21 95:8,13 117:4

**EXHIBIT 8** 3:22 99:1,3 103:20 104:24

**EXHIBIT 9** 3:24 102:8,9,12,15 126:20

**EXHIBIT 10** 4:3 110:2,3

**EXHIBIT 11** 4:4 112:7

**EXHIBIT 12** 4:6 123:4,5,7 132:17

**EXHIBIT 13** 4:7 130:8,10

**EXHIBIT 14** 4:9 140:13,14

**EXHIBIT 15** 4:11 148:3,6

**EXHIBIT 16** 4:13 151:17 161:19

**EXHIBIT 17** 4:14 159:1,3

**EXHIBIT 18** 4:16 163:9,10

**EXHIBIT 19** 4:17 165:9

**EXHIBIT 20** 4:20 169:14 173:19

**EXHIBIT 21** 4:22 173:22 174:7,14 180:7 183:7

**EXHIBIT 22** 5:3 174:8,11 180:24

**EXHIBIT 23** 5:5 183:25

**EXHIBIT 24** 5:7 185:19 186:15,17

**EXHIBIT 25** 5:9 192:2,4

**EXHIBIT 26** 5:10 198:17

**EXHIBIT 27** 5:12 207:9,11

**EXHIBIT 28** 5:13 210:18

**EXHIBIT 29** 5:15 215:24 218:2

**EXHIBIT 30** 5:17 217:13

**EXHIBIT 31** 5:19 219:24 220:1

**EXHIBIT 32** 5:21 224:19 225:1

**EXHIBIT 33** 5:22

**EXHIBIT 34** 5:24 228:5,13

**EXHIBIT 35** 6:3

**EXHIBIT 36** 6:4

**EXHIBIT 37** 6:6 230:15

**EXHIBIT 38** 6:7 235:20,23

**EXHIBIT 39** 6:9 240:3 251:25

**EXHIBIT 40** 6:10 243:7

**EXHIBIT 41** 6:11 247:18

**EXHIBIT 42** 6:13 249:20 254:3

**EXHIBIT 43** 6:15 253:18

**EXHIBIT 44** 6:16 256:3

**EXHIBIT 45** 6:18 258:16

**EXHIBIT 46** 6:20 262:6

**EXHIBIT 47** 6:22 267:8

**EXHIBIT 48** 6:24 280:17 285:10 286:9

**EXHIBIT 49** 7:3 286:10,17

**EXHIBIT 50** 7:5 295:25 296:2


## #


**#0035** 5:25

**#0058** 6:3

**#0066** 6:5

**#4081** 5:12

**#IHN8570** 4:21 7:6

**#ihn8570-diem** 4:18


## $


**$1,795** 73:1 75:5

**$1,895** 73:14 74:4,7

**$133,300.03** 240:20

**$14,000** 126:8 251:8

**$14,100** 194:13

**$142,097.86** 261:4

**$163,624.88** 258:7 259:1,12 260:3 261:3

**$168,521.49** 250:17

**$19,981.18** 151:3

**$2,290** 222:15

**$25,000** 237:7

**$35,000** 251:24

**$4,475** 131:25

**$41,156.79** 126:23 127:3


## -


**-**-8218** 10:10

**-005** 132:25 133:1


## 0


**000005** 131:8

**000054** 132:13

**0005** 132:11

**001061** 159:4

**001069** 159:5


## 1


**1** 3:10 53:22,23,25 67:2 70:5,9 72:20 96:18 103:10 130:11 143:7 149:12 150:13 160:9 163:24 174:14 203:8 241:24 259:6 291:17,22 292:5

**1,795** 183:2

**1-1** 284:24,25

**1/15/21** 6:16

**1/21/21** 4:3

**1/5/2021** 253:16

**10** 4:3 39:12 110:2,3 129:10 150:24 187:25 188:3,6,14 199:25 200:2 220:3 236:17,24 237:7,9 242:10,11,13,24 271:10

**10/16/22** 6:7

**10/20/20** 6:10

**101** 2:3

**102** 3:24

**105** 3:6

**1099** 26:8

**10th** 103:18 171:13


Confidential

*AB Litigation Services*

**11** 4:4 112:6,7 186:7, 8 287:5
**11-page** 192:6
**11/11/20** 6:11
**11/24/21** 3:18
**110** 4:3
**1103** 247:23
**1106** 253:17
**111** 188:25
**112** 4:4
**116** 3:6
**1162** 253:17
**11:44** 72:6
**11:56** 72:6
**11th** 149:7 247:24
**12** 4:6 123:4,5,7 132:17 177:2 241:22 287:23
**12/14** 253:11
**12/14/20** 250:12
**12/15/20** 4:9
**12/4/20** 5:13
**1216** 241:22
**12180** 10:20
**123** 4:6
**12:38** 98:25
**13** 4:7 130:7,8,10 290:10 291:1
**130** 4:7
**1387** 5:13
**1390** 263:14
**13th** 87:2,4 124:1
**14** 4:9 140:13,14
**140** 4:9
**148** 4:11
**14th** 123:18 148:20, 24
**15** 4:11 148:3,6 188:17
**15-page** 123:7
**151** 4:13
**1532** 228:13
**1533** 228:13
**1536** 207:12
**1539** 208:13
**1540** 207:12
**158** 4:14
**16** 4:13 87:19 88:5,8 151:16,17 161:19 235:25
**160-something** 241:6
**163** 4:16
**165** 4:17
**168,000** 250:15
**169** 4:20
**16th** 170:2 172:11
**17** 4:14 54:16 158:25 159:1,3
**173** 4:22
**174** 5:3
**1765N** 2:7 301:6
**18** 4:16 163:9,10 235:25
**180** 252:17
**183** 5:5
**185** 5:7
**1895** 183:4,11,12
**18th** 2:7 10:20 122:15 301:6
**19** 4:17 165:8,9 301:6
**191** 5:9
**1941** 59:18
**1949** 59:18
**198** 5:10
**1:08** 98:25

**2**

**2** 3:12 64:1,2,8 69:22 70:4,12 71:4 103:17 105:18 123:25 130:12 136:22 144:10 147:12,15,16 149:13 150:3,4,6,13 153:17 160:7,18 162:13 167:16,17 171:11 183:7 193:4 200:1 203:8 221:9 222:20 247:22 263:13 289:20 292:8
**2/20** 170:21
**20** 4:20 169:13,14 173:19 235:5 300:13
**2009** 12:4
**2011** 28:19 30:9,16 37:22 38:18 39:4 41:22 43:21 44:21 52:1 268:5
**2012** 29:5,12,17 30:16 44:24
**2013** 15:6 37:22 55:3
**2014** 55:23 101:23 276:12
**2015** 10:23 65:18 66:9
**2015-ish** 29:17
**2017** 15:11 62:22 289:12
**2018** 6:20 207:17
**2019** 20:18 72:10,21 74:13 207:17 208:22 210:8
**2020** 45:9 49:2,4 52:1,23 74:6,14,21 101:2 103:18 106:4 117:5 122:10,15 123:16,18 124:1 148:5 149:7 185:4 194:5 211:20 235:6 236:1 239:24 296:14, 24
**2021** 72:11 73:5,13 148:24 191:12 204:9, 12,18 211:20 259:2, 12 260:6 261:1 290:17
**2022** 26:16 94:14 301:6,13
**2025** 301:18
**207** 5:12
**21** 4:22 10:16 173:20, 21,22 174:7,9,14 180:7 183:7 235:4,5
**21,527.02** 261:3
**210** 5:13
**215** 5:15
**217** 5:17
**219** 5:19
**22** 5:3 174:3,8,11 180:24 183:22 256:11
**220** 144:16 146:23 147:21
**223** 3:6
**224** 5:21,22
**227** 5:24
**228** 6:3,4
**22nd** 185:3 296:14, 24
**23** 5:5 183:23,25 188:7,9,11
**23,000** 288:4,13
**23-** 178:15,20 179:5
**230** 6:6
**235** 6:7
**239** 6:9
**24** 5:7 185:17,19 186:15,17 188:7,8 272:8
**243** 6:10
**244** 202:17
**247** 6:11
**248 563-3267** 10:3
**249** 6:13

Confidential

**24th** 66:15 72:11 73:13 198:24 286:25
**25** 5:9 191:25 192:2,4 236:16,23
**2502** 263:14
**253** 6:15
**255** 6:16
**258** 6:18
**26** 5:10 198:16,17 207:8
**26,000** 178:16,20 179:6
**261** 3:6 6:20
**267** 6:22
**27** 5:12 207:8,9,11 208:22 273:11 290:15 301:18
**27-1** 290:16
**27th** 72:10,21
**28** 5:13 210:17,18 301:13
**280** 6:24
**286** 7:3
**28th** 148:5
**29** 5:15 74:13 215:23, 24 218:2
**290** 3:7
**295** 7:5
**29th** 87:12 268:5
**2:15** 160:19
**2:41** 172:10
**2:54** 173:25
**2nd** 160:3,18

**3**

**3** 3:14 54:14,18 66:19,21,22 71:6 74:12 130:12 144:23 145:21 146:3 149:12 150:13 160:19 168:17 212:21 236:9 254:23 280:15 284:24 285:9 287:3 292:10
**3-inch** 192:21
**30** 5:17 108:15 109:3 217:12,13
**30-45** 69:8
**301** 301:8
**303 301-8950** 2:8
**303 893-9800** 2:4
**3054** 298:8
**30th** 74:14,21 117:5 191:12 204:9,12
**31** 5:19 219:23,24 220:1
**32** 5:21 224:19,22 225:1 241:22
**33** 5:22 224:19,22 226:7 250:12 253:21, 23 258:1
**34** 5:24 228:4,5,13
**3498** 132:16
**35** 6:3 228:7,9 229:17,20
**36** 6:4 228:7,9 230:5
**37** 6:6 163:15 230:14, 15
**38** 6:7 235:19,20,23
**39** 6:9 240:2,3 250:4 251:25
**3:07** 173:25
**3:30** 189:14
**3:35** 189:14

**4**

**4** 3:16 72:7,9,20,23 73:11,13 74:11 183:7 213:21 256:11 268:2 270:2 291:10 292:12
**4,000** 248:7
**4,300** 250:20
**4,313.97** 250:20
**4/15/21** 205:1
**4/16/22** 6:6
**40** 6:10 108:15 109:3 243:6,7
**40s** 41:20
**41** 6:11 247:17,18 293:4
**42** 6:13 249:19,20 253:8 254:3
**43** 6:15 163:15 253:13,18 255:14
**44** 6:16 256:2,3
**4475** 131:21,24
**45** 6:18 258:16
**4563** 4:15,16 5:10 6:23 29:2
**4565** 5:5,16,18 29:2
**46** 6:20 262:6 267:7
**4650** 29:1,3
**4693** 5:9
**47** 6:22 267:7,8
**48** 6:24 280:17 285:10 286:9
**49** 7:3 286:10,15,17 293:4
**4:38** 233:2
**4:42** 233:2
**4th** 73:4 210:8

**5**

**5** 3:18 72:7,9 73:4,7 128:20 129:15 145:20,24 214:10 215:6 241:24 286:20 292:3
**5/4/85** 10:1
**50** 7:5 32:9,10 109:4, 8 295:25 296:2
**50-gallon** 108:14 109:2
**5280** 5:24 6:3,4 228:14,18,23
**53** 3:10
**57** 195:18
**58** 258:1
**5:33** 267:4
**5:39** 267:4
**5th** 259:2,12 260:5 261:1 290:17

**6**

**6** 3:20 92:16,18,20 95:22 96:18 136:22 146:20 153:17 162:13 221:9 222:20 286:22 287:4 292:17
**6-** 48:20
**6/10/21** 5:24
**6/27/19** 3:16
**605** 197:3 202:18
**62** 226:23
**64** 3:12 226:23
**650** 2:3
**66** 3:14
**67** 281:8
**6:20** 292:22
**6:28** 292:22
**6:35** 198:24
**6:38** 299:12
**6th** 45:9 49:2,4 52:22 74:6

**7**

**7** 3:21 54:13,15 95:8, 13 117:4 147:10,14 281:8 287:17
**7/14/20** 3:22 6:9
**7/20** 194:2
**7/22/20** 5:10
**7/29/11** 6:22
**7/6/20** 3:20 5:15,17

**7/9/20** 5:9
**70** 109:3
**71** 3:6
**714** 253:12
**72** 3:16,18
**7th** 204:9,18

**8**

**8** 3:3,22 93:9 99:1,3 103:20 104:24 129:1
**8/13** 181:14
**8/5/21** 6:3
**8/7/19** 5:12
**8/7/20** 4:7
**8/7/2020** 130:19
**800** 48:20
**80202** 2:3,7
**80211** 5:11
**80215** 10:21
**80s** 264:15
**8889** 131:5
**890** 150:6,8
**8:48** 160:4
**8th** 207:17 239:23

**9**

**9** 3:24 98:13 102:8,9,12,15 122:10 126:20 187:25 188:2 271:10 281:8
**9/14/21** 3:21 4:11
**9/16/20** 4:20
**9/2/20** 4:14
**9/2/21** 6:4
**9/22/20** 4:22 5:3,5
**9/23/20** 3:24 5:21
**9/25/20** 5:7,19
**9/3/20** 4:16
**9/9/20** 4:13,17
**90** 141:9 195:18
**90s** 264:15
**91** 284:6
**92** 3:20
**95** 3:21
**955** 203:8
**956** 203:8
**957** 204:5
**960** 204:24
**966** 227:5
**970** 227:5
**971** 227:18
**979.93** 226:24
**98** 3:22
**999** 2:7 301:6
**9a.3** 164:22 167:22,24
**9th** 157:12 159:9 162:2 173:3,6 211:19

**A**

**a.m.** 72:6 160:4
**abandoned** 135:1 145:1,5,14,15,17 256:24
**abiding** 281:7
**ability** 101:13
**Absolutely** 34:15
**abstract** 281:24
**acceptable** 154:23
**accepted** 129:12
**access** 100:22 114:6 144:21 168:21 214:21 232:1,5
**accessed** 91:17,18,20
**accidentally** 285:2
**accompany** 212:9
**accompanying** 300:3
**accord** 52:19
**accordance** 150:12
**account** 111:8,10 149:24 190:19 241:18 289:7
**accounting** 288:22
**accurate** 9:8 34:2 35:13 52:3 91:16 105:13 123:18 127:23 259:9 287:1,8 292:5,8,10,12,13,15,17 298:11 301:9
**accurately** 132:14
**Acknowledged** 300:12
**acknowledgment** 277:14 283:4
**acquire** 38:16
**acquired** 62:8
**acronym** 252:5
**Act** 6:12 180:17
**acted** 284:7
**action** 84:10 139:21 154:11 161:7 170:25 282:16 283:8,10 284:6 290:14
**actions** 86:2
**active** 146:7
**actual** 88:7 97:6 98:6,16 100:5 105:1 119:11 150:10 168:2 182:14 237:24
**ad** 84:12
**add** 114:5 213:5 225:19
**added** 39:24 149:25 176:24 219:14 271:18
**adding** 251:8
**addition** 129:21 162:8 237:23
**additional** 81:7 86:9,11,12 87:15,25 91:7 93:14,22 94:9 96:2,4,12,13 98:4,13 102:18 113:11 114:2 119:3,9,10 147:24 173:4,11,14 176:25 181:8,20,23,24 185:8 217:17 218:7,15,19 251:8 261:8 266:3 272:20,21 291:12 297:9
**Additions** 263:15
**address** 5:11 181:20 203:12,13 209:18 271:13
**addressed** 133:10,22 142:6 184:7
**addresses** 29:2
**addressing** 181:16
**adjacent** 189:8
**adjourned** 299:12
**adjusted** 279:19
**adjuster** 36:25 37:3 84:23 85:7 117:13 118:8,12 120:24 121:6,10 126:25 169:3 183:10 200:13 233:5,6,8 237:22,25 238:3 251:21 252:23 284:11
**adjuster's** 177:5
**adjusters** 277:13 283:3,14,15
**adjusting** 153:16
**adjustment** 233:5 236:19 238:1,16
**Adjustor** 6:7 235:24
**administration** 241:25
**Admissions** 292:3
**adopting** 261:20
**advance** 228:8
**advice** 219:4
**advise** 129:15 137:10,14 138:21

Confidential

139:5 165:20 175:10 177:12 180:7 247:25 262:25 268:9 293:25

**advised** 245:2 268:11

**advises** 165:14,21

**advising** 101:4 251:1

**aerator** 57:13

**aerators** 210:12

**affect** 281:19

**affected** 49:11 85:25 90:6 91:6,12 92:2 160:21 189:5 218:17

**affecting** 92:4

**age** 63:12 101:25 276:13 293:5,11,15, 20

**agent** 157:15,18 162:21 163:3 167:6, 7,10

**agents** 158:8 163:4

**agree** 34:24 68:14, 16 71:3 106:1 149:21 158:1 186:17 217:5,7 221:24 250:13,15 258:5 285:10,11

**agreed** 73:21 75:8 85:8 89:16,18,22 157:25 299:8

**agreement** 3:17,19 5:20,21 52:18 75:7, 12 235:10,16 236:12 283:18 297:3

**Agreements** 72:10

**ahead** 22:22 35:22 85:8 89:20 121:16 128:15 129:24 150:21 152:19 153:25 154:16,17 160:24 177:9 205:18 207:2 229:18 251:20 260:22 296:22

**ahold** 84:23 129:24 157:6

**aid** 31:13

**air** 39:22 81:16 82:5, 7,9 112:21 203:3

**alerted** 58:13 97:1

**Alex** 44:2

**allegations** 11:10

**allege** 241:1 281:10

**alleged** 156:13

**allotted** 294:15

**allowed** 91:15 210:14 214:2

**Alpha** 20:16,17,19, 22 21:3,4

**Alterations** 263:16

**ambiguous** 24:11

**amended** 291:1

**amendment** 300:3

**amendments** 300:9,10

**amount** 45:3 74:3 87:3,12 97:7,15 136:23 137:2 178:4 179:18 180:1 182:6, 18 186:18,20 219:12 226:24 237:8 240:19 241:1 254:7 258:24 259:11 261:2 278:11

**amounts** 48:15 182:14 188:12 217:6 218:2 219:14 241:1 260:25 281:16 290:13

**and/or** 196:10 283:12

**ANDREW** 2:2

**Andrew. quisenberry@ coloradolaw.net** 2:4

**Anger** 162:6

**angle** 204:13

**angry** 161:5

**annual** 56:18

**annually** 274:7,8

**answering** 259:23

**answers** 9:2

**anticipate** 127:25 293:10,12

**anticipated** 177:16, 18

**anticipating** 293:6

**antifreeze** 176:9

**antimicrobial** 86:2

**anymore** 79:20 131:22 271:8

**apartment** 101:14

**apologize** 20:10 101:10 105:11 211:7 241:13 242:8 284:19 289:12 291:3

**app** 89:3

**apparent** 169:10

**apparently** 146:17 250:12

**APPEARANCES** 2:1

**appeared** 153:19 158:3 199:9

**appears** 73:2,18 283:21

**appliances** 59:2,3, 6,12

**applicability** 264:25

**applicable** 94:14 138:4,15 201:1,11,21 232:13,15 247:9

**application** 202:5

**applied** 202:7

**applies** 168:5

**apply** 167:12 202:12, 15 265:10

**appointed** 301:3

**appraisal** 236:19 279:20,23

**approval** 5:23 84:23 85:7 86:5 136:25 235:13

**approvals** 86:10,12 152:19 226:1

**approve** 207:1

**approved** 13:19 37:4 50:6 67:14 172:1 189:9 225:13 284:1 295:9,11

**approximate** 155:23

**approximately** 10:23 15:6 20:18 28:19 29:5,17 30:9, 16 43:1,23 44:18 51:12 76:17 78:20 122:7 144:14

**April** 26:12

**arbitrary** 88:8 180:19

**arbitration** 236:20

**archived** 148:23

**area** 56:1 76:10,14, 22 79:21 89:13 90:20 91:1 127:1 135:12 188:17

**areas** 79:23 90:22 94:9 114:6 160:21 171:4

**argue** 156:23 172:22

**arise** 14:12

**armored** 144:17 146:23 147:20

**arose** 15:18,20 132:12

**articulated** 152:11 291:13

**asbestos** 18:3,16 27:7 86:11 97:2 98:10 218:16

**ascertained** 250:21

**asks** 172:11

**assigned** 118:8 122:9,11 147:23

**assist** 17:25

**assume** 57:22

**assumed** 248:22

**assuming** 30:21 295:8 299:6

**assumption** 88:20

**Asterisk** 141:16

**atmosphere** 82:4

**Attach** 4:23

**Attach-claim** 4:11

**attached** 95:9 150:1 193:24 200:6 300:10

**attachment** 4:18 285:2

**attachments** 4:21 249:6

**attempt** 181:12 276:1

**attempted** 239:8

**attention** 54:7,12,13 55:22 56:15 67:1 68:13 69:17 72:20,23 74:12 163:23 164:11 170:1 171:4,5 174:14 180:24 192:17 204:23 207:16 208:11 214:9 220:3 223:16 225:24 241:22 268:2 271:12 272:8 281:7 286:13, 19 291:6,17 292:3 296:4 298:2

**Attested** 301:13

**attic** 214:11,13,15,19

**attorney** 8:6,18,19 24:3 239:12 266:17, 19,22 301:10

**August** 10:16 103:18 106:4 122:15 124:1 148:5 194:5

**authorization** 64:16 68:13,22

**automated** 37:8

**Avenue** 2:3

**average** 127:19,20, 24

**averages** 127:13

**avoid** 9:2

**aware** 47:4 49:12 56:10,13 60:7 62:2,4, 5,7 65:5 75:15,18 77:11 81:17 111:19 133:6,15 134:6,13 154:5 158:8,18,19,22 204:16 209:1 212:4, 17 218:11 244:1 245:6 252:23 264:5,7 266:1,15 267:1 268:15 279:22

**B**

**B-E-R-T-E-A-U** 114:14

**Bachus** 2:2

**back** 15:16 17:4 19:10 20:15,25 21:22 22:23 24:13,18 25:22 26:15 28:6 34:11,24 35:8 38:4 43:8 48:13 49:24 50:9 52:17,19 55:4,9 64:5 71:11 83:9 85:17 87:14 88:9 90:17 91:12,24 92:1 94:16 97:20 98:22 105:23,25 108:13 111:16 114:19 115:7,9 124:21 125:4 131:18 133:13 138:13 144:21 148:13,18 149:16 150:1,11 154:1,20 159:7 161:1 170:8 172:10,12,13, 22 178:24 180:10 181:13 185:5 190:5, 15 193:21 199:13,18 200:2 201:24 204:13 207:24 208:1 230:7 233:3 235:17 239:13 240:15 241:11 242:12 243:19 244:14 245:14,18 251:17 261:18 267:5 271:2 286:2,25 288:14 291:16 292:19,23 293:23 298:1

**background** 11:15, 19 12:15,18 13:19 33:1 34:17 168:19 202:10 265:21

**backtrack** 10:24 36:9 84:25

**Backup** 3:20 5:4,8

**backwards** 160:11 254:12

**bad** 25:4 63:3 110:22 284:18 295:18 296:25 297:2,4

**Baldwin** 114:13

**ball** 48:1 161:18 205:12,16

**Bana** 228:17

**base** 125:7,11 126:2 260:5

**baseboard** 223:8 232:4

**baseboards** 221:1

**based** 33:1 96:3 100:4 122:13 124:19, 23 126:7,14,16,20 127:16 129:9 130:24 132:17 143:24 158:9 162:15 167:6,7 168:23 174:25 175:1 176:22 177:5 178:9 183:12 190:2 194:11 211:3 215:9 219:1 221:18 240:10 257:21 259:9 262:20 263:9 290:17

**basement** 21:24 22:3 39:23 40:11,12 41:9 55:25 110:12 113:8 124:21 130:22 131:15 134:10,14 146:16 193:9 206:22 211:23,24 241:18 271:18,24 273:19 276:5,6 277:19

**bases** 218:18

**basically** 15:22 183:19 187:8 197:12 239:10 240:10,14 243:21

**basis** 35:19 51:19 56:19 99:20 100:3 129:3 152:2 153:3 156:8 234:20 235:9 261:10 280:9 282:25 283:11,19 284:6 290:13 291:2,12

**Bates** 131:7 132:13 159:4 163:14 192:8 202:17 207:11 211:3 226:23 235:25 247:23 253:17 263:13 267:17

**bathroom** 40:11 84:2,4,5 90:24 91:6, 11,15,20,25 92:4 113:10,13,19 115:8 189:8 205:9 216:20 221:11 223:14 226:15 227:20 232:2, 5 257:3,12,21 273:19 276:7

**bathrooms** 271:18

**bathtub** 144:20,22 146:24,25 147:22 193:12,14

**bathtubs** 229:21

**battery** 213:4,13

**Bear** 280:13 281:3

**bedroom** 40:13 115:10 211:24 220:24 223:4,10

**bedrooms** 40:10 55:10

**Beech** 29:1,4,5,11, 14 30:12,17,18 44:12,14,19,24 59:18 203:14

**began** 85:6 128:15

**begin** 8:25 85:8 128:15

**beginning** 286:20 287:5

**begun** 92:11

**behalf** 17:22

**belief** 244:6 281:11 283:1 284:7

**believed** 164:1 219:2 247:8


Confidential

**believing** 99:20 100:3 156:9 283:11

**bell** 118:14

**Bellator** 6:7,13,15 211:21 233:11,17,19, 20 234:3,7,9,11,13, 20,24 235:2,10,24 236:12 237:10,14,18 238:17,24 247:10,25 250:6 253:15 254:1, 7,10 255:10,25 257:9,20 258:5 259:2,13 261:22 263:13 264:21,23 265:17 266:2,16,18, 21 280:3 281:6,17 290:17 295:5 298:16

**Bellator's** 250:13 258:6 259:18 260:5, 20 261:1,20

**bellies** 270:12

**benefits** 119:9,10

**Berteau** 114:13

**best-guess** 242:5

**bib** 39:24

**Bicycle** 16:14

**bid** 94:12 96:5,8,10, 14,21 126:8 181:17

**bids** 125:23

**Biennially** 274:7

**big** 63:1 76:10,11

**bigger** 108:20 158:22 208:20 244:12 248:10

**bike** 16:12

**bill** 99:17 100:3 103:21 104:22 110:25 227:13,24 237:25 288:5

**billed** 94:9 116:11

**bills** 212:2 225:21

**birth** 9:25

**bit** 10:25 14:3 16:20 20:15 33:6 34:18 43:4 55:1 98:12 116:14 132:23 141:23 152:7 157:13 163:6 169:21 200:25 212:14 239:14 244:10 250:23 287:15

**biweekly** 266:8

**black** 76:6 77:2 166:12 167:15

**blinds** 221:2 223:9

**blow** 171:4

**blowers** 112:20

**blown** 214:17

**book** 66:10 138:14 200:18,21,23 262:14, 23 263:2,3

**bookcase** 145:7

**bookshelf** 134:23

**boost** 250:23

**boot** 204:1

**borrow** 22:15 223:2

**boss** 121:14 136:8

**bottom** 69:18 76:21 89:13 111:7 117:5 123:25 133:1 153:17 160:8,19 162:12 163:24 165:24 174:14 188:2 198:23 202:17 207:19 217:19 221:20 223:17 239:22 244:11 253:16 254:23 257:1,17,19 296:5,6,14

**bought** 14:10 44:12, 24 108:20 135:2 146:15 269:15 276:23

**Boulder** 15:1,2

**bowl** 226:11

**box** 55:25 56:3,9,12 69:1 70:14 111:8 134:21 135:10 143:9, 14,20 144:4,7 145:1, 12 146:3 206:16 248:9,18 256:16,21 269:20 270:2

**boxes** 130:25 145:17,18,19,21 227:9 243:20 248:22 256:18,24

**brakes** 270:13

**breach** 290:14

**breached** 282:18 283:1

**break** 9:16,19 58:16 72:3 288:15

**Breakdown** 4:6 5:3, 7

**breaker** 134:5 146:6, 7

**breakers** 268:10

**breaks** 47:9

**Brian** 88:11 92:12,13 93:11 96:17 97:1 100:4 117:9,15 157:17,20 161:11,13 162:21 163:22 169:23 170:3,5 216:10 293:24 297:20

**Brian's** 159:16 181:10

**briefly** 56:14 95:10 98:20 146:19 224:25 230:19 247:19 250:10 255:24 256:7, 10 286:13 296:3

**bring** 17:24 18:11 19:11 82:3 136:6 220:17

**broke** 56:25 203:22

**broken** 80:13 191:20 270:18 288:21

**brought** 14:18 17:23 100:17 125:3 153:14, 15 157:18 158:21 200:10 256:13,21 257:3,10,21,24

**Bruce** 193:6

**Builders** 155:1

**building** 29:1,3 60:19 64:17 65:1 68:14,20,22 69:3,13 70:10 81:25 82:3 139:7,13,17 260:2, 10,13,14,15,20,25

**buildings** 28:24,25

**built** 41:20 59:17,18, 19 293:3

**burst** 47:2

**business** 12:1 13:6, 17,21 14:4,16,18,22, 23 17:7,12 25:12,17 26:14 27:24 38:7 68:10 85:3 111:16 155:1 244:19

**busy** 83:10

**buy** 14:11 293:8

**bypass** 141:7 223:11

**C**

**cabinet** 4:11,23 145:7 147:1,5 225:13,18

**cabinet/countertop** 225:3

**cabinetry** 18:6 227:7,11

**cabinets** 186:25 187:4 216:21 225:6, 10,12,17 226:18,20 279:11,13

**cabinets/vanity/ countertops** 225:7

**cable** 146:23

**calamities** 27:8

**calculated** 251:16 281:20,22

**calculates** 237:14

**call** 57:8 78:2 79:10 82:14 83:17,23 88:15 111:13 238:23 280:6 284:13 297:22

**called** 43:10 75:25 78:1,2,3,5 117:25 129:25 155:3 161:19 199:9 258:13


Confidential

**calls** 266:9

**camera** 56:22

**canceled** 116:23

**capable** 109:15 138:6 168:20

**capacity** 103:4

**capital** 242:19,20

**caps** 245:10

**Captioner** 301:3

**carbon** 213:9

**card** 111:13,19 116:24

**cards** 111:14

**care** 19:24 82:14 83:16 84:11

**Carpentry** 220:20 288:19

**carpet** 39:19 220:23 223:4

**carrier** 88:3 238:1

**carries** 78:18

**carry** 111:14

**case** 34:18,23 36:5 54:11 149:20 188:20 256:20 261:6 278:13 290:24 293:10

**cash** 111:12 120:4

**cashed** 120:8

**cast** 204:3 205:8

**caused** 50:13,20 80:17 110:17 136:12 142:8,15 166:20 205:25 278:5,9

**causing** 43:11,13 76:1 78:9 251:24

**cease** 15:10

**ceased** 29:18

**ceiling** 86:9 93:22 103:14 143:21,23 144:2 188:21,23 214:22 216:19 218:15 269:23

**center** 243:21

**CERTIFICATE** 301:1

**certification** 272:15

**certifications** 12:9, 11,21 13:23 14:1 27:15 201:8 265:25

**Certified** 301:2

**certify** 300:1 301:5, 7,10,12

**chain** 4:16 7:5 169:19

**challenge** 295:14

**chance** 110:5

**change** 40:4,17 41:11 60:18,22 128:12 184:18,19 246:17 248:19,21 276:18

**changed** 25:18 39:24,25 41:2 94:6 109:15 114:17 132:14 251:20 259:21 261:4,5,15 287:9

**changing** 40:19,20 41:3 225:16 282:6

**characterize** 209:18

**charge** 28:1,3,4 45:5 51:13 52:19 127:21 250:20

**charged** 45:3 48:15, 19 94:13

**charges** 98:4 99:10 252:24

**charging** 45:7 48:18

**chase** 84:13

**cheap** 223:19

**cheaper** 207:3

**check** 17:2 52:4 57:15 71:11 72:17 93:11 96:25 98:16 120:2,15,17 124:4 131:17 185:5 221:21 235:18

**checked** 111:9

**checks** 116:23 119:15,19,23,24 120:11

**cherry-picking** 149:25

**chief** 155:2 156:23 157:6

**children** 10:17

**Ching** 61:10

**choose** 65:21 175:23 211:20

**Chris** 289:2

**Cipriano** 60:11

**circuit** 145:17 146:6, 7

**circuitry** 213:5 271:16

**circuits** 141:8,9 146:12 268:10,23

**cite** 135:24 136:2

**cited** 211:4

**Cities** 154:23

**City** 3:12,14 64:9 65:14 139:8,12 154:9,22 155:3 159:20 160:20 165:24 195:10 242:7 265:12 275:15

**civil** 38:2

**claim** 3:20,21 4:6,13, 18,19,21,23 5:7 7:5 8:16 22:12 23:2,12, 15,22,25 28:2,5 30:25 35:21 37:15 62:23 63:4 79:16,18 88:13 93:9 94:17 103:2,7,14 111:1,24 117:6,17,20 118:1,5, 18 119:8,11 120:25 121:3,23 122:9,13,15 147:23 157:22 158:18 162:25 175:4 179:7 186:18,24 187:15 191:3,18 202:7 204:15 221:3, 10 222:9,20 230:20 231:11 233:5,6 234:6,7,10,13 235:11 237:12 238:9,16 239:16 244:12 245:2, 4 246:16,22 250:14 252:16 261:24 275:22 277:8,16 278:21 279:19 280:2 283:12 287:10 288:17 290:13 291:13 297:15

**claimed** 52:16

**claiming** 128:2 184:21 258:25

**claims** 6:7,13,15 62:16,17 233:11,18 235:24 250:6 252:9 253:15 259:2 276:25

**clarification** 160:4,5

**clarify** 102:14 104:3 105:15 108:1 148:22 170:12 177:18,21 260:23 285:5

**clarifying** 37:11

**class** 13:25 70:6 200:24 201:2,4

**clean** 56:21 82:15 86:1 221:12

**cleaned** 100:11 112:17,23 210:11

**cleaning** 5:9,12 17:2,8 53:14 56:17, 18 125:8 192:7 194:12 204:14

**cleanup** 27:7 223:15

**clear** 34:8 60:6 184:22 208:22 214:21

**clogged** 47:9 57:13

**close** 272:19

**closed** 16:19 42:20 117:20

**closet** 39:21 221:6,7, 9 223:13

**Closing** 277:15

**cloud** 246:12

Confidential

**clue** 48:2,3 269:5

**Clyde** 2:6

**co-workers** 16:17

**CO/SMOKE** 213:3

**coats** 188:22

**code** 6:20 31:15 59:22,25 62:3,5 63:12 64:20,25 65:3, 6,8,9,10,18,21 66:1, 3,4,6,7,10 68:14,22 69:9,18,19 125:3 131:15 132:8 135:15, 18,19,22,23,24 136:2,6,10 137:10, 12,15,23 138:3,7,8,9, 12,14,21 139:1,8,14, 17,21,24 140:5 142:22 153:21 154:4, 10,11,23 156:9,13,19 157:10 159:21 160:20 162:16 164:3 165:16,23 168:1,11 172:3 190:19 194:4, 10,12,14,16 196:10, 12,16 197:4 200:11, 12,14,15,18,20,21,23 201:9,12,16,20,25 202:4,9,13 205:22 207:23 208:5 209:4,9 211:9,13,15 212:25 243:24 244:1 247:5, 8,13 256:22 257:4, 11,16,21,24 262:14, 22,24 263:2,3,4,10 264:20,25 265:9,14, 19 270:4 274:21 275:3,4 277:22,23 278:15,17 282:21 284:3 287:22 288:2 289:15,18,24

**code-compliant** 209:11 243:23 270:7, 22

**code-related** 134:7 157:16 162:8 275:16

**coded** 32:25 33:3

**coders** 33:4

**codes** 138:13 140:3, 4 156:15 200:7,10, 12,24 201:2,3 265:5

**CODEX** 127:15

**coding** 64:18 169:8

**cold** 101:7

**Colfax** 2:3

**Collect** 45:17

**collected** 236:16

**college** 200:24 201:2

**colleges** 11:16

**Colorado** 2:3,7 5:6, 14,16,18,22 6:11,23 10:20 12:13 37:24 101:5 127:15 180:17 301:6

**colors** 188:22

**column** 69:18

**combination** 159:15,23 225:25

**combining** 141:8 146:12

**combustion** 39:22

**Comfort** 6:22 267:12

**comfortable** 100:20

**commenced** 85:4

**comment** 64:17 65:1 71:8 199:1

**comments** 68:20 69:3,4 70:10

**commission** 300:16 301:18

**common** 109:18 196:22

**commonly** 109:22 129:12 176:7 195:2 197:18

**communicate** 48:7

**communicating** 22:11 23:1,17,18 87:23 88:3

**communication** 117:16 234:13 277:12 280:10 283:16 297:24

**communications** 67:8 111:23 254:1,6, 9 255:9 277:8

**companies** 18:22, 24 19:1 20:21 27:4 62:18 127:20 274:9

**company** 8:7 14:20 15:22 18:4 19:7,23 20:1,2,6,7,12,24 21:1,2,5 25:15 28:12, 14 31:6,8,10,19 32:9, 11,14 35:25 62:10 78:3 98:7 125:15 158:16 161:10 231:1 233:10 234:2 236:18 240:13 242:18 252:24 254:17 289:6 301:20

**company's** 73:24 289:5

**compare** 37:2 181:22 218:2 285:13

**compares** 33:24

**comparisons** 31:13

**compensated** 158:15

**compensation** 158:16 222:19 235:14 261:23

**complained** 196:1 209:23 210:7

**complaining** 57:6 207:25

**complaint** 6:24 11:11 280:14 281:8 285:14 291:5

**complete** 114:25 162:17 294:10 300:4

**completed** 39:14 66:5 106:5 113:24 148:5 175:8,9 240:10 258:22 272:19 275:9 294:21

**completing** 115:12, 16

**completion** 177:19, 21

**complex** 158:22

**compliance** 66:13 139:24 209:3,9

**compliant** 59:22,25 135:23 194:15 213:15 265:13

**complied** 66:6

**comply** 65:8,9

**complying** 180:18

**component** 96:6

**components** 61:24 136:3

**Comprehensive** 6:17

**computer-aided** 301:8

**conceivable** 251:7, 10

**concern** 34:8

**concerns** 34:13,16 35:10

**concluded** 92:9

**concludes** 298:23 299:11

**conclusion** 141:25

**concrete** 141:10 203:23 281:25 282:1

**condition** 45:18 50:13,19 58:25 135:3 143:15 190:16 240:15

**conditions** 51:23 58:6 102:18

**condo** 38:5

**conduct** 88:6 291:5

**conducted** 287:17

**conduit** 147:20

**confident** 147:14

**confidential** 6:22 34:12,24 267:12 299:5

**confidentiality** 34:16


Confidential

**confirm** 183:9 285:7
**confirmed** 161:18
**confused** 107:8 122:22 254:5
**confusion** 283:21
**Conifer** 5:14
**connect** 114:7
**connected** 106:14
**connecting** 194:19 272:2
**considered** 180:5
**consistent** 241:2
**consisting** 130:11 140:21 159:3 192:6 235:23 301:8
**consists** 102:16,17
**constitute** 300:3
**construction** 4:5,8 12:2,16 14:25 21:11 23:8 25:13 116:6,7 201:7 242:17 289:6
**construed** 24:11
**consultant** 15:22
**contact** 87:6,9 88:12 117:14,21 118:11,18 119:5 121:25 155:2 231:10 239:8 266:21, 24
**contacted** 85:1 118:20 191:1,2
**contacting** 83:11
**contaminants** 112:22
**contaminated** 193:16
**contamination** 114:24
**content** 142:1
**CONTENTS** 3:1 4:1 5:1 6:1 7:1
**context** 70:2 87:21 88:7 138:7 201:5 228:20 233:21
**contextual** 87:16
**contingent** 115:17
**continue** 25:16 107:16 108:9 113:4 157:11 175:17 205:3
**continued** 4:1,2 5:1, 2 6:1,2 7:1,2 75:4 92:11 218:8
**continues** 197:1 245:8
**continuing** 218:5
**continuity** 203:3 277:13 283:3
**continuously** 29:12,13,21,23 30:19
**contract** 5:23 6:8 31:20,24 67:2 222:10,16 235:24 259:7
**contracted** 31:22
**contracting** 12:22 19:23 20:6,7,11,25 21:5 25:21 137:22
**contractor** 26:9,11 36:25 38:10 116:11 129:7 191:2 230:22 263:6 272:16
**contractors** 22:11 23:1,24 37:2 262:1 279:8,16 288:10
**control** 48:4,6 219:5
**conversation** 67:12 80:19 122:6 156:1 157:1,19 159:8 161:22 166:22 199:1 201:17 207:21 219:8 221:18 238:22 297:19,22
**conversations** 67:25 203:18 217:24 218:6,10,12 234:16 238:20 252:4 266:11
**conveyed** 262:17
**cooperated** 137:18
**coordinate** 86:4
**copies** 72:10 285:1
**copper** 194:19 196:21 197:20 208:18
**copy** 54:1 64:8 255:6,25 256:9 258:4 267:19 280:14 286:17 290:2 298:25
**corner** 144:14 257:17
**correct** 25:19 28:13 32:18,20 36:21 39:15 44:21 48:11 69:1,5 73:1,10,14 74:1 81:4 87:7 91:4 95:25 97:25 99:13 103:23 106:15 108:4 109:11 114:18 123:2 127:4 160:10 162:21 165:19 167:13 169:9, 10 172:24 177:23 178:6 183:17 194:14, 23 197:7 198:10 200:4 203:13 208:24 209:24,25 210:11 211:10 213:12,15 215:1 216:12 232:20 240:17,21 242:1 244:3 254:25 255:20 259:3,16 260:4,7,9, 18 261:21 263:5,21 264:2 265:4 278:19 287:14,24 289:22 290:22,23 292:7,9, 11,16 297:2,17
**Correction** 5:11
**correctly** 27:19 106:13
**correspondence** 87:14 169:23
**corrosion** 57:18 153:14
**cost** 96:21 97:6,13 100:6 126:22 127:3, 12 151:2 194:13 226:21 237:24 240:19 242:19 248:14 250:14,16 252:19 254:10 258:6 281:15
**costs** 198:4 204:4 206:23 252:8 279:11, 17 281:11
**counsel** 34:16 71:22 116:20 224:5 261:7 267:10,15 280:13 285:7 296:11 301:10
**counsel's** 76:24
**countertop** 226:9 279:12
**countertops** 226:10
**country** 15:24
**County** 3:12,14,16, 18 45:14 46:4,7,22 47:3 64:9 65:14 139:8,13,17 154:10 242:7 265:12 275:14
**couple** 16:17 23:9 93:20 131:15 169:18 204:18 263:12
**court** 6:23 8:22 9:12 29:1,2,4,5,11,14 30:8,12,17,18,19 38:16,22 44:12,14,19 46:17 119:18,20 120:12 203:14
**cover** 143:21 165:17 221:21 269:25 273:10 297:17
**coverage** 5:3 151:10 153:19 162:8,15 167:12 171:9 178:1, 5,11 180:1 284:8 294:19 295:18 296:25 297:2,3
**covered** 150:15,20 153:5 154:1 166:9,21 167:13 168:3,10,12 187:4 269:24 270:4,6 297:18,24
**covering** 269:25 270:3 277:4
**covers** 145:2,4
**COVID** 19:24 26:19, 20 38:5 52:16 88:20 295:12
**crack** 75:23 76:2 80:17,23,25 136:13 142:16 205:2,4,24

**cracked** 47:2 80:10 142:8 221:25 226:13

**cracks** 192:19 270:12

**CRC** 301:17

**create** 31:14,20,22 33:22 36:1,2,12,14 123:15 127:18 254:18 268:10

**created** 31:18 32:2, 18,19 35:21 36:5 37:13 123:14,19 124:18 128:5,6,8,19 217:1,2 250:18 267:12

**creation** 32:21

**credit** 111:13,14 116:24 130:12

**crisscross** 133:3

**crisscrossed** 141:9

**criteria** 114:2

**CRR** 301:17

**Ct** 4:15,16 5:5,10,16, 18

**cues** 9:2

**cumulative** 242:11, 14,15,16,25

**curious** 254:20

**current** 109:13 113:6 115:11,12 132:8,17 135:15 138:13 186:8 196:18, 20 198:5 209:8 212:25 229:1 252:15 281:22 282:7

**Cursory** 58:10

**customer-supplied** 206:12

**cut** 200:1 249:16

**cutting** 91:13 226:10

**D**

**D-A-M-A-R-I-S** 231:5

**damage** 3:20 5:3,7 6:15,17 17:1 19:1 27:6 77:18 79:23 80:4 83:21 84:11,13, 14 85:13 89:15 90:18 91:19 103:1 124:19 166:8,20 221:15 237:25 278:9,14,16, 22 281:24 287:18

**damaged** 83:15 90:1 100:10 150:14 168:11 171:22 226:13,19

**damages** 6:18 128:1,9 164:21 166:8 258:14 259:5,7,17 260:2,24 261:7,18 278:16 290:13,16,21

**Damaris** 231:5

**darn** 271:20

**date** 9:25 52:8,9,22, 25 53:5 57:1 62:3,6 71:7 74:2,6,16,21 87:3 90:23 91:2 117:5 122:7 123:17, 19,22,23,25 124:3 133:7,16 134:15 135:7 136:7 143:16 148:5,23 155:23 169:8 177:3 185:2,3 191:23 195:24 204:22 209:11 211:19 213:7,13 214:7,25 217:18 220:17 230:10 233:21 235:6 238:10 239:22 243:25 244:2, 4,9 250:11 253:16 260:24 268:16,17 269:14,21 270:25 271:14 273:16 275:22 277:1,4 278:18 281:22

**dated** 72:10,21 73:4 103:18 159:9 170:2 171:12 173:1,2,6 194:2 198:23 204:18 207:17 247:23 268:5

**dates** 16:2,3 93:18 97:14 118:22 152:6 218:20

**Davis** 13:3,4,15 14:4 15:17,19 16:21 17:22 18:25 19:18 20:13 21:1,3 82:19,21 83:5, 8 103:4 111:17 168:24 219:1 228:21 230:25 234:1 289:3

**day** 61:4 77:13,19 79:7 88:17 111:14 155:5 204:20 260:9 275:23 283:6 295:25 296:16 300:12

**days** 74:17,18 82:19, 22 83:5 87:7,19 88:5, 8 93:20 111:17 204:19 283:15

**dead** 269:11

**deal** 25:4 45:19 180:15

**dealing** 84:6 171:1 177:11

**deals** 168:1

**debate** 129:10

**debris** 19:9,11

**December** 239:23

**decide** 175:5

**decision** 171:9

**decora** 215:3,15

**deductible** 258:7 297:7

**deemed** 182:3

**Defendant** 2:9

**Defendant's** 3:10 7:3 291:18

**deficiencies** 272:20

**deficiency** 272:12

**Define** 29:23 58:4,23 184:19 191:6 206:6

**degradation** 283:24

**degree** 12:1,12 16:9 78:17 81:22 86:7 129:9 201:1

**degrees** 252:17

**Delay** 283:2

**delayed** 180:5 283:12,13

**delays** 277:12

**delineation** 197:17

**demand** 6:24 239:7 266:10

**demands** 266:7

**demo** 19:12 221:3,5 223:10

**demo'd** 113:11

**demolition** 85:25

**demonstrating** 75:9 116:21 281:15

**Denby** 2:6 3:3 8:4,6 22:20,23 23:6 24:7 34:15 35:2,8,18 53:21,24 57:25 63:25 64:3,5,7 66:23 71:22 72:2,8 92:16,19 95:15 98:23 99:2 102:7,11 110:1,4 112:5,8 117:1 123:3, 6,10 130:6,9,13 131:6,9 133:13,17,19 134:1 140:9,12,15, 19,25 141:21 148:7, 10,13,14 151:15,18 159:2,7 163:8,11,13, 17 165:7,10 169:12, 16 173:21,24 174:1, 6,13 179:3 183:24 184:2 185:18,21 189:12,15,16 190:4, 12 191:24 192:3,5,10 198:15,19 207:8,10, 15 210:17,21 215:23 216:1 217:12,16 219:23 220:1 224:5, 11,18,24 228:4,6,12 230:14,16 231:6 233:1,3,4 235:19,21 240:1,5 243:6,8 245:18,21 246:2,3,10 247:17,19 249:19,22 253:19 256:2,6 258:18 261:16,17 262:8 265:17 267:3, 5,9 268:1 278:2 280:13,18 285:5,12 286:7,12,16 292:2,

Confidential

21,23,24 295:24 296:3 298:14,16,22 299:2,8,10

**denial** 152:5 155:10 162:4,5 173:7 283:19 284:15

**denied** 154:4,6 162:7 180:5 283:12

**denies** 162:15

**Denver** 2:3,7 3:12, 14,16,18 5:5,15,16, 17,18 6:20,23 11:22 45:14 47:20 62:21 63:1 64:9 65:14,17, 19 82:14,17,23 83:1 93:23 136:5 139:8, 12,17 147:6 154:9 155:3 156:24 157:7 195:11 198:3,13 199:2,9 212:25 215:22 242:7 295:9, 10 301:6

**denying** 284:8

**dependent** 46:24 47:19

**depending** 209:17

**depends** 48:9 75:6

**depict** 144:24

**depicted** 146:3,9

**depicts** 144:7 146:21 147:9 257:2

**Deponent** 300:8

**deposition** 8:8,10, 12 10:25 35:4 245:7 267:11 298:23 299:4, 11,12 301:3,5

**describe** 32:7 34:2 35:13 76:12 77:2 80:23 146:20

**description** 34:3 35:16 132:11 192:15 194:18 215:9 220:22

**designate** 34:12 299:5

**designed** 36:8,18 81:19,21 270:2

**destroyed** 114:8 225:15

**detach** 94:10 279:14

**detail** 4:6 39:6 172:9 181:21 255:2,4 279:9,15,18

**detailed** 69:4 103:24 104:11,23 105:12,22 166:23 182:12 206:3 217:6 227:5 259:12, 17 260:25 265:14 271:14 287:13 297:20

**detailing** 96:8 97:12 116:15 255:3 291:2

**details** 65:14

**detector** 212:22

**detectors** 213:1,3,9, 17

**deteriorated** 192:18

**determination** 80:16 180:8 250:13, 16

**determine** 36:22 137:17 263:22,23

**determined** 43:12 126:22,24 234:21,24 254:7,10

**determining** 129:3 218:23

**Development** 6:6 230:21 231:10

**Development's** 230:20

**devices** 191:8

**diagnostic** 210:3,5

**diameter** 76:24 192:23 193:1 196:18 202:2

**Diem** 3:10,12,14,16, 18,20,21,22,24 4:3,4, 6,7,9,11,13,14,16,17, 20,21,22 5:3,5,7,9, 10,12,13,14,15,17, 19,21,22,24 6:3,4,6, 7,9,10,11,13,15,16, 18,20,22,24 7:3,5

8:1,5 9:24 23:8,19 28:15,18,20,22 29:7 30:24 31:2 38:20 72:8 116:5,12 131:7, 10 132:13 159:4 207:11,12 220:3 226:23 227:5,18 228:13 235:25 241:22 253:17 254:22 256:11 257:25 268:1 280:18 285:12 286:12 292:24 300:1 301:4, 20

**difference** 70:19 226:20 279:7

**differences** 33:25

**differently** 252:17 285:18

**difficult** 119:12,14 295:10

**dig** 43:5

**digging** 248:8

**digits** 10:5,9

**dining** 232:6

**direct** 54:6 207:16

**directed** 142:4

**direction** 262:23

**directly** 83:3 136:14, 16 142:10,15 150:14 233:23

**dirty** 193:16

**disagree** 149:14 150:16,18 153:9,11 158:7 167:19 171:16 176:17,19,20 177:1 217:7 252:1 296:23 298:2,5,10

**disagreed** 129:15 167:2

**disagreeing** 295:19 296:25

**disagreement** 50:8 161:23 175:6,11

**disappeared** 129:23

**disappointed** 167:2

**discern** 144:8 205:23 251:15

**discernible** 219:7 251:5

**disclaim** 272:21

**disclose** 288:7

**disclosed** 264:9

**disclosure** 6:19 259:6,18 260:11 261:8,10,18 267:19 290:16

**disclosures** 211:5 267:21

**disconnect** 249:13

**disconnected** 55:21 107:19 108:11 176:4

**discontinue** 174:21

**discount** 289:4

**discovered** 84:3

**discovery** 3:11 7:4 11:8 54:2 267:15 286:18 291:19

**discuss** 118:25 156:3 208:5

**discussed** 60:14 79:21 91:2 94:22 114:12 117:3 126:17 287:25 289:9,23 290:19

**discusses** 197:2

**discussing** 19:2 159:8 229:9

**discussion** 73:22 135:20 150:19 153:18 156:11,12 162:11 163:21 187:12 201:15,17 233:16 264:24 265:1, 5

**discussions** 51:4 67:21 157:10 162:20 177:7 234:23 293:24

**dishonest** 246:7

**disposal** 279:14

**dispute** 157:16 182:5,8,9,13,20 294:1

**disregard** 284:8

**dissecting** 144:1

**dissolved** 25:13

**distinction** 69:25

**distinguish** 224:21 288:6

**distinguishable** 57:19

**diversify** 26:22

**Docs** 6:20

**document** 3:6 4:11, 23 54:3 64:10 66:24 72:24 92:23 95:2,16 99:3 102:12,19 110:7 112:11 123:11 130:14 131:7,9 139:20 140:17,20,24 141:1 148:14 151:19, 21 159:3 163:12,14, 18 169:17,20 181:3,7 185:24 192:6 207:11 208:12 210:22 216:1, 4 220:7,11 224:25 225:25 227:4 228:13 235:21,23 236:2,11 240:6 243:12 249:23 256:7 258:15,19,24 259:9,19 260:1 262:9 267:14,15,17 280:15, 20,24 284:20,23 285:6,9 289:16 290:15 291:9,23

**documentation** 159:20 164:3 281:14, 15

**documentations** 116:21

**documents** 11:2,5 72:12 75:9,16 125:17 126:1,2,6,17 139:16 157:11 196:4 211:4 224:6 250:5 261:9 266:4 285:15

**dollar** 96:21 97:7,15 178:5 182:12 248:8

**dollars** 51:25 52:3 73:16,20 116:9 175:20,22 177:4 237:6,8

**door** 39:21 53:15 89:12 187:16 188:14 220:25 221:6,8,11 223:7,10,11,12,14

**double-check** 216:17 232:23

**double-checking** 292:19

**download** 89:3

**downspout** 229:7

**downspouts** 229:7

**downstairs** 44:7 57:4 78:19 133:12,24 240:11 271:17

**drain** 5:9,12 47:2 56:17,18,24 57:20 75:23 81:24 82:1,3 125:8 136:12 142:9, 12,16 176:7 192:7 194:12 203:1 204:8 270:11 274:4,11

**drainage** 78:19

**drained** 176:3

**drains** 176:8

**draw** 54:11,13 55:22 56:15 67:1 68:12 69:17 72:19,23 74:12 163:23 164:11 169:25 174:13 180:23 192:17 204:23 208:11 214:9 223:16 225:24 241:21 268:2 272:8 281:7 286:13,19 291:6,9,17 292:2 296:4 298:2

**Drawings** 5:21

**drive** 10:20 46:19

**driver's** 37:18

**driving** 154:11

**drop** 214:19,23

**dry-out** 17:2

**dryer** 56:1 134:21 272:1

**drywall** 75:25 76:5, 8,15,16 79:22 90:21 91:3,11,24 92:1 216:20 223:21 231:14 232:2 275:17

**duct** 103:16 112:22 270:21 271:8

**ducts** 39:22 112:23

**ductwork** 114:19

**Ductworks** 4:4 112:15 288:24

**due** 50:7 57:17 63:12 101:8 103:15 168:12 171:21,24 175:6,11 189:9 281:12 282:11 283:23,24 287:22 293:5,15

**dug** 143:25 203:20

**duly** 8:2

**duplicative** 291:4

**duration** 110:13

**duty** 83:14

**Dwelling** 253:21

**Dwellings** 186:9

**DWV** 81:6,11,18 143:11,13 171:21 191:20 192:19 196:9 202:1 222:1 226:13 272:6 273:24

**E**

**earlier** 99:15 105:19 108:1 114:12 115:3 117:3 159:8 187:2 220:15 244:14 247:3, 4 255:2 256:17 264:10 281:5 289:10, 23 290:8,19

**early** 53:19

**easier** 109:4

**ECF** 280:14 285:8

**economic** 25:4 198:8

**edited** 164:17

**education** 11:15,18 12:5,9

**Edward** 2:6 8:5

**Edward.denby@ clydeco.us** 2:8

**effect** 72:25 73:5,17 74:13 75:16 210:13 277:3

**efficient** 108:17

**effort** 180:3 252:15

**efforts** 82:15 96:12 216:11 218:5,23

**eight-page** 140:20

**elaborate** 25:5 33:5 55:1

**elaborating** 100:18

**elective** 201:6

**electric** 4:7 125:14 129:19,25 130:17 135:19 136:23,25 138:25 140:16 141:3 142:3 211:1 212:5,16 248:6,22,25 249:1 263:24 264:5 275:7 277:22 287:20 288:1

**electrical** 41:23 53:16 54:24 55:12,18 56:9,12 58:12 59:22 60:5 61:24 62:2 113:21 115:6 125:2 128:19 130:22,24 131:15 132:8 134:20 135:14 136:3 137:3, 15 140:5 142:6,22 145:1,10 153:23 154:18 168:13 169:7, 8 171:25 175:14,18 190:20 211:9,13,16, 18 212:6 214:14,15 215:9,11 240:12 243:17,20 245:3,11 247:15 256:13 264:7 268:6,7 269:18 271:12 272:12 274:24 275:1,4 276:2 278:3,16 283:22 298:18

Original

**electrician** 42:5 125:1 128:16,18 129:14,16,17 135:13 137:6,14 138:1,21, 23,24 141:17,24 143:21 145:6 156:20 189:6 244:22 245:22 248:2,5 262:22 269:1,9,23 272:20

**electrician's** 125:11 137:8

**electricians** 125:21 137:21 139:4

**electronic** 54:9 298:25

**electronically** 267:17

**Elizabeth** 5:14

**Elkmont** 4:4,8,10 21:11,23 22:3,9,14 23:3,7,11,14,18,21, 24 24:24 25:9,12,13, 24 28:1 116:6,7 288:25

**Elkmont's** 25:25 27:24

**Elm** 4:15,16 5:5,10, 16,18 6:23 29:2 30:7, 19 38:16,22 46:17 59:19 119:18,19 120:12 203:14

**else's** 118:16

**email** 3:21 4:6,9,11, 16,17,20,22 5:10 6:11,16 7:5 47:12 88:16 95:9 117:18 119:6 138:2 140:21 141:6 142:4 148:3,4, 23 149:6,10,19 150:5,6,11 151:11 154:20 155:9,24 157:3 159:11,12,18 160:3,7,8,20 161:9 162:2 163:21 164:12 165:11,13,14 166:24 170:1 171:12,15,17 172:10 174:15,18 176:16 180:7 181:11 198:14,19,23 238:22 243:16 245:8 247:22, 23 262:13,17 265:7, 14 266:11 280:7 295:22 296:8 297:20, 21,24 298:4,10

**emailed** 93:4 161:11

**emailing** 141:3

**emails** 117:18 158:23 159:4,15,24 160:17 170:1 172:17 280:11

**emergency** 13:4 16:21

**Emily** 61:10

**emotion** 244:10

**emphasis** 12:1

**employ** 20:23

**employed** 15:18,19 19:19,21 20:17,21 242:20 301:10

**employee** 26:4 27:18

**employee's** 26:5

**employees** 17:17 22:1

**employment** 20:14

**empty** 69:1

**enable** 36:18

**enables** 265:18

**encompass** 27:4 190:14 220:22

**end** 36:16 74:16 104:17 111:13 112:25 128:21 163:7 239:14

**ended** 25:8 60:24 224:1 233:24

**ends** 228:25

**enforced** 160:20

**enforcement** 139:21 154:10 159:21

**engage** 18:2

**enormous** 192:19

**ensure** 270:12

**entail** 40:14,19

**entails** 65:3

**enter** 74:20,23 299:7

**entered** 123:18

**entire** 184:22,25 197:9 198:9 207:5 212:7 241:19,20 243:23 272:15 295:4

**entities** 17:22

**entitled** 179:17 237:6

**entity** 21:12

**entity-wise** 20:3

**entry** 223:7

**Environmental** 98:10

**equal** 21:20

**Equipment** 96:18

**error** 71:14,19

**escaped** 153:6

**escrow** 272:19,24 273:1,3

**ESQ** 2:2,6

**essential** 272:17

**essentially** 8:12,15 14:15 24:11 25:16 36:17 91:13 107:19 132:9,12 142:2 171:16 176:10 195:7 198:7 209:10 237:19 260:1 293:19

**establish** 268:19 269:9

**established** 183:2

**estate** 12:2,13 15:22 31:3 37:19

**estimate** 4:8 5:11, 16,18 6:13,15 33:11, 15 36:19 37:6 70:21, 23,24 87:1 88:2 92:22 93:5,9,13,24 94:17 95:2,10,24 96:2,13,24 97:18 98:14 99:12 102:16 103:9 112:1 117:2,4 122:18 123:1,7 124:10,16,17 125:6, 7,12,19 127:18 128:1,8,9,19,22 130:2,11 131:25 132:13,15,16 147:24 148:4 149:10,24 150:1,3,11,12,23 151:5,8 180:25 181:7,8,12,25 185:9 186:3,10,11,16 190:1,2,13 191:9 194:2,8,11 202:16 211:8 212:6,20 215:6 216:2,14,24 217:1,3, 17,20,22,25 218:1,19 219:10,15 226:5 234:17,21 237:18,23 239:6,14,15 240:9,14 241:14,23 242:5,9,22 245:3,11,15,17 246:6,20,21 248:13 250:6,7,11,19 251:15,23 252:7 253:15 254:2,11 255:10,13,14,19 256:1 258:1,4 259:2, 13,18 260:6 261:1,20 278:22 281:6,17 287:25 290:17,21

**estimate's** 250:15

**estimated** 234:2

**estimates** 23:7 27:3 33:22,24 35:20 36:4, 24 92:13 97:12 98:22 120:22 122:3,23 125:23 173:4,12,15 181:16 182:10,13 189:17,19 190:7,9 206:2 219:11 234:25 242:10 254:18 255:8 283:4

**estimating** 13:8,11, 20,21,24 20:1 25:15, 21,25 26:13,25 27:9, 15,23 31:13 33:1,2, 19 34:6 36:4,18 37:10 168:23 200:25 234:2 254:17 279:5

**estimator** 12:24 70:18 127:12

confidential

**evaluation** 272:14

**event** 96:25

**eventually** 51:8 57:17,23 104:8 108:12 208:3

**eviction** 52:14,15

**evidence** 268:23,25

**exact** 16:3 79:19 82:13 83:6 117:9 118:22 191:23 199:15,17,21 238:10 250:24 285:6,17

**examination** 3:2 8:3,13

**examines** 54:4,22 64:6,19 66:25 68:16 92:21 95:14 102:10 112:10 123:8 140:23 148:9 151:20 153:1 154:5 159:6,23 163:16 165:12 166:12 167:18 169:15 171:14 173:23 174:12 181:6 184:1 185:20 186:14 192:9 195:1 198:18 202:23 205:7 207:13 210:20 215:25 216:6 217:14 228:10 230:18 232:24 236:1 240:4 243:10 247:21 249:21 254:4 256:4 258:17 262:7 285:19 286:11 287:11 290:4, 11 291:14 296:7,17 298:7

**excavation** 144:16

**exceed** 236:17,24 237:7

**exceeded** 97:7

**exceeds** 179:16,18

**Excellence** 98:10

**exchange** 297:21

**Exclusion** 258:14

**exclusions** 153:8

**Exclusive** 3:16,18

**excommunicated** 244:10

**excuse** 32:5 119:13 148:25

**execution** 238:11

**exhibit** 3:10,12,14, 16,18,20,21,22,24 4:3,4,6,7,9,11,13,14, 16,17,20,22 5:3,5,7, 9,10,12,13,15,17,19, 21,22,24 6:3,4,6,7,9, 10,11,13,15,16,18, 20,22,24 7:3,5 53:22, 23,25 54:4,22 64:1,2, 6,8,19 66:21,22,25 68:16 72:20 73:4,7 74:11 92:18,20,21 95:8,13,14,22 96:18 99:1,3 102:8,9,10,12, 15 103:20 104:24 105:2 110:2,3 112:7, 10 117:4 123:4,5,7,8 126:20,21 130:8,10 132:17 140:13,14,23 148:3,6,9,15 151:17, 20 153:1 154:5 159:1,3,6,23 161:19 163:9,10,16 165:9,12 166:12 167:18 169:14,15 171:14 173:19,22,23 174:7, 8,11,12,14 180:7,24 181:6 183:7,25 184:1 185:10,16,19,20 186:15,17 192:2,4,9 195:1 198:17,18 202:23 205:7 207:9, 11,13 210:18,20 215:24,25 216:6 217:13,14 218:2 219:24 220:1,3 221:23 222:15,17 224:19 225:1 228:5, 10,13 230:15,18 232:24 235:20,23 236:1 240:3,4 243:7, 10 247:18,21 249:20, 21 250:2,3 251:25 253:18 254:3 256:3 258:16 262:6,7 267:8 280:17 285:10,19 286:3,9,10,11,17 287:11 289:20 290:4, 11 291:14,17,22 295:25 296:2,7,17 298:7

**exhibits** 3:9 4:2 5:2 6:2 7:2 72:7,9 149:17 174:2 186:14 224:22 228:9 253:22 254:4 256:4 258:17 299:1

**exist** 142:12,17 161:17 162:1 214:8

**existed** 213:7,8,11 214:6,24 243:25 244:2,3

**existence** 75:15 283:4

**existing** 142:18 196:17 197:8 203:25 204:2 205:10 208:8 214:1,20 220:23 221:1 223:4,5,7,8 243:17 263:19

**exists** 154:22

**exiting** 172:20

**expect** 293:20

**expected** 132:4 242:18

**expense** 109:7 204:1 223:24 297:6

**expenses** 116:10,22 175:12 297:14,16

**expensive** 223:22

**experience** 27:9,10 33:2 70:18 87:6 163:4 168:23,24 200:22 219:1 265:18

**experienced** 195:16

**experimenting** 27:13

**expert** 138:10 211:5

**expertise** 137:25

**expires** 300:16 301:18

**explain** 55:23 85:18, 21 111:9 127:10 192:14 196:11,15 242:2

**explained** 161:22 214:1

**explaining** 127:7

**explanation** 152:5 173:7 284:17

**export** 217:18 250:11 253:16

**exported** 124:6 239:23

**exposed** 131:14 132:7 134:10

**express** 166:7 167:5

**expressed** 166:4

**expressing** 167:1

**extended** 74:24 75:1,2 153:20

**extensions** 75:10 167:12 229:6,7

**extent** 67:16,24 71:22 83:21 85:14 105:8 116:20 122:5 143:5 223:1 246:10, 11 249:4 261:8 266:24 283:8

**exterior** 46:20 141:14 211:22 213:20

**exteriors** 27:7

**extra** 113:17

**F**

**fabricator** 225:3

**facets** 41:4

**facilitate** 22:14 23:4 89:2

**facing** 90:20

**fact** 158:15 255:19

**factor** 258:7

**factors** 198:8 281:12 282:8,12,13

**factual** 290:13

**fair** 172:15 176:17 178:8 281:23 288:12

**fairly** 57:13


Confidential

**faith** 180:3 284:18

**fall** 38:18 39:4 43:21 44:21 49:17 50:18 51:12 52:1 235:4,5 236:1

**falls** 179:7 214:22

**familiar** 33:18,20 64:24 72:14 93:2 95:15 141:1

**family** 14:22 187:23 220:24 223:4

**fancier** 108:21

**faster** 37:1 223:25

**faucet** 40:3 41:9 206:11,13,21

**faucets** 41:2,7

**faulty** 153:6

**favor** 156:24

**feasible** 294:14

**February** 211:20 286:25

**Federal** 225:4

**fee** 237:15,19 242:20 251:2 252:5

**feeder** 134:5

**feel** 119:8 181:5 220:4 277:7 285:6 296:3

**feeling** 275:5

**fees** 97:2 203:19 242:6 250:24

**feet** 199:25 200:1,2

**fell** 187:7

**felt** 134:2 285:21,25

**figuratively** 136:21

**figure** 18:18 76:1 78:9,20 115:6,7 130:21 131:22 136:8 212:18 218:20 262:24 267:24 279:1 288:21

**figured** 295:23

**figures** 127:17

**figuring** 145:9 282:3

**file** 4:11,23 71:23

**filed** 191:18 281:1 285:8

**fill** 176:8 205:16

**final** 64:13 66:15,16 71:12,16,20,23 140:6 219:12

**finaled** 71:15

**finalized** 123:23

**finally** 147:7 202:20 227:18 230:5

**financial** 261:23

**find** 18:17,19 37:8 75:22 76:13 84:13 164:21 200:10 204:2 205:13 224:12 233:12 259:25 275:2 284:13

**finding** 15:23 77:25 198:2

**findings** 57:11

**fine** 57:15 81:16 107:12 237:20

**finger** 82:6,8

**finish** 8:25 67:10,13 115:9 194:15 206:13 235:15

**finished** 11:22 38:25 111:25 280:19 296:18

**finishing** 91:24 112:23

**fire** 5:15,17 13:20 82:14,18,23 83:2 93:23 124:20 147:6 215:22 233:22,24,25 234:8,10 268:11

**fires** 13:18 17:2 27:6

**firing** 110:14

**fit** 76:22,23

**five-minute** 72:3

**five-page** 207:11

**fix** 135:7 252:9 269:14 270:24

**fix-and-flip** 24:22,23

**fixed** 40:9 133:9,22 134:3 278:25

**fixture** 40:14 47:9 211:22,24

**fixtures** 40:1,5,9 41:11 58:6

**fizzle** 172:23

**flag** 154:20 284:12

**flesh** 172:21

**flick** 59:12

**Flood** 5:15,17 82:14, 17,23 83:1 93:23 124:20 147:6 215:22

**floods** 14:25

**floor** 78:7,8 80:4 90:2 193:7 223:5

**flooring** 220:24

**floors** 39:20 113:19

**flow** 208:2

**flows** 36:7

**flue** 99:9 271:2

**Flush** 59:5

**flushed** 210:12

**fly** 267:24

**focus** 54:24 171:6 190:23 220:3

**focused** 17:8

**focuses** 164:21

**focusing** 260:20

**follow** 58:17 87:13 97:23 182:24 267:22

**follow-up** 87:11 88:4,6 173:11 297:23

**foregoing** 300:2 301:8

**forget** 295:12

**forgot** 20:14 77:14

**form** 21:3 35:19 70:4 246:8 277:25 298:12 301:8

**formatted** 285:18

**formed** 20:12 21:1,4, 6

**forming** 21:23

**forms** 291:12

**forward** 51:1 120:13

**found** 76:2 77:13,22 80:10 82:16 86:9 96:13 112:18 116:18 132:6 133:2 210:3,9 218:14

**Foundations** 163:15

**four-page** 102:15

**fourth** 102:17 209:18 215:6,12

**frame** 25:7 39:11 176:22 191:10 200:13 208:25 211:17 221:7,9 223:10,11 249:16 294:15,17 295:1

**frames** 24:23 187:16

**framing** 221:5,13,15 222:20 223:13 248:2 249:10 277:17

**franchise** 13:4,7,9, 10,13 14:5,7,12 15:3, 5,8,12,18 20:13,16 289:3

**franchises** 15:23

**Frank** 44:8,9 152:8 155:2 161:16 199:10

**Frankly** 257:5

**free** 181:5 220:4 285:6 296:3

**frequently** 238:15

**friend** 13:14 19:23

**friends** 21:19

**front** 43:4,5 70:7

Confidential

75:13 76:15 79:22 89:12 91:3,25 145:7 167:25 242:18

**fronting** 242:19

**frustrated** 172:16 180:14,21

**frustration** 172:12

**FRV** 178:2,7,13,18 179:2

**full** 63:9,11 149:24 216:24 283:17 285:23 288:4,5

**full-pay** 283:16

**Fullerton** 67:22

**fully** 149:23 164:19 172:21

**function** 33:4

**functional** 199:19

**functionality** 41:15 42:11,13 81:14

**functioned** 55:5

**functioning** 113:21 114:5 134:25 145:13

**functions** 209:2

**funds** 96:4 294:12

**furnace** 39:23 51:5 90:13 106:25 107:5, 12,15,18,20 112:20 220:25 223:7

**furnaces** 50:4,5,6,8, 24 89:25 97:8 98:9 99:7 100:7,9 101:17 103:21 104:9 105:1, 14 107:9,21 108:2 110:12 176:4 184:24

**fuse** 145:16,18 256:24

**FW** 4:20

**Fwd** 4:23

**G**

**Gabe** 266:12

**gain** 114:6

**galvanized** 195:3 196:21,23 197:6,11, 15,16,18 198:1 199:11,14,15,25 200:2 208:3,6,9,17 257:17 273:13,15

**galvy** 199:4 207:19

**Gann** 289:2

**garage** 225:10 227:9,23

**garbage** 279:14

**gas** 108:16 110:15, 17

**gave** 33:10,12 86:14 110:10 129:22 141:17 157:7,23 200:15 201:22 204:22 234:10,11 285:22

**general** 12:19 13:8 69:12 129:7 168:17 192:16 202:10 255:5 297:16

**generally** 65:13 66:11 187:18 204:6 218:4 249:6

**generate** 33:16

**generated** 96:2

**generating** 246:21

**gentleman** 19:9

**GFCI** 141:15 271:16, 17

**GFCIS** 271:18

**ghosted** 239:11

**Ghosting** 277:15 283:5,6

**give** 19:3 23:5,16 47:6 68:7 70:2 74:18 110:11 111:12,20 126:1 136:2 140:18 152:24 153:12 155:7 159:22 164:16 177:4 181:4 194:22 228:7 237:1 245:11 286:2 289:3 298:14

**giving** 158:13 200:19 201:10 267:2

280:3

**glad** 9:6

**glean** 169:5

**Gmail** 4:14

**go-to** 18:14

**Gonzales** 155:2,11, 14,18 156:8,13 157:2 161:16,25

**good** 8:5 18:19 20:20 32:12 72:5 180:3 205:12 219:6 235:3,7 236:5 237:2 293:3

**Gotcha** 25:20 163:8 176:16

**grade** 256:14,21

**graduate** 12:3

**graduated** 16:5

**grand** 237:9

**Grant** 233:9 238:6, 16 247:7,10

**Grant's** 265:21

**Graphics** 20:16,17, 19,22 21:4

**Great** 251:3

**Greco** 60:11

**grew** 86:8

**grinding** 162:18

**ground** 75:25 76:4, 7,9,15 78:14,15,23 269:9

**group** 18:8

**growth** 14:22 84:4 189:10 193:23

**Guerra** 245:6,14 246:4,5

**guess** 33:9 35:19 46:25 47:1 56:16 59:11 70:3,23 71:2 76:12 80:3 90:19 91:14 100:12 113:5 121:19 122:8 160:17 170:13 173:18 176:14 202:5 210:6

212:20 218:4 219:13 224:19 225:16,25 239:21 242:21 248:13 249:5 258:10 261:17 263:9 295:8

**guessing** 255:1 295:15

**guide** 164:4

**guidelines** 36:4

**gutted** 113:10,19

**gutter** 229:6

**gutters** 63:8,11

**guy** 18:16 129:23,24 258:11

**guy's** 121:14

**guys** 21:20 71:23 140:10 211:4 260:1

**H**

**habitability** 6:12 101:6,13 180:17

**hail** 62:24 63:1

**hailstorm** 62:21 63:15 289:12

**hall** 188:6

**hallway** 188:14

**hand** 47:1 174:10

**handed** 72:9 186:16

**handle** 47:25 48:5

**handled** 163:5

**handling** 157:22

**hands** 48:2

**handyman** 228:15, 16 229:2 269:2

**handyman-type** 39:20

**hang** 39:21

**hanging** 137:3 248:9 269:22

**happen** 31:23 37:14 107:18 108:10 156:7 205:18 284:14


Confidential

293:21

**happened** 25:2 45:8 49:10 62:20,25 92:8 97:4 117:6,7,11 118:4 125:5 143:18 155:9,13 157:9 160:22 162:3 187:11 248:25 266:2

**happening** 34:21

**happy** 156:7 162:23 163:1,2 164:4 244:22 245:23

**hard** 157:14 249:3

**hard-wired** 213:1, 10,11

**hardship** 52:16

**hardware** 221:9 223:12 227:8

**hat** 116:17

**hazard** 268:11 272:13

**he'll** 104:12

**head** 9:3 25:23 62:14 63:24 75:17 88:11,13 116:2 118:9,13,15 119:21 138:11 173:8, 16 177:17 201:14 217:4 224:3 255:17

**heading** 96:20

**heard** 170:8 251:12 259:14 295:10

**hearsay** 141:23 142:1

**heat** 101:8,14 108:9

**heater** 94:10 100:16, 18 101:9,20 105:24 106:3,7,13 107:9,20, 23 108:5,7,8,10,15, 19 109:2,10 176:3,4 270:22 271:5,7

**heaters** 39:23 90:14 97:9 98:9 99:8 100:21,22 101:21 102:2 103:22 107:21 108:3 109:18,21 271:9 276:11

**heating** 3:23,24 4:3 51:6 98:8 104:13 110:10

**held** 29:10 81:15 203:3

**HELOC** 115:21,24

**helped** 138:23

**helping** 200:11

**helps** 202:5

**Hermann** 82:25 83:4 217:1,6,17,25 218:22 219:4

**Hermann's** 218:7

**hesitated** 17:7

**Hessel** 102:22,24

**Hey** 47:12,24 78:17 124:25 125:2 127:21 138:8,12 153:22 154:1 200:12 206:24 218:14 222:17 246:13 248:9 284:12

**hidden** 146:25

**high** 195:12,20,25 210:3,9 264:15

**higher** 75:11 127:22 196:5 198:5 217:10 255:20,21 290:21

**Highwater** 3:22,24 4:3 98:8,12,20 102:25 103:6 104:15 105:21 110:10 111:10,22 125:16,18 126:11,17

**hire** 18:5,8 138:1

**hired** 269:1

**hiring** 161:12

**history** 47:20

**hit** 19:24

**hoc** 84:12

**hold** 20:14 28:23 122:12 164:15 170:23 202:22 205:6 213:23 216:4 221:5

**holding** 28:21 31:3

32:9,11,14

**hole** 91:14

**holes** 114:5,7 137:5 231:14

**home** 6:22 27:8 41:17 61:7 141:24 155:1 190:15 243:22 262:21 273:6 278:4

**homes** 5:21,22 14:24 224:20 225:2, 22 267:12

**honestly** 94:2 256:8 298:13

**hoping** 163:6

**Horan** 121:13

**hose** 39:24 271:4

**hoses** 176:11,12

**hot** 55:2,4,7,18 100:24 275:25

**hours** 96:19,20 284:15

**house** 19:2 30:5,17, 18 39:12 40:8 41:18, 20 42:3,6,9 43:11,14 44:12,14,19 50:11,13 55:5,8 56:2 57:14 58:1,2,7,12 77:12,20 78:16 79:16 83:15,25 89:13 90:22 109:3,9, 19 122:18 146:15 169:3,4 195:12,21 212:7,10 213:9 214:25 229:1,7 230:7 241:19,20 243:23 252:16 276:19 277:2 293:1,2,5,8,11,12,15, 22 297:9

**houses** 12:20 15:2 20:1 47:8

**hundred** 51:25 52:3 73:16,20 116:2,9 237:5,8 274:2

**hung** 38:8

**hurricane** 117:10, 12,17

**hurricanes** 27:6

**HVAC** 104:15 125:4, 15 126:16

**hygienist** 77:4

**hypothetical** 237:3 281:24

**I**

**idea** 69:16 71:10 73:25 112:18 113:12 144:21 206:22 215:7 255:15

**ideas** 32:24 35:19

**identified** 263:4

**identify** 290:12 298:4

**identifying** 287:17

**IHN8570** 4:12,13,24

**illegal** 132:7 134:9, 13,17,18 141:7,15

**illegally** 141:10

**images** 249:5

**immediately** 90:16 118:3

**impact** 51:5

**implications** 208:5

**important** 9:7 194:23,24 196:7

**impossible** 273:4,5

**impression** 133:11, 23 170:16

**improper** 56:2 189:21,25 190:11

**improperly** 206:17

**improving** 208:2

**in-wall** 272:5

**inadequate** 189:20 190:3,10,13

**inapplicable** 138:4

**incident** 45:8 73:6,9 75:21 110:20 142:12 193:17 277:24 278:5

**include** 17:18 240:25 241:7,8

**included** 96:22 150:3,14 214:16 237:19

**includes** 125:4 216:19 222:17 287:21

**including** 17:19 115:21 194:19 236:19

**income** 24:19 26:23 38:4 158:9

**Incorporated** 267:13

**incorrect** 180:9

**increase** 221:7

**increased** 183:4 186:18,21 281:12,16 282:11

**incurred** 97:7 98:4 252:25

**independent** 38:10 46:16 137:20 149:2

**independently** 137:17

**indicating** 64:21 68:24 70:14 76:18 78:20 81:1 99:24 111:2 132:16 138:3 143:25 215:17 216:4 226:7 241:15 245:8 253:6 254:19 265:9

**indication** 68:7 92:3 136:2

**indirectly** 136:16, 17,18 142:10

**individual** 118:12 252:2

**individually** 289:1

**industry** 31:11 85:19 97:5 127:12 129:6 168:21 169:2 242:17

**inflate** 288:11

**inflation** 281:12,18

282:4,12

**info** 265:20

**inform** 157:1 161:25 163:25

**information** 33:10, 12 65:15 69:12 93:14,16 94:24 119:4 141:4,17 154:9 160:21 169:4 245:9 247:8 250:21 262:15, 17 277:14 280:7 281:10

**informed** 222:10

**informing** 101:12 142:3

**initial** 87:6,8,13,24 88:2 89:16,19,21 92:14 131:25 192:11 248:7

**initially** 45:5 57:12 86:17 89:15 109:17 225:18 238:19

**initiate** 52:14,15

**initiated** 79:18

**input** 32:21 36:11 47:18 246:20 255:23

**inside** 41:18 90:21 91:11 147:1 176:10

**insider** 218:25

**inspect** 46:13 53:3,4 58:2 86:15,17 139:23 145:3 159:20 191:5 275:9

**inspected** 58:4 84:17,19 208:1 212:10

**inspection** 6:22 41:25 42:6 43:12 58:14,20,23 66:5,15 71:7 84:21 86:18,19, 20,22,25 87:4,11,13, 24 88:4,6,10,14,17, 19 89:1,2,10 92:6,8, 14 93:20 120:19 133:9,21 134:2 142:21,23 153:16 154:21 155:6,11 156:14 160:23 162:1

189:23,24 191:6,7 206:20 244:23 245:23 246:5 267:12, 13 268:4,13 287:17

**inspections** 6:22 43:8 45:18 46:8,11, 16 61:11 66:11 111:24 152:19 155:15 189:19 190:2, 9 275:14 295:11

**inspector** 71:3,8 155:3 156:24 157:7 198:12 199:2,10

**install** 194:20 198:4 223:19 229:6 232:1, 2,4

**installation** 55:24, 25 227:22

**installed** 81:13 100:13 113:18 135:10 196:19 206:14 221:1 225:11 248:2

**installing** 194:18 206:12

**instance** 17:24

**insufficient** 190:17

**insulation** 214:10, 17,20

**insurance** 8:7 12:25 33:18 62:9,18 70:22 78:2 97:5 127:12 157:15 158:16 236:18 238:1 246:16 251:21 252:24 259:6 277:3 279:5 284:11 288:8,11 301:20

**insurers** 62:12

**intake** 79:13

**intellectual** 34:8

**intention** 239:4 246:11

**intentionally** 61:25 62:1

**interact** 238:15

**interaction** 234:12

**interactions** 262:21

**interchangeably** 17:5

**interested** 14:17,23 15:2 301:11

**interim** 107:5 108:10

**internal** 117:14 161:10

**International** 65:18 197:4

**internship** 12:20

**interpret** 141:22

**interpretation** 168:6 278:8

**interpreted** 164:17

**interpreting** 172:13 200:22 201:9 297:5

**interrogatories** 54:12 286:20

**interrogatory** 54:13 286:20,22 287:3,16 290:10,12 291:1,10

**introduce** 174:7 185:15 255:25

**introduced** 83:6 255:14

**introduction** 89:12

**introductory** 88:15

**investigate** 57:8

**Investments** 28:15, 18,20,23 29:7 30:24 31:2 38:20 116:5,13

**invoice** 3:22,24 4:3 5:9,12,24 6:3,4 97:22 99:7 110:15 130:11 131:5,11 132:6,11,24 133:1 203:9,11 204:17 207:17 210:1, 7 229:5,19 230:6 232:8

**invoiced** 219:16

**invoices** 27:3 97:20 98:6,7 105:8 192:6 204:8 206:3,8 264:14


Confidential

**invoking** 279:23

**involve** 41:3 46:22 252:15

**involved** 25:24 30:24 38:1 45:25 47:3,7 63:20 67:15 158:19 238:3 251:18, 19 289:15

**involvement** 163:7 230:20 246:22,23

**IPC** 197:2,4 202:18

**IRC** 6:21 65:17 66:9, 13 289:21

**iron** 204:3 205:8

**isolated** 133:12,25

**issuance** 157:12 172:25

**issue** 38:17 42:24 47:24 48:10 51:3 57:3 77:13,23 79:12 92:13 93:8,11 95:1 98:12,15 120:22 134:7 135:2 170:23 241:4 248:18 268:23 273:21 274:22 275:3 293:6 297:4

**issued** 93:9,10,12, 24 94:17 99:12 112:2 117:2 119:24 120:1,7 147:25 149:12,13 150:12 159:9 173:2 181:9 182:9 275:18, 22

**issues** 41:13,15,18, 23 42:8,10,14,16 43:11,13 55:17 56:8, 11 58:11 59:15 62:3, 5 81:17 115:7 131:13 132:6,10 133:2,6,15 136:10,11 142:5,8,11 145:10 162:9 169:8 195:15,24 207:22 209:10 243:24 244:1, 3 264:1,5 265:19 269:18 271:14 277:23 278:4 287:22 293:8,11,13

**item** 94:12 96:5,18, 22 149:13 150:3,4,13 181:18

**itemized** 222:9

**items** 37:7 96:8,10, 14 99:16 113:17 149:12 150:7,20 154:4 162:12 165:18 172:4,9 188:1 193:25 216:22 220:16,19,21 231:13,15 252:3 269:16 275:16 287:13 288:16 290:5

**J**

**January** 101:23 204:9,18 259:2,12 260:5 261:1 290:17 301:18

**Jason** 118:14 301:2, 17

**Javelin** 15:21 16:9, 16

**Jeff** 8:1 254:22 300:1 301:4

**Jeffrey** 9:24 23:8,19 116:12

**JM** 301:20

**job** 17:23 18:7,17 27:10 65:7 81:6 208:20 230:25 246:17

**jobs** 22:8 26:25 27:2

**Joe** 219:20

**Joey** 82:25 83:4,7, 11,17 84:6,17 85:2,4, 6,10 89:17 92:10 94:9,23 96:10,22 216:10

**Joey's** 95:5 96:3,6

**John** 19:13 57:10 67:5,7 75:25 78:1,25 80:7 81:13 85:2 91:18 104:13,14,16 105:23 107:5,14,22 108:13 125:9 126:11 128:13 154:15 159:16 160:4,8,19,25 190:25 191:5,16 194:11 195:23 200:11 201:10,13,15 210:8 264:9 265:5 270:19 271:2 274:3,9

**John's** 57:11 202:16

**July** 45:9 49:2,4 52:22 74:6 87:2,4,12 117:5 123:16,18 127:15 191:12 194:5 198:24 204:9,12 211:19 235:6 268:5

**jump** 15:16 98:11,21 103:17 194:1 204:5 217:5 239:13 253:3 257:25 291:16

**jumping** 48:13 69:2 129:1 229:17 230:5

**junction** 56:3 134:21 135:9 143:9,14,20 144:7 145:12,18 146:3 256:24 269:20

**June** 20:18 72:10,21 74:13,14,21 123:16

**junk** 19:10

**jurisdiction** 65:20

**Jury** 6:24

**justifiable** 252:18

**justified** 129:8,11

**Justin** 121:14,15 122:19,20 128:14 148:18 154:14,19 155:7,8 156:6 157:5 159:10,16,19 160:4, 5,8,9 161:20,22 171:1,2 174:16 177:11 180:10 221:18 280:8

**Justin's** 171:5 176:16 181:11

**K**

**K&d** 6:6 19:4,5 230:19,21 231:3,10 233:13,14,18,19 234:3,10 275:10

**K-U-R-T-I-S** 231:4

**keeping** 113:16 158:9

**Kevin** 26:6,10

**kick** 279:13

**kickback** 262:2,3

**kind** 19:5 36:2 48:1 78:14 84:12 94:22 107:7 109:20 113:16 140:15 145:2 168:24 172:20,22 190:23 196:25 199:20 204:6 259:22

**Kings** 3:14 67:3,6,9, 15,18,22 68:1,4

**kitchen** 13:16 19:7 40:12 84:4 113:10, 14,19 115:8 144:18 146:22,25 147:22 187:22 188:6,13,24 189:5,7,8,11 205:8 208:16 216:20 218:16 223:6 226:10, 18 271:17,19 273:20 279:10

**knew** 50:24 68:9 78:17 82:19 85:19 133:8,20 145:3 156:6 200:9,14 208:1 218:10 233:18,19 270:18 274:25 289:2 297:7

**knowing** 27:13 142:14,19 187:19 202:13 293:20

**knowledge** 12:19 13:20 70:4 124:4 132:18 137:22 141:24 202:10 265:18

**Kribble** 10:14

**Kurtis** 231:4 233:15, 16

**Kyle** 114:13

**L**

**L-E-V-L-R** 31:9

**label** 254:13

**labeled** 131:8 132:13 159:4 163:14

Confidential

202:17 207:11 208:12 226:23 235:25 253:17

**labels** 211:3

**labor** 18:8 19:12 223:24 295:14

**lack** 91:14 101:8 116:16 277:13 283:2, 3

**lacks** 172:9

**lady** 118:10

**Lakewood** 10:20

**landed** 22:8

**language** 153:7 161:8 164:8

**laptop** 76:18,20,21, 24

**large** 18:7 248:3

**larger** 108:14 128:20

**lastly** 31:5 71:2 291:8

**late** 283:5,9

**latent** 272:13

**launched** 20:4

**laundry** 144:15 147:21 206:17,19 272:1

**lavatory** 193:6,7,14 208:16

**law** 150:15 284:10

**lawsuit** 8:16 22:13 23:3 38:2,17 71:17 75:22 115:17 236:20 258:12 259:10 260:2, 10

**layers** 64:23

**layperson** 127:9

**leading** 273:19

**leak** 47:10 205:17

**leaking** 47:10 81:17 205:19,20 206:24 207:6

**leaks** 42:15 206:25

**leaky** 79:15

**learn** 27:12

**learned** 27:10

**learning** 27:14

**lease** 49:20 50:18 52:4 72:10,21,25 73:4,5,13,16,17 74:12,16,23,24 75:2, 3,7,10,11 183:2

**leased** 30:2,4 114:11,13

**leases** 72:17 74:10, 20 180:17 183:1 185:5

**leasing** 183:12

**leave** 16:15 20:19 24:3 47:15 52:18 203:1 206:19

**leaving** 51:2 117:16

**left** 20:22 80:13,15 107:1,7 117:13 144:4,14 203:6 219:21 246:13

**legal** 141:25 142:7

**length** 76:20 80:25 192:24

**lengthy** 192:18

**letter** 4:13 5:5 146:11 151:9 152:3, 11,23 154:3,8 157:12 159:8 161:21 162:4, 7,15 173:1,2,5,6 184:3,10,13,15 185:8 239:7 266:10 284:16

**letting** 82:9 148:2 172:23

**level** 40:3 41:3 152:15 252:15 279:9, 15

**LEVLR** 31:9 32:8,9, 15 35:20 36:8,11 37:7,14 267:1 299:5

**license** 12:13 37:18, 19 38:8

**licensed** 37:23 251:20 263:6 269:8 272:16

**licenses** 12:12,21 27:16 37:17 265:24

**light** 40:1,5,8 41:11 47:9 53:18 141:19 211:22,23 230:7 276:5 284:2

**lights** 59:12

**limbo** 170:19

**limit** 24:8 178:17 179:2 278:12

**limited** 246:21

**limits** 179:8,13,18

**linen** 221:9 223:12

**lines** 68:1 119:5 200:7 207:19 208:3 257:14,17 270:17 274:4

**liquid** 203:2

**list** 18:10,13,14 39:6 61:22 62:13 70:6 127:16 282:6

**listed** 25:6 64:18 65:10 66:7 69:15 70:5 71:8 132:12 183:13 222:4,15

**listen** 8:23 219:4

**listing** 186:9

**lists** 150:7

**literally** 136:21

**litigation** 38:2 301:11

**live** 30:12,14 43:22, 24 44:5

**lived** 10:22 29:13 38:25 43:17 44:1,9 48:19,22 49:8 61:4

**living** 101:7 106:19 115:10 208:19 212:21 273:7

**LLC** 2:2 3:23,24 4:3 5:9,12,15,17,24 6:3, 4,7,13,15 21:13

25:13 28:15,16 30:24 31:2,9 32:5,8 116:13 192:7 228:14

**LLP** 2:6

**local** 139:13

**located** 40:9 90:9 232:6

**location** 42:24 91:2 100:14 146:5

**locations** 15:24 213:2

**lock** 182:25

**logged** 89:5,6

**logical** 175:15

**long** 10:15,22 15:25 26:10 28:18 29:3 38:15 43:22 46:4 52:7,25 53:11 78:16 83:4 84:16 86:15,23 92:6 94:19 100:20 106:9 112:21 120:24 121:1 155:9,25 162:4 169:4 177:6,8,16,24 191:22 199:19 238:12 268:18 276:21 283:13 291:15 295:7 296:16

**longer** 25:12 48:22 101:1,7 132:1,2 196:19 197:18 290:20

**looked** 80:23 89:14 90:24 103:20 104:24 105:3 134:22 161:8 167:24 189:6

**loop** 266:6

**losing** 25:8 130:7

**loss** 6:17 30:20 47:3 49:10,14,15 50:7 52:8,9,22 53:1,6 57:1 62:3,6 73:17 74:2,6, 17,22 83:14 86:15 87:4 89:13 90:23 91:2 119:12 133:7,16 134:15 135:7 143:16 158:9 168:10,12 169:9 171:23 174:20, 21,24 176:18,24 177:3 178:2,13

Confidential

179:12 180:8 182:2 184:16,21,24 187:5 189:4 191:12,22 192:12 195:22,24 209:12 211:19,25 212:24 213:7,14,24 214:7,25 222:18 229:8,23 230:10 231:19,22,25 233:21, 22,25 234:8 235:6 241:7,8 243:25 244:2,4 260:15,16 268:17 269:14,21 270:25 271:14 273:16 277:1,4 278:10,18 282:22 283:23,24 294:18

**losses** 233:24 276:24,25

**lost** 24:22 25:3,5

**lot** 11:6 27:7,13 34:24 37:5 47:19 84:12 85:16,25 96:7 117:7 129:10 161:13 287:21 288:8

**low** 57:7 176:8 195:25 196:1,3 207:25 209:23 210:7

**lower** 38:24 39:2,14 40:3 41:3 45:2,7 52:5,10 53:3,4 61:1 79:24,25 115:4 127:22 216:20

**lower-level** 77:15

**luan** 223:19

**lying** 158:11,12 175:20,23

M

**M-A-R-D-E-G-I-A-N** 26:8

**machine** 271:4

**made** 47:4 52:18 78:10 95:4 116:10,24 117:2 118:11 123:22 131:17 132:12 169:10 207:22 210:2 220:10 225:6 266:7 267:20 280:7 281:25 282:1

**mail** 119:15 120:14

**mailed** 98:16 119:17,19 152:1

**main** 56:20 83:25 117:25 136:22 194:20 195:4,9 204:14 220:2 270:11 271:15,17

**maintaining** 260:8

**maintenance** 45:23 46:2 53:8

**major** 11:25 201:5

**majority** 279:8

**make** 9:8,19 23:24 35:2 37:1 45:17 46:2 56:15 59:4 60:6 62:16 66:6 81:10 106:22 109:24 113:25 114:1,5,25 115:4 116:4 124:25 142:6 143:18 156:6,7 176:23 182:15 189:11 190:1 195:11 197:13 215:18 261:6, 7 272:18,25 273:3,25 278:10 282:6 284:14 289:7 298:16

**makes** 24:10 138:6 238:3 285:1

**making** 17:9 114:3 186:24 187:14 203:5 209:1

**manage** 45:11

**management** 3:16, 18 12:2 45:20 73:22, 24 201:7

**manager** 30:3 45:20 49:22 78:4

**managing** 45:16

**manner** 270:6

**March** 26:12

**Marcus** 129:18 244:25 245:1 249:1

**Mardegian** 27:18, 20,21

**Maren** 49:9,13 106:17

**Mario** 21:17 154:25 224:13,14,15,17

**mark** 53:21 66:21 92:16 95:8 102:7 110:1 112:5 123:3 130:6 151:15 158:25 163:9 165:7 169:12 174:2 183:22 191:24 198:15 207:8 210:17 224:19 240:1 295:24

**marked** 53:23,25 64:2,8 66:22 72:7,9 92:18,20 95:13 99:1, 3 102:9 104:24 110:3 112:7 123:5 130:8 140:14 148:3,6,15 151:17 159:1 163:10 165:9 169:14 173:22 174:11 180:25 183:25 185:19 192:2, 4 198:17 207:9 210:18 215:24 217:13 219:24 224:22 225:1 228:5, 9,13 230:15 235:20 240:3 243:7 247:18 249:20 253:18 256:3 258:16 262:6 263:13 267:7,8 280:17 285:10 286:10,16 296:2

**market** 25:6 49:24 51:23 127:14

**markets** 127:21

**marking** 174:8

**married** 10:11,15

**master's** 12:6

**material** 81:19 86:9 204:4 207:22 227:11

**materials** 86:1 90:6 153:19 295:11,13

**math** 237:1,2

**matter** 293:18

**matters** 23:11,14

**maxed** 178:11

**maximum** 264:11 278:11

**Meadors** 301:2,17

**meaning** 96:22

**means** 9:13 64:20 69:19 134:18 146:14 188:20 192:15 202:20

**meant** 126:1 276:17

**Mechanical** 223:17

**mediation** 236:19

**medicine** 186:25 187:3

**meet** 114:2 137:12, 15 138:8 155:17 244:22 245:23 246:4

**meeting** 128:13 166:3

**member** 21:14 28:16

**members** 21:16 32:6

**memo** 130:12

**memory** 21:21 94:25 99:25 104:25 109:2 119:2 293:3

**Mendoza** 21:17,18 25:24 41:10 224:14

**mentioned** 15:17 134:4 135:9 162:20 274:21 279:23

**message** 142:2

**met** 114:15 153:22 154:14 161:19 180:19 274:9

**metal** 270:2

**meters** 141:7 213:21 214:5

**method** 236:19 262:18

**Metro** 3:16,18 45:14

**Metropolitan** 5:9,12 56:17,18 104:13 125:8,18 126:6 192:7 194:12 204:8

**Michigan** 11:21 201:3

**microbial** 84:3 189:10

**mid-90s** 209:22

**middle** 167:15 249:9

**midway** 287:23

**Mike** 102:22,24

**military** 11:13

**mind** 69:24 100:18 254:20 288:14

**mine** 13:14 19:24 180:3

**Minimal** 266:23

**minimize** 203:25

**minimum** 158:10 201:25

**minor** 39:20

**minute** 19:3 148:8

**missed** 224:8

**missing** 172:8

**misstatement** 170:14

**misunderstood** 125:25

**Mitch** 17:18

**mitigate** 83:14 176:23

**mitigated** 100:11

**mitigation** 16:25 17:8,15 27:5 82:15 85:1,5,11,14,22 96:12 124:20 175:6, 8,9 177:19,22 216:11 218:5,23 219:14,19, 21 225:15 294:7,8,10

**mixture** 196:20

**mold** 18:4,16 82:16 83:15 193:23

**moment** 152:24 153:12 181:4 230:16 281:4

**momentum** 16:18

**money** 14:13 22:7 23:21 24:22 25:3,5,8 28:4 67:18 115:19,21 179:10,11 219:19 236:16 237:6 238:4 242:18 244:18 260:9 262:3

**monitoring** 96:19

**monoxide** 213:1,9

**month** 48:20 49:20, 21 74:4,25 75:10 176:25

**month-to-month** 185:6

**monthly** 75:4

**months** 29:25 176:24 177:2,5,13 178:4,11 181:14 294:18 295:5,15

**morning** 8:5

**Mostek** 118:14,15, 17,25 120:16,19,22, 24 121:6 122:17

**move** 44:11 67:14 69:22 81:16 99:8 255:6

**move-in** 269:16

**move-out** 185:6

**moved** 30:16,18 44:18 48:23 49:23 77:16 103:16 106:16, 17 107:17 184:23 185:1

**movement** 235:13

**moving** 46:8 49:22 50:25

**mud** 223:23

**multiple** 95:4 133:2 141:8 146:12

**N**

**nail** 88:7

**Napolitan** 4:14 75:25 80:7 82:10 104:13,16 105:23 125:9 128:14 190:25 204:11 207:21 210:8 265:6 270:19 274:4

**Napolitan's** 197:22

**nasty** 41:12,14

**National** 135:19

**nature** 62:23 67:12, 24 235:9

**NDAS** 34:20

**NEC** 135:15,18,22,23

**necessarily** 75:6 158:19 171:25 172:19 189:24 196:13 205:19 246:16 265:6 288:17

**needed** 17:24 25:8 42:22 43:12 50:10 63:7,16 67:13 78:10 79:16 81:9 85:11,13 86:8,10 130:21 135:8 137:11,15 156:6 168:15 171:23 189:25 193:20 195:5 197:23,25 212:18 231:13 240:10 241:19 246:12 248:23

**needing** 26:22 101:14

**negotiated** 75:11

**nerve** 243:21

**net** 93:8 236:17

**newly** 143:13

**nicely** 220:18

**Nicole** 114:13

**nine-page** 159:3

**nodding** 9:2

**Noelle** 141:2

**noncompliant** 136:3,4

**nonconsecutive** 192:7

**noncoverage** 152:5

**nonetheless** 86:21

**nongalvanized** 208:6

**nonlawyer** 168:6

**nonverbal** 9:2

**normal** 57:13 157:6 284:13

**Notary** 300:15

**notation** 195:13 205:1

**notations** 132:24

**note** 69:11 105:7 116:19 122:14 132:24 140:19 149:6 163:13 187:1 192:5 195:13 200:5 208:15 213:21 215:2 235:22 240:18 244:11 250:11 251:14 253:14 258:23 264:13 267:10 271:10 273:11 287:20 288:23

**noted** 98:13 132:10 162:10 167:11 168:19 268:23 288:20 289:21

**notes** 74:13 122:14 149:10 151:1 193:6 204:18 206:7 209:21 212:21 215:2 269:7 271:12

**notice** 46:1,2 80:1 86:14,24 265:13

**noticeable** 79:22

**noticed** 41:24 90:18 131:12 144:3

**notified** 85:6

**notify** 25:11 58:11 184:17

**notifying** 85:5

**November** 72:11 73:4,13 115:2 210:8 247:24

**number** 4:12,13,23 7:6 10:2,4 13:13 54:13,15 65:10 87:7

111:13 117:25 127:1 132:16 143:7 147:10, 12,14,15,16 155:7,8 157:8 161:16 177:4,5 178:11 198:3,4 200:6 201:4 230:5 231:13 239:20 241:2 255:1, 2,4 282:20 284:23 286:14,20,22 287:4, 16 290:10 291:1,10 292:5,8,10,12,17

**numbering** 254:14, 15

**numbers** 33:16 192:8

**numerous** 269:8,10 277:12

**nuts** 202:24

**O**

**O&p** 255:21

**oath** 9:13

**object** 8:19 246:8 277:25

**objection** 8:19,21

**obligated** 294:8

**obligation** 9:14

**observe** 58:5,24

**obtain** 23:6 37:20 48:7 120:11 129:20

**obtained** 288:25

**obtaining** 16:8 26:24 86:5

**occasion** 56:21

**occupancy** 60:16, 19,22 276:18

**occupiable** 61:1

**occupied** 46:19 273:6

**occur** 155:11 193:7

**occurred** 49:15 276:25

**October** 20:18 115:2 207:17 208:22

**odd** 77:17

**odds** 228:25

**offer** 47:17

**offered** 157:7,8 261:22

**offering** 156:24

**offhand** 216:18,19

**office** 4:9 15:23

**official** 265:12

**officially** 25:11

**officials** 139:7,13,17

**Oftentimes** 37:2

**Oklahoma** 31:19 35:25

**older** 293:17

**on-site** 89:14 128:13 153:16,22 154:14 160:23 191:8

**one's** 140:7

**one-page** 140:21

**ongoing** 111:16 220:14 270:20 282:2 283:14

**online** 116:24

**open** 78:9,10 91:13, 23 103:14 145:6 246:13 253:2,3,21

**opened** 76:2 80:10 91:9 112:19 145:8,11 193:21 208:17 210:14 227:8 252:16 257:13

**opening** 221:8 223:10

**operate** 110:16,18

**operated** 28:18 213:4

**operating** 15:8,10, 12 22:4,7 27:23 32:15 106:11 107:6 112:20 285:14

**operations** 82:13 118:22

**opine** 139:14 249:4 265:19

**opining** 138:6

**opinion** 69:25 125:7, 11 137:9 157:21,23 158:2,13,14 162:24 164:7 180:4 190:18 201:20 218:25 240:16 252:14 283:25

**opinions** 137:23 138:7 212:12 264:19

**opportunity** 8:15 14:11,21 15:17,20 65:19

**opposite** 90:10

**option** 47:15

**order** 34:23 35:3 36:25 50:7 53:20 82:5,13 87:17 100:19 106:22 118:22 119:23 120:1 142:6 144:20 172:3 214:18 299:6

**orders** 120:6

**ordinance** 150:15

**ordinances** 157:11

**originally** 223:21

**out-of-pocket** 115:20 116:9,22 175:12 297:6,14,16

**outcome** 301:11

**Outfitters** 16:14

**outlet** 215:20

**outlets** 40:1,19,20 269:7,9,10 271:16

**outsider's** 158:20

**outstanding** 119:9, 10

**overflow** 83:10

**overhead** 129:3,6,7 234:24 242:9,22 243:1 251:15 252:4 255:15,18

**oversight** 224:9

**owe** 158:5 175:2

**owed** 174:22 261:4

**owes** 219:18

**owned** 14:8 29:3 78:15

**owner** 14:9,22 17:13 19:6 20:9 26:3 46:17 102:25 141:19 231:1, 3

**owners** 16:18 21:20

**ownership** 38:19

**owns** 169:3

**P**

**p.m.** 98:25 173:25 189:14 198:24 233:2 267:4 292:22 299:12

**PA** 161:12 265:22

**pages** 102:16 130:10 169:18 203:7 227:19 253:21 301:8

**paid** 23:21 74:3,7 94:12 99:18,21 116:16 171:22 182:6, 14,19,23 216:24 219:10,12,15,16,17, 20 224:6 227:13,24 244:18 251:18 261:3 275:12 282:21,22 294:19 297:17

**paint** 188:14,17,22 189:2,10 232:5

**painted** 39:19 114:9

**painting** 53:14 187:15

**panel** 134:20 232:1,5 271:16

**panel's** 146:16

**paneling** 223:19,22

**panels** 131:14 132:7 133:3,7,11,16,23 141:8 145:4 146:6,7 214:1 220:25 223:6 248:22


Confidential

**paper** 22:15 267:19

**paragraph** 163:24 165:24 167:16 183:7 209:18 247:25 272:10 281:7 284:6 296:5,15

**parameters** 36:15

**paraphrase** 157:5 158:6 182:15

**paraphrasing** 89:19

**part** 22:9 43:5,6 54:24 61:12 85:9 91:23 113:13 160:1 164:18 169:2,19 174:19 187:4 221:2 231:24 234:13 250:25 259:15 278:10 288:17 297:15

**part-timers** 17:20

**partial** 152:4 173:7 197:15 270:14 284:15

**partially** 42:17 113:19 158:8

**parties** 18:1,12

**partner** 5:20 155:1

**partners** 15:14 32:4

**parts** 205:10 232:12, 14 299:5

**party** 17:25 18:2 22:7 158:18 301:10

**party's** 267:20

**pass** 206:20

**passed** 118:23

**password** 267:16

**past** 47:7 53:11,13 288:10

**patch** 81:6

**patched** 81:11 114:8,9 231:14

**patching** 232:2 275:17

**Paul** 13:3,4,15 14:4 15:17,19 16:21 17:22 18:25 19:18 20:12 21:1,3 82:19,21 83:5, 8 103:4 111:17 168:24 219:1 228:20 230:25 234:1 289:3

**pay** 45:19 67:18 108:15 116:11,12 158:4 165:21 166:8, 19 170:4,6,9,10,11, 17 174:23 219:20 225:19 226:17,20 238:2 298:17

**paying** 52:12 57:5 77:15,16 165:15,17 174:19 224:2 279:3

**payment** 93:8,12 95:2,5 98:13 111:8 117:2,3 149:12,13 150:12 182:2 222:11 226:1,24 229:12 232:9,11,15 244:15

**payments** 23:24 92:14 95:4 116:4,5,8 119:8,11 151:4,6 181:23 182:10 186:9 236:17 283:2

**Payments.xlsx** 4:19

**payout** 283:17

**pen** 22:18 223:2

**pending** 9:18,19

**penetration** 82:1 203:5

**people** 17:4 34:20 47:20,21 105:16 155:5 176:11

**percent** 32:9,10 129:10 141:9 236:16, 17,23,24 237:7 241:24,25 274:2

**percentage** 251:16

**percentages** 255:23

**PERCRS** 69:8

**Perez** 220:20 222:23 224:2,7,12 288:18

**perfect** 246:2

**perform** 22:3,6 46:7, 16 53:8,12,16 56:4 58:1,20 83:7 86:18, 24 87:15 120:19 131:1,10 211:11 212:6 225:9 231:16 276:1

**performed** 39:5 42:5 60:16,18 66:11 67:19 85:11 87:2,11 88:10 103:10,25 104:2,3,4,6,7 105:14, 21 111:25 114:20 142:21 147:3 194:5 204:11 211:13,16,19 215:22 222:22,25 224:2 227:5,21 232:20 246:25 270:13

**peril** 166:9,21 168:3

**period** 29:15,24 30:14 166:21 184:16, 18

**permanent** 271:5

**permissible** 198:1, 13 199:4,11,16 213:4

**permissions** 201:20

**permit** 3:12,14 4:15, 16 63:16 64:9,15,17 65:1,7 66:1,4,16 67:11,16 68:2,11 71:3 113:9 154:17 156:3 203:19,20 275:19,24 276:14 289:12,21,24

**permits** 64:13 102:1 128:15,17 150:21 152:8,19 153:25 154:16 160:24,25 203:18,19 242:4,6 250:20 275:18,21

**permitting** 67:2 160:15 205:15 241:24 250:24 295:9

**person** 55:18 60:9 116:12 124:14 135:21 191:1 269:2 280:4

**Personal** 8:6 301:20

**personally** 27:17 29:7 58:2 116:5 155:17 284:9

**persons** 287:17

**perspective** 158:21

**pertained** 222:7

**pertains** 168:18

**peruse** 148:8

**PEX** 194:18 208:18

**PEXS** 195:1 197:20 198:5

**Philip** 41:10

**phone** 79:2 83:17 88:15 89:4,8 117:25 155:7,8,20 157:8 161:16 201:17 203:18 238:23 266:9, 11 280:6 297:22

**phonetic** 10:14 60:12 289:2

**photo** 62:1 144:5,6, 18 256:25 257:1,2,8, 19,22

**photographs** 4:10 5:21 61:18 78:22 140:22

**photos** 61:22,23 89:7 189:5 243:19 249:9

**physical** 28:24

**physically** 17:14 31:15 58:20 88:21

**PI** 237:19

**PIA** 251:2,12 252:4

**pick** 120:11

**picture** 143:7 144:10,23 145:20,21, 24 146:10,20 147:8 257:10

**pictures** 42:2 143:3

**piece** 22:15 270:2

**pile** 19:9

**piles** 120:14


Confidential

**pipe** 47:2 56:24 57:20 75:23 76:2 77:10 78:18 79:15 80:11,12,20 81:3,12, 13,14,18 82:11 89:14 90:20 114:7 136:13 141:10 142:9,13,16 143:10 166:8,20 170:17 192:19,22 195:2 197:6 198:1 199:11,14,15,16,18, 20,21,24,25 200:3 205:2,4,10 208:6,17 222:1 226:14 272:6 273:21 274:1,13,15, 18

**pipes** 166:20 170:6, 9,10,11 171:23 203:22 283:22

**piping** 81:7,8 203:21 207:22 273:13,15

**piss** 244:7

**pissed** 244:9

**place** 35:3 206:5 277:23 287:6 299:7

**places** 89:7

**plaintiff** 2:5 258:25 298:24

**plaintiff's** 3:10 6:18 7:3 54:1 116:21 259:10,17 267:10 286:17 291:18

**plan** 84:6,8 114:19 115:11,12,16 232:11 293:16

**planning** 109:1 293:14

**plastic** 81:19 257:14

**plastic-type** 195:2

**plate** 153:17 162:12 221:20

**play** 161:18 196:24

**plumb** 109:5

**plumber** 18:15 19:13 78:2,5 81:15 91:9,18 94:13 114:4 124:24 125:6 137:10 138:1,20 139:5 153:17 154:15 156:19 165:22 198:2 201:11 202:14 247:5 262:21 264:17

**plumber's** 125:7 137:8

**plumbers** 18:9 125:20 137:21 197:19

**plumbing** 3:14,15, 23,24 4:3,15,16 41:4 42:8 56:15 59:8,25 60:5 61:24 62:5 67:3, 6,9,13,15,18,22 68:1, 4 69:9 78:16 83:25 98:8 104:12,13,14,16 106:8,21 109:19,21 110:10 113:8,20 124:25 128:17 136:22 137:2,11 139:25 140:5,6 141:10 144:21 153:24 154:18,19 155:3 156:3,23 168:14 169:8 175:15, 18 191:8 194:13 195:15,23 197:4,22, 25 201:24 202:13 206:18,25 208:23 209:11 210:9 231:12 232:1,5 240:11 247:15 257:3,6,10, 16,21,23 264:6,8 270:9 271:5 273:12 274:24 275:4,6,19,24 277:22 278:4,16 279:14 289:24 298:18

**pocket** 113:12 279:3 295:19,20 297:1,10, 11,13

**point** 19:6 37:8 38:19 44:9 49:19 53:18 80:19 83:11,12 90:20 105:24 106:25 109:14 117:4,24 119:7 128:11 129:14 130:5,23 151:1 152:2 154:7 161:14 172:11, 17 175:4,14 176:8 179:9 180:14 185:14 209:5 213:19 222:17 233:5 241:24 258:8,9 259:20 261:21 268:16 271:1 273:12 277:6 293:7,21

**policies** 163:5

**policy** 5:3,7 153:7 161:8,10 163:3 164:8,14,17,21,24 177:2 178:2,10,17,19 179:2,8,13,18,25 252:21 277:5 278:8, 12 279:20 282:19 283:1 297:5,17

**pool** 76:23

**porch** 43:4

**portion** 76:15 111:7 176:13 222:11 260:16

**PORTIONS** 3:5

**position** 8:17 14:7 16:4,6,9 87:25 119:7 149:14 151:2,10 152:10 153:4,9 161:23 162:14 164:2, 6 167:2,6 171:17 172:22 176:20 197:22 201:19 221:14 258:6 259:10, 17 260:9,24 261:19 270:5 290:25 298:6, 11

**possession** 227:7, 10

**Possibly** 51:21

**post-denver** 124:19

**post-undergrad** 12:5

**potential** 51:5 62:2 82:16 175:12 264:25 267:23

**potentially** 83:15 209:13

**power** 271:16

**precede** 142:11

**preceded** 39:17

**precedes** 13:11

**Precision** 5:21,22 224:20 225:2,22 226:1

**predating** 145:17

**preexisting** 31:21 195:3 205:24 278:15, 17

**prefer** 99:25 149:18

**preferred** 18:15,16

**preloss** 190:15 240:15

**premark** 63:25 183:22

**premises** 46:13,17 49:13,18 50:14,17,21 52:2,20 53:5 178:3

**prep** 203:17

**prepare** 10:25 27:3 33:14,15 212:6 234:25 241:13,14 281:1

**prepared** 70:24 92:22 122:3,25 125:19,23 189:17 190:7 211:8 217:17, 22 220:11 234:18 237:18 239:21 240:22 242:9 250:8 251:24 253:4 254:2, 11 255:11 259:2,13 261:18 278:21 279:2 280:24 283:5

**preparing** 33:11 35:20 36:4 127:25 128:21 220:13 239:15 262:16

**present** 46:10 77:22 88:21,24 134:14 275:23

**presented** 122:17 235:22 236:7

**pressure** 42:15 57:4,6,14 194:20 195:4,10,11,14,15, 17,20,22 196:5 205:15,16 207:25 209:19,21,23 210:2, 4,7,10,15 264:11,15

**pressurize** 205:13

**pretty** 95:17 113:10, 18 119:1 170:22 186:1 219:5 229:18 234:3 240:12 244:17 271:20,21,24 294:3

**preventing** 17:1

**previous** 143:20 150:10 171:2 188:25 195:15 210:12 233:18

**previously** 58:16 91:2 101:16,19 103:20 104:24 122:3 126:17 134:3 145:16 195:23 206:4 258:1 261:9 267:14 276:17 289:9

**price** 34:1,3 35:12,15 51:16,24 73:19 100:5 127:16,23 136:9 282:6,11 288:11

**prices** 97:4 100:5 127:13

**pricing** 97:6 127:1

**primary** 190:23

**prime** 188:20,21

**principles** 35:19,24 36:3

**printed** 117:5 124:1 217:18 239:22 253:16

**printouts** 37:14

**prior** 24:14 26:17 46:8 51:17 52:8,22 57:1 58:12 60:21 62:3,6 73:17 74:2 85:5 88:13 92:3 97:17,19 103:1 112:23 135:7 142:12 143:16 159:10 164:23 168:22 169:8 177:11 183:2 186:16 195:22 205:19 209:11 213:7,13 214:7,25 217:20 219:1 230:24 233:21 238:10 242:10 243:25 244:2,4 248:3 264:4 269:12,13,20 270:24 271:14 272:24,25 273:3,16 277:23 280:3 291:4 301:5

**Pro** 3:13

**problem** 50:25 75:24 149:1 160:12 221:20 260:23 274:25 299:10

**problems** 45:19 295:13

**proceed** 86:11 89:20 150:21 175:5,10,14 294:11

**proceeded** 87:17 92:10

**proceedings** 52:14, 15 301:7,9

**proceeds** 278:20

**process** 31:6 32:19, 22 47:18 63:20 86:3 114:8 127:6 128:16 152:18 175:4,16 184:25 225:15 279:4

**processing** 37:1

**procurement** 67:16

**produce** 71:25 105:10 140:10 261:14

**produced** 58:16 71:17 105:8 261:9,11 267:11,14,25 296:10

**product** 31:21 36:16 89:5

**production** 3:6 211:3

**professional** 16:6 301:2

**proffer** 101:12

**profit** 129:4,6,8 234:24 242:9,11,14 251:15 252:4 255:15, 18

**profitably** 15:13

**program** 33:15

**progress** 257:24

**prohibiting** 198:9

**project** 24:25 45:20 67:14 113:6 208:20 222:7 267:1

**projects** 5:24 6:3,4 19:14,15 228:14,18, 23

**promise** 129:18,25 138:25 210:25 211:4, 8 212:5,16 244:25 249:1 287:20 288:1 298:17,19

**prompted** 43:7 77:12 88:4 96:1 248:13

**promptly** 294:7,11

**pronunciations** 121:21

**Proofer** 301:21

**proper** 125:1 136:6 190:1

**properly** 56:3 83:16 99:17,21 114:22 119:21 122:18 124:22 259:24 274:14

**properties** 28:21,22

**property** 3:16,18 19:1 29:7,8,11,14 30:2,3,7,10 34:9 38:17,20,23 43:18 45:16,20 46:14,22 49:21 50:20 51:20 53:9,10 58:3,14,19, 25 59:17,20,22 60:8, 15,18,25 61:12,19 62:9,17 67:19 69:15 73:22,24 77:18 78:4 80:8,9 83:22 84:17, 20 86:16 88:22 105:22 119:16,18,20 120:12,20 134:16 135:4 139:21,23 142:20 150:20 165:17 174:24 189:20 190:10 191:5, 16 192:12 214:18 237:24 240:15 252:9, 20 259:1,11 268:12, 17 269:13,15 274:11 276:19,21 277:1,4 281:11,16 287:2 293:7,16,20,25 294:15,24,25

**proposal** 4:4,8 5:13 6:6 84:10 102:17 103:18,25 104:18,23 105:12 112:14,16,23 119:3 126:19 129:22 130:2,11,21 132:13 224:21 226:1,6,22,25 227:4,19 248:14

**Proposal/payment** 5:23

**proposals** 23:7 97:12

**proposed** 214:14

**protect** 10:8

**protected** 267:16 271:16

**protection** 141:15

**protective** 34:23 35:3 299:6

**protest** 129:12

**provide** 32:24 33:13 98:3 101:1 107:15 130:18,20 155:15 156:14 159:20 181:20 212:12 218:25 232:2 246:6, 20 247:4,7 265:8,13

**provided** 16:21 18:25 64:13 75:14 86:23 102:22 130:1, 17 157:21 176:18 190:2 233:17 237:11 238:21 245:3,15 247:5,14 260:1 294:17

**providing** 151:9 160:5 180:16

**proving** 183:13

**provision** 236:22 279:21,24 289:25

**proximate** 168:4

**public** 6:7 35:5 233:6,8 235:24 237:22,25 252:23

300:15

**pull** 40:15,24 90:1 102:1 128:15 153:25 154:16 160:24 163:4 242:3 276:15

**pulled** 50:9 63:16 68:2 89:25 100:8,21 102:4 107:23 108:22 113:9 128:16 131:16 145:1,2 154:17 160:25 184:24 187:8 189:7 193:25

**pulling** 103:21 150:21 203:18

**purchase** 15:4,6 30:7 58:8,9,10 60:8, 22 61:12

**purchased** 15:3 30:11 39:9 41:17,22 42:3,6,9 43:17 44:14 55:5 56:2 58:1,2,19, 21 59:20 60:15,17,25 61:2,7,11,19 113:17 135:4 142:20 143:16 268:12,17 293:2 297:5

**purchasing** 58:12 269:13 274:11

**purgatory** 118:5

**purportedly** 136:12

**purpose** 21:23 25:17 28:20 31:3,10 54:23 83:13 130:25 220:13 229:4 270:3

**purposes** 279:5,6 288:22

**push** 171:8 298:1

**pushed** 134:23 157:13

**put** 10:8 35:3 39:19 49:23 50:9 56:3,9,12 81:7 82:6 105:23,25 114:22 124:21 125:4 131:17 132:16 156:18 194:9 199:12 200:1 205:12,15 237:3 257:15 264:19

**puts** 242:16

**putting** 17:3 40:15, 22 125:24 199:18

**PVC** 80:11 81:3,7,13 82:11 143:10 192:21 205:4

**Q**

**quantity** 34:4 35:16

**question** 8:13 9:4, 18 24:14 32:12 35:8 36:7 54:23 63:3 70:3 81:12 83:18 100:1 105:18 107:22 108:6 112:3 133:13 168:17 177:10 178:22,24 179:4 209:8 235:3,7 245:19 251:3 255:9 257:19 259:15 260:8 261:12 282:23 287:2, 7 291:4,9 296:10,13, 23

**questioning** 35:4 167:10 182:25 186:2 245:8 267:23

**questions** 8:14,18, 25 9:9 20:6 24:18 79:10 98:21 143:1 174:9 195:6 229:18 230:9 245:19 263:12 292:25 298:22,24

**quick** 22:24 79:8 89:12 243:8 263:12 267:3 282:16

**quickly** 79:5,6 98:19 147:7 164:5 168:16 180:23 215:21 226:3 285:13 294:1,8,12 295:9

**Quisenberry** 2:2 11:3 22:17 24:5 34:7, 11,22 35:7,11 72:1,4 116:25 148:11 223:3 224:10 246:8 258:22 261:14 277:25 280:25 285:11 291:22,24 292:1 298:24 299:4

**quit** 121:2

**quote** 129:20

**quoting** 153:7

**R**

**R-E-E-M-E** 231:8

**radial** 205:2,4

**rails** 39:25 161:2,3

**raise** 51:16,19 73:21, 25

**raised** 52:2 73:19

**ran** 59:13 141:10 205:8

**random** 228:25

**ranging** 204:8

**rate** 127:16 183:15

**ratios** 158:9

**re-advise** 230:21

**re-let** 51:8,14 52:2 73:9 114:17 183:3, 15,16

**re-marked** 286:9

**re-rent** 19:5 184:23 229:21

**reach** 103:6 121:24

**reached** 118:17,21 159:10 175:13 238:13 249:1

**read** 10:7 22:23 33:20 35:8 133:13 141:21 168:7 178:24 190:4 202:9 245:18 298:25 300:2

**reader** 111:19

**reading** 165:25 166:10 167:14 172:12 178:10 260:22

**ready** 17:9 19:5

**real** 12:2,13 15:22 22:24 31:3 37:19 219:7 267:3 282:16

**reality** 283:25

**realize** 248:19

**realized** 24:4 128:18 218:16 241:19 248:18

**realizing** 248:3

**Realtime** 301:2,3

**realtor** 61:6,13

**Realtors** 61:15

**Realty** 38:9

**rear** 273:10

**Reask** 100:1

**reason** 100:25 104:10 123:20 145:6 167:19 172:7,21 180:13 250:25 251:7 283:22 288:15,24

**reasonable** 45:18 86:12 87:5,8,12,17 88:5 180:4 277:9,21 278:2 284:17

**reasons** 103:15

**reassess** 131:19 136:7

**reassign** 118:1

**reassigned** 117:22, 24 121:3,5,7,10,23

**rebuild** 115:8 284:1

**rebuilt** 172:2

**recall** 19:14 23:20,23 24:1,2,7,8,13 29:9 40:18 42:4 53:7 67:20 73:19 74:9 77:19 85:4,7 86:9 93:10 97:14 98:6,15 101:4,12,22 102:4 104:22 110:13 116:23 118:17 119:21 120:23 121:8 122:5 148:19 151:3, 6,7,8,13,25 152:2 154:7 156:5,10,17 157:14,20 161:24 167:1,10 170:3,5 171:10 173:14 174:15 177:14,15 180:12 181:2,23 184:2,12 185:8,24 186:20,24 193:18 195:5 201:12,15

Confidential

207:20 216:13 217:2, 24 222:21 224:1 225:23 227:17 228:3 234:22 236:12 238:10 240:22 246:15 247:16 251:13 252:3 258:12 265:1 269:17 271:21 280:5 295:16 297:19

**recalling** 186:10,11

**receipt** 180:6 269:2, 3

**receipts** 116:24 226:1

**receive** 139:16 158:15 173:3,4,14 237:8 245:9

**received** 12:10,11, 12 93:6 97:22 148:19,20 149:3 151:4,6 182:19 237:10 278:20

**receiving** 104:22 151:7,8,9 174:15 181:3,23 182:20 184:2,10 185:7,8,24

**recently** 111:25

**recept** 82:2

**receptacle** 215:16, 19

**receptacles** 215:3, 13 269:10

**recess** 72:6 98:25 173:25 189:14 233:2 267:4 292:22

**reckless** 284:7,10 291:5

**recognize** 110:7,9 112:11,13 123:10,13 130:13,16 140:17 148:14,17 151:21 159:12,14 163:17,20 169:20,22 184:5 198:19,21 210:21,24 220:7,9 236:2,6 240:5 243:12,14 249:22 256:7 258:18, 21 262:8,11 280:23

**recollect** 39:7

**recollection** 19:17 51:2 76:25 149:2,20 168:1 184:10 246:14

**recommend** 208:16 269:8 272:21

**recommendations** 272:18

**recommended** 270:11 272:3,11,12, 23

**reconnect** 249:13

**reconnected** 106:11,16,17 108:3

**reconsider** 171:9

**reconstruction** 17:10 150:22 220:17

**record** 9:23 10:5,9 34:7,12 64:3,4,5 66:17 98:23,24 102:14 105:7 116:19 121:18 123:6 130:9 131:6 140:19 147:13 148:10,12 159:2 163:13 173:24 174:5 178:25 189:12,15 192:1,5 207:10 210:19 233:1,3 235:22 253:14 261:7 265:16 267:3,6,9 280:16 285:5 286:8 292:21,23 296:1 299:2,3,10 300:4

**records** 116:15 140:10

**recover** 239:5

**recovered** 236:18

**rectify** 135:6 268:16, 22 269:20

**red** 154:20,21 155:15 156:14 162:1 167:3 284:12

**redo** 108:14 130:22 243:22 271:6

**redone** 225:12 243:18

**reduced** 301:7

**reducer** 194:20 195:4,10,14

**refer** 19:15 66:17 82:17 83:9 188:19 223:20 224:8,15

**reference** 69:6 76:13,19 200:6 243:17 289:24

**referenced** 64:25 66:4 239:14 290:15

**references** 6:20 214:10 272:2

**referencing** 65:25 76:20 256:16 285:13

**referral** 233:13 239:11

**referred** 13:18 201:13 224:17 233:14 234:3,6 266:17,18,22 287:2

**referring** 131:7 133:4 134:20 150:10, 11 157:17 159:19 160:2 164:24 165:1,3 173:5 192:19 194:7, 21 195:7 197:2,5 200:8 203:15,16 205:5 215:18 227:11 243:18 244:24 245:25 248:5,11 254:15 282:9 284:20 297:10,12

**refers** 134:11 135:16 297:13

**refile** 285:3

**reflect** 123:6 128:9 130:9 131:6 159:2 165:14 192:11,21 207:10 210:8

**reflected** 65:6 68:15 88:2 182:10 259:1 260:11 273:11

**reflecting** 210:1,2 224:6

**reflection** 123:19 298:11

**reflects** 72:25

**reframe** 221:11

**refrigerator** 59:7

**regarded** 272:13

**Registered** 301:2

**regrout** 229:20

**regularity** 270:19

**regularly** 191:14

**rehabitable** 106:22

**rehung** 53:14

**reimbursed** 229:15 230:3

**reimbursement** 111:5 181:20 222:3 225:22 227:1,16 228:2 230:12 252:7 288:5

**reimbursing** 115:23

**reinstalled** 81:3 108:23 110:13

**reissued** 120:2,5,17

**reiterate** 140:9

**relate** 165:16 297:14

**related** 62:17 110:20,25 111:15 123:24 157:11 168:2 189:4 195:14 204:15 211:25 212:24 213:24 221:3,25 229:22 230:10 231:18,21,24 252:8,9 288:1 301:10

**relates** 287:10

**relationship** 21:18 68:4,7,9 154:25 219:6

**released** 33:8 37:16

**relevancy** 37:15 65:25

**relevant** 202:12

**relied** 261:10

**rely** 125:17 261:8

**remain** 108:11 287:1


Confidential

**remainder** 270:16
**remains** 115:4 260:24
**remember** 18:21 21:6 26:18 32:13 38:13 40:6,8 41:8,16 42:5,7,23,24 43:5 44:16 45:6 46:5 48:12,17,21,23 49:1, 16 51:7 52:20 55:15 56:6 59:16 62:14 63:22,23 74:24 76:11 78:4,24 79:11 83:5 84:16,22 85:9,24 89:11,21,24 90:10 92:10 93:11 94:2,19 95:5 96:1 98:7 106:12 117:19 118:7, 12,21 122:1,17 124:14 130:4 136:18 140:24 144:25 155:25 157:18 165:1 166:25 167:4 177:23, 24 181:6 182:4 184:14 187:6,11,14 193:22 200:8,9 216:18 218:4 223:1,9 226:15,18 234:5,14 235:1,8,17 237:13 238:12 247:13 248:8 250:24 255:12 265:7 268:11 269:4 271:3 274:10 279:25 280:5, 12 297:25 298:13
**remembering** 49:21
**Remind** 122:11
**reminded** 38:3
**reminder** 9:12
**remnant** 226:9
**remodel** 70:1,5,20
**remodels** 21:24 22:4
**removal** 19:11 105:4 147:5 193:12 214:10 216:21
**removals** 19:7 263:15
**remove** 18:6 55:2, 11,13 82:7 89:25 90:14 100:13 137:1 153:23 199:15 203:21 220:23,25 223:4,5,6 285:4
**removed** 19:9 50:7 55:18 80:20 81:1,7 86:10 92:2 93:22 97:9 100:11 106:19 108:2 144:22 145:21 147:2 168:15 171:24 172:1,2 189:9 192:18 193:7,20,24 199:18, 23 208:17 214:3,20 225:14 248:1,2 249:10 284:1
**removing** 81:3 99:7 204:3 275:25 284:2
**renovation** 45:23
**renovations** 45:22 113:7 115:12,16,20
**rent** 30:19 45:3,20 48:15,24 49:1 51:13, 16,19 52:2,12,17,19 57:6 73:14,20,23,25 74:3,7 75:4,11 77:15, 16 241:7,9
**rentable** 113:25 114:1,3 115:1,5
**rental** 3:17,19 4:10 20:1 28:11,14,21,22 39:18 49:24 176:17 178:8 293:16,19 294:19
**rented** 29:11,21 30:10,13 38:24 44:25 45:2 49:4 50:11 52:5 61:3 179:24
**renting** 29:19 38:22 39:2,14 44:13,16 48:14
**rents** 45:17
**repainted** 231:14
**repair** 46:21 47:13, 17 50:7 63:10 69:25 70:6,19 81:10 91:18 175:17 197:8,10,12 252:20 278:3 281:11 294:15
**repaired** 50:10 66:12 82:10 271:1 287:3 293:25 295:1
**repairs** 45:21,22 47:7 53:8 60:13 114:25 128:2 139:24 175:6,11,13,16 176:23 177:8,12,16, 18,22 210:1,2 241:1 258:25 259:11 261:2, 4 263:16 272:23,25 273:2 294:11,20,22, 23
**repeat** 132:14 147:13
**rephrase** 9:6 22:10, 22,24 25:10 29:6 32:5 35:22 45:1 50:15 60:17 81:12 94:15 107:10 108:6 128:6 145:16 173:1 175:21 182:7,11 222:13 238:8 251:5 275:21
**rephrasing** 254:21
**replace** 41:6 43:6,14 70:1,6,19 101:17,19 102:2 109:7 110:15 137:1,2 172:4 187:10 195:3 197:8 199:15, 17 207:2,5 220:25 221:8,11 223:12,14 226:17,19 269:9 278:9 279:10,12,13 289:13
**replaced** 40:3 42:17, 18,21,23 43:9,12 53:18 56:25 57:17 80:11 81:9 101:24 106:8,22 113:9 114:9 143:13 171:21 191:20 192:22 198:10 199:23 203:3 205:21 208:18 211:24 225:14 226:19 249:12 271:9, 21 273:13,16 274:13 276:5,12 277:17 283:22
**replacement** 43:7 63:9,11,15 126:22 127:3 143:11 151:2 186:25 197:12,14 221:15 237:24 240:19 250:14,16 254:10 258:6 270:15
**Replaces** 205:4
**replacing** 197:9 207:4 257:13 284:2
**replumbed** 257:6
**replumbing** 137:7
**reply** 298:8
**report** 6:17,22 57:15 128:25 133:9,21 134:2 142:23 267:12 268:4,9,13 271:11 272:10 273:2,9,12
**reported** 79:11 191:11
**reporter** 8:22 9:12 22:25 35:12 57:23 72:5 133:15,18,20 141:12 173:20 174:4 179:1 183:23 185:17 190:6 245:20,22 286:6,15 301:1,2,20
**represent** 122:13 211:2
**request** 3:6 46:2,3 71:24 105:9 112:16 116:22 131:18 154:13 184:16 267:18 290:24
**requested** 3:5 94:23 112:14 118:8 154:8, 12 159:19 161:1 194:9 250:22 301:12
**requests** 3:11 11:8 54:2 180:19 291:19 292:3
**require** 136:5,12 225:16 271:12 276:14,15
**required** 45:23 46:21 66:5 85:15 88:1 96:11 136:11 137:24 138:22 139:2, 5,9,14,18 156:20 165:23 195:11 207:23 208:23 212:7 226:24 248:4 263:19
**requirement** 65:7

270:4

**requirements** 284:3

**requires** 213:1

**research** 59:21,24

**reserving** 267:22

**reset** 94:10 100:23 104:8 105:1 106:6,7 107:1,5,14 108:8 279:14

**resetting** 105:9,14

**reside** 10:19 29:14, 16 43:20

**resided** 29:15

**residence** 69:14,15

**Residential** 65:18

**residing** 29:18

**resolution** 6:7,13,15 180:4 235:24 266:13, 14

**resolved** 8:20

**respect** 8:17 19:1 22:12 23:2,12,15,22, 25 28:1,5 36:11 40:4 45:21 50:12,19 56:14,23 60:5 63:14 75:21 93:13 103:7 106:24 107:12 108:7 111:7,16 117:4 119:8 128:1 164:2,23 178:1 184:20 187:15 191:3 197:6 201:9 208:15 211:9 214:13,15 218:5 219:19 221:13 222:19 226:22 231:11 234:17 235:10 237:11 238:8 239:15 242:21 244:15 251:14 255:8 260:20,25 261:23 267:23 269:7 270:9 275:3 276:18 281:3,5 283:7 284:5 287:16, 20 288:23 289:18,20, 23 291:8 294:18 296:13

**respectfully** 71:24 290:24

**respective** 253:22 267:20

**respond** 170:24

**responded** 160:8,9

**response** 54:21 101:3 149:11 151:4 161:4 162:5 164:12, 13 170:20 172:7 245:7 286:24 287:1,4 290:9,15 291:1,13 292:6,8,10,12,15,18 294:4 296:14

**responses** 3:10 7:3 11:8 54:1 286:17 291:18

**responsibility** 272:22

**responsible** 115:23

**rest** 103:24 106:21 113:14 169:18 220:17

**Restate** 278:1

**restaurant** 15:23

**restoration** 12:25 13:3,20 16:24 17:3, 11 27:4 31:11 83:20 127:12 220:14 242:18

**Restoration/ service/remodel** 4:6 6:9

**restorations** 14:20 27:5

**restore** 240:15

**result** 63:4 71:8 127:1 192:12 193:15, 16

**resulted** 127:2

**results** 87:24

**retail** 15:23 279:5,8, 16

**retain** 67:6 225:5 235:2

**retained** 67:7 112:4 211:21 233:6 238:17, 24

**retesting** 264:14

**returned** 81:14

**reupgrade** 277:22

**reuse** 199:14

**reused** 199:6

**reveal** 272:20

**review** 11:5,7,10 54:20 93:5 95:11 112:8 171:12 181:5 220:4 230:17 235:21 247:20 263:2,10 296:4 299:4 301:12

**reviewed** 11:2,4 71:21 169:16 184:9 186:4 236:11 263:3

**reviewing** 122:23 202:6 236:4 267:10 280:19 296:19

**revised** 95:23 216:2 217:2

**revolved** 190:24

**rewire** 213:5 214:18 241:20 249:14

**rewired** 241:19

**rewiring** 136:6,12 137:6

**rewrite** 220:18

**Richardson** 4:18, 20,23 7:5 158:24 162:21 163:25 165:14 166:4,23 171:8,15 172:18 293:24 295:17 297:20 298:5

**Richardson's** 162:24 171:12,16

**rid** 109:6 203:22 286:3

**ring** 118:14

**rip** 202:24

**ripped** 62:21

**Rob** 141:18

**role** 17:12 167:6,7,10

**roll** 228:6

**rolling** 152:9

**roof** 3:13 62:19,20 63:7,8 66:15 82:1,4 203:5 289:13

**roofer** 63:15 64:23 65:4,16

**roofing** 3:12 27:6 64:9

**roofs** 203:4

**room** 55:2,4,9,21 84:1 90:13 91:10,19 115:10 144:15 146:24 187:17,19,21, 23 188:2 212:21 220:24 223:5 232:6

**roommate** 39:1 44:3 48:19

**root** 167:13

**rot** 153:15

**rot-related** 162:9,12

**rotted** 221:20

**rotting** 153:19

**rough** 237:3

**roughly** 74:17

**round** 108:17

**route** 279:18

**RPR** 301:17

**rule** 161:10

**run** 15:13 39:22 48:1 56:20,21

**running** 42:14 47:10 59:4 100:24 101:1 135:1 144:17,18 147:21 204:14 219:1

**runs** 146:23,24

**rust** 153:14


**S**


**S-I-C-H-E-R-I** 121:20

**safe** 131:17 272:15


Confidential

**sales** 20:16
**salvageable** 202:21,25
**Sara** 10:14
**satisfied** 92:12
**satisfy** 105:16 113:9
**save** 205:10,11 206:23
**Schanker** 2:2
**Scherry** 121:19
**school** 16:5
**scope** 50:8 70:5 85:8 86:8 89:16,19,21 94:6,10 103:13 105:22 106:2 128:20 129:15 131:21,22 132:3,14 149:24 168:20 171:2 175:7, 11 190:14,17 194:8 204:14 215:22 217:8 248:3,8,18,20,21,24 249:2 274:4 278:22 279:2 295:4
**scoped** 270:12 274:11
**scoping** 270:16
**Screenshot.jpg** 6:21
**screw** 144:3
**Seal** 300:17
**seal/prime** 188:16 189:2
**seals** 221:2
**seats** 206:11 207:3
**section** 34:12 64:16, 17 65:1 67:2 68:13 69:3,12 72:23 73:11, 13 74:12 80:11,25 81:6 91:9 168:1,9 191:20 192:18 196:7 197:1,3 200:20 202:9,18 205:11 217:6 221:3,5 263:14 273:17
**sections** 138:3 197:10 201:13 202:6 247:8,13 263:4 264:25 265:9,14
**securely** 39:25
**security** 10:4,8
**seek** 244:18 288:4
**seeking** 83:13 98:5 128:10 179:10,12 222:11,19 260:10 288:5
**seepage** 79:23
**sees** 144:7
**segment** 39:17
**self-repairs** 276:2
**sell** 25:7 38:5 279:1
**send** 47:12 86:24 119:4 138:2 155:5 298:9
**sending** 154:12 277:14
**sends** 160:19
**sense** 9:20 109:24 285:1 289:8
**sentence** 54:25 55:23 164:24 165:19 166:11,17 167:15 200:6 243:11,16
**sentences** 56:16 163:25
**separate** 13:17 20:24 55:20 130:23 219:11
**separately** 285:3
**separating** 260:19
**September** 10:23 30:9 101:2 122:10 148:20,23 149:7 157:12 159:9 160:3, 18 162:2 170:2 171:13 173:3,6 296:14,24 301:6,13
**sequence** 254:14,16
**serve** 109:13 291:1
**served** 11:13 286:25
**serves** 21:21 94:25 104:25 109:2
**service** 272:18
**serviced** 195:23 272:13
**services** 13:5 16:22, 25 18:25 22:6 28:1,4 107:16 222:12 233:17 237:11 238:1 267:13
**serving** 109:16,18, 21 268:10
**set** 3:10 7:3 18:10,13 20:3 54:1 108:12 109:18 155:7,8 157:8 286:18 289:7 291:19
**settlement** 239:5
**settlements** 236:17
**setup** 96:18
**seven-page** 163:14
**sewage** 6:13 77:3,6, 7,9
**sewer** 5:7 17:9 42:17,25 43:7,10 270:14
**Sewer/sump** 3:20 5:4
**shared** 267:16
**shares** 32:10
**sharing** 146:17
**shed** 141:19
**sheet** 156:14 162:1
**sheets** 300:3
**shifted** 25:6
**shining** 77:21
**shop** 16:12,13
**short** 19:22 161:12 202:10
**shortly** 151:8
**show** 53:25 66:21 70:7 95:7 148:2 154:15 163:8 173:18 183:21 198:14 219:5 249:8 295:21
**showed** 89:12 153:22 196:15 243:20
**shower** 206:11,21 207:3,5
**showers** 206:10
**showing** 64:7 99:2 102:11 143:21 154:10 183:19 188:11 196:14
**shows** 249:10,11
**shut** 13:14 19:18 25:9
**shutoff** 194:20 195:4,9
**Sicheri** 5:5 6:16 7:5 121:19,20,24 122:2, 9,17,20 147:23 174:16
**Sicheri's** 122:14 149:10
**side** 70:8 76:21 84:1, 5 90:10,15,16,24 91:10,12,15,19,22, 24,25 92:1 100:10 186:7 193:9,21 196:20 218:10 223:21
**sides** 84:2
**sidewalk** 43:6
**Siding** 3:12 64:9
**sign** 34:20 262:4 298:25
**sign-off** 71:4
**signature** 54:9 236:9 300:8
**signed** 31:24 140:1 236:8
**significance** 195:19
**significant** 137:2 142:5
**signifies** 124:3
**signifying** 96:15

**signing** 104:17

**sills** 221:2 223:9

**similar** 33:15 186:1 224:5 257:19 271:11

**similarly** 9:1 71:6 242:10 258:10

**simply** 41:4

**single** 30:6

**single-family** 60:23 69:13,15

**Singletrack** 4:7 125:13,18 126:13 129:21,22,24 130:1, 17 131:1,8 132:11,24 134:15 135:21 140:16 141:2 248:6, 25 263:24,25 264:4 275:7

**sink** 226:10,11 279:14

**sinks** 82:2

**sir** 281:20

**sit** 107:7 242:6

**sitting** 107:19 179:23 232:19

**situated** 109:12

**situation** 47:1 48:9

**Situationally** 46:24 47:19

**six-month** 30:21

**size** 76:17,19 221:7

**skewed** 158:14,17

**skip** 203:7

**slab** 188:14

**slabs** 187:16

**slightly** 242:13 254:12 255:21 285:18

**SLM** 301:21

**slow** 141:12 155:5

**sludge** 76:10,23 77:23 78:13,15,23 79:23 82:15 90:23 91:6,7,15 112:18 193:15

**sludgy** 76:6 77:2 90:7

**small** 55:20 153:14 196:18 273:17 296:5

**smell** 77:6,7,8

**smoke** 213:16

**smoke/carbon** 212:22 213:1

**smoother** 37:1

**snake** 56:20 154:19 257:14

**snap** 89:7

**Social** 10:4

**software** 20:2,4 31:6,11,12,14,18,21 32:2,17,25 33:8,23 34:6 35:20 36:1,3,12, 14,17 97:5 127:11 267:1

**sole** 21:14 26:3 28:16

**solely** 17:8

**solution** 176:9

**Solutions** 15:21 16:9

**something's** 293:21

**sort** 22:6 32:24 46:20 47:11,15 68:10 86:2 88:17 89:4 91:19 97:11 114:23 123:23 124:8 130:1 145:7 155:6 156:7 161:17 168:4 180:4 191:7 201:8 216:21 235:14 249:2 262:2,3 266:12 283:18 284:16

**sorts** 295:13

**sought** 222:3 252:7

**sounds** 199:12,13 239:25

**span** 19:22

**speak** 122:2 155:22 157:15 161:20 238:6 264:18

**speaking** 289:20

**specialist** 18:6

**specific** 135:24 156:15 256:19

**specifically** 13:4 20:11 54:12 96:9 133:5 154:3

**specifics** 156:5

**spell** 121:17

**spent** 11:20 20:15 115:19 169:3

**spilled** 77:9

**spoke** 11:2 16:20 78:25 79:11 90:19 118:24 155:20 239:9 256:17 280:1,4 290:8

**spot** 268:6

**springs** 206:12 207:3

**stack** 81:25 205:16 285:23

**stacks** 285:22

**staff** 155:12

**stair** 39:25

**stairs** 243:21

**stairway** 214:2,3

**stalemate** 175:16 232:18

**stamp** 124:8

**stamped** 267:18

**standard** 129:8 176:23 188:2 215:3, 13,14

**standardization** 129:5

**standards** 27:1

**stands** 252:5

**standstill** 162:18

**stapled** 141:11,14

**start** 13:10 19:23 26:13 29:19 38:22 39:2,16 44:13 46:25 54:25 79:16 84:22 185:25 203:5 214:11 291:21

**started** 13:21 19:22, 25 26:19 35:9 39:13 44:16 48:14,17 84:24 111:22 115:9 123:21 143:24 144:1 248:8

**starting** 31:6 144:15 204:17,21 209:19 224:25 228:12 249:13 256:10 257:14 289:5

**starts** 287:4

**STAT** 69:18,19

**state** 9:22 11:21 25:11 49:22 51:3 121:15 154:3 164:12 201:3 211:8

**stated** 146:11 155:14 165:23 183:9, 11 234:21 246:4 257:9,20 259:18

**statement** 156:13 170:13 221:24 260:21 281:17

**states** 37:23 70:17 176:22 272:10

**stating** 158:3 162:17 200:15 245:9 297:13

**status** 71:8 113:6,23 266:7

**statute** 101:5

**statutory** 283:11

**stay** 128:25

**staying** 174:6

**step** 82:11 175:15

**steps** 85:22

**Stevens** 44:2

**sticking** 144:3 290:20

**stipulation** 177:4 282:21

**stood** 181:10


Confidential

**stop** 15:12 119:23 120:1,6 131:18,20

**stops** 210:12

**storm** 63:1

**stove** 59:7

**straight** 93:18 197:14

**straw** 82:6

**street** 2:7 43:3,6 274:16 301:6

**strictly** 246:20

**stuck** 118:5 242:24

**stuff** 13:16 19:8 45:20 64:14,21 108:16 112:19 114:7 131:17 176:14 206:14 218:21 225:8 243:22,24 271:3 293:17

**stuff's** 90:15

**Sub-contractor/ trade** 5:19

**subcontract** 17:21, 24

**subcontractors** 22:12 23:2,25

**subject** 22:13 23:3 75:22 139:21 299:6

**subjects** 166:23

**submission** 96:3 182:2

**submit** 96:13 97:11 124:10,13 194:9 226:25 227:15 228:1 230:12 237:22 252:24 258:13 266:3

**submitted** 28:2 96:10,11,22 97:16, 17,19 99:11,14 100:4 104:25 111:5 122:24 126:2,8 149:11 152:8 212:2 216:10,14 222:9,11,16 225:21 229:11,25 232:9,14 239:6 240:13 255:7 258:5 266:5 295:5

**submitting** 97:18 181:13 222:21 232:11

**subpanel** 55:21

**subpanels** 213:22 214:5

**subpoenaed** 245:6

**subroom** 188:4

**subsequent** 128:3, 22 183:3 185:7 211:19 239:6 269:13 298:7

**substance** 76:6 77:3 90:7 152:22 252:2

**substantial** 208:23

**substantially** 136:23 250:1 251:23

**substantiate** 97:15 98:2,4

**substantiation** 141:4

**subtotal** 255:19,21

**success** 239:10

**successful** 24:25 26:24 81:10

**succinct** 282:5

**sufficient** 106:3 109:4

**suggested** 84:10 273:2,8

**suggestion** 201:16

**suggestions** 32:25 161:12

**Suite** 2:3,7 301:6

**Summary** 6:20 186:8 253:20

**Sump** 5:8

**sun** 77:21

**supersedes** 164:9

**supervision** 18:9

**supervisor** 118:16

**supplement** 94:23

**supplemental** 6:18 94:24 95:1,23 99:10 117:3 149:11 151:4 173:12 219:14 248:13 258:14 259:5 261:7 267:19 290:16

**supplementation** 96:11

**supplements** 87:14 88:1 218:6

**supply** 57:16,19 116:22 196:9,20 273:23

**supporting** 126:1

**supposed** 24:21 136:8 199:5

**surface** 188:17 213:21

**surprise** 154:2 245:1,4

**surprising** 291:7

**surrounding** 206:18

**suspected** 75:24 84:3 189:9 193:23

**swapped** 207:20 208:4 211:22

**swapping** 41:4

**sway** 163:4

**switch** 25:20 211:23 257:18

**switches** 215:10

**Switching** 257:7

**sworn** 8:2 9:13 301:5

**system** 37:8 55:12, 18 56:9,12 58:12 109:19,21 113:21 137:15 176:5 194:19 195:15,23 197:22,25 206:4,25 207:5 208:23 209:3 263:19 264:1,5,6,7,8 270:9 272:15 273:12 276:2

**systems** 41:19,23 137:19 268:6,7

271:12 274:11

**T**

**TABLE** 3:1 4:1 5:1 6:1 7:1

**tag** 154:21 155:15 156:14 162:1

**tagged** 284:12

**takedown** 96:18

**takes** 37:5 65:17 242:6

**taking** 8:23 40:22 84:11 87:25 170:23 172:13 294:24 298:6

**talk** 14:3 56:16 98:11 132:23 160:14 198:12 215:21 260:14

**talked** 53:19 98:20 118:7,10 152:8 153:13 161:10 168:25 183:1 218:24 220:15 226:18 244:14 256:18 264:10 276:1 287:15 288:7 289:11 294:6

**talking** 30:20 35:9 59:7 69:3 82:24 105:19 108:5 111:22 122:7 140:16 146:7 157:17 168:13 202:11 215:12 259:5 260:13,17 273:23 277:18

**talks** 194:18

**tangent** 98:19 113:5

**tape** 99:9 270:21 271:8

**task** 127:17,22

**tasked** 145:9

**tasks** 127:14

**tax** 127:16

**taxes** 242:16

**Taylor** 233:9 236:7 238:6 243:15 250:22


Confidential

262:12,25 277:15 283:6

**Taylor's** 240:13

**tear** 91:20 162:9 165:16 171:21,24 172:5

**tear-outs** 13:16

**technical** 110:21

**technique** 8:13

**telephone** 10:2

**telling** 141:5 246:5 264:4 295:16

**template** 226:11

**tenant** 44:7 45:19 46:8 48:23 50:13,17 51:17,25 52:10 53:5 57:5 77:15 100:19 101:7 106:18,23 107:1,17 108:8 114:12,17 185:1 196:1 207:24 209:23 210:6

**tenants** 46:14 120:12 184:23 208:19 269:18 273:6

**tend** 47:20

**tended** 83:9

**tens** 175:19,22

**term** 145:13 251:12

**terminating** 20:12

**terms** 12:22 16:10 33:9,10 45:15 70:23 75:3 85:12 102:18 235:16 236:12 263:2 277:12 284:12 297:6

**terribly** 72:15

**test** 59:2,12 205:9, 12,15 210:3

**tested** 195:17

**testified** 8:2 39:13 91:5 108:19 162:24 178:3 209:22 230:19 247:3,4 290:20

**testify** 99:23,25

**testifying** 99:15 246:3

**testimony** 3:5 8:23 9:8 108:1 168:18,22 281:5 300:4

**testing** 18:3,4 86:11 97:2 98:10 191:7 205:21,25 218:16

**text** 70:15

**theoretically** 200:3

**thicker** 285:25

**thing** 9:17 10:7 46:20 47:11,15 52:16 68:10 72:1 82:9 88:18 105:13 109:20 111:19 114:22 123:23 124:8 133:8, 20 135:8 145:7 152:9 153:15 156:7 161:17 168:4 171:5 179:23 197:9 198:9 204:1 205:16 207:4 244:21 262:2 275:5 285:17

**things** 9:7 12:20 13:20 17:2 18:6 33:14 38:5 42:11 47:24 52:17 58:6 59:7 82:16 85:17 86:8 112:18 117:7 131:16 143:25 144:1, 4 145:11 152:20 154:19 161:2 162:17 163:6 171:3 184:23 203:19 206:23 221:25 222:18 223:25 252:8

**thinking** 59:6 103:15 108:13 118:15 150:9 177:6

**thought** 22:19 125:25 130:23 138:3 190:1 205:12 265:3 297:18

**thousand** 116:3,9 237:6,8

**thousands** 175:19, 22

**threaded** 137:4

**three-page** 130:10

235:23

**through-the-wall** 272:3

**throw** 200:7

**Thursday** 205:1

**tie** 196:21 203:24,25

**tile** 90:2

**Tim** 17:18

**time** 8:24 11:20 14:20,25 18:18 19:22 20:15 23:13 24:4,23 25:6,7 29:15 37:5 38:5,9 39:5,11 42:16 44:9,18 45:8,18,19 49:19 51:3 52:1 53:4, 11,19 54:20 59:15 60:21 62:8 72:25 73:8 77:19 78:16 80:3 84:19 87:3,13, 20 88:5 93:24 94:2, 17 98:3 105:25 106:9,25 107:2,5,14, 17 109:14 110:13 113:12 117:8 118:23 124:6,8 126:15 128:11 130:23 134:14 144:20 145:13 147:1 155:21 169:4 171:6 172:14 176:22 184:18,22 186:23 187:7,18 191:10,11 203:17,19 205:11,18 207:21 208:8,25 209:5,8 211:17 220:15 238:5, 7 242:6 244:23 245:24 246:5 258:8,9 259:20 261:18,19,21 268:18 271:1 274:10 275:20,22 280:1 282:23 289:6 294:15, 17,21 295:1 298:9

**timeline** 115:13,14 117:9

**times** 25:14 105:17 191:5 295:15

**timing** 96:25 110:22 176:23

**title** 29:9

**titled** 249:7

**today** 9:14 11:1 15:8 19:2 27:24 28:2 130:7 179:14 229:9 267:11,25 273:22 287:1 298:25

**toe** 279:13

**toilet** 47:9,11 59:5 90:1,15 193:6,7,14 257:6

**toilets** 82:2

**told** 51:24 71:14 87:2 97:9 138:8 155:9 157:5 165:15 212:17 246:15 263:23 264:2 275:3 277:15

**ton** 222:14

**tool** 37:10 127:13 168:21

**top** 25:23 62:14 63:24 75:17 76:18, 19,21,24 116:2 118:9,13 119:21 138:10 144:14 150:7 167:16 173:16 177:17 181:14 201:14 204:22 217:4 224:3 242:16 249:9 255:17 257:8 284:23 296:8

**topics** 297:24

**total** 127:8 154:2 261:2

**Totally** 153:17

**touching** 206:18

**track** 107:3 113:16 130:7 232:12

**traction** 235:12

**tradesman** 116:10

**tradesmen** 18:11 47:18

**Trail** 5:14

**trained** 138:10

**training** 12:10,11 13:24

**transaction** 244:20

**transcript** 35:4 300:2 301:9,12

**transcription** 301:8

**transfer** 38:19

**transferred** 117:9, 12

**transmission** 280:6

**trash** 215:19

**trashed** 108:12

**trauma** 27:7

**Travelers** 4:13,18, 20 5:3,7 8:6 11:8 54:1 62:10 78:3 79:10,12,17 85:5,6 86:4,14,15,24 87:23 92:22 93:8,14 94:24 95:1,10 97:12,17,19, 23 98:12,22 99:11,16 101:4,13 111:24 112:1 117:1,21 118:20 124:11 149:15 150:6 151:9 152:11,16 154:7,8 156:25 157:1 158:4 159:9 164:1 165:15, 21 166:7 170:24 171:9 173:1,2,4,11 174:23 175:7,10 177:12,15 180:7 182:6,8,9,13,19 184:13,17 185:9 189:17 190:7 194:10 212:2 216:15 217:8 218:6 219:18,20 222:5,10,16,17,21 225:22 226:25 227:15 228:1 229:12 230:1 232:9 239:8,9 241:17 244:7,9 252:16 255:7 256:1 258:5 261:3 266:3,7, 12 277:5,6,22 278:3, 21 280:2 282:18 283:1,11 284:7 288:5 294:2,16 295:18 298:17 301:20

**Travelers'** 157:22

**Travelers's** 117:25 151:2 153:3 189:18, 19 190:8,9 221:14 277:7 286:18

**Travis** 212:16 275:6

**Tread** 16:14

**trepidation** 167:5

**Trevor** 228:17

**tricky** 209:7

**trigger** 172:3 214:4

**triggered** 137:5

**triggering** 284:3

**trim** 232:4

**trip** 210:12

**trouble** 186:10

**true** 300:4

**truth** 9:14 301:5

**tub** 55:2,4,7,19 275:25

**turn** 59:4,13 150:23 176:8 208:20

**turned** 55:6 206:23

**two-family** 60:23 276:19,21

**two-handled** 206:12

**two-page** 148:4

**two-plus** 76:25

**two-pronged** 269:10

**two-something** 79:19

**two-tank** 194:19

**two-unit** 30:5

**two-weeks** 266:9

**Tyler** 121:12,13 128:14 154:14 221:19 265:21 280:8

**type** 18:2 21:12 31:12 53:12 71:7 82:9 86:22 96:9,10 195:8 208:19 215:3 223:22 269:2 272:5

**types** 27:2

**typewritten** 301:8

**typical** 215:20

**typically** 46:7 97:6 242:16

**U**

**uh-huh** 9:3 16:23 43:19 54:19 66:25 69:23 73:12 75:20 94:21 105:6 112:10 143:6 148:9 150:25 189:3 196:8 199:3 207:18 208:21 209:16 212:23 226:2 243:10 244:16 245:13 256:12,15 263:17 264:12,16 272:4 273:14 282:17 287:19 288:3 290:7

**ultimately** 108:18 183:14

**unaware** 169:7

**Unbeknownst** 144:19

**unbiased** 288:9

**unconnected** 107:7

**uncovered** 218:7

**undergrad** 11:23

**undergraduate** 12:12 16:5,8

**underground** 144:16 203:21 204:2, 4 205:7,8 206:1

**underneath** 144:19 146:24 147:21 288:24

**underpaid** 97:1,3 99:16 100:3

**underscore** 254:25

**undersized** 196:10 201:24 202:3

**understand** 8:10 9:5,9 94:11 141:18 152:10,13,14,17,22 153:1 160:25 164:13, 19 171:20 172:14 196:14 197:5 202:7, 11 242:15 251:22 279:9

**understandable** 153:18

**understanding** 27:22 46:9 65:16,17 69:14 81:24 124:5 146:15 152:21 178:3, 9 182:16,22 197:19 212:25 213:25 221:14,19 236:21 237:5 239:10 244:17 257:2,9,20 262:20 282:20 284:9 289:4

**understood** 85:21 153:24 177:2 196:16

**unhappy** 161:14

**uniform** 189:11

**uninsured** 278:24, 25

**unit** 30:6 38:24,25 39:3,14,18 43:17,20 44:11,13,17 45:2,7 48:14 49:2,4,5,11,23 51:6,9,14 52:5,11 53:3,4 61:1 73:6,9 74:3,8,21 79:24,25 80:1 96:21 106:2,10 107:16 109:12 113:8, 23 114:6,11,12 115:1,5 174:20 175:25 183:3,14 211:23 213:18 275:8

**units** 46:18 72:18 109:16 113:15 141:8 146:12,13 184:20

**university** 11:21,22 12:19

**unreasonable** 87:20 93:25 94:3,18 96:24 283:20

**unreasonably** 283:12

**unrelated** 221:25 222:2,18

**unvented** 206:19

**update** 6:10 113:14 290:9

**updated** 95:21 182:1 184:25 216:13 240:25

**updates** 186:6 238:21 239:2 266:25 267:2

**upgrade** 108:18 153:21 168:11 172:4 190:19 194:4,10,13, 14 206:6,15 207:23 211:14,15 212:7 263:20 272:12,18 284:4

**upgraded** 137:11, 12,15 197:23 198:1 212:13

**upgrades** 63:12 137:24 138:21 139:1, 5,9,14,18 154:11 156:9,19 159:21 162:8 165:16,22 168:2 206:4 208:23 211:9 272:21 278:3 282:21 287:21 288:6 297:9,14 298:18

**upper** 38:25 43:17, 20 44:11,13,17 48:14 49:2,4,5,11 51:6,9 72:18 73:6,9 74:3,7, 21 80:1 113:23 114:11,12 115:1 174:20 175:24 183:3 271:19 275:8

**upstairs** 19:4 20:8 40:10,11 44:2,5,6 50:22 55:2 78:19 100:19 101:8,14 106:2,11,23 107:1,6, 16,17 108:8 109:12 114:6 130:24 133:11, 24 146:17 185:1 203:4 206:13 229:20 231:13 240:11 257:5, 12 271:17 276:7

**upward** 16:18

**user** 37:9

**usual** 242:24

**Utilities** 59:9

**utility** 84:1 90:13 91:10,19 146:24

**utilize** 47:17

**utilized** 46:4

**V**

**vacancy** 29:25

**vacant** 46:14 52:7

**vacate** 49:13,18 50:14,20 52:10,13

**vacated** 50:17 51:25 52:20 53:5 106:18

**vacuum** 86:1

**valid** 132:1,2

**Validation** 181:17, 18

**values** 127:6 182:12 234:21

**valve** 110:17 206:11

**valves** 206:21

**vanity** 90:1,8,16 91:6 114:8 226:12,15 227:20 232:3

**vantage** 90:19

**variation** 34:1 35:13

**variations** 34:4 35:17 36:20,23 37:7, 8,9

**vendor** 83:8 112:4 116:10

**vendors** 18:10,15 48:7

**vent** 47:2 56:24 57:20 75:23 81:24 99:9 136:13 142:9, 13,16 203:1 272:3,5

**vented** 206:17

**ventilated** 82:4

**ventilation** 272:2

**Venting** 202:21

**venture** 32:4

**verbal** 9:1 130:3 155:6 161:21 166:22 238:21 297:23

**verbally** 298:4,12

**Verification** 54:8

**verify** 74:10 202:2 275:12

**Verisk** 89:5

**version** 37:3 68:19 71:24 95:21 100:4 176:10 216:7,8,10 239:21 240:13,21 250:6 255:2,3,4 285:10

**versions** 239:19 240:23,25 241:17

**versus** 48:5 70:1,19 169:3 183:11 185:10 186:16 197:12 208:6 245:4 251:23 279:5 283:23 288:8

**vertical** 81:25

**view** 80:20

**viewed** 246:17

**vinyl** 220:24 223:5

**violated** 262:25

**violations** 278:15, 17

**virtual** 86:18,19,25 87:4,11 88:9,13 89:2, 10 92:6 93:19 169:5

**virtually** 88:19 89:7

**visible** 80:3

**vision** 246:12

**visit** 80:8

**Visual** 191:7

**visually** 58:24 85:16

**volt** 146:23

**volunteered** 15:1

**VP** 141:24

**W**

**W-2** 20:23

**wait** 8:20,24 242:7

**walk** 58:5,20,24 90:14

**walked** 234:10

**wall** 76:1 78:9,11,18 80:5,10,21 83:24 84:2 89:25 90:10,11, 16 91:10,14,18,23 92:1 99:9 100:10,22 136:19,21,22,23,24 137:1,5 153:17,23 168:14 172:1 187:8 188:23 189:7,9 193:10,22,24 216:21 218:17 220:24 221:5, 9,10,13,15,16,19 222:20 223:6,10,13, 22 225:13,19 232:5 249:10,12,13 277:17, 18 284:1,2

**walls** 78:17 83:23 141:11,14 188:21,22 189:2 208:16

**wanted** 14:23 21:24 36:12 77:17 89:13 149:1,25 202:25 215:18 251:20 288:9, 12 289:6

**warning** 284:16

**warrant** 101:5

**warranty** 6:12 101:13 180:17

**Washing** 271:4

**waste** 47:2 56:24 57:20 75:23 81:24 82:2 136:12 142:9, 12,16 144:16 196:17 200:7 203:1,2

**water** 3:20 5:3,7 6:15,17 13:20 17:2,9 27:5 39:23 42:14,15 57:4,6,13 59:4,13 81:15 82:8 83:20,21 84:14 90:14 94:10 97:8 98:9 99:8 100:15,18,21,22,24 101:1,9,19,21 103:21 104:8 105:24 106:3, 7,13 107:8,20,21,22 108:3,5,7,8,10,14,19 109:2,10,18,21 153:6 176:3,4,5,7,8 190:20

Confidential

205:17 207:25 209:19,21,23 210:2, 4,7,9,15 270:22 271:5,7,9 276:11

**ways** 48:8

**wear** 162:9 165:15 171:21,24 172:5

**weather** 101:6

**Wednesday** 160:18 203:20 247:23

**week** 238:18

**weeks** 217:19 239:1 283:15

**welded** 39:25

**well-known** 127:7

**West** 2:3 10:20

**Western** 11:20

**wet** 83:15,24 84:2 90:11 136:19,22 221:10 225:13 277:18

**whatnot** 220:18 284:11

**whatsoever** 262:3

**width** 192:22,25

**wife** 32:8 231:4

**wife's** 111:12

**window** 221:2 223:8,9

**windows** 39:19 187:16

**winter** 51:1 176:11, 12

**winterize** 174:20 175:24 176:6

**wire** 56:1

**wires** 131:16 133:3 134:5 135:1 145:2,10 214:19,23

**wiring** 40:17,24 131:14 132:7 133:2, 6,16 134:10,13,17,18 141:10 213:2 241:18 248:1,23 249:7,11,17

**wiring-related** 276:9

**withdraw** 177:10 286:21

**withdrawn** 70:25 155:16 204:22 208:10 248:14 254:8 264:17 291:6

**withstanding** 137:23

**word** 65:20 91:15 116:16 172:16

**words** 79:19

**work** 13:15,17 15:1, 25 16:10,24 17:15,21 19:4 20:8 24:2 25:21, 25 27:7 34:16 36:8, 16 38:25 39:5,14,17, 20 40:5 45:23 46:23 53:9,12,16 55:24 56:23 57:1 60:18,22 63:18 65:8 66:5,12 67:19 70:5,6,22 81:12 83:7,9,17,19 85:1,5,9,11 86:5,6 89:19 90:3 92:11 93:22 96:9 100:6 103:10,14,24 104:11, 14,23 105:12,15,22 106:2 112:22,24 113:3,12,20,24 114:4,20 115:9 117:9,16 122:18,19, 22 127:6 129:7 131:1,10,19,20,22,23 132:3,12 135:12 137:4 138:9 143:24 147:3,4 168:20 171:6 190:15 192:11,14,15 194:5,8 195:8 204:12,19 205:13,14 206:3 207:4 211:11, 14,15,16,18 214:11, 14,15 215:9,22 217:8 218:7,8,22 219:19 220:14,17 221:24,25 222:4,14,18,22 224:2,13 225:9 227:4,21 228:20 230:24 231:16,18 232:20 233:23 240:10 242:4 246:25 249:2 252:8 257:24 275:8 288:1

**work-out** 191:13

**worked** 13:15 15:21 16:12 19:13 26:10 38:8,13 59:13 67:5 83:2 103:1 114:21 122:1,19 123:22 141:2 228:18,23 230:22 233:20,22 234:4 239:6 271:2

**worker** 97:20

**working** 12:20 14:19 20:3 68:9 202:14 203:18 206:17 219:6 248:7

**workmanship** 153:6

**works** 33:19 81:18 141:2 155:1 242:16 244:20 279:10 284:10

**would've** 93:7

**wrenches** 200:7

**write** 191:8 262:13

**writing** 156:19 163:6 165:23 168:20 265:9

**written** 3:10 7:3 54:2 68:18 102:22 122:14 155:7 164:13,19,20 167:4,9 258:9 286:18 297:3

**wrong** 42:22 119:15 158:4 164:2,5 201:23 203:12 263:7,18 291:23 293:15,17,18

**wrote** 163:3 166:2 167:21 168:2 198:22 243:15 262:12

**X**

**Xactimate** 13:25 33:14,16,23 97:4,5 100:5 124:4 126:25 127:2,6,7,11 168:21 242:15 255:22 279:12 282:6

**Xactimate's** 127:17 279:9

**Xactware** 89:5

**Y**

**yard** 19:10 43:5

**year** 10:16 37:20 39:2 43:23 44:20 51:12 61:21 83:6 115:2 127:15,20 235:8

**years** 13:13 16:1 38:13 39:12 46:5 77:1 78:8 79:19 94:5 164:25 165:4 179:24 199:13 252:14 274:5

**you/us** 244:12