IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-02664-REB-KLM

---

DEPOSITION OF: JOHN NAPOLITAN - September 28, 2022
(via RemoteDepo)

---

JEFF DIEM,

Plaintiff,

v.

TRAVELERS PERSONAL INSURANCE COMPANY,

Defendant.

---

PURSUANT TO SUBPOENA AND AGREEMENT, the deposition of JOHN NAPOLITAN was taken on behalf of the Defendant in Arapahoe County, Colorado, by remote means, on September 28, 2022, at 9:36 a.m. MDT, before Gail Obermeyer, Registered Professional Reporter and Notary Public within Colorado, appearing remotely from Douglas County, Colorado.

REMOTE APPEARANCES

For the Plaintiff:

ANDREW C. QUISENBERRY, ESQ.
Bachus & Schanker, LLC
101 West Colfax Avenue, Suite 650
Denver, Colorado 80202
Email: andrew.quisenberry@coloradolaw.net

For the Defendant:

EDWARD C. DENBY, ESQ.
Clyde & Co US, LLP
999 18th Street, Suite 1765N
Denver, Colorado 80202
Email: edward.denby@clydeco.us



I N D E X


| EXAMINATION OF JOHN NAPOLITAN: September 28, 2022 | PAGE |
|---|---|
| By Mr. Quisenberry | -- |
| By Mr. Denby | 6 |



| DEPOSITION EXHIBITS: | | INITIAL REFERENCE |
|---|---|---|
| (Exhibits provided electronically to the court reporter.) | | |
| Exhibit 51 | Letter to Napolitan from Salabak, 9/15/22, Re: Diem v. Travelers Personal Insurance Company, Subpoena to Attend Deposition, with attachment | 11 |
| Exhibit 52 | Letter to Napolitan from Salabak, 6/9/22, Re: Diem v. Travelers Personal Insurance Company, Subpoena to Produce Documents - 4565 Elm Court, with attachment | 15 |



| DEPOSITION EXHIBITS: (Previously marked) | | |
|---|---|---|
| Exhibit 3 | City and County of Denver, Plumbing Permit for 4565 Elm Court, Denver, Colorado 80211, 8/31/20 | 113 |
| Exhibit 12 | Estimate; Insured: Jeff Diem, 4565 Elm Court, Denver, Colorado 80211, 7/14/20, Bates Nos. Diem_001298 - Diem_001312 | 121 |
| Exhibit 25 | Invoice #4693 to Diem from Metropolitan Drain Cleaning, LLC, 7/9/20, various Bates numbers | 86 |
| Exhibit 27 | Invoice #4081 to Diem from Metropolitan Drain Cleaning, LLC, 8/7/19, various Bates numbers | 63 |




I N D E X (Continued)


| DEPOSITION EXHIBITS: | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 44 | Email to Travelers Insurance from Grant, 1/15/21, Re: Jeff Diem, 4565 Elm Court, Denver, Colorado 80211, Bates Nos. Diem_000019 - Diem_000089 | 123 |
| Exhibit 46 | Email to Bellator Claims from Diem, 2/12/21, Re: Code summary.docx; Denver 2018 IRC screenshot.jpg, Bates Nos. BELLATOR_001389 - BELLATOR_001397 | 127 |
| Exhibit 47 | Comfort Home Inspections, Confidential Inspection Report, 4563 [sic] Elm Court, Denver, Colorado 80211 | 130 |




WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

* * * * *

THE REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record.

MR. QUISENBERRY: Andrew Quisenberry on behalf of plaintiff, and we are in agreement.

MR. DENBY: Edward Denby on behalf of defendant, we are also in agreement.

THE REPORTER: And, Mr. Napolitan, do you declare your testimony in this matter is under penalty of perjury?

THE DEPONENT: I understand. Yes, I do.

THE REPORTER: Thank you.

JOHN NAPOLITAN,
having verbally declared his testimony in this matter is under penalty of perjury, testified as follows:

EXAMINATION

BY MR. DENBY:

Q. Good morning. Could you please state your name for the record.
A. My name is John Napolitan.
Q. Thank you, Mr. Napolitan. And I appreciate you taking the time to be here with us today. Before we get started with the deposition, I'm going to just have to go through some background regarding a deposition; how it works and just the way this is -- in particular, how this is going to work, since this is done via Zoom, which is somewhat of a new thing since COVID has begun.
The first thing I'm going to ask you is, are you represented by counsel today?
A. No.
Q. And have you consulted with an attorney about this deposition?
A. No; not my own.
Q. Okay. And now, I'm just going to go over a little bit about the background of the deposition. So the deposition is just a question-and-answer



session. I'm going to be asking you some questions on behalf of my client, Travelers, with respect to your involvement in the plaintiff's claim in this matter. You're going to just answer those questions.
The court reporter who is here, Ms. Obermeyer, is going to take down everything that we say. So as a result, it's extremely important that you wait for me to finish asking my question; give a little bit of a wait, you know, a little lull of time, just to make sure we don't talk over each other -- given that that sometimes happens electronically -- and then, you know, provide your answer for the record. I just ask that you speak as clearly and as loudly as possible, so that she takes down everything that you say.
I will also ask that you please provide only verbal answers. She can only take down verbal responses, so please try to avoid nodding your head, you know, saying uh-huh, or anything along those lines.
If there's any questions that you don't understand, it's okay to let me know that you don't understand it, and I'll try my best to rephrase it to you. It's extremely important that when you answer a question, that you understand the question that has been presented to you. If you do answer a question, it's going to be assumed on the record that you



understood the question that was asked of you. So if there's anything that's ever unclear at all, please just ask me, and I'll do my best to get it to a manner that, you know, we're both understanding what's being asked.
The other thing, there might also be objections. Mr. Quisenberry might raise some objections to my questions. If he does do that, you would not answer the question until we finish discussing the objection. Typically, and just as a background, there are a couple types of objections. He may object to -- he may make an objection on the basis of form. If he does do that, we'll discuss the objection, and he will most likely advise you that you will need to answer the question.
He may advise you that if there was anything attorney-client privileged, that you can -- in that case, he might advise you not to answer the question. But, you know, if that arises, we'll deal with that when it gets there. And have you ever taken part in a deposition before?
A. No.
Q. Okay. And as the court reporter indicated to you at the beginning, do you understand that you are under oath and are sworn to tell truth?



A. Yes, I do understand that.
Q. Okay. And I'll just also let you know that if you don't know the answer to a question or you do not remember the answer to a question, it's perfectly acceptable to say that. As I kind of said at the beginning, we want to make sure that the record is accurate and she takes down your testimony as precisely as possible. So if you don't know the answer to something, it's better that you say you don't know the answer, than to try and make up something that may not be accurate.
A. Understood.
Q. Okay. And the other thing, too, is if you need to take a break at any point, you just let me know, and we'll be glad to do so. The only thing -- only request that I have is if I do have a pending question, that you answer the question before we take the break.
A. Understood.
Q. Okay. And did you do anything to prepare for this deposition today?
A. I did go back and look at the estimate that I had sent. And then I also went back and looked at an invoice or two and got it up on the screen here, just so that I was more familiar with time frames and

the like.
The other thing I do to get prepared was that I went through my list of business cards. And I couldn't remember the adjuster's name, so I thumbed through -- I have a little stack of business cards that I keep. And this was actually still in there (indicating).
MR. DENBY: Okay. First, let the record reflect that Mr. Napolitan has presented a business card for Travelers adjuster, Justin Sicheri.
THE DEPONENT: That is correct.
MR. DENBY: And that is spelled S-i-c-h-e-r-i; Sicheri, if I said that correctly.
**Q. (BY MR. DENBY) The other thing, Mr. Napolitan, I'd also just like to note, since you've indicated it, do you have anything open on your computer with respect to what you reviewed for this deposition, currently?**
A. Yeah. Over here to my left, my left-hand side, I have my QuickBooks open, so that I have the estimate up on the screen. Is that acceptable or unacceptable?
**Q. That is actually unacceptable. I would request that you don't have anything open right now and that you testify as we go through it from your memory.**



**But when I do ask you a question about your estimate or invoice, that's when I'll drop it into the chat box or I'll share my screen with it. It will come up on the screen. You can take your time to review anything that I present to you before I ask you any questions about it. And that way, you know, you'll at least have an opportunity to look at anything I show you before you have to answer anything.**
A. Okay. And I can show you -- yeah. It's closing very slowly, but it is closing right now. It is no longer up (indicating).
**Q. Okay. Thanks. I appreciate you showing me that. And I'll take your word for it for the deposition. And, you know, if I do at any point notice that you might be, you know, looking at something, I may just ask you about it. But, for the most part, you know, I will take your word that everything is closed.**
A. Very good.
**Q. Okay. So the first thing I want to bring up is that this deposition was scheduled today pursuant to a subpoena. I'm going to pull up a copy of the subpoena.**
MR. DENBY: And I would ask, Ms. Reporter, that this be marked as Exhibit 51. I'm just going to show a copy of the subpoena, if I can get this into



that box here. All right. So I dropped the document in. If everyone can just confirm if they see it or not?
THE REPORTER. Yes, I do.
(Deposition Exhibit 51, remotely introduced and provided electronically to the court reporter.)
MR. DENBY: Okay. Thank you.
**Q. (BY MR. DENBY) Mr. Napolitan, if you could just pull up that document when you have a chance and take a look at that.**
A. I haven't seen it.
MR. QUISENBERRY: Just one housekeeping matter. We can stay on the record for this. It may be that if he's on a phone, Ed, that it won't come up. I know that happens sometimes with an iPad. So it may be best to do the screen-share.
MR. DENBY: Okay.
THE DEPONENT: I'm on the iPhone. And I'm so sorry, but nothing is coming up right now.
MR. DENBY: Okay. Let me try sharing my screen with you. Hopefully -- not that anyone needs to look at me anyway. So let me see if I can get this to pop up that way. And we'll just -- so now, if you guys see it --



THE DEPONENT: There we go.
MR. DENBY: I'm going to slide this over.
**Q. (BY MR. DENBY) Do you see the subpoena that I'm talking about now?**
A. Yes, sir.
**Q. Okay. Great. I'm going to scroll up to the top, since I had gone down into it a little bit. I'll scroll through it. If you need me to stop to take more time to look at anything, feel free. I'm going to kind of go through this a little bit fast, just because this isn't all that relevant. This is more of a housekeeping matter. And I know Mr. Quisenberry has a flight this afternoon. So for his sake, we're going to try to keep this going as efficiently as possible.**
A. So I'm just going to first show you -- this is the notice of deposition. This deposition notice originally states that it was scheduled for Monday, October 3rd, 2022. Pursuant to the agreement of the parties, did you agree to appear for this deposition today, September 28th?
A. Yes, I did agree.
**Q. Okay. And then I'm going to now show you what is the actual subpoena document. This is page 5 of 9 of the subpoena PDF that I've presented as Exhibit 51 -- to be marked as Exhibit 51. And on this**

subpoena, if you'll see where I'm holding the mouse, there's a check box next to "Production," and it says, "See Exhibit 'A.'" And then Exhibit A had requested that you bring some documents with you here today. Did you bring any documents to this deposition?
A. No. I didn't realize I was to have physical documents prepared ahead of time. I apologize.
Q. Okay. That's no problem. That's really more just to make sure that we have your full file. So to the extent, as we go through this deposition today, anything comes up that hasn't previously been provided to either plaintiff's counsel or through plaintiff's counsel to Travelers, I'll just request that you provide that after the deposition; if it's in electronic form and it's something that you can just email over to us. But if that becomes an issue, you know, we'll cross that bridge when we get there. But I just wanted to, first, ask if there was anything additional that you brought today.
A. No. I'm fine.
Q. Okay. Thank you. So -- and the other question I'm just going to ask you very briefly is, do you recall ever receiving any document subpoenas from Travelers in this matter?


A. No. I've never received any documents from Travelers.
Q. Okay. And I'd just like to briefly ask you, then -- I'm only going to pull up one of them. What is your business office address?
A. 3124 South Parker Road, Unit -- Box No. 439, Aurora, Colorado 80014; basically, Parker Road and 225 area.
Q. Is that the same address listed -- I'm now going to show you what --
MR. DENBY: Ms. Reporter, could you please mark this as Exhibit 52.
(Deposition Exhibit 52, remotely introduced and provided electronically to the court reporter.)
Q. (BY MR. DENBY) Exhibit 52 is a document subpoena with the cover letter dated June 9th, 2022. Mr. Napolitan, is the address on this subpoena the correct address for your business?
A. Yes, it is.
Q. And do you recall ever receiving this letter?
A. No, I did not receive this letter.
Q. And is the address on this letter, is that a physical office, or is it a virtual office?


A. It is a rented mailbox at a UPS Store.
Q. Do you have a physical location that your business is -- a physical address for your business?
A. No, I do not have it. I -- no. I use this for all my business matters.
Q. Okay. So if someone ever needed to serve you personally with something, how would they serve you? What would be the best method to serve you?
A. Give me a call, and I'll be glad to meet up with them wherever it's convenient and whenever it's convenient for them. Nobody ever called me and said, "Can you -- we need to serve you with this." And then I would have gladly said, "What part of town are you in? This is where I'm at. This is" -- and I would have worked it out.
Q. Understood. I'm just asking, because, typically, you know, the state requires that a business list an address for service of process. And that why I just want to clarify, going forward, that in the event a subpoena is needed to compel your testimony at a trial in this matter, what would be the appropriate address to send that subpoena to. Is there a home address that would be better?
A. Sure. You can send it to me at my home address.


Q. And what would that address be, sir?
A. 3443 South Cimarron Way; C-i-m-a-r-r-o-n Way, Aurora, Colorado 80014.
Q. Okay. Great. Thank you very much.
A. But I'll be glad to comply, if you'll just use my business address and keep my family with minimal distraction and concern.
Q. Okay. And now that we do have contact information for you, we will give you the courtesy of reaching out to you in the event that becomes necessary to coordinate a way to subpoena you to reduce the -- to reduce that for you.
A. Thank you very much.
MR. DENBY: Okay. Everyone, just bear with me, please. I'm just going to keep my share-screen on, that will just make it easier so if we need to use the exhibits, we can go right into them.
Q. (BY MR. DENBY) Mr. Napolitan, what's your educational background?
A. I have a bachelor's of science from the University of Florida, 1985; as well as, subsequently, I attended Red Rocks Community College, where I took plumbing courses.
Q. Okay. When you graduated from the University of Florida with your bachelor's in science,

**did you obtain -- did you take any courses that had anything to do with plumbing?**
A. Not at that time.
**Q. Okay.**
A. The degree was --
**Q. I'm sorry. Go ahead.**
A. The degree was -- I apologize. The -- my degree was in advertising, which turned out to be the art history of business.
**Q. Okay. So nothing related to plumbing while you were in college?**
A. Correct.
**Q. When did you attend Red Rocks Community -- was that Community College?**
A. Yup.
**Q. When did you attend there?**
A. I took several courses over about a year or two. And I want to say this was about 2010 -- 2009, 2010.
**Q. Okay. What did you do between when you graduated from the University of Florida and when you went to Red Rocks for the plumbing courses?**
A. I lived in Asia, in Japan, for five years, till I found my bride. And then we ended up going from -- to Florida, where the economics weren't that



great, so we went to Denver, and I had a packaging and shipping store from '92 through the 2000s. Then I went into being a GC, which is what led me to being a plumber. The days that I was working on plumbing were the best days of the project. So after a while, I opened my own plumbing (inaudible).
**Q. I'm sorry. Could you repeat just the last part of that. It was kind of breaking up for me. I'm not sure if anyone else had that as well.**
THE REPORTER: The last thing I heard was, "I opened my own plumbing," and that's the last part we heard.
A. Oh, I apologize. In the 2000s, I was doing fix-and-flip and acting as a GC to a project manager. And when the funds dried up in 2008 and 2009, I started doing, specifically and only, plumbing and found it to be rewarding, both financially and emotionally.
**Q. Okay. I'd just like to break that down a little bit. Starting with the time that you spent in Asia, what did you do for employment while you were there?**
A. I was a teacher of English. English is the second language. It's called ESL. And in the late '80s, that was a big -- that was great business. Japan



was an (inaudible) at that time, and it was a wonderful place. It's a wonderful place now, but at that time it was amazing.
**Q. Okay. So when you were in Japan, did you do any work related to plumbing at all?**
A. No.
**Q. Any work related to contracting or construction at all?**
A. No.
**Q. Okay. I believe you said after that you moved to Florida?**
A. Yes.
**Q. What line of work were you in when you resided in Florida?**
A. I managed a small transportation company that moved Japanese tourists from -- about town, but primarily to Disney World; and so the logistics, moving people around.
**Q. Got you. How long did you live in Florida for?**
A. About a couple of years; a year and a half, two years.
**Q. Do you remember, about, the years?**
A. Yeah, I do, actually. From -- let's call it from around '90 through '92.



**Q. Okay. And while you were in Florida, did you have any employment experience that was related to plumbing, contracting, or construction work?**
A. Not really, no.
**Q. When you say, "not really," was there any involvement with it at all?**
A. No, no, no. I don't -- no.
**Q. Okay. And then I believe you testified that after Florida you moved back to Denver?**
A. Yes.
**Q. How long have you lived in Denver since you moved back from Florida, since you moved from Florida?**
A. Yes, I have lived in Denver continuously since '92.
**Q. When you first moved to Denver, I believe you testified that you were employed in a packing and shipping company?**
A. Yes, that's right. I had a Pak Mail shop.
**Q. What was the name of that shop?**
A. Pak Mail; P-a-k, M-a-i-l.
**Q. Were the you the owner of that business?**
A. I was the owner of that franchise location.
**Q. And what was the purpose of that business?**

A. We supplied packaging and shipping services and mailbox rental.
**Q. So did you have -- I'm sorry.**
A. It's identical to The UPS Store.
**Q. Okay. Thank you. So did you have anything to do with plumbing, contracting, or construction with respect to that business?**
A. No; at that time, no.
**Q. And when did that -- when did that business end, again?**
A. And then -- I left -- I sold that business at around 2004.
**Q. Why did you sell the business?**
A. The internet changed everything, and people could now go directly to UPS via online. And it pretty much ended the value of our -- how our business model worked was dramatically changed by the advent of the internet.
**Q. Okay. So after you -- after you ended that business, where did you -- what did you do next for employment?**
A. I did fix-and-flip.
**Q. And what made you get into the fix-and-flip business?**
A. My brother had been doing it since the



'80s and had been highly successful with it, much older brother.
**Q. Okay. What's your brother's name?**
A. My brother is Jerry Napolitan.
**Q. And did you form a company to operate the fix-and-flip business?**
A. Yeah. It was called Investor Remodeling, LLC.
**Q. Were you the sole member of that LLC?**
A. Yes, I was.
**Q. Was your brother involved with you in the fix-and-flip business at all?**
A. Only as an advisor and motivator, not financially.
**Q. Were there any partners that you had in the business, financially?**
A. Yes.
**Q. But they weren't members of the LLC?**
A. Correct.
**Q. And can you just elaborate on your financial business partners, please?**
A. My other brother --
**Q. Okay.**
A. -- who -- my other brother, Jimmy, would lend me the money to buy the houses and lend me the



money to do the upgrades and repairs, and then I'd pay him back at closing.
**Q. Did you do the work yourself?**
A. Yes, I did.
**Q. Did you have any employees?**
A. No, not really.
MR. DENBY: I apologize. I have a train coming by right now. It's going to be a little noisy for about ten seconds.
(Pause.)
MR. DENBY: All right. That should do it. Sorry about that. We get a couple a day here where I live, so . . .
**Q. (BY MR. DENBY) Was there anyone that you ever used for assistance with these jobs, even though they weren't technically employed by you?**
A. Yeah. You'd have to have your -- like, a concrete guy would do the stoop for you, the electrician might redo a panel for you. And that's part of contracting, is to contract with subcontractors. But a lot of the work I just flat-out did myself.
**Q. Do you have a general contractor's license?**
A. No.



**Q. What type of work did you perform yourself?**
A. Pretty much a wide variety of home repair.
**Q. Did that include plumbing work?**
A. Yes, it did. And that's what led me to become a plumber, to be honest with you.
**Q. Okay. What type of plumbing work did you perform in the context of your fix-and-flip business?**
A. Broad spectrum residential plumbing, pure residential, and lots of repairs and replacement stuff. And the days that I did plumbing, I couldn't wait to get going in the morning and really enjoyed those days. And that's when it became very evident that, then, why don't you just do that for a living.
**Q. Okay. Understood. And I guess to backtrack a little bit, did you enter the fix-and-flip business prior to going to Red Rocks Community College, or did you go to Red Rocks first?**
A. No. I was involved in the fix-and-flip business, found that I was enjoying the plumbing side of it very much, so I began taking classes in it, and it just blossomed.
**Q. Do you recall when you first did any plumbing work with respect to the fix-and-flip jobs?**
A. Let's call that around 2009 -- I'm sorry.

For my fix-and-flips?
**Q. Yeah.**
A. Oh, from the first one. Every house I worked on, ever, needed to have upgrades to the kitchens and bathrooms. And that's -- you know, that's -- when you do renovation, those are the two most important areas, realistically, for your bang for the buck. So plumbing was involved in virtually every single flip that I was involved in.
**Q. Okay. Did you use subcontractors to do the plumbing with respect to the fix-and-flips?**
A. In the beginning, I would have plumbers that we used. And I would -- and that's when I learned a lot about how to do it, and it was fascinating. When they were working, I was fascinated by what they were doing. When other contractors were doing their various trades, I respected and admired them, but I wasn't really all that into it.
**Q. Understood. So essentially, is it fair to say that you first got into the plumbing by watching the subcontractors who performed the plumbing work in the course of your fix-and-flip business?**
A. Yeah, being involved with them.
**Q. And at what point did you switch from, I guess -- I'm sorry. Let me rephrase that. At any**



**point in the fix-and-flip business did you switch from using plumbing subcontractors to performing that plumbing work yourself?**
A. I ended up coming into contact with a master plumber, Earl Hurkett, and fell under his tutelage, under his wing, and found -- found a person that I just very much admired, respected, and was -- he was so succinct and excellent in his capabilities to explain things. So I did a tremendous amount of projects with him involved closely and learned a tremendous amount there as well under his -- because he really, really knew code and layout and design and standards. And he was able to articulate quite well. So I feel like I had a very good experience. That's what really continued to propel me forward with my enjoyment of plumbing.
**Q. Okay. Understood. Could you say his name again for the record, please? Was that Turkett?**
A. Earl Hurkett.
**Q. Hurkett. Okay.**
A. Yeah.
**Q. When did you meet Mr. Hurkett, or about how long have you known him?**
A. Oh, geez. I mean, this really goes way back. I met him rather early on when I was getting



into plumbing. And like I said, he was -- I was propelled into it. Every plumber -- every master plumber I met invigorated me, and so I spent a lot of time around them. And so this would have been shortly after I was finishing up -- not finishing up -- but during my Red Rocks early-on phase, real early on, so -- but I don't have an understanding exactly when I started working closely with Earl. It just seemed like an evolution.
**Q. Okay. So just to make sure I got that correct, is it fair to say that, essentially, you retained plumbing subcontractors at the beginning, you admired watching them doing their work, which was what got you interested in the plumbing. At then at some point after you had started taking classes at Red Rocks Community College, you came into contact with Earl Hurkett, and that's when you started? Is it fair to say that you were, essentially, an apprentice of his?**
A. Kind of. But apprenticeship is specific and controlled work; meaning that you have to be underneath a master of responsibility. You can be a master plumber, a master electrician, et cetera, but if you want to have an apprentice under you getting his hours logged with the Department of Regulatory Agencies, DORA, you have to be -- and don't quote me a



hundred percent on this -- you have to be a master of responsibility. I believe that's the term that is used here in Colorado. Well, I didn't get apprenticeship hours logged under him. I was -- he was acting very much as a paid advisor and consultant and overseer.
**Q. Okay. So I guess is it fair to say then, essentially, you hired Mr. Hurkett's company to perform plumbing jobs with respect to your fix-and-flip business, and in the course of him performing those plumbing jobs, he essentially -- that's where you picked up -- you picked up on plumbing from him?**
A. Yes, yes. That's not too far from it. That's pretty accurate. Enjoyed it very much. And, you know, he would oversee how -- how the work was done, and it was a great education.
**Q. What education did he provide to you?**
A. Oh, meaning that every single job, he would look at the job, explain how it is to be correctly done, what materials. Then he would come and check to see how you had done with implementation of that, explain to you better ways to do implementation; "Did you set up" -- and I would get the right tools, et cetera. And then throughout, your work is being looked at and critiqued gently, and so that's how your education happens in the trades.

Page 30

You're doing and participating, and then there's a refinement of, "Well, let me show you some better ways to approach this. By the way, you can't have this," et cetera.

**Q. Okay. So essentially, you would hire him as a subcontractor, and then in the course of that job, you would actually be performing that plumbing work for him as your subcontractor and learning through performing that work?**

A. We would do a great deal of the physical work. He'd have to, of course, do some -- you know, bits here and there. But mostly, you can't learn how to do something by watching someone else's hands do it. Your hands have to be the ones that hold the tool. You can't learn what is the right amount of pressure to apply, when are you -- what's the best way to do something. The code, I did take that. And application of code was what really was of great benefit as we went through our sojourn together, our time together.

**Q. Okay. I'm going to ask you a few questions about the code, shortly. I just want to just quickly go over a few more things about how this arrangement with Mr. Hurkett worked. So if you could just explain to me, did you have to pay him any compensation, or was there any reduction in the amount that --**

Page 31

A. No. I paid him for the services he rendered to me. It wasn't a free education.

**Q. Did you have to -- did you essentially have to pay any more for -- did you have to pay more to essentially get him to be able to perform -- to learn when he performed the services? So I'll give you an example. Say the contract price, normally, would have been a hundred dollars. To be able to perform the work for him and learn in the course of doing the work, did you have to maybe, say, pay 105 to be able to get that experience? Like, did you have to give him anything to be able to get that hands-on experience with respect to the plumbing from him on these jobs, or was it just --**

A. I paid him a consulting fee, or something of that nature, depending on the job, what was involved. Sometimes --

**Q. So your agreement really just pertained more to the work that he did. Everything that you did with respect to the plumbing and any training you received, is it fair to say that was informal?**

A. Yes.

**Q. Okay. I was just trying to figure out if you guys had a formal arrangement with respect to any training you received, or if that was just kind of a byproduct of him -- your subcontract with him? What type of training did he -- I'm sorry. Go ahead.**

Page 32

A. No. It was informal.

**Q. And what type of training did he provide to you?**

A. Oh, extensive explanation as to design, layout, code, and things of a more technical nature.

**Q. Did he teach you about different types of plumbing systems and pipes?**

A. That's all part of code, yes.

**Q. Okay. And was all the training that you received from Mr. Hurkett hands-on training?**

A. Yes.

**Q. Was there ever any book involvement? Did he ever provide you any manuals or guides to review?**

A. No, no. He would explain, on every specific challenge, how it would be best to approach it. He would -- might diagram it out. And he would also sometimes clarify the underlying code that we were trying to meet.

And he would also explain to me non-code matters. For example, if you have a laundry line nearby, you want to join that laundry line in -- as far downstream -- not where it's most convenient to join the main line, but downstream a considerable distance, so that you didn't have soap back -- suds backing up into anything. In other words, not just, "Here is what code says you must do," but, "Here is the best way to approach this design that goes above and beyond the parameters of code."

Page 33

**Q. Okay. And I guess with respect to the code, how -- how were you educated as to -- was it just all -- let me rephrase that. Withdraw.**

**Was the education that Mr. Hurkett provided you with respect to code all just verbal conversations about how code is applied?**

A. Yes. I had a course at Red Rocks where we went through the UPC chapter by chapter. And an active inspector for Douglas County, the county just south of me, was teaching, so it was extremely pragmatic application of code and highly detailed. And I loved it. It was a good class; overwhelming at times, but, you know, there's a lot there.

**Q. Gotcha. Okay. I'll ask you a few questions about that shortly. I just want to first finish up anything that you may have learned from Mr. Hurkett, before we jump into the formal training from -- received at Red Rocks. So with respect to code, did Mr. Hurkett ever go over any code manuals with you?**

A. There's one. I wish I had it in front of me. The code book is a thick -- about 15 chapters of actual code and then appendices that have all the data underneath that supports all of that, and the specialties. There's a series of appendices that deal with your local codes as well. And then, of course, you have your municipal codes. How things are handled in Denver would be different than how they are handled in Aurora, a town next to Denver, even though -- so that's a lot of what else would transpire. So the education was very thorough.

**Q. Understood. My question, however, was, when you were receiving this education/training from Mr. Hurkett, did he ever physically go over a code manual or a code guideline with you when you were discussing a project?**

A. We rarely pulled out the UPC and haggled over definitions. It was virtually always pretty clear and evident, when he says something to the effect of, "Code says you can't -- you must be within X number of inches. It is better to be right here, rather than right here, even though this is within code. This is the better place to do the work at"; for example, because of suds backing up.

**Q. Understood. Did he ever provide you any**



**training or education as to how to determine which code sections might apply from a code manual or a code book by physically reviewing that code book with you?**

A. In the very beginning, when I was finishing up my -- when I had finished my Red Rocks class, I had the book with me, and it turned out that it was unnecessary to tote that thing around. We never got into the weeds like that. By the way, when -- if you did get into the weeds, it was far better to check with a local inspector as to what practices are for a certain matter. In other words, you just call up city and go, "Hey, what's the -- what do you want to see on this?" They'll tell you.

**Q. Okay. And just to clarify, you said it's better to check in with the local inspector. When you say "local" in that context, do you mean local as being -- differentiating local from a city?**

A. No, no, no. City is the local.

**Q. Okay.**

A. That way, yeah.

**Q. Wasn't sure if you were referring to maybe a county instead of a city, so that's why I just wanted to clarify.**

A. Whatever is the municipality or whoever is going to be looking at the work. And I've never known



it to be anything other than the city you were in. So it would be the town -- the municipality of Edgewater, which is inside of Denver; or the municipality of Sheridan, again, a municipality that's actually inside of greater Denver. And then sometimes it's just purely Denver, and you'd call up, "What is the current" -- by the way, codes change, edit, alter quite a bit all the time. So it's not unusual at all to call up your local municipality and ask them for guidance on a specific matter that you aren't a hundred percent on.

**Q. Okay. So just getting back to when you were with Mr. Hurkett, then, when you were training with him onsite at any plumbing jobs, did he pretty much just tell you -- did he pretty much just explain to you, these are the code sections that are in play for this job?**

A. We didn't get into the numerical, you know, Section 15.01. It would be, "This is where -- this is how you have to do it, and this is why you have to do it this way."

**Q. Understood. Did he ever go over with you, advise you or train you, though, how to determine what code might apply by looking at a particular plumbing system?**

A. It was always self-evident. Gas code



would apply to when you're working on gas line; drain code when -- but we didn't get into a specific code number, because I didn't disagree with him. If he said, "This needs to be done this way" -- by the way, every single one of these is evident.

**Q. I guess my question is, at that point when you were training with him, you know, what knowledge did you have that enabled you to understand the code sections that he was referring to without having, you know -- how did you know what code sections he was referring to, or did he have to explain them to you?**

**Like -- let me rephrase that. At this time when you're training with him, did he say, you know, "These are the code sections that are applicable to this job"; or how did you know -- you know, how did you know what code section was applicable at that time in your training?**

A. I knew where to go within the code book if I did not agree with him. I always agreed with him. It was -- by the way, he would say, for example -- let me give you a simple example, okay, that you might be able to relate to at your home. You want to put the drain from your laundry machine into the drain box that's in the wall in your laundry room. That has to be 2 inches now. It wasn't always that way.

Page 38

Well, if he says, "Look, it's got to be 2 inches and it's got to be to these lengths, specifications," I would say, "Okay. Certainly." Then he would explain to me why, why was the code even written like that. Had to do with self-siphoning, which I found fascinating.

So I would never -- I didn't know -- and if it came down to, "Wait a minute. Where can I find that?" It's pretty easy to find. Plus, most of the time if you have -- if you couldn't remember the exact number -- is that 18 or 16? -- you would just Google it real quick. And you can Google something, and you'd be amazed how fast you can come up with it. And I had a real solid understanding, through excellent education, of when I needed to double-check something.

**Q. Okay. I guess my question just is, with respect to the code, did you have any knowledge of how code was applied, prior to training with Mr. Hurkett?**

A. Yes, I did. I did.

**Q. And what knowledge was that?**

A. Well, I had had this excellent class at Red Rocks Community College. And the reason that I had taken the class was that throughout my fix-and-flip years, I had learned quite a bit of it and realized that this was something that I really needed to get

Page 39

further education on; took the classes at Red Rocks, found them to be wonderful, eye-opening, changed everything for my business. And that's when I glommed onto Earl Hurkett, who was an excellent teacher and explainer of code. He took it to the next level for me, in terms of -- it's one thing to just know the rules, but it's another thing to know how to best apply rules and to get the most out of that.

**Q. Okay. And that's kind of what I'm trying to get to, is to know, essentially, what Earl trained you on with respect to the code to learn how to apply it to a particular plumbing system that you might -- that you might observe.**

**And so I guess, just to clarify too, going back, so I guess the first thing is, before -- you had started taking classes at Red Rocks before you started your training with Earl, right?**

A. Correct.

**Q. Okay. Thank you for clarifying. So let's jump back, then. When did you start taking classes at Red Rocks, if you can remember the year?**

A. 2009, 2010, 2011, somewhere right in that area. And, I'm sorry, I didn't --

**Q. No. It's okay. Like I said, if you can remember a date, we prefer it; but if you don't**

Page 40

**remember, it's okay to say you don't remember and provide a general range. What prompted you to take classes at Red Rocks?**

A. Oh, I was learning so much and was just getting invigorated by what was going on; wanted to learn as much as I could and realized that there was an awful lot that I still needed to learn. So then I started taking these classes and becoming fascinated by it and just ended up, like I said, blossoming.

**Q. Understood. Did you enroll in a formal program at Red Rocks, or did you take the classes in more of a piecemeal fashion?**

A. I wish they had a program that -- you know, that you followed a specific set. They had a series of excellent classes, some that required prerequisites. You would take those prerequisites. And so in that regard, I was involved in that level of a program. Sadly, in America right now, we do not have extensive trade schools. And we are -- unlike our university system, our trade school system is still woefully way behind what it ought to be at this juncture.

**Q. So, I guess, just to unpackage (sic) that, is the answer that you -- was there a formal program, or was it just taking, you know, classes that seemed**

Page 41

**relevant to what you were trying to learn?**

A. I started with -- I wanted to take some specific classes, code and service, and they required that you would have a prerequisite in OSHA. And I don't recall -- there was one other minor prerequisite; Intro. And so I took my prerequisites, and then I started taking the classes that were the real meat of my concern. I ended up taking -- there were very few classes being offered. I took most of them.

**Q. Okay. And I'm sorry to just ask this again, but was this -- was this a formal program with a name; say, like, you know -- not to use undergrad as an example, but an undergraduate study, you know, political science, econ? When you applied to go to Red Rocks, was there, say, like a plumbing program or a --**

A. Yeah; yes, sir. I was involved in the plumbing program, but it did not have a rigid series of classes that you had to take in a certain order, the way that you do at, say, Duke or something like that.

**Q. Okay. And with respect to this plumbing program, did you receive any certifications or degrees with respect to the classes that you took?**

A. No. The only entity who can offer certification in plumbing is the Department of Regulatory Agencies. You may not get -- a school may

Page 42

not confer upon you a journeyman's license.
**Q. Understood.**
A. Only the state can confer that upon you.
**Q. I'll rephrase it another way. Did Red Rocks confer any sort of degree or certification for completing the plumbing program?**
A. No. They don't have that. At that time, that was not an option.
**Q. Did you complete the plumbing program as offered by Red Rocks?**
A. I completed what I could. There was only two instructors, and one of them went away. And the one that I wanted to -- the only course I couldn't get was the electrical plumbing; but the other ones, I did take. But it's not -- again, this is not a program with a regimen. This is a series of classes that are offered under the plumbing section, and I took many of them.
**Q. Okay. And do you recall just the specific classes that you took?**
A. Well, my favorite was code, then my second favorite was service.
**Q. And what did the code class entail?**
A. Going through the UPC, this big thick book. My bad. One second. Here are -- here is 2009.

Page 43

This is the one that I was using when I took the class (indicating). And then, of course, I got a more updated one subsequently years later, but -- so we would go through every single chapter in the -- in the UPC -- IPC. I'm sorry. And it was a fascinating class.
MR. DENBY: Okay. Just first, let the record reflect Mr. Napolitan has presented and shown to the camera two copies of manuals that I believe were IPC manuals that were used in the context of his studies at Red Rocks. It was difficult to discern from the copies that were held up, what exactly they were titled. But it does appear that it was just two copies of code books.
**Q. (BY MR. DENBY) Mr. Napolitan, in the context of your studies, was there any practical application of those code books to plumbing systems? For example, did you do any, like, case studies or evaluation of systems where you were asked to determine what code provision may apply, or was it more limited to a book study and discussion of those codes?**
A. The second one, book study and discussion thereof.
**Q. Was there any -- while you were at Red Rocks, were there any courses that involved practical**

Page 44

**application or interpretation of the code with respect to, you know, a physical plumbing system.**
A. Service classes would actually have you physically install something, maybe install a faucet. And any -- and code is always in the background of everything that you do.
**Q. Okay. Aside from code and service, are there any other classes that you recall taking at Red Rocks with respect to plumbing?**
A. Well, yeah. The first thing that pops into my mind is my OSHA class, which everyone has to take in pretty much every trade; you know, the basics. And service was fascinating. Code was fascinating. Those are the two that I remember, mostly.
**Q. Okay. And with respect to the code class, was that -- was there an examination that you needed to pass in that class?**
A. Every week.
**Q. Okay. And did you pass the code class?**
A. Oh, yeah, yeah, yeah.
**Q. Do you remember what your grade was, if they did a grading basis?**
A. No. It's basically -- just like with the state, it's a pass/fail situation. I did pass -- the final exam, I did rather well on it. I just remember

Page 45

that. And that's, again, what kept me stimulated and enthusiastic about being in code. I just don't remember what the actual grade was.
**Q. Understood. That's okay. Are there any other classes that you recall taking with respect to plumbing, at Red Rocks Community College?**
A. At the moment, I do know -- I just don't recall, you know, how it was set out.
**Q. Okay. And how long -- how long did you attend Red Rocks Community College for?**
A. Well, this was -- these classes occurred over maybe a year or two in the early 2000s; around 2009, 2010, 2011, maybe.
**Q. And was this a full-time education, or were you taking these classes at night?**
A. No. Correct, the second one. I took these at night after work.
**Q. And did you graduate from Red Rocks Community College?**
A. These were just classes you take. It's not a formal program. It's not a formal regimen. It's not something with a degree that you work towards. It is -- these are classes that are offered under the plumbing section.
**Q. Do they provide any sort of accreditation**

**or certificate of completion with respect to the classes that are taken?**

A. No. Sadly, that doesn't exist. Even to this day, you can't get a degree in plumbing, a certificate in plumbing. It can't be done by anyone. It can only be conferred by the state. So you can take classes that will prepare you for taking the exam, but in order to take the exam, you have to have hours of apprenticeship underneath a master of responsibility. So no matter how many classes you take, no one can give you that, other than the state.

**Q. And do you have a license, a plumbing license, from the state?**

A. No, I don't.

**Q. Why not?**

A. I don't have the requisite hours underneath a master of responsibility.

**Q. Did you ever try to obtain the hours under a master of responsibility?**

A. Not -- no; because I got into plumbing late in life, and it takes a long time to rack up the 5,000 hours.

**Q. Wow. 5,000, you said?**

A. Yes. By the way, that can be -- that's a moving target. It may be 5400.



**Q. Okay. Thank you. So after you finished your classes at Red Rocks Community College, is that when you began the training that we discussed earlier, with Mr. Hurkett?**

A. Yes.

**Q. And I'd just like to talk a little bit more about the code. So with respect to the code -- sorry. First, let me rephrase that. How long did you -- how long did Mr. Hurkett provide training to you for, or how long did you train with him for?**

A. Years. And I was using him as an advisor for years.

**Q. Do you remember what -- go ahead.**

A. And if I had a question, to this day, I still have a close rapport with him, and I would just pick up the phone. However, that's extraordinarily rare. I haven't had to question, because I only do residential. Residential plumbing is very easy with respect to code. It is very easy. So I rarely ever call him with a code question. I haven't had to call him in quite some time. It's almost all politics.

**Q. Do you recall, I guess just generally, when, about, you would have stopped receiving training from him and on doing plumbing on your own?**

A. It wasn't so much that I stopped, that I



had a formal training period with him and then I was on my own. I was on my own and using him for advice and consultation and education and project review, constantly. Mr. Hurkett would come out and you swore you had gotten everything perfect. And he would come out and say, "This, this, and this." And you're, "Damn it. How did you -- god." So I know I'm not being -- sorry, Gail. I'm using my hands and not using descriptive words.

But he had an amazing ability to still give me an education, even when I was absolutely, positively certain, this time I've got it perfect. And he would come out and, "Oh, I can show you two more things." That was frustrating in a good way.

**Q. That's -- I'm not laughing at you. I'm actually laughing, because I had a boss at a prior job that was the same way with respect to my writing. I would say, "This is the one. I got it. There's no edits coming to it," and there would always, inevitably, be some that it's on there. So I know where you're coming from with that.**

A. And plumbing is almost all common sense, and it's very obvious. So when you -- so when he comes out and says, "You need to do this," how did -- you know, how does that happen? Dang it. But it's right.



And on a separate note, plumbing code is universal. It goes -- it is not like some code where you have to use a certain product that's only sold by the mayor's nephew, you know. That's not happening. It's almost all very, very much based on science and studies. That's why it's constantly changing and being updated. So there is no political aspect to this. So when you get -- when somebody points something out to you, it's based on common sense.

**Q. Gotcha. Okay. Thank you. So I guess my next question is, did there come a point in the course of your fix-and-flip business when you stopped utilizing Mr. Hurkett as a plumber and started performing the plumbing aspect of those jobs by yourself?**

A. It naturally gravitates from -- just as a child no longer needs Mom and Dad to take care of them so much. You'll still always have that wonderful relationship with your mom and dad, but they don't need to make you breakfast anymore.

**Q. Do you remember when you started performing the plumbing work with respect to your fix-and-flip business?**

A. When did I start doing the plumbing at my fix-and-flips?

**Q. Yeah.**

A. Probably in the mid-2000s. Almost every property I bought had -- required some level of plumbing repair.

**Q. Okay. And why did you stop the fix-and-flip business?**

A. The financial crash of 2008, '9, and '10.

**Q. So what did you do after that?**

A. Plumbing.

**Q. Did you start another company?**

A. Technically, I started Discount Drain Cleaning, okay; because no matter how bad an economy gets, it doesn't matter what Chairman Powell says, if your toilet is backing up, or the President is an idiot, if your toilet is backing up, you're calling someone, regardless whether the economy is good or bad.

Well, it was the one thing that -- there's been a lot of -- there was a lot of competition from people coming to our country that had kind of boxed out my participation in the fix-and-flip. In other words, there were people who were undercutting me dramatically, because they had access to cheap, cheap, cheap labor. The one thing that they couldn't do was drain cleaning, because it's filthy work. And I would do the -- I was willing to do drain cleaning. It's not



(inaudible) aspect of the state. You do not require a license to do drain cleaning.

Well, people would have -- and that's -- then I realized later that as I got very good at this, and it happened quickly, that having the name "Discount" in your title undermines your capability. If you're so good, why are you discount?

**Q. Understood. How long --**

A. And I got it.

**Q. So how long did you operate Discount Drain Cleaning for?**

A. A year or two, before I realized what a dopey -- the plumbing world really grew on me, but it also -- I got a great reputation in town among all the other real estate investors and the other fix-and flippers, and so I really didn't need to try to win every bid with my discount being -- and quite the opposite. I didn't want to be seen as the cheap guy. I wanted to be seen as the guy who could do a good job for you.

**Q. Okay.**

A. And so I changed my name to Metropolitan Drain Cleaning. When your name is Napolitan, Metropolitan kind of sounds good.

**Q. It works.**



A. It made it easy for people to remember me by. Also, Metropolitan Drain Cleaning meant, at the time, if I had to move to a new city, it was a transferable name. And the economy was pretty scary for a while.

**Q. Do you remember what year you started Metropolitan Drain Cleaning, LLC?**

A. I want to say 2009. We could be quibbling over, you know, was it November 2009, was it, you know -- but right around that area.

**Q. Okay. Are you the sole member of that LLC?**

A. Yes, I am.

**Q. Any business partners that are not members of the LLC?**

A. No. It is me only.

**Q. Do you have any employees?**

A. No.

**Q. Did you have any employees at the time that you performed the work for the plaintiff in this lawsuit?**

A. I had subcontracted to have a fellow help me with the actual installation, a helper.

**Q. Understood. Is that someone -- was that an independent contractor?**



A. Yes.

**Q. What was that person's name?**

A. Bruce Thomas.

**Q. Do you still utilize Mr. Thomas for jobs today, if necessary?**

A. Yes. We both have a very warm and cordial, mutually beneficial relationship. I still help him. He still helps me. He's a sole independent guy, I'm a sole independent guy, and we constantly compare notes. I spoke with him last night on, how do you price out (inaudible) project.

THE REPORTER: Excuse me. Mr. Napolitan, the last thing I heard was, "I spoke with him last night on, how do you price out" -- and then you were muffled.

A. How do you price out a specific project.

THE REPORTER: Thank you.

**Q. (BY MR. DENBY) Okay. And does Mr. Thomas have a company that he operates through?**

A. Yes, he does.

**Q. What's the name of it?**

A. The name is After Hours.

**Q. Thank you. And, I'm sorry, I just want to jump back real quick with one question about the Discount Drain Cleaning. Did you perform any work, any**

**plumbing work besides drain cleaning, for that business?**
A. Yeah. I did plumbing repairs, but very little. Virtually -- I mean, if someone said, "While you're there, can you fix this drippy faucet," yeah. But this was when I was still discovering and learning, mostly. And this is where -- the era which I blossomed from doing a simple kitchen faucet install, "Hey, let's swap out that old nasty one with a nice new one," to more sophisticated matters that required knowledge of code. You don't need the knowledge of code to swap out like with like.
**Q. And why is that?**
A. You're just -- literally, take off the old faucet, disconnect the old faucet, slide the new one in, reconnect it. You're doing -- all you're doing is upgrading the existing. You are not making any substantial changes to the plumbing system.
**Q. Okay. And -- well, we'll get back to that later. But is there a reason that -- was there any reason that the cracked DWV pipe in this case couldn't have just been a swap with like and like?**
A. The cracked pipe was cast iron. I replaced it with PVC. But it was actually like for like in terms of its specifications, its capabilities.



However, PVC is much easier to work with than cast iron; dramatically lighter and much more affordable.
**Q. Okay. And did you replace the entire DWV pipe with PVC, or was it only a portion of the pipe that was replaced with PVC?**
A. A portion, the part that was needing to be replaced.
**Q. And the PVC, I guess, is it interchangeable -- connects interchangeably with the pipe that's already there?**
A. Yes. What you do is you use mission bands or shielded couplings, they're called. And that's what you use whenever you want to have two different types of materials come together; because materials expand and contract at different rates, so you can't just glue two different things together. You can't glue plastic to cast iron.
**Q. Okay. So with respect to the cracking -- the cracked pipe that's the basis of the plaintiff's claim, that damage was repaired just through the PVC patching that you just testified about, correct?**
A. That's correct.
**Q. Okay. And, I apologize, I took that a little bit out of order. We're going to get back and talk about that a little bit more. But before we do,**



**I'd just like to finish up with respect to Metropolitan, just with respect to your business and the background of your business, and then we'll just move on to the specifics of plaintiff's claim.**
**So I had asked you if you had done any other repairs through Discount -- any other plumbing work through Discount Drain Cleaning. I'll ask you the same question with Metropolitan Drain Cleaning. Once you formed Metropolitan Drain Cleaning, did you perform any -- have you performed any plumbing work besides drain cleaning?**
A. Uh-uh, yes, I have.
**Q. What type of plumbing work have you performed?**
A. Residential plumbing.
**Q. And what services would those entail?**
A. DWV, supply, repair, installation.
**Q. Do you diagnose issues with plumbing systems?**
A. Yes, yes. Possibly, it's the favorite part of my business. The problem-solving is just wonderful.
**Q. And when you say "problem-solving," that's -- when you say that, are you referring to the process of figuring out what's actually wrong with the**



**system and coming up with a plan to fix it?**
A. So, you have a puddle of water on the floor. You should never have a puddle of water on the floor. How did that get there? And there are many ways you can have a puddle of water on the floor. Figuring it out is absolutely -- for me, it's the best part of the day.
**Q. Gotcha. Okay. I guess just generally, then, are there any other -- is there any other experience that you've received either -- through the course of Metropolitan Drain Cleaning, with respect to plumbing, that we haven't talked about; any experience or training?**
A. Formally, I feel like I've given you -- formal training, I feel like you have a clear understanding of what I've gotten. As per informal, it's all been experience. And I have worked every single day, it seems like. But I have worked too hard gaining a great deal of hands-on, real world experience. I can tell you a great deal about what is behind that wall without ever -- some people just give me an address, and I can tell you what's going on.
**Q. Okay. And do you have any other -- any licenses or certifications that we haven't discussed, with respect to plumbing?**

A. Oh, no. You have a thorough understanding of what I possess and don't possess.

**Q. Okay. And just the same thing, are there any licenses or certifications with respect to plumbing code?**

A. Again, I have given you everything on that.

**Q. Okay. All right. So -- and, just generally, are there any other licenses that you may have?**

A. No.

**Q. Okay. So when did you first become involved with -- how did you first come to know the plaintiff in this matter, Jeffrey Diem?**

A. A long time ago.

**Q. Do you recall how?**

A. No. I recall that we met at John Fisher's Breakfast Club. And he was doing resti- -- not restitution -- the word is on the tip of my tongue -- flood mitigation and stuff like that. It's -- I'm having a senior moment on that term.

**Q. It's okay. If you can't recall, it's okay to say you can't remember.**

A. Wow, what a tough term. He was doing remediation. And this was a long time ago. And we had



met there. And naturally, people who do drain cleaning come into contact with people who have had flooded basements. And so the two go hand in hand.

**Q. Okay. And when was the first -- do you recall when Mr. Diem first ever contacted you with respect to performing any plumbing services for him -- plumbing or drain services, I should say?**

A. Correct. Either one, this would have been quite some time ago. He's a great guy, so I loved working for him; but a long time ago. And he had properties, as well as his own business. So I can't remember the exact first job I did. I just remember that he was a pleasure to work for and a real straight-up guy. And so I just remember coming away thoroughly impressed with him, early on; liked him, and then whenever I worked for him, was very pleased with having done business with him.

**Q. Okay. When you say performed the work for him, did you perform work for him as a plumber with respect to his business, or was this work that you performed for him with respect to the plumbing needs at his property?**

A. His properties.

**Q. Did you ever perform any work -- perform any services or work for Mr. Diem with respect to a**



**remediation -- with respect to his remediation company?**

A. No, I did not do any work for Jeff's remediation work, ever. A hundred percent of my interactions with him were for properties he owned or was referring me.

**Q. Okay. And for the purposes of --**

MR. DENBY: I'm sorry. Ms. Obermeyer, could you just read back that last answer? I apologize.

(The last answer was read back as follows: "No, I did not do any work for Jeff's remediation work, ever. A hundred percent of my interactions with him were for properties he owned or was referring me.")

**Q. (BY MR. DENBY) And did Mr. Diem refer plumbing business to you at properties other than his?**

A. Yes. For example, if somebody had a backup in their basement and the carpet and drywall was ruined, they would -- his company would repair everything, but then he would recommend the customer to have the lines cleaned so that it didn't happen again. And I was one of the companies that -- you know, he's going to give them several, but I was one that he would name as a referral.

But I'm paid by the customer, not by Jeff. That's what I mean when I say I did not ever work for



his remediation company, but he did refer me. And I love anybody who refers me.

**Q. Gotcha. And did you ever have to pay him any moneys for those referrals?**

A. No.

**Q. And do you know what Mr. Diem's background is in terms of his, you know, education or what he does for a living?**

A. When?

**Q. Let me rephrase that. Do you know what Mr. Diem's background is in terms of what he does for a living?**

A. I know that at the time I first met up with him, he was doing remediation and was getting started up in real estate investing. Now, I am of the impression that he is real estate investing, primarily.

**Q. Okay. Are you aware if Mr. Diem has any knowledge of cost estimating or preparing estimates for, you know, property damage claims?**

A. I would think so.

**Q. What makes you think that?**

A. When you do remediation, you have to be able to assess how much it's going to cost rather quickly. And so you have to have a pretty good understanding of material costs and labor costs and be

Page 62

pretty aware of what each project would require.

**Q. Okay. And had you ever seen Mr. Diem's property -- had you ever performed any services at Mr. Diem's property, prior to the crack in the drain-waste-vent pipe?**

A. Are you referring to, have I done any work at Elm?

**Q. Yes. Let me rephrase that. Have you done any work for Mr. Diem at his Elm Street (sic) property that is the subject of this lawsuit, prior to the drain-waste-vent pipe that cracked in July of 2020?**

A. Yes, I had been in that house prior. I want to say we may have worked on a drippy water heater line. But my -- this, I am very foggy on. I know that I had been to that property before the cracked stack. Stack is what we use for vertical -- the word for vertical pipes. Line is what we use for horizontal. So the cracked stack, I had been there before; but it had been for -- had nothing to do with DWV. And I think it was a drippy supply line going into a water heater.

**Q. Do you remember when Mr. Diem -- when you went to Mr. Diem's property, Elm Street property, regarding this drippy water heater line?**

A. No. This would have been prior to -- this

Page 63

would have been pre-COVID.

**Q. Okay. I'm just trying to find an exhibit here real quick.**

MR. QUISENBERRY: Hey, Ed, can we take a quick break?

MR. DENBY: Yes, absolutely. Let's just go off the record, I guess, real quick.

(Discussion off the record.)

(Recess, 11:10 a.m. to 11:15 a.m. MDT.)

MR. DENBY: I'll show the exhibit, and then I'll drop it in -- I'll drop it in after I close out the exhibit.

THE REPORTER: Will this be 53?

MR. DENBY: No. This is --

**Q. (BY MR. DENBY) I'm now showing you what is premarked as Exhibit -- which was marked as Exhibit 27 at plaintiff's deposition. This is a five-page document consisting of invoices that were prepared by Metropolitan Drain Cleaning. I'm going to just now show this to you. Please take a look at it. We can go through them one by one to probably make that easier. So once I finish this invoice, I'll jump to the next page. I'll allow you to review that before I ask you any questions regarding that. Do you recognize the first page of this exhibit --**

Page 64

A. Yeah.

**Q. -- Exhibit 27, which is Bates-marked as Diem_1536?**

A. Yes, I do remember this, yup.

**Q. How do you recognize it?**

A. Oh, it's just a routine maintenance, main line drain cleaning.

**Q. Now that you've reviewed this invoice, which is dated August 7, 2019, does that refresh your memory as to when you first may have visited Mr. Diem's property?**

A. Yeah, it does -- does help me. Thank you.

**Q. And when do you recall having first visited his property?**

A. It would have been either at this time or a previous time when I also went over to Beach Court, which was a couple -- for the same thing, though. In both cases, it was for maintenance cleans. So yes, my very first experiences with Elm Court were drain cleaning.

**Q. And do you remember why the drain cleaning was necessary?**

A. The -- at that time, no, I don't recall exactly whether it was he had had a backup or was about to have a backup. If a toilet starts to gurgle or not

Page 65

flush robustly, that's a surefire sign you could have a problem in your main line. That's always a clarion call for drain cleaning.

**Q. And did this drain cleaning have anything to do with the DWV pipe that is at issue in this lawsuit?**

A. No; because the damaged section of pipe was upstream, above where the cleanout is that we went through.

**Q. Was it the same pipe, though?**

A. The stack was what was compromised. Then it -- the compromised area was above the cleanout where we went in. And then the -- we cleaned everything that was downstream from that cleanout that was in the laundry room.

**Q. Okay. So that would have been in the DWV pipe, though?**

A. Yes. It would have been the same pipe per se, but my blades didn't go -- I didn't run my blades upstream. I ran my blades downstream, obviously.

**Q. Okay. And just -- I apologize if this is, obviously, straightforward. When you say "downstream," by that do you mean you're running your tool down the pipe, instead of from the bottom -- instead of from the**

**bottom up?**
A. Correct.
**Q. Okay. And when you were called to Mr. Diem's property back in August 2019, did you have an opportunity to inspect or observe any other aspects of the plumbing system?**
A. No. I just cleaned the line.
**Q. And where in the house was your work relegated to? Let me rephrase that. Where in the house did you perform the cleaning of the line?**
A. The laundry room, also referred to as the mechanical room.
**Q. Did you notice any -- did you notice any -- sorry. Let me rephrase it. Did you notice any code violations with the plumbing system that were existing in August 2019?**
A. I wasn't looking. I was looking for the cleanout. Once I found the cleanout, I focused solely on getting that line cleaned.
**Q. I know you said you weren't looking, but did you happen to observe any?**
A. I don't recall.
**Q. Did -- do you remember if you saw any code violations with respect to the plumbing system and the drain-waste-vent pipe?**



A. I don't recall. I was called to clean the line and, therefore, was focused purely on the task at hand.
**Q. Did Mr. Diem tell you how old the plumbing system was when you first -- when you first inspected it at his property in August 2019?**
A. We did not discuss. It was not part of the -- it needed to be cleaned, whether it was young or old.
**Q. Based on your observations, did you have any opinion as to how old the plumbing system may have been?**
A. I would have assumed, from my experience there, that it was the original pipe.
**Q. Did Mr. Diem ever advise you of any code violations that existed on the property when he purchased it?**
A. We never discussed -- or I don't recall. I don't recall is more accurate.
**Q. When you first viewed the property in August 2019, did you observe any -- sorry. Let me rephrase. When you first observed the plumbing system in August of 2019, did you observe any elements of the plumbing system that required an upgrade?**
(Pause.)



**Q. I'm sorry. Was there a verbal answer?**
A. I'm thinking.
**Q. Okay. I thought I saw you nod your head a little bit. I didn't hear anything, so I wasn't sure.**
A. In older neighborhoods, everything needs an upgrade.
**Q. But with respect to Mr. Diem's property, then, as an older property, is it fair to say that it would have required upgrades at the time -- the plumbing system required upgrades at the time you observed it in August 2019?**
A. I can't remember what I observed at that time there, other than where the cleanout was.
**Q. And you stated that you can't recall if you observed any code issues at that time?**
A. I don't recall.
**Q. And I'm just showing you what is the exhibit. So the first page, we're going to skip over, and I'm going to jump to the next page. This is page 2.**
MR. QUISENBERRY: Ed, can you make that the full screen? That would help me see it a little bit better.
MR. DENBY: Oh, yeah. Give me one second. Sorry about that.



MR. QUISENBERRY: There we go.
MR. DENBY: Can you still see it that way?
MR. QUISENBERRY: Yeah. And if you zoom in a little bit, I think I can see it better. There we go.
MR. DENBY: Okay. Cool.
**Q. (BY MR. DENBY) So now, taking a look at the second page of Exhibit 27 -- that is 27, right? -- yeah, Exhibit 27, which is Bates-labeled as Diem_1537, do you recall returning to the property in October of 2019 to perform additional work for Mr. Diem?**
A. Yeah. The -- that's right. Yeah, the lines weren't -- the faucets weren't performing well.
**Q. And is the performance of the faucet and the psi of the water pressure a code issue?**
A. The code allows for galvanized pipe to be used. However, galvanized pipe rusts from the inside out and clogs up easily with rust nodules. And so once this starts, this degree of compromise, it is best to swap them out with new. And if you're going to do that, you should upgrade them to better quality materials, like copper or PEX. But I was able to get the lav to flow better and the kitchen as well.
**Q. Just back to the original question, are you aware of any Denver -- are you aware of any**

**plumbing code provisions that apply with respect to the psi of the flow of water in a pipe?**

A. The psi is not -- if I could be -- this may not -- I'm not a hundred percent, but I don't believe that your psi levels are regulated in Denver County; but that, traditionally speaking, your psi really needs to be around 60. And the overall psi throughout much of Denver tends to be 70 to 80. So we have good flow, a nice, good flow that's nice and robust.

**Q. Okay. Is there a code that -- I guess the question is, is there a code that applies if the psi is over a certain threshold that requires it to be -- that will require the flow to then be corrected and reduced?**

A. I'm not sure.

**Q. Okay. And looking at this invoice, do you recall at that time -- you said improved the flow in the lavatory and improve the flow in the kitchen. When you say "improve the flow," do you recall if that was to reduce the psi of the water flow or to increase the psi of the water flow?**

A. I didn't alter the psi of the water flow. The psi is actually determined coming into the property. It is not something that is regulated at the fixture level. It is regulated at the incoming -- at



the base level.

**Q. Okay. So when you say, "improved flow," could you just explain what you mean, what you did?**

A. In many cases you will take apart the end of the faucet, or you'll dissect supply lines, and you flush out rust chunks and debris that is in the line. And then you clean the aerators, and that will take care of a lot of flow issues right there.

**Q. Okay. And with respect to the lines being galv, you testified that rust from inside -- rust forms inside the lines. Would you consider the rust that forms inside these lines to be wear and tear?**

A. That part, yes. With galv -- galv are connected by male and female. The male is threaded, obviously. And the V shape of a thread now lowers the thickness of the wall of the pipe. And so you'll see rust marks on galv pipe at the threads first. Once you see that you've got rusting at the threads, you know that -- it's a pretty good indicator that you probably may have rust on the inside of the pipe as well.

So you can just look at a pipe and have a pretty sensible understanding whether it's kind of getting worn out, just by looking at it.

**Q. Okay. And was the DWV pipe -- DWV refers to drainage, waste, and vent. It's on the drain side**



**of your plumbing**

**Q. Was that pipe -- I'm sorry. Was that pipe galv at that time?**

A. No. The pipe that I looked at and worked on here is on the supply side. This would be under --

**Q. I'm sorry. I didn't mean to cut you off. That was a bad habit on my part, to say "Okay."**

A. If you want, I can explain that DWV is under gravity and supply is under pressure.

**Q. Okay. Thanks. And I guess with respect to the description noted in this invoice, when you say the, "Lines are galvey [sic] and need to be swapped out," which lines are you referring to?**

A. The ones that are feeding the hot in the -- the ones that are feeding these two fixtures.

**Q. So is that a supply line?**

A. And I want to -- I think that in that case I was -- I believe I was referring to that lavatory. I think that's probably what I was referring to.

**Q. Okay. I'm going to show you the next page of this document, which is Bates-labeled as -- actually, you know what? -- Bates-labeled Diem_1538. This is also dated October 17 -- I'm sorry. This one is dated October 17, 2019. The prior one -- invoice was dated October 8, 2019. And if you would just take**



**a look at this invoice for me, please. Do you recognize this document?**

A. No. I don't recall it really well. I'm sorry.

**Q. It's okay if you don't remember. The document does state "Metropolitan Drain Cleaning" on it, correct?**

A. Yes. I just don't remember that visit really clear.

**Q. The question I'm just going to ask you is, it says, "Sent Jeff videos." Do you recall what videos you would have sent Mr. Diem?**

A. Yeah. A lot of times when you take pictures of flow, you shoot a -- with your cellphone, you take a little quick clip, "Here is what it looked like when I was -- when I got here." And then you do all the things I talked about previously to make the flow better, and then you send a little video, via your cellphone, that shows you improved it.

**Q. Okay. And is taking videos a normal course of your job when you perform either drain work or plumbing work?**

A. Yeah.

**Q. Do you recall if you ever took any videos with respect to any work that you performed with --**

**regarding the cracked drain-waste-vent pipe?**
A. We may not have taken videos. We'll take pictures sometimes.
**Q. Okay. Do you recall if you took any pictures with respect to the drain-waste-vent pipe?**
A. I don't think I took pictures of it on the day that it was done. I don't recall.
**Q. Okay. Do you know if you took any pictures, in general?**
A. We do have pictures of it, of the work, but it may not have been -- we didn't take it because it was that day. But I might have something, somewhere.
**Q. Okay. I'm just trying to figure out if you took any pictures yourself, or if these were pictures that someone else gave them to you. Because based on the documents that were disclosed in this lawsuit, I didn't see any pictures that were produced as having been taken by Metropolitan Drain Cleaning.**
MR. DENBY: So I'd just like to ask -- note for the record that plaintiff, to the extent that you guys have those and they haven't been disclosed, I'd ask that you produce them. And, Mr. Napolitan, to the extent that those were not provided to plaintiff, I would ask if it's possible after this deposition that,



you know, we'll figure out a way to make it convenient for you to provide those photos to counsel and myself.
A. Please understand that that work had been done prior to this -- to the Travelers situation. And I didn't even think that it would be part of this. This was not an intentional hiding or misleading of information. I just didn't even think about that.
**Q. Okay. Understood. And that's completely normal. Just to the extent there is anything else out there that maybe didn't make its way into the lawsuit, I would just request that you double-check your records and, you know, provide them to counsel and myself.**
A. If I have them, I'll supply them.
**Q. Awesome. Thank you. So jumping to the next page now, I'd like to just ask you about this one. This is Bates-labeled Diem_1539. Please just take a look at this document. This is an invoice, also dated October 17, 2019. Particularly, if you could review the "Description" section.**
A. (Deponent examined document.) Okay.
**Q. Do you recognize this document?**
A. Right. I just remember that I was advising him to get rid of the -- get rid of galv.
**Q. And what galv were you advising him to get rid of?**



A. The galvanized pipe that I could see.
**Q. In what locations of the house?**
A. Mechanical room.
**Q. Is the mechanical room where the DWV pipe is located?**
A. Yes.
**Q. And the DWV pipe was galvanized, correct?**
A. Some is the secondaries; in other words, the pipe that feeds to -- into this, yes --
**Q. So --**
A. Venting pipe that's galvanized usually doesn't need to be replaced, because it only has air in it. It's the wet portion that needs to be repaired and replaced. So you'll have a pipe that, in the middle of it, is where the T is. And so halfway down the pipe, it needs to be replaced. Everything above where the water comes in is now, technically, vent, and that doesn't often need to be swapped out. It's fine and can be used as per code. But everything downstream of where the water comes in on that galv will be compromised.
**Q. And is that something that you can repair just by replacing with a piece of PVC pipe?**
A. Yes, or ABS pipe.
**Q. Would the repair -- is there any -- are**



**any other aspects of the plumbing system required to be repaired to make that replacement to the pipe, or can you just do that by itself? You can go in and swap out the piece that needs to be fixed and that's it?**
A. No, no, no. A lot of times you have to -- you need to open up walls or open up floors to get to the deteriorating pipe. So this is a bigger job. You don't want to do these big jobs when there's tenants there. So it's the kind of thing you want to do between tenants, because it is extensive rehab. It's not a quick service call, at least in this case. There are situations where, yeah, you just swap out a small section pretty easily.
**Q. And what is the extent of the replacement that you were suggesting in this invoice?**
A. Well, you've got -- pretty extensive, actually. I'm saying that you've got galv that's going up into your lav -- into your bathroom, going up to the lavatory, the hand sink, as well as the stuff that feeds over to the kitchen; and that those should be replaced with something better than galv.
I recommend PEX or copper. PEX has great temperature extremes, is lightweight and very easy to work with, so you have very short labor times. But copper has an antimicrobial, antibacterial aspect to

Page 78

it, so it's -- and oxygen permeation doesn't happen so much with copper, the way it does with PEX. So they're both very good materials to use and are common.

**Q. And did you also recommend -- was it also your opinion that the pipe needed to be replaced in the lavatory walls and kitchen?**

A. Yes.

**Q. And how did you determine that?**

A. You can see galv. And I could see that there were galvanized pipes. I know that there was galvanized pipes, because rust came out. And then if you have copper stub-outs coming up, you know somewhere your galv touches -- it has to connect to copper. So copper doesn't like any other metal except brass. So whenever you have the two get together, the copper will have a shortened life.

**Q. Okay. And if the work -- if Mr. Diem had performed the work -- performed the recommendations detailed in this invoice at October 2019, would that work have required code upgrades to the plumbing system?**

A. It would have -- anything that is visible needs to be brought up to code. If you can't see it, you don't know whether it needs to be brought up to code. But anything that's visible should be brought up

Page 79

to code. As per work that is done under permit, it must be brought up to code. It's not standards and practices. It's regulation that it be brought up to current code, if it's visible. In other words, an inspector will not ask you to open up all the walls in the entire house to show him all of it. He only wants to see that which can be viewed and is under the permit.

**Q. Okay. And so why did you recommend that Mr. Diem open the lavatory walls and kitchen?**

A. I did. I also recommended that the lavatory walls get opened and the galvanized pipe removed, to be replaced by PEX or copper. I did make --

**Q. Why did you make that recommendation?**

A. Why did I make the recommendation?

**Q. Yes.**

A. Because I had already -- I was being called out there to resolve problems.

**Q. Okay. So just -- I guess the question is, though, if Mr. Diem was to perform the work to rectify the issues with the galvanized pipe that are noted in this invoice, he would have been required to upgrade the plumbing system to code, correct?**

A. If it were -- if we were doing it under

Page 80

permit. But that would need the word "required." I do everything up to code, period, like I said earlier, because code is common sense. It is science.

**Q. Okay. So for the type of work detailed here, are there any instances when you would versus would not need a permit to do that work?**

A. If you are swapping out like with like -- in other words, I am swapping out a galvanized with a copper, but I'm not making any new substantial changes in layout -- no, you do not need a permit for that.

**Q. Would a permit have been required to replace the portion of the galvanized pipe that cracked -- sorry. Let me rephrase that.**

**Would a permit have been required to replace the portion of the cracked DWV pipe with PVC?**

A. No; to the best of my knowledge, no. I am swapping out a 4-inch -- a 3-inch DWV with a 3-inch DWV.

**Q. And the crack in the DWV pipe was the only damage that -- was the only damage to the plumbing system that was caused (sic) by plaintiff's claim, correct?**

A. I don't know.

**Q. Let me -- I guess I could rephrase that. When plaintiff ultimately contacted you in July of 2020**

Page 81

**with respect to the cracked DWV pipe, was there any other damage to the plumbing system that you witnessed?**

A. I'm confused.

**Q. He had -- I'm doing a poor job of explaining this. So plaintiff reported a claim, because he noticed some damage to his property as a result of the cracked DWV pipe. Was there any other -- were there cracks in any other area of the plumbing system, besides the DWV pipe?**

A. I don't think -- I don't know.

**Q. Was there anything besides the crack in the DWV pipe that prompted plaintiff to retain your services in July 2020?**

A. I was -- the opposite. I was not called to work on the DWV pipe that I had repaired earlier. I was there because there had been another big plumbing problem that had resulted in a real mess.

**Q. Could you please elaborate on that?**

A. I don't know; because the DWV that I worked on was in the lower area, in the mechanical room. The area that I saw, all the walls had been removed. And as you can see in the pictures that I supplied, there was no drywall there. And so that's when we pointed out that, "Hey, you've got to bring this stuff up to code if" -- and Mr. Sicheri said, "Go

Page 82

pull your permits and get started. And if it's got to be" -- and so we had to bring everything up to code, because it was all visible at that time. And the problem wasn't due to the repair work that we had done on the DWV.

**Q. And I understand that. But just with respect to the incident that, you know, precipitated your involvement in Mr. Diem's claim, was there anything that happened to his plumbing system, besides the crack in the DWV pipe?**

A. I'm not aware of what caused the initial claim.

**Q. At any point, do you recall when he first -- let me rephrase.**

**Do you remember when he fixed the DWV pipe, when he performed that first patch with the PVC?**

A. To some degree, yes.

**Q. Was there another incident at Mr. Diem's property after that that caused damage to the property --**

A. I don't know.

**Q. -- or was the additional work that was uncovered, was that just the result of further mitigation that occurred after you fixed the DWV pipe?**

Page 83

A. The way I recall this was that we repaired a DWV pipe, then later was called to see the damage situation that was not caused by our work. And when we got there, it was already opened up. I don't know what caused the initial reasoning for there to have been all this stuff removed; "stuff" meaning drywall.

**Q. When you first fixed the DWV pipe, was there any additional damage to the plumbing system visible?**

A. I don't recall.

**Q. Do you recall if anything had been gutted or if the pipes were -- any of the pipes that were -- that would typically be within walls were visible at that time?**

A. The drywall for the bathroom was on the back side of the pipe. The front side, I believe, was open. It was -- it had never been drywalled on the mechanical room side, and so it was pretty easy for us to get to.

**Q. In between the time when you fixed the DWV pipe and the next time you saw the property, had there been any sort of gutting or additional mitigation work that took place?**

A. When we got there, I believe the drywall had been removed already.

Page 84

**Q. Was anything additional done in between when you fixed the DWV and the next time you were at the property?**

A. I don't recall.

**Q. Okay. And sorry to just jump back, but I kind of went on a little -- I deviated a little bit. Just with respect to the work that is detailed on this invoice, I had asked you if it would require a permit. Could you just elaborate on when -- when a permit might be necessary for this work or when it might not be?**

A. I'd say if you're going to do an addition.

**Q. Okay. So based on the description here, since this is -- would a permit be required?**

A. No.

**Q. And is that because there's no additions?**

A. No. This was just to repair up the flue. And, I mean, I was originally called to just look at this water pressure issue. And these are some notations that I included and a little extra stuff that I included. This doesn't require.

**Q. Okay. So if Mr. Diem wanted to perform the work in this last paragraph here regarding the galvanized pipe being replaced with PEX or copper, would that require a permit?**

A. No.

Page 85

**Q. Okay.**

A. Let me rephrase my answer. I don't know if City of Denver would -- they tend to want you to pull a permit to walk across the street. So you want to be -- you know, they may say -- for that, there may have been something there that they would want something, possibly. But typically, you're just swapping out like with like, and it's not something that you pull a permit for.

**Q. Would there be any code sections applicable to that work?**

A. Every single thing that you do has to be done to code.

**Q. Would it be considered a code upgrade?**

A. I'm not sure how to answer that.

**Q. I guess I'll rephrase it. If the change from the galvanized -- is the change from the galvanized piping to the PEX or copper required by code, or is there something else that's driving that recommendation?**

A. Galv is inferior.

**Q. And does the code require, though, that non-galvanized products be replaced? I'm sorry. Does the code require that galvanized products be replaced with non-galvanized products?**

A. I do not believe so. I do believe -- well, not believe -- I'm absolutely certain that if you have lead, lead must be replaced. And that is what brought our participation to the point where we needed to have permits pulled and the like, because you had led visible.

**Q. Gotcha.**

MR. DENBY: I'm trying to get my "Comments" box to reappear real quick, so I can drop the last exhibit that I just closed out, in for you. I don't know why this has disappeared. Give me one second. I apologize. That's all right. I'm sorry.

**Q. (BY MR. DENBY) So now, moving on, I'd just like to talk about your work with Mr. Diem with respect to this claim. I'm now going to show you what has been premarked as -- which has been previously marked as Exhibit 25 from plaintiff's deposition, if it loads. So Exhibit 25 is an 11-page document, also just consisting of invoices and estimates from Metropolitan Drain Cleaning. This is an 11-page PDF. And I'll label any particular documents as we go through them. Okay.**

**So, Mr. Napolitan, just getting back to now when you were first retained by Mr. Diem to come to the property following the crack in the**



**drain-waste-vent pipe. I'm going to now show you what has been marked as Exhibit -- which has already been marked as Exhibit 25. Please take a look at the first page of that.**

THE DEPONENT: I'm sorry. I've got a rotating icon here, "Edward Denby has started screen-sharing." Maybe I'm looking at the wrong page. Let's see if there's another. It's not letting me move off of this page. There we go.

MR. DENBY: How about now?

THE DEPONENT: I apologize. I do not see it. I'm still getting this rotating clockwise icon. Mr. Denby, can you please just read it to me, and I'll be glad to answer your questions?

MR. QUISENBERRY: Maybe try maximizing it, Ed, because I see it. I'm not sure where --

MR. DENBY: How is that, Mr. Napolitan? Do you see anything?

THE DEPONENT: I wish I could show you how -- okay. In the third spot, I can see each one of you people; you know, Gail, Edward, and Drew. I can see your screens here. Then when I scroll -- when I drag to the right, I see only Mr. Denby up in the corner and a black screen. And it won't let me even go to the first -- it says that I'm muted and I'm not



participating. So, I'm so sorry I'm not seeing this document, sir.

MR. DENBY: Okay.

THE DEPONENT: Oh, shoot, shoot, shoot, shoot.

MR. DENBY: Let me stop sharing my screen and reshare it. Maybe it's a little glitch and it will come back now. Let me see if I can share the actual exhibit instead of my screen. Let's try that. Do you see anything now?

THE DEPONENT: It's gone right back to the, "Edward Denby has started screen-sharing."

MR. DENBY: So now I'm just sharing the document directly, instead of my screen.

THE DEPONENT: I apologize. It's just you and I, sir.

MR. DENBY: I'm not really too sure, short of maybe just leaving the room and coming back in now. Drew and Ms. Obermeyer, do guys see the exhibit?

THE REPORTER: Yes, I do.

MR. QUISENBERRY: Yes.

THE DEPONENT: The fact that I'm the only who -- it has to do with the fact that I'm the only one who is using a cellphone.

THE REPORTER: Would you like to go off



the record while you talk about this?

MR. DENBY: Yeah, let's go off the record.

(Discussion off the record.)

THE DEPONENT: And the document I can see is Invoice -- or, yeah, Invoice 4693.

**Q. (BY MR. DENBY) Do you recognize this document?**

MR. DENBY: Oh, sorry. Did we go back on the record?

MR. QUISENBERRY: Are we back on the record?

THE REPORTER: I did go back on.

MR. DENBY: Okay. I just wanted to make sure.

**Q. (BY MR. DENBY) So, Mr. Napolitan, if you'd please take a look at page 1 of this document. This is Bates-labeled as Diem_000822. Do you recognize this document?**

A. Yeah. It's the bill for working on the DWV line behind the water heater.

**Q. Okay. And this bill would be for the replacement of the cracked portion of the line with the PVC pipe?**

A. Yup, yes.

**Q. Okay. When you say -- what required the**

**removal of the water heaters?**
A. Oh, you couldn't get -- they were in front of this pipe, blocking access.
**Q. Did you put the water heaters back in place after you fixed the pipe?**
A. Yes.
**Q. When you put them back in place, were they operating?**
A. Yes.
**Q. Okay. At the time that -- when you finished performing the work, did you have any idea that there would be any -- did you have any indication that there would be supplemental work involved with this job?**
A. I don't recall.
**Q. And do you recall speaking with Mr. Diem about this work?**
A. I don't recall our conversations.
**Q. Do you recall if Mr. Diem was present at the property when you repaired the DWV pipe on July 9, 2020, as detailed in the invoice?**
A. I don't believe so. I don't believe he was -- I don't know.
**Q. Okay. When you repaired -- when you repaired the DWV pipe on that day, do you recall if**


**Mr. Diem ever gave you any -- ever provided any indication that there was additional issues with the plumbing system?**
A. I don't recall.
**Q. Did Mr. Diem pay you for this invoice, for this -- yes, for this invoice?**
A. I believe so.
**Q. Okay. Scrolling to the next page, which is Bates-labeled as Diem_000823, please take a look at this document and -- do you recognize it?**
A. Yeah. I just had the wrong address on there. The Elm Court and the Beach Court are only two blocks away from each other, so it's a -- it's an embarrassing mistake, but . . .
**Q. Oh, no worries. Do you recall what prompted you to prepare this invoice?**
A. No.
**Q. Do you recall -- why did you go back to the property on Wednesday, July 15, 2020?**
A. If I'm not mistaken, I want to say that we needed to get started on demo.
**Q. And what was that demo in relation to?**
A. The repairs needed for this project.
**Q. What repairs -- what repairs was the demolition needed for, given that the DWV pipe had**


**previously been repaired?**
A. Oh, no, no, no. I'm referring to that there had been a big problem. We had already come out and -- this is subsequent. That's what I'm under the impression of right now.
**Q. So do you recall, was there another issue with the plumbing system in between when you repaired the DWV pipe on July 9th, 2020 and when you went back to the property on July 15, 2020?**
A. I don't recall.
**Q. When you returned to the property -- when you were present at the property on July 15, 2020, was there any damage that was the byproduct of a plumbing system malfunction?**
A. I don't know.
**Q. So you don't know -- is it fair to say that you don't know between the time you replaced the DWV pipe on July 9, 2020, and the time you returned on July 15, 2020, if there was another incident or event at the plaintiff's home involving the plumbing system that caused damage to the plaintiff's property?**
A. I believe there had been; but I don't recall, exactly, the details.
**Q. And when you were at the property on July 15, 2020, do you recall seeing any damage to the**


**property or sewage that was dispersed in the property?**
A. I don't remember.
**Q. Do you remember any information about what this intervening event could have -- what could have transpired in this intervening event?**
MR. QUISENBERRY: Object to form. You can answer.
A. I'm sorry. I don't remember the events.
**Q. (BY MR. DENBY) Do you remember if the DWV pipe that you repaired on July 9, 2020 failed at all between then and July 15, 2020?**
A. It did not.
**Q. So if there was a subsequent -- if there was another event that occurred between July 9, 2020 and July 15, 2020, it would not have involved the DWV pipe that you repaired?**
A. That is correct. The pipe was -- our work on that pipe was in very good condition when we started to have to demo out every bit of it. It was not the cause of the July 15th visit.
**Q. Do you have any opinions as to what the cause of the July 15, 2020 visit was?**
A. Not at this time.
**Q. Okay. With respect to the description that says, "Bruce removed lavatory and toilet," what**

Page 94

**aspect of the house was that performed on?**
A. The lower bathroom.
**Q. Do you know why the lavatory and toilet needed to be removed?**
A. I don't remember, exactly, what the reasoning was.
**Q. And is that the same for the bathtub removal? Was that in the same location of the house?**
A. They're next to each other.
**Q. Was there any indication that the lavatory, toilet, or bathtub needed to be removed when you were at the property on July 9th, 2020?**
A. Yeah, right, right, right. Okay. So if I'm -- again, this is a little hazy for me, but they needed to be removed a lot, because the -- everything else was being taken out. They were either compromised or they were in the way of the work that would be -- needed to be done.
**Q. Was the removal of these items something that arose in between when you performed the repair to the pipe on July 9, 2020 and when you returned on July 15, 2020?**
A. I'm sorry. The question again?
**Q. Was the removal of the lavatory, toilet, and bathtub something that arose in between the time**

Page 95

**that you repaired the DWV pipe on July 9, 2020 and when you returned on July 15, 2020?**
A. We removed the items because of the flooring needing to be swapped out, that had been damaged, I believe.
**Q. Was there any indication that those items would need to be removed because of damaged flooring when you replaced the -- repaired the DWV pipe on July 9, 2020?**
A. No, they didn't need to be repaired. I mean, the repairs that -- the removal of these things was due to a subsequent event that did not involve the stack that we swapped out.
**Q. And just again, to clarify, when you say the "stack," that's referring to the DWV pipe, correct?**
A. Yes, that's right. The vertical pipe that we swapped out was not the cause of the problem.
**Q. Okay. And just again, I apologize if I asked this, do you know what the cause of the subsequent problem was?**
A. I don't recall.
**Q. Okay. And then just looking at this invoice further, the second day, Thursday, 7/16, there's a reference to an additional individual, Tim. Who is that?**

Page 96

A. Tim Mossberger.
**Q. Is that someone that you've also used as an independent contractor?**
A. He's a friend of mine who's got strong upper body strength and is -- he's very good with -- he's very mechanically inclined, and so he's an excellent guy to have on your roster.
**Q. Did you pay him anything with respect to the work he performed for you?**
A. I don't recall.
**Q. Does he perform services for Metropolitan Drain Cleaning outside of this claim?**
A. On occasion, as per -- whenever I need a second set of hands or a helper. He also does work -- automotive for us.
**Q. Is he a plumber?**
A. No. But he is strong, and that's what we needed for this. We didn't need a plumber. We needed a strong back.
**Q. Gotcha. Okay. I'm next going to draw your attention to what's been premarked as Diem -- sorry, TRAVELERS_000244, within the same exhibit. This is an estimate dated July 20, 2020. If you'd please just review this document for a second. Let me scroll down so you can see the whole thing.**

Page 97

A. (Deponent examined document.)
**Q. Please let me know whenever you've finished reviewing it.**
A. (Deponent examined document.) What would you like to know?
**Q. Okay. So, what is this document?**
A. It's an estimate for work.
**Q. And what work?**
A. The -- to get the property up to code.
**Q. And that's with respect to the plumbing?**
A. Yes.
**Q. Okay. And why did you prepare this estimate?**
A. Mr. Diem wanted to have an estimate to work off of.
**Q. Did Mr. Diem advise you that these -- that this work would be required due to code?**
A. We advised him that it needed to be done to code; that if you want to pull a permit, anything that is visible needs to be made -- needs to be up to current code. Since everything was visible, virtually everything would need to be brought up to code. Also, things that were in -- known to be in bad condition also needed to be brought up to good condition.
**Q. Okay. Starting with the latter, anything**

**that was in bad condition, but that existed prior to the crack in the drain-waste-vent pipe, would you agree that that is not related to this claim?**

MR. QUISENBERRY: Object to form. You can answer.

A. I'm not sure how to answer that, whether something -- it would only be done purely because it's code; and if it weren't for code, you wouldn't be replacing it, even though it's shot, it's done, it's played. It's at the end of its life, and it is about to -- if it hasn't already failed, it's about to fail, but it's within code? That doesn't make any sense at all to keep it.

You get rid of anything that is failing or it's at the end of its life. It's gone bad. And everything that -- and when you swap out anything, you always bring it up to code. And everything that was visible, clearly had to be brought up to code. Galv is not going to be allowed with Denver, and so all the galv needed to go; all the cast iron that we knew was rotted, because we had just repaired it, you know. So we're certain we've got a problem there.

So, you know, I was like, "Well, gee, John, all right, fine. Replace the parts you know are failed or are in the act of failing. You've just had a



catastrophic event, and you're not going -- you're only going to Band-Aid something?" That doesn't make any sense at all. No. We brought the -- everything that could be -- that was visible needed to be brought up to code.

Everything that is attached to it really needs to be brought up to par, at least up to -- it needs to be made safe and functional; even if it's, "Well, technically, it's on this part, so you can't really see it easily; so, therefore, it's not covered by code." No. You obviously do the right thing and get every bit of that that needs to be taken out. You know, it's not just a matter of code. It's a matter of liability. I don't want to end up having this stuff fail. We did it correctly.

**Q. (BY MR. DENBY) Understood. The aspects of the plumbing, though, that were in poor condition and needed to be brought up to code as a result of that, would you agree that those -- the condition of those plumbing systems was not related to the cracked DWV pipe. These other aspects of the plumbing system were in poor condition, separate from the issue with the cracked DWV pipe?**

A. Yes. The cracked stack was its own problem that got corrected. The fact that you've got



galv and copper commingled had nothing to do with the fact that the stack cracked. I'll give you that.

**Q. Okay. And my next question is, you also testified that anything visible needs to be brought up to code. What was visible the first time that you were at the property on July 9, 2020?**

A. The only thing I could see at that time was, obviously, the stack we were working on. And we could see that there was galv all over the place. So that's what prompted the whole conversation about getting rid of galvanized pipe. Whenever you see galvanized pipe, you always recommend replacement of it; the same way that you do with lead pipe.

**Q. So I guess my follow-up question is, though, at the time that you repaired the cracked DWV pipe, none of the piping systems referenced in this July 20, 2020 estimate were actually visible to you?**

A. No, no, no. When we wrote that up, we could see -- at this point, we could see this stuff.

**Q. I understand that. I'm saying, at the point when you first repaired the DWV on July 9, 2020, the stuff that's -- the plumbing issues noted in the July 20th invoice estimate were not visible on July 9, 2020?**

A. Yeah. I'm sorry.



**Q. That became visible after the fact, correct?**

A. Much of the -- some of it in the mechanical room, the galv was visible; but, no. This estimate came in after we were able to -- after we were able to see more of the situation.

**Q. Okay. And -- oh, go ahead.**

A. We were not advocating that you replace galv with galv. We were advocating that you replace galv with better materials. And then I even went -- apparently I went so far as to cite the code source on -- that this wasn't my opinion. This dated back to code. As I read down here, it says here, "Denver uses IPC, see Section 605." And so I cite code as per the reason I want to get rid of the galv and replace it with copper and PEX.

**Q. Okay. And the issue that's prompting -- the reason for changing the pipe from -- the reason -- withdrawn.**

**The reasons that prompted you to want to change the galvanized pipe, that existed before the date of loss, correct?**

A. Yeah. It existed -- the pipes were galvanized at the time of loss and remained galvanized to where I could see them and, therefore, me prompting

to cite the code; that, let's get rid of the galvanized that caused this problem, or possibly could have caused the problem; and that this wasn't my opinion, this was code that I had to live up to.

**Q. Were you of the opinion that some form of -- that the galvanized piping in the house may have contributed to any subsequent event that happened?**

A. I don't know if -- the correlation and causation.

**Q. Okay. But when you say in this note that all -- both supply and DWV is out of code and undersized, those issues would have existed prior to the crack in the DWV pipe, correct?**

A. Yeah.

**Q. Okay. And do you know what Section 605 of the IPC states, just from your memory?**

A. It's about materials, apparently, and that you can't -- you can use galv only to swap out a repair. So if you're going to swap out a 12-inch nipple that has corroded and rusted out, you can swap it out with a brand-new galvanized, but you may not use -- you may not put in galv into a new situation. You may only use approved materials, which are almost always going to be plastic and copper.

**Q. Okay. But with respect to the cracked**



**DWV pipe, that wasn't necessary, since it could be repaired with PWC (sic), correct?**

A. Yeah, correct. We did not need -- the PVC pipe that we swapped out did not need -- you could swap it out with PVC.

**Q. Okay. And the replacement of the remaining galvanized pipe, that has nothing to do with the cracked DWV pipe, correct?**

A. Correct.

**Q. Okay. And just this last sentence, what do you mean by, "CPVC for domestic supply"?**

A. That is a type of lightweight plastic pipe. It's fragile. It's -- it's a type of plastic pipe. You've got PVC pipe, which is a stronger, white, thicker, Schedule 40, Schedule 80. There's a lot of variety within it. And then there's this CPVC, which is a --

THE DEPONENT: One second, guys. My phone just gave me a low battery.

A. CPVC is a type of plastic that cannot be used for domestic supply. And I wouldn't recommend it -- even if Denver did allow it, I wouldn't use it anyway. It's just too flimsy.

**Q. (BY MR. DENBY) Okay. So, in your opinion, how is any of the replacement of this**



**galvanized pipe in any way related to the cracked DWV pipe?**

A. None of it is related to the cracked DWV pipe that we repaired. That was a separate issue, a separate problem, that had -- we were brought out, we repaired. And it was not part of any subsequent event.

**Q. Okay. In your opinion, would you -- was the repair to the DWV pipe separate and apart from whatever prompted -- whatever incident prompted the work that is the subject of your estimate?**

A. Yes, you are correct.

**Q. Okay. But you don't recall what happened in between the repair of the DWV pipe and the preparation of this estimate?**

A. You are correct.

**Q. Okay. Did you ever perform the work detailed in this estimate?**

A. Yes, we did.

**Q. Was it all completed?**

A. The -- I'm not sure about the -- what we call trim, the final trim. I'm not a hundred percent certain that we got to some aspects of that. Final trim, by the way, is things like putting the little handle knobs on shower faucets and things of that nature. Okay?



**Q. Okay. In your opinion, would any of the code issues requiring replacement of this plumbing system have existed, but for this intervening incident that occurred?**

MR. QUISENBERRY: Object to form. You can answer.

A. I don't know how to. Could you repeat that?

**Q. (BY MR. DENBY) Yeah, I'll rephrase -- I'll rephrase it. It was not the best question.**

**In your opinion, would the plumbing upgrades detailed on this estimate -- sorry. In your opinion, were the plumbing details -- are the plumbing upgrades detailed by this estimate, were they required due to the cracked DWV pipe?**

A. They were not required due to the cracked DWV pipe, they were required because of visibility. The subsequent event that I'm not too clear on meant that the drywall had been removed. And once we could see it, we had to bring it up to code. And that's the code upgrade estimate that I submitted for it.

**Q. Okay. In your opinion, if the subsequent event did not occur, would this claim have ended once you repaired the DWV pipe?**

A. There would have been no claim. There was

Page 106

no claim for my -- my DWV work did not jack up stuff.
**Q. Okay. So essentially, not to repeat -- to rephrase your answer, your DWV work had nothing to do with the subsequent estimate?**
A. You are correct.
**Q. And this subsequent estimate was -- would not have been related if this intervening incident did not happen?**
A. Correct.
**Q. And if the intervening incident did not happen, your replacement of the DWV pipe should have completed this claim?**
A. I don't know about the words "completed this claim."
**Q. Let me put it this way. If the intervening event did not occur, would any additional work have been required to the cracked DWV pipe?**
A. No, because the cracked DWV pipe had already been satisfactorily repaired and was not the source of the problem.
**Q. If this intervening incident did not occur, would any work have been required to the remainder -- the remaining elements of plaintiff's plumbing system?**
A. No. This estimate was specific to being

Page 107

able to move forward with getting repairs made from the event that brought this about.
**Q. Okay. I'm going to briefly scroll through this off-screen, just to see if there's anything else I want to look at before I close this out.**
(Pause.)
**Q. Okay. Very briefly, just with respect to the estimate and the work that you completed, do you recall, at any time after this estimate was prepared, if there were any -- if any subsequent issues arose with the plumbing system at Mr. Diem's property?**
A. The -- I don't recall correctly. I'm not a hundred percent certain on that.
**Q. Okay. I'm just going to briefly scroll through the remainder of these invoices and just ask you some questions real quick. Just for time's sake, I'm going to try and move through them a little quickly. I'm now showing you what has been premarked (sic) as Diem_955. Do you recognize this invoice?**
A. Yeah. Again, I apologize that I made a boneheaded error and put in the wrong address in that "Description" part.
**Q. It's okay. I'm going to note here on the "Permits, fees" item, "Plumbing permit issued 8/31/20." Did you apply for the plumbing permit that was issued**

Page 108

**with respect to Mr. Diem's property?**
A. The master plumber did.
**Q. Who was the master plumber?**
A. Enrique Riaz, who is Earl Hurkett's boss.
**Q. What company is Mr. Riaz affiliated with?**
A. Oh, I'm having another one of those name moments. I'm sorry. It's on the tip of my tongue, and I don't recall.
**Q. That's okay. What was Mr. Riaz's involvement with Mr. Diem's project?**
A. He pulled the permit that we were having Earl look at. So Earl was -- put it all together and gave us our walking papers, and then we had to -- and I believe that that's how the permit was pulled.
**Q. Why was Mr. Riaz involved with pulling the permit?**
A. Oh, because he owns the -- it went through Earl Hurkett. And I could be wrong. On the bureaucratic end of this, I have very little involvement. I'm on the get-the-work-done end of it and responsible for how that goes.
**Q. Did you not apply for the permit, just simply because you're not a plumber, a licensed plumber?**
A. Correct. I don't have the correct

Page 109

licensure for -- at that level to do it. But I was under their strict supervision of it, and so as we went along, any adjustments, errors, things of that nature, are -- we'd review, go over, make repairs on, make adjustments on, whatever.
**Q. Okay. Aside from pulling the permit, how was Enrique Riaz involved with the work that you did for Mr. Diem?**
A. He wasn't. It was that he had his people, Earl, look over every bit of this and then come on out, supervise, double-check, review, and have, basically, control over the project.
**Q. Okay. So -- I'm sorry?**
A. And then we did all the the physical labor of bringing everything in and doing all the repairs -- doing all the work.
**Q. Did Enrique Riaz or someone that worked for him -- did Enrique Riaz or someone that worked for him supervise the work that Metropolitan did at Mr. Diem's premise?**
A. Yes.
**Q. Were they there every day that you guys did work?**
A. Not every single day. They were there as we made substantial completions of certain points,

Page 110

prior to having -- calling in an inspection. Then they would come on out, review the work, and anything that needed to be changed, those were made, and then the inspection would be called.

**Q. Did you obtain Mr. Riaz to act as the master plumber for this job?**

A. Earl did.

**Q. Did you speak to Earl about needing a master plumber?**

A. Yes.

**Q. What other involvement did Earl have in Mr. Diem's claim and/or project?**

A. Nothing but overseeing the work that we had done. It was purely a -- he had no involvement with Mr. Diem on any level in any way whatsoever.

**Q. Do you know if they were paid any money by Mr. Diem?**

A. Mr. Diem and Earl never had any contact of any sort.

**Q. Did you pay Earl any money for his involvement in this project?**

A. Yes, I did.

**Q. How much did you pay him?**

A. I want to say $300 for pulling the permit, and then I paid him and another fellow for subsequent

Page 111

supervisory visits to advise and prepare for inspections.

**Q. Okay. Aside from that, was there any other involvement that Earl or Mr. Riaz had with respect to Mr. Diem's project, as a master plumber?**

A. No, no. This was -- they did supervisory, making sure that everything was done to code and that -- everything was with respect to passing inspection, as per permit, and nothing beyond that. They did not have anything to do with pricing, or timing, or anything of that nature.

**Q. Okay. Did they ever provide any opinions on what code provision may or may not apply?**

A. That's -- they would be very specific that certain -- you know, you have -- this has to join 40 inches downstream, not where you're at currently joining. So again, they supervised the code enforcement aspect of this, and that's that's all they did.

**Q. Do you know if they ever spoke with anyone from the Building Department about enforcement of the code?**

A. I do not believe they did. They would just come out and express to me what needed to be done to be ready for inspection, then they would call in the

Page 112

inspection.

**Q. Did they ever provide you any documents from the City, from the Building Department, indicating that certain code sections were applicable and that repairs were required as a result?**

A. I don't recall if they -- if there was even such a document existing.

**Q. Okay. But you don't recall ever seeing anything to that effect?**

A. No, no. The City did not -- to the best of my knowledge, the City did not come out and write up some kind of document that says, "In your particular case, we want this done." It was -- you need -- when a rough permit is pulled, it just has to be up to code.

**Q. Okay.**

A. The City doesn't say, "Oh, in your case we want you to do these three things." It's, you call it in, the City comes out, and they may say at that time, "You failed on these three things"; then you fix those and come back out.

**Q. Gotcha.**

A. And the idea is that you be well-prepared and thorough and complete, prior to the inspection, so when they come out they take one look and you pass, and you're done, and you move on to the next thing.

Page 113

**Q. Would an inspection have been necessary for the repair that you made to the crack in the DWV pipe?**

A. No.

**Q. Okay. I'm now going to show you what has been previously marked as Exhibit 3, if it will open for me. Do you recognize --**

MR. DENBY: Let the record reflect that this is Exhibit 3 from plaintiff's deposition. This is a three-page document, Bates-labeled as Diem_000093 to 000095.

**Q. (BY MR. DENBY) Do you recognize this document, Mr. Napolitan?**

A. It's the plumbing permit.

**Q. And who is Kings Plumbing Incorporated?**

A. Enrique.

**Q. Okay. Thank you. And do you know what -- do you know what the valuation of $3800 depicts or is in reference to?**

A. It's a rather standard number for this kind of work. And you just put -- they need to have some level of evaluation -- the City requires some level of evaluation so that they can charge you accordingly. Small jobs, they charge small fees; big jobs, they charge big fees. So they want to know what

the valuation is for charging people.
And you have to be fair and accurate and honest as you can be, even though you don't know exactly what the bill is going to end up being. But, typically speaking, a job of that size is probably going to be around 3800 bucks.
**Q. Okay. Would the permit for this have been based off of your estimate, the estimate that you prepared?**
A. It may or may not have. I don't recall.
**Q. Okay.**
A. He's going to say, this is the right number for this kind of permit and this kind of work. Whether I'm under the market or over the market is irrelevant, really.
**Q. Okay. I was just going to ask, is there a reason why your estimate would detail the price of the work as being $14,100, while the valuation would detail it as only being $3,000- --**
A. Because -- yeah. In that case, he is only stating -- and I'm not exactly sure why it says 3800 there, whether that was -- that's on the low end of the spectrum, so I'm going to do the low end versus -- I don't think he ever had any knowledge of what I put in there. But I'm going to charge what I'm -- what I'm


going to need to get for that job, regardless of that. So I can't speak to the 3800, other than that's what the number was that -- the City required a number needed to be put there.
**Q. Okay. And do you recall when this permit was applied for?**
A. I don't, no. I don't recall. I don't remember when it was applied for.
**Q. If the permit was paid for on 8/31/2020, would you agree that this was probably applied for after you had repaired the DWV pipe?**
A. The DWV pipe had nothing to do with any of this. So yes, it would have been after we had fixed the DWV pipe.
**Q. Okay. So this permit pertains to work that was necessary to the plumbing system as a result of the intervening incident that occurred after you repaired the DWV pipe?**
MR. QUISENBERRY: Object to form. You can answer.
A. I'm repeating myself. The DWV pipe was not the cause of any of this, just -- so we pulled the permit, because we had to, in order to do the work to correct the plumbing from the separate incident that had nothing to do with the DWV pipe.


**Q. (BY MR. DENBY) Okay. If you look at the "Building Comments" section, it says, "Plumbing - PERCRS 38-45." Do you know what that refers to?**
A. I do not. I'm sorry.
**Q. Okay. And is it typical in building permits for them to list the applicable code sections that may relate to a job?**
A. Again, I'm not in the bureaucratic end of this. Because I do not ever pull permits, I'm not really an expert on the colloquialism of Denver's permitting. But no, normally they just -- you pull a permit for a rough, you pull a permit for overall. And they don't actually go and -- they may say, "Hey, we want CO detectors installed," or something like that. They may give you some kind of indication on that.
**Q. Okay. And lastly, I'll just ask you, if you look where it says, "STAT Code 1:305 - Plumbing domestic appliances," do you know what that refers to?**
A. No.
**Q. Okay. All right. And do you recall ever seeing a version of this permit that was signed off by an inspector?**
A. I want to say I did not ever see the final. I know that we passed underground and we passed rough.


**Q. Were inspections performed for those?**
A. Oh, by the way -- yeah. Just so that you understand, underground is any time that you're breaking open concrete and going, like I said, underground, under the terrafirma, which we had to do in this case because we were working on the lower bathroom. And so there was an inspection for opening up the concrete and repairing all the stuff that's underneath the concrete.
Then, after that, you have an inspection of all the rough-in. And that's all the drainage, waste, and vent -- DWV and supplies that go up to fixtures. And then your final is after all the fixtures have been installed, to make sure that that's all good. So the underground and the rough, we did pass. I don't recall what happened on the final.
**Q. Okay.**
A. And by the way, all that, it doesn't matter. You could call it in, Drew. It doesn't matter who calls in the inspection. The City -- as a matter of fact, calling in is a misnomer. You actually go through an automated tree on -- you know, "Put in the permit number. Put in the date. Put in the" -- you know. And so anyone can call it in. And if it passes, it passes. It doesn't matter whether the person who is

standing in the room is a master plumber or the guy who is standing there who opened the door for you is the housewife.

**Q. Okay. But that work -- the inspections that were performed with respect to the underground and rough, those were unrelated to the work that you performed with respect to the DWV pipe, correct?**

A. You are correct.

**Q. Okay. All right. So bear with me for one second. I'm going to try to get through the rest of this very quickly. Do you recall when you completed the work at Mr. Diem's premises? Let me rephrase that.**

**Has all the plumbing work for Mr. Diem been completed?**

A. I did not do the final trim part, I believe. I did not finish -- I'm sorry. I don't recall how far we got on final trim. That's a better way to put it.

**Q. Okay.**

A. We did do some of it. I don't remember if we -- I'm not a hundred percent certain on where that got left off at.

**Q. Okay. Do you know if anyone else took over that work -- completed that work for him instead of you?**



A. I don't know. By the time this occurred, this whole aspect of -- all this problem that has nothing to do with plumbing and everything to do with this claim had already muddied up the situation.

**Q. Understood. And I'll just, lastly, ask you with respect to these invoices, rather than going through each of them individually. If you'd like it take a look at them, feel free. But there's an invoice dated October 8, 2020; January 7, 2021; another one dated January 7, 2021, probably the same one; April 19, 2021; and July 30th, 2021. So any work that would have been the subject of these invoices would not have been related to the DWV issue, the crack in the DWV pipe, correct?**

A. I'm not looking at them; but yeah, that would be a correct statement.

**Q. Okay. And do you recall if you performed any services for Mr. Diem after July 30th of July 2021?**

A. On this property?

**Q. Yes.**

A. No -- oh, again, I don't recall. We -- god, I wish this was from recent, not two years ago, when the chronology was much easier. I didn't realize I was going to have to be documenting -- this is the kind of thing I wish I had a diary for. Fuck, I don't



know. I don't have any -- I can't see any of the invoices.

**Q. Oh, is it not sharing?**

A. No.

**Q. Sorry about that. I apologize.**

A. So when you're saying stuff --

**Q. That's completely my fault; because I wanted to go and send the document so the reporter would have them, and I forgot to share my screen after that. So let me jump right back up to where I started from. I believe I said we were talking about 10/8 with respect to the plumbing permit, as you see there.**

A. And I try very hard to give very thorough and well-detailed invoices that have a good sense of chronology on them. These are dated and, you know, who did what on when, and what was going on.

**Q. Exactly. And not to cut you off, but that's just what my question was, essentially. If you look at these invoices, starting with this October 8 and going all the way through July of 2021, my question, just generally, was, the work that you were performing for Mr. Diem at that time was unrelated to the cracked DWV pipe and only related to repairs that were necessary due to the subsequent incident?**

A. Yes.



**Q. Okay. Thank you. So we can close that one out. Give me -- I'm just going to kind of scroll through, but I think I'm getting very close to the end here. So just give me one second.**

**Did Mr. Diem ever share any estimates that he prepared -- that he prepared, with you?**

A. Did he share?

**Q. Yes.**

A. No. You know, I don't seem to remember any -- when we met, like this stuff that I'm looking at right now --

**Q. I'm just trying to draw your attention to -- when I ask you about this document, just to streamline things.**

A. I've never seen it before.

THE REPORTER: Is this Exhibit 12, Mr. Denby?

MR. DENBY: Yes. I'm sorry. I'm trying to save some time and jump to where I want to get to the question. But this is Exhibit 12.

**Q. (BY MR. DENBY) Okay. So, Mr. Napolitan, do you recall ever seeing this?**

A. I'm sorry. I don't recall ever seeing this.

MR. DENBY: Okay. Sorry. Hold on. Let

Page 122

me share -- send the document before I move on to the next one.

**Q. (BY MR. DENBY) Do you know who Bellator Claims is?**

A. No, I'm sorry, I don't.

**Q. Do you know if Mr. Diem retained a public adjuster by the name of Bellator Claims?**

A. I do know that he had retained a public adjuster. I do not know anything about that.

**Q. Did you ever have any communications with Mr. Diem's public adjuster?**

A. I don't recall. I may have. I don't know. It would not have been a momentous moment.

**Q. Okay.**

A. I know that I didn't have to write down anything. Somebody may have called up and said, "Hey, I just want to make sure."

"Do you think I did something?"

I don't know. There could have been an incidental call. I don't recall ever having contact, but -- I don't remember having any contact. Do you have any knowledge that I had contact with him?

**Q. That's why I'm asking you the question, because I'd like to know, just from your recollection. But if you don't remember it -- and, quite frankly, I**

Page 123

**was jumping ahead to my next question.**

MR. DENBY: Can you read back my question, please -- no, I don't have anything.

**Q. (BY MR. DENBY) The question is just whether you recall having any contact with Bellator. And if you don't recall it, that -- that's what your answer is.**

A. Yeah. I don't think I did at all. I think that -- as a matter of fact, now that I'm thinking through, I think that this was a non-event. Nothing -- I never had contact. Now that I'm thinking about it, I don't believe I did.

**Q. Okay. I'm going to now show you what has been marked as Exhibit 44 from Mr. Diem's deposition. This is a letter that was sent to Travelers by Bellator. What I'm going to draw your attention to are some photos of Mr. Diem's property. I'm going to first draw your attention to a page Bates-labeled as Diem_000022, particularly the bottom picture regarding the bathroom plumbing needing to be up to code. Do you recall if the bathroom looked like it did in that picture when you performed the DWV repair?**

A. I don't recall, because this is on the other side of the wall. I wouldn't have been in this room.

Page 124

**Q. At the time you did the DWV repair, you hadn't -- you didn't go into the bathroom?**

A. I didn't go -- I don't remember going into the bathroom on that -- no, I don't remember going in there.

**Q. And you didn't cut the wall open?**

A. I don't think I did.

**Q. Okay. Had you cut the wall open, you probably would have remembered that, correct?**

A. Yeah.

**Q. Okay. Do you know what is depicted in this first picture that's labeled Diem_000023, where it says, "Plumbing Needs to be Brought up to Code"?**

A. That is the -- that's the back side of a bathtub. And it looks to me -- I can't tell whether it's the upstairs bathtub or the downstairs; but I want to say it's the upstairs bathtub, due to the configuration -- that's the upstairs bathtub.

**Q. Do you have any opinion as to why this report says this needs to be brought up to code?**

A. When I say something needs to be brought up to code, I wasn't being specific to this one -- well, this (inaudible) here.

**Q. I'm just asking, with respect to this one picture, do you know why with this picture it says,**

Page 125

**"Plumbing Needs to be Brought up to Code"?**

A. The cold side, I can't -- supply coming up, on the right-hand side you see there's a copper pipe coming up. And I'm not sure how it's connecting to the cold side of the faucet, the shower faucet. I'm sorry. That's the hot. I apologize. That's on the hot side. I apologize. So I'm not a hundred percent. It's not glaringly jumping out at me at this moment as to why it says that.

**Q. Is there anything in that picture that would be potentially related to the crack in the DWV pipe?**

A. No. This is on a different floor. This is -- no. I don't get it, no.

**Q. I'm just going to show you now -- included in this document is also an estimate that was prepared by Bellator. I would just like to show you -- if I can jump to the correct page here -- you know what? Never mind. Let me just share this exhibit.**

**And going back to the claim just a little bit, did you ever meet with anyone from Travelers while you were at Mr. Diem's property?**

A. Yeah. I met with Justin Sicheri.

**Q. What was the nature of that conversation?**

A. We reviewed what needed to be done, and he

said to get started.

Q. Was there ever any discussion regarding documentation regarding the code upgrades that were necessary -- let me rephrase that.

Do you remember ever having any discussion with him and Mr. Diem regarding providing documents demonstrating the code upgrades that were required?

A. I don't recall, specifically.

Q. Okay. And I might have asked this before, but did you ever speak with Mr. Gonzalez, the City building inspector?

A. No, I did not.

Q. Okay. And were you ever provided any documentation from Mr. Gonzalez or his office indicating that the code upgrades claimed by Mr. Diem were required?

A. Oh, wait a minute. Is this the guy that wouldn't return -- I wanted to know what the story was. I don't recall, specifically.

Q. Okay. But you never -- did you ever receive any document saying that the plumbing system needed to be upgraded, due to the application of various code sections?

A. I don't believe I ever received a document from the City of Denver concerning this property.



Q. Did Mr. Diem tell you if he ever received any documents from the City of Denver regarding code upgrades related to this property?

A. I don't know.

Q. What do you think is a reasonable cost for all the code upgrades that are purportedly required to Mr. Diem's property?

MR. QUISENBERRY: Object to form.

A. I don't know.

Q. (BY MR. DENBY) Do you think that your estimate accurately reflects the amount of cost to perform that work?

A. Yes.

MR. DENBY: Sorry. Just bear with me for one second. I'm trying to just go through to see, because I'm almost at the end here.

Q. (BY MR. DENBY) I'm going to now just show you what has been previously marked as Exhibit 46. Is it your opinion -- do you believe that a lot of the code upgrades that were required to Mr. Diem's property existed prior to the crack in the DWV pipe in July 2020?

A. Yes. They were galvanized before we ever arrived.

Q. Okay. Do you know --



A. There was lead pipe there already -- there already, prior to our ever visiting the property ever, for the first time, for any reason whatsoever.

Q. Okay. I'm just now going to quickly show you what has been marked as Exhibit 46 from plaintiff's --

A. I'm not seeing any of your documents again. So, I see your face. There we go. There we go. Thank you.

Q. So I'm going to quickly show you what has been marked as Exhibit 46. This is a nine-page document. I'm specifically going to be referring to page Bates-labeled as BELLATOR_001390. This is an email that Mr. Diem sent to Bellator Claims. And I'd just like to note -- I'd just like to show you here, if you look where it says "P2502.2," the section in red. So the first sentence, Mr. Diem says, "From what I have been told, I have enough wrong with my existing system that I would be required to upgrade everything." Do you disagree with that statement?

A. I do not disagree with that statement.

Q. And those problems with his system were existing prior to the crack in the DWV pipe in July of 2020, correct?

A. Correct.



Q. And these code sections here that are cited, starting with the one that I just referred to -- and I'll scroll through to the next page -- would -- do you believe that any these code sections are applicable to the damage that was caused by the cracking in the DWV pipe?

A. I don't know.

Q. How about this Code Section P2906.8?

A. I'm not -- as I read this, I'm a little confused as to what you're asking me.

Q. I was just asking -- Mr. Diem cited a whole bunch of code sections here, and I was just -- that he says are applicable to the claim. And I'm just curious whether any of these code sections -- in your opinion, these code sections -- any of these code sections I've shown you here are applicable to the crack in the DWV pipe, or if they're more relevant to the subsequent -- to, you know, the work that was necessary due to the subsequent incident?

A. The things that are listed here have nothing to do with the DWV.

MR. DENBY: Okay. Thank you. And I'm just going to stop sharing my screen, so I can send this to the court reporter. That was Exhibit 46. I have one more exhibit, and then I'm going to probably

just turn this -- I have a few more -- like, a few more minutes, and then I'm done.

**Q. (BY MR. DENBY) And I'm now just going to also show you what has been marked as Exhibit 47 from plaintiff's deposition. Just briefly, this is an inspection report for Mr. Diem's property. Exhibit 47 does not have any Bates numbers, as this was just produced at Mr. Diem's deposition. This is a 43-page document.**

**And real quick, I'm just going to direct your attention, Mr. Napolitan, to the findings regarding the plumbing system in here.**

A. This document was dated 2011?

**Q. The report is dated July 29, 2011, correct.**

MR. QUISENBERRY: Can you expand that, Ed, too?

MR. DENBY: Yeah. Sorry about that. It comes up so big on my end, I forget to do it for you guys.

**Q. (BY MR. DENBY) Let me know whenever I can scroll for you.**

A. (Deponent examined document.) Okay. So this is a property inspection --

**Q. And I guess --**



A. -- from years before I had any -- before I'd ever visited this property.

**Q. Understood. And the reason I'm showing this to you is just because this was a report that was prepared when Mr. Diem -- around when Mr. Diem purportedly purchased the property. And I guess just from showing it to you, if you could take a look at it, from your review of the document, would you agree that this document notes that there are existing -- that there were issues with the plumbing system that existed when Mr. Diem purchased the property?**

A. Apparently this guy has found some matters that need to be resolved.

**Q. Okay. And from your review of this, were any of the matters -- do you know if any of the matters noted here --**

A. I haven't -- all I'm doing is glancing at tiny, little print, on a cellphone screen, of a document that -- I'm certain this guy is right. You know, what's not to believe? Is it the cause of your problems? I don't know. Did it have anything to do with my work on the DWV? No.

**Q. MY question was actually going to be -- and we'll make it easy -- is any of the work that's noted -- any of the things that need to be taken care**



**of -- sorry. Let me rephrase that.**

**Are any of the problems noted in this -- were any of the problems that were noted in this report part of the work that you performed at plaintiff's property, to the extent you can determine same?**

A. From what I -- put it this way, Ed. This thing is denoting things like -- the only thing I can crystal clearly see for sure is an S trap. Well, I sure didn't put back in an S trap. I did everything correctly and nicely. That's why it passed. And our work was good quality. So yeah, there may be something on here that got corrected, because I had to.

MR. DENBY: Okay. I think -- give me one second, but I think at this point I'll probably just turn this over to Mr. Quisenberry, if he has any questions. I just wanted to -- give me 30 seconds to make sure I don't have anything right now; but if there is, I could also just -- Drew, if you want to get started with your questions, actually, anything that you might have, I can look to see if I have any follow-up while you do that, unless you weren't going to ask anything.

MR. QUISENBERRY: I do not think I have any questions of the witness today.

MR. DENBY: In that case, if I could have



everyone's indulgence for just another minute or so while I look through just my outline here, just to make sure there's nothing I missed or any other additional documents I need to bring up.

MR. QUISENBERRY: Sure.

MR. DENBY: I think, outside of that, we should probably be close to wrapping up. So first, let me just share this document that I just introduced, the inspection report. And I'm leaving my screen off of share-screen for right now. If there's anything else to put up, I'll jump back to that.

**Q. (BY MR. DENBY) And I guess, Mr. Napolitan, have you ever testified as an expert witness before in any litigation?**

A. No.

**Q. Okay. Are there any reports or documents that you've prepared with respect to your observations at Mr. Diem's property that we have not discussed today?**

A. I don't believe so.

**Q. Okay.**

A. I think you have a really thorough, rather encyclopedic -- you know, hell, the only thing you don't have is my colonoscopy.

**Q. All right.**

A. Do I need to submit that?

**Q. No, you do not. That one, you can keep personal for yourself.**

**This might cover -- just lastly, do you know if the City ever inspected Mr. Diem's property at all with respect to this loss?**

A. I don't know.

MR. DENBY: Okay. Just checking one thing, but I think we're pretty much done. Okay. I think -- I think that wraps up everything on my end. I have no further questions for you today, Mr. Napolitan. So if Mr. Quisenberry still has nothing to ask of you, I believe that will conclude this deposition.

THE REPORTER: Mr. Quisenberry, would you like the witness to read and sign his transcript?

MR. QUISENBERRY: Yes, please, and we'll handle that.

THE REPORTER: Would you like the etran, and do you need the newly-marked exhibits?

MR. QUISENBERRY: Yes, etran, with an electronic copy of the marked exhibits.

THE REPORTER: Mr. Denby, same for you, etran?

MR. DENBY: Yes, please. Thank you.

THE REPORTER: Do you need another copy of



the newly-marked exhibits?

MR. DENBY: Just anything that was newly-marked today; which, if I remember correctly, was only one or two things, right?

THE REPORTER: Correct, just two.

MR. DENBY: We're off the record, right?

THE REPORTER: I just had to put the orders on the record. We're off now.

WHEREUPON, the within proceedings were concluded at the approximate hour of 1:26 p.m. MDT on the 28th day of September, 2022.

* * * * *



I, JOHN NAPOLITAN, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached ( ) Yes ( ) No

______________________
JOHN NAPOLITAN

The signature above of JOHN NAPOLITAN was subscribed and sworn to or affirmed before me in the county of ___________ , state of Colorado, this _____ day of ____________, 2022.

______________________
Notary Public
My commission expires

Jeff Diem, 9/28/22 (go)



REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, GAIL OBERMEYER, Registered Professional Reporter and Notary Public ID 19994012647, State of Colorado, do hereby certify that previous to the commencement of the examination, the said JOHN NAPOLITAN verbally declared his testimony in this matter is under penalty of perjury; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 5th day of October, 2022.

My commission expires May 20, 2023.

Gail Obermeyer
______________________
Gail Obermeyer, RPR
Registered Professional Reporter
Notary Public, State of Colorado

__X__ Reading and Signing was requested.
_____ Reading and Signing was waived.
_____ Reading and Signing is not required.

Page 138

Errata Sheet

NAME OF CASE: JEFF DIEM vs TRAVELERS PERSONAL INSURANCE
DATE OF DEPOSITION: 09/28/2022
NAME OF WITNESS: John Napolitan
Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________

_______________________