IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-02664-REB-KLM

---

DEPOSITION OF: MARCUS GUERRA - October 3, 2022
(via RemoteDepo)

---

JEFF DIEM,

Plaintiff,

v.

TRAVELERS PERSONAL INSURANCE COMPANY,

Defendant.

---

PURSUANT TO AGREEMENT, the deposition of MARCUS GUERRA was taken on behalf of the Defendant in Arapahoe County, Colorado, by remote means, on October 3, 2022, at 9:32 a.m. MDT, before Gail Obermeyer, Registered Professional Reporter and Notary Public within Colorado, appearing remotely from Douglas County, Colorado.

REMOTE APPEARANCES

For the Plaintiff:
ANDREW C. QUISENBERRY, ESQ.
Bachus & Schanker, LLC
101 West Colfax Avenue, Suite 650
Denver, Colorado 80202
Email: andrew.quisenberry@coloradolaw.net

For the Defendant:
EDWARD C. DENBY, ESQ.
Clyde & Co US, LLP
999 18th Street, Suite 1765N
Denver, Colorado 80202
Email: edward.denby@clydeco.us



I N D E X


| EXAMINATION OF MARCUS GUERRA: October 3, 2022 | | PAGE |
| --- | --- | --- |
| By Mr. Quisenberry | | 112 |
| By Mr. Denby | | 5, 113 |

| DEPOSITION EXHIBITS: (Exhibits provided electronically to the court reporter.) | | INITIAL REFERENCE |
| --- | --- | --- |
| Exhibit 53 | Singletrack Electric, Estimate & Proposal No. 3498 to Elkmont Construction, 8/7/20, Bates No. Travelers_000940 | 70 |
| Exhibit 54 | Bellator Claims Resolution, LLC - Notice of Representation, Final Demand, to Travelers Insurance, 2/18/21, Bates Nos. Travelers_001785 - Travelers_001852 | 76 |
| Exhibit 55 | Letter to Singletrack Electric, LLC from Salabak, 6/9/22, with attachments, Bates Nos. SINGLETRACK_000002 - SINGLETRACK_000016 | 82 |

| DEPOSITION EXHIBITS: (Previously marked) | | |
| --- | --- | --- |
| Exhibit 28 | Promise Estimate, Invoice No. 890 to Diem, 12/4/10, with attachments, Bates Nos. Diem_000148 - Diem_000153 | 50 |
| Exhibit 39 | Sewage Estimate to Diem from unknown, 7/14/20, Bates Nos. Diem_001185 - Diem_001240 | 67 |




I N D E X (Continued)


| DEPOSITION EXHIBITS: (Previously marked) | | INITIAL REFERENCE |
| --- | --- | --- |
| Exhibit 44 | Email to Travelers Insurance from Grant, 1/15/21, Re: Jeff Diem, 4565 Elm Court, Denver, Colorado 80211, Bates Nos. Diem_000019 - Diem_000089 | 74 |
| Exhibit 46 | Email to Bellator Claims from Diem, 2/12/21, Re: Code summary.docx; Denver 2018 IRC screenshot.jpg, Bates Nos. BELLATOR_001389 - BELLATOR_001397 | 100 |
| Exhibit 47 | Comfort Home Inspections, Confidential Inspection Report, 4563 [sic] Elm Court, Denver, Colorado 80211 | 90 |




WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

* * * * *

THE REPORTER: Mr. Guerra, do you declare your testimony in this matter is under penalty of perjury?

THE DEPONENT: Yes.

THE REPORTER: Thank you.

MARCUS GUERRA,

having verbally declared his testimony in this matter is under penalty of perjury, testified as follows:

EXAMINATION

BY MR. DENBY:

**Q. All right. Please state your name for the record.**

A. Marcus Guerra.

**Q. Okay. And, Mr. Guerra, are you represented by counsel for this deposition today?**

A. No.

**Q. Have you consulted an attorney about this deposition?**

A. No.

**Q. Okay. I'm just going to go over a little bit about the background of a deposition. Have you**

ever given a deposition before?
A. No.
Q. Okay. Well, in that case, a deposition is just a question-and-answer session. So I'm going to ask you a bunch of questions that pertain to your involvement in Mr. Diem's claim. The court reporter is going to take down everything that I say and what you say in response to me. So especially since we're doing this thing over Zoom, it's very important that you just allow me to finish asking my question before you begin to answer. And then leave a little bit of a lull, just in case Mr. Quisenberry has an objection. Sometimes things can kind of cross over with, you know, doing it over the internet. So, just so we keep the record clear for the court reporter, that, you know, helps it run a little more smoothly.
If you do not understand a question that I ask you, it's okay to tell me that you don't understand or ask me to rephrase it. I'll be glad to try and do so to the best of my ability. The most important thing is that any question that you answer, that you do know what I'm asking you. If you don't say that you don't understand it or ask me to rephrase it, it will be presumed that you understood what I was asking you.
A. Okay.


Q. And do you understand that you're under oath and that you swore to tell the truth today?
A. Yup.
Q. Okay. If you need to take a break at all, that's completely fine. All I ask is that you answer any questions that I may have pending -- a question that I may have pending at the time, and then we can take a break.
A. Okay.
Q. And Mr. Quisenberry may have an objection, as I indicated a few minutes ago. If he does have an objection, you know, you don't need to say anything. You can let us handle the objection, and then unless he advises you not to answer for some reason, mostly likely you will still have to answer the question. As a little bit of background about that, he may make an objection to the form. If he does make an objection to form, you know, that's just something he's noting for the record, but you still have to answer the question, unless he instructs you otherwise. That's pretty much how that works.
A. Okay.
Q. And did you review anything to prepare for this deposition today?
A. No.


Q. Okay. And I know you're on your computer right now. Do you have anything open on your desktop that you're looking at with respect to this claim?
A. Yes.
Q. Okay. And what do you have open?
A. My estimates.
Q. Okay. I would just ask if you could please close that for now. Once we get to the estimate, I'm going to introduce the topic that we're using in the lawsuit as an exhibit, and I'm going to send it over to you, share my screen, depending on what works best, and you'll be able to look at it fully and review it before I ask you any questions. But just for the purposes of the deposition, it's important that you don't have any outside materials in front of you.
A. Okay.
Q. Thank you. And just so I state for the record, this deposition was scheduled to be a subpoena. However, pursuant to agreement of the parties, you agreed to come in today, correct?
A. Correct.
Q. Okay. And I guess, to get started, do you recall ever receiving a document subpoena from my office with respect to this lawsuit?
A. Yes, I think so.


Q. Did you ever provide a response to that subpoena?
A. No.
Q. Why not?
A. Because I just didn't think much about it; forgot about it.
Q. Okay. Well, in this case, you know, we're going to go through some documents that we have that were produced today. And I'll just note for the record, that to the extent this conversation indicates that there's any other documents that you may have created or reviewed that weren't produced by the plaintiff in this lawsuit, then I would request that you just submit those documents to me and Mr. Quisenberry via email after this deposition.
A. Okay.
Q. Okay. Thank you. And just very quickly, I have to confirm one thing. Are you here today on behalf of Promise Electric, LLC?
A. Correct.
Q. And what is your relationship with Promise Electric?
A. I own it.
Q. Are you the sole owner?
A. No. My wife is 50 percent.

Q. Okay. Sorry, I should have clarified this. Since it's an LLC, I should have used the term "member." Are you and your wives the only members of the LLC?
A. Correct.
Q. Okay. And is the business address for the LLC, 1387 Conifer Trail, Elizabeth, Colorado, zip code 80107?
A. No. It's been changed.
Q. What is your current business address?
A. 7385 South Revere Parkway, Suite 705, Centennial 80112.
Q. Okay. And in the event any future correspondence was needed with, say this matter goes to trial and your attendance was subpoenaed, that would be the appropriate address to use?
A. Correct.
Q. Okay. Thank you. I'd like to briefly ask you about your educational background. What is the highest level of education you've received?
A. 12th grade.
Q. Did you receive a GED or a high school diploma?
A. Diploma.
Q. What did you do after graduating high



school?
A. Became an electrician.
Q. And what's the process for becoming an electrician?
A. You've got to go through electrical apprenticeship school and just work in the field.
Q. Did you go to an electrical apprenticeship school?
A. Yes.
Q. What school did you go to?
A. Well, there was an in-house school for Riviera Electric, and then I went to Red Rocks Community College.
Q. Which one of those did you do first?
A. The apprenticeship school through Riviera Electric.
Q. Okay. Is that just an electrical company that you worked for as an apprentice?
A. Correct.
Q. When did you first start working for them?
A. When did I first start working for them?
Q. Yeah. When did you start your apprentice with Rivera -- or Riviera?
A. Geez, 30 years ago.
Q. Okay. So the early 1990s?



A. Yeah.
Q. Okay. And that's -- stuff like that with dates like that, obviously I know it's going back a ways, so to whatever extent you can remember a ballpark on things, that's completely fine.
A. Okay.
Q. What type of experience did you gain through the apprenticeship with Riviera?
A. Just becoming a commercial electrician.
Q. And what did the apprentice -- what did you do as an apprentice?
A. All sorts of things. I installed conduit, ran wire, installed switch gear, ran heavy equipment, troubleshoot, service calls.
Q. Was that pretty much all hands-on experience training with an experienced electrician?
A. Correct.
Q. Okay. How long were you an apprentice for Riviera for?
A. A couple years.
Q. Did you work for them as an electrician at all?
A. Yes.
Q. Who provided your training?
A. I don't remember.



Q. Aside from getting training in the field, was there any -- did Riviera provide any sort of, you know, book training or materials that they wanted you to learn?
A. Yes, books.
Q. Can you just briefly describe how that aspect of the apprenticeship worked?
A. You just went in a couple nights a week in the office, and there was a teacher there with a bunch of apprentices, and we just did regular classroom studies.
Q. Was that held at Riviera's offices?
A. Yes.
Q. And was the teacher an employee -- an electrician employed by Riviera?
A. I believe so.
Q. Okay. How long were you an apprentice for?
A. Four years.
Q. At some point while you were working as an apprentice for Riviera, did you begin schooling at Red Rocks Community College?
A. No. Red Rocks was many years later.
Q. Okay. When you took the classroom component -- let me rephrase that. Withdrawn.

**Q. Did the classes offered my Riviera include any instruction on electrical code?**
A. Yeah, the majority of it.
**Q. What type of instruction would they provide about electrical code?**
A. I don't understand what you mean.
**Q. Like, what type of instruction did they provide? So did they teach you how to analyze the code sections, interpret what might be -- you know, how to diagnose a code issue if you were onsite at a house or a building? You know, what about code were you taught?**
A. Yeah. Pretty much, they taught you how to read the code book. So, exactly what you said, navigate through it and make the installations of your electrical per the NEC code.
**Q. And what code is it?**
A. National Electrical Code.
**Q. Were there any tests that they required?**
A. Yes. There were tests every week.
**Q. And were those tests done on a pass/fail basis?**
A. Say that again.
**Q. Were those tests done on a pass/fail basis?**
A. Correct.



**Q. And did you pass the course?**
A. Yes, I did.
**Q. Okay. After you completed your apprenticeship with Riviera, what happened next in your career as an electrician?**
A. I just -- I went on to another company, where I continued school with them. And then I took my journeyman's license, when I was able to get my hours in, and became a journeyman and just worked in the field for a number of years and became a foreman and a superintendent.
**Q. Okay. What company did you go to after Riviera?**
A. ICG Electric.
**Q. And when were you employed by them for; like, if you can remember the dates, if you can remember the range of dates?**
A. I have no idea.
**Q. Do you remember about how long you worked for them?**
A. I worked for them for about three years.
**Q. Are they located in Colorado?**
A. They were located in Colorado. They sold the company.
**Q. Okay. So when you left Riviera, you had not yet obtained an electrician's license?**



A. Correct.
**Q. Okay. Did you continue as an apprentice? Did you start as an apprentice at ICG?**
A. Correct.
**Q. Was there anything similar or different about that apprenticeship than the one from Riviera?**
A. No. It was about the same.
**Q. And that apprenticeship, you were instructed by a licensed electrician?**
A. Correct.
**Q. Did ICG offer any classroom or book component to your apprenticeship?**
A. Yeah, same; same as Riviera.
**Q. Was ICG's program also run by an electrician employed by ICG?**
A. I can't remember.
**Q. Can you describe how that program worked?**
A. The same as Riviera.
**Q. So was it a nighttime program?**
A. Yes.
**Q. How long was the -- how long did you attend the program?**
A. I can't remember. It was the remaining time that I needed to get my license, so I would guess a couple years.



**Q. Okay. So this would have been something that you would have had to do continuously throughout the apprentice process?**
A. Back then, you didn't have to; nowadays, you do. But back then, you didn't have to, I just chose to.
**Q. Okay. Did ICG offer any instruction on electrical code?**
A. Yes. We installed all our electrical per code requirements.
**Q. Did they -- did that program have any tests?**
A. Yes.
**Q. And did any of those tests apply to code issues?**
A. Yes.
**Q. And what would they test you about with respect to the code issues?**
A. Just how to use a code book.
**Q. Did part of your instruction with respect to the code include onsite analysis of code issues?**
A. Did it -- say that again.
**Q. Did it require onsite analysis of code issues?**

A. Yeah, at times.
Q. And how would that work as an apprentice? Like, if you went to, say, a commercial building or a residence, would the electrician who you were working with, would he ask you to diagnose -- see what your potential thoughts on the issues were, or would someone point out what potential issues were?
A. No. You would have to be -- as a field worker, you would do your training. You would take -- you know, you're led by your foreman, of course, but at that point, you pretty much already know what to do to diagnose the issues. I wasn't in any type of service back then. I was only an installer, so it was all new construction. So there was really never any troubleshooting; and when there was, it was towards the end of the job.
Q. Okay. I guess, in that case, you said that -- so, as an electrician, how much of your work at that time would have been as an installer versus troubleshooting?
A. I'm sorry. Repeat that again.
Q. So how much of your work as an electrician at the time that you worked for ICG, was it mostly installation work, or was it troubleshooting and service work?



A. It was 95 percent installation.
Q. Okay. And I think you testified earlier that you received your journeyman's license while you were working for ICG?
A. Correct.
Q. What is a journeyman's license?
A. It's a -- it's a license to be able to install electrical conduit without a supervisor.
Q. Are there any other licenses that are applicable to electricians?
A. Yeah. There's a master's license.
Q. What does a master's license do?
A. A master's license is basically the same as a journeyman's license, for the exception of you are now able to contract your own work and oversee multiple journeymen, licensed cardholders.
Q. Are there any restrictions on the type of work that an electrician can perform with a journeyman's license?
A. Yeah. You can't pull no permits or start a business.
Q. Are there any restrictions with respect to the type of work you can perform? Like, can you perform installations, but not service work, or is that not --



A. As a journeyman?
Q. Yeah.
A. No. You can do every type of work with a journeyman's license.
Q. Okay. And I guess if you can just clarify. What types of electrical work are there besides installation and service work, if there are any?
A. I mean, it's just mainly -- those are the two. Well, that's where it sums up, really, and then the categories fall under those.
Q. So what categories would fall under installation work?
A. Anything to install electrical, I guess. I mean, you can -- I mean, I can go down a list of types of things you can install, but I'm not going to --
Q. I guess, more generally, is that new electrical systems, or does that include repairs as well?
A. It includes repairs; repairs and new install.
Q. Okay.
A. Service work is repairs, and new install, both.



Q. When would repairs fall under installation work versus service work?
A. So let's just say you install -- you do new construction, and you put the wrong wire on the wrong side or something and it keeps tripping the breaker, well, then you go and repair it.
Q. With installation work, are repairs usually a large component of those types of jobs, or are those jobs mainly new electrical components and systems?
A. No, it's not common.
Q. Okay. Do you remember when you obtained your journeyman's license?
A. I don't remember. Maybe -- well -- well, I guess, it was four years after I started electrical, because I didn't -- I didn't waste no time after I got my hours, to take my test.
Q. How many hours did you have to fulfill before you could take the test?
A. Eight thousand.
Q. How do you go about applying to take the journeyman's test?
A. I just go -- well, back then, you had to -- it was all paper forms. You filled the paper form in and submitted it through the State of Colorado,

and then you just schedule a date to take the test.
**Q. Okay. Do you have to provide -- do you have to show them anything that you completed your hours? How do they get that information?**
A. Yeah. The company that you work for has to give you an affidavit of the hours worked with them.
**Q. Okay. And after you obtained your journeyman's license, were you employed as an electrician by ICG, or did you go somewhere else?**
A. I went somewhere else.
**Q. Where did you go?**
A. Fort Carson Army Base.
**Q. What did you do there?**
A. I was a foreman, running a railyard.
**Q. What were your responsibilities in that job?**
A. Overseeing a train railyard. And I was an equipment operator.
**Q. What were your responsibilities as an equipment operator?**
A. Backhoe digging, digging trenches for pole lights.
**Q. Did you perform any electrical work while you were employed at Fort Carson Army Base?**
A. I don't think so. It was my guys that did


all the install.
**Q. And what exactly are a foreman's responsibilities?**
A. Just to make sure the job gets complete and finished.
**Q. So you would have had electricians working under you?**
A. Yeah.
**Q. Okay. How long did you work at Fort Carson Army Base for?**
A. About a year.
**Q. And why did you -- where did you go after that?**
A. I went to install fire alarm systems at the Broadmoor Hotel.
**Q. Do you remember, roughly, when you were installing fire alarms at the Broadmoor?**
A. It was around -- what year, you mean?
**Q. Yeah; the year, the time period.**
A. It was around 1999, something like that.
**Q. How long were you -- how long were you employed there?**
A. I did that project -- it took about a year.
**Q. Were you employed directly by the**


**Broadmoor, or were you employed by a service company that they hired?**
A. I -- I was employed by an electrical company from out of state.
**Q. Do you remember the name of the company?**
A. Cohen Electric.
**Q. And was your employment with Cohen Electric limited just to this job at the Broadmoor?**
A. Yeah.
**Q. How come?**
A. It was just a government -- it was a government-paying job. That's the reason why I left ICG, is because as soon as I got my journeyman's, I decided to go do government work only -- or should I say, Davis-Bacon scale wages.
**Q. What does that mean?**
A. That means that, like, if you work in a labor union or, you know, the electrical union, they have a certain rate. And when you work for a government company, they pay you the same rate as a union worker would get paid. It's just significantly higher.
**Q. Gotcha. What did you do for employment next?**
A. I moved here to Denver, and I just


started -- I was just a foreman for a lot of years. I worked for -- well, I did a lot. I mean, I went to Alaska for a while to work on a gold mine. I went to Wyoming. I traveled a little bit and built some large projects up there. I kind of bounced around. I mean, I worked for a couple companies; one for about seven or eight years, and then another one for three or four years. And I kind of jumped around a little bit.
**Q. Okay. In that case --**
A. I got a lot of experience in different types of electrical systems, you know; worked at the airport, DIA, for a few years.
**Q. Briefly -- before we briefly just go through the various electrical experience that you gained, just when you were installing fire alarms at the Broadmoor, was there any other electrical work that you did for them?**
A. No. It was just fire alarms.
**Q. And did that work have any, you know, code-related component?**
A. Yeah, yeah. You do everything to the NFPA, national fire codes.
**Q. Okay. So after you moved to Denver -- and I know you said that you jumped around and worked for (sic) a foreman -- if you could just take me through, I**

guess, the various electrical experience that you've, you know, received. What would be the next electrical job -- what would be the next job that you had that required electrical work, following the Broadmoor?
A. Well, I worked -- you mean you want me to tell you what companies I worked for?
Q. Yeah. Just go through each one, one by one, briefly; just the company and, you know, the experience.
A. I worked at E Light Electric for a little bit. I was installing -- a foreman and installing.
Q. Do you remember how long you worked for Elie (sic) Electric?
A. Maybe a year or two.
Q. Did you work for them as a licensed electrician?
A. Yeah. I had my license back -- way back in our conversation. Once you get your license, you keep your license.
Q. Is there any follow-up testing that's ever required?
A. Yeah. You have to test every three years.
Q. Have you maintained your electrician's license consistently since you obtained it?
A. Yes. I let my journeyman's license go,



but I keep my master's license.
Q. Okay. Let me clarify that.
MR. DENBY: I'm sorry. Ms. Reporter, could you read back his last response?
(The last answer was read back as follows: "Yes. I let my journeyman's license go, but I keep my master's license.")
Q. (BY MR. DENBY) What do you mean by you let your journeyman's license go?
A. I let it expire.
Q. Okay.
A. There's no need for it; because what I was doing is I was paying double fees for nothing, because I'm a master electrician.
Q. Gotcha.
A. Once I got my master's license, all you're doing is paying -- because you have to pay your fees every year. So all I was doing is paying for two licenses, when I didn't need my journeyman's anymore.
Q. Okay. So essentially, once you get a master's license, you can do everything a journeyman can do?
A. Oh, yeah, for sure, and more.
Q. Do you remember when you let the journeyman's license go?



A. No. I would say maybe -- I don't know, maybe nine or ten years ago.
Q. Do you remember what year you obtained your master's license?
A. No. Maybe around 2009 or 2010, maybe sooner. I don't remember.
Q. Okay. And what did you need to do to obtain the master's license?
A. Study, take the test.
Q. Is there --
A. I guess you had to have supervisor -- certain hours of supervisor and blueprint reading, which I had many years of at this time.
Q. Okay. So you need to take a test and also submit -- comply with a certain number of hours of experience as a supervisor?
A. Yes.
Q. And where did you gain the experience as a supervisor?
A. Just throughout the years of -- you know, like, we were just getting into E Light Electric at the Fort Carson Army Base. It started from there.
Q. Okay. That would have essentially been in your roles as a foreman?
A. Correct.



Q. What type of jobs did you handle when you worked for E Light Electric?
A. I was running about five or six jobs. It was -- I did a library, a couple schools. I can't remember. I was running quite -- you know, like I said, five or six jobs at a time.
Q. Any residences?
A. No. I didn't get into residential until about 20 years after I was into electrical. I did side work, but you can't really count that, I guess.
Q. Is there a big difference between a commercial versus residential electrician?
A. Complete different -- two different worlds.
Q. And how is that?
A. Because commercial is a different type of wiring and different types of application and installation. And residential is just the Romex and wood, plastic boxes.
Q. Are there different codes that are applicable to commercial?
A. Yes.
Q. When you obtained the training that we discussed earlier at -- I'm trying to find the names here -- ICG and Riviera, was there only commercial?

A. Yeah, it was pretty much all commercial. But now that I think about it, I did do some residential for ICG. We did some townhomes or something for about six months, a year.
**Q. Do you remember what those jobs required?**
A. On that one, it was just wiring some townhomes.
**Q. And when you say "wiring," can you just elaborate as to what you mean by that?**
A. Just installing Romex inside the walls of a building.
**Q. Is that the type of wiring?**
A. Yeah, Romex.
**Q. Are there any codes that are applicable to the installation of wiring?**
A. Yes.
**Q. And when you took the courses that ICG offered regarding code, was that residential code or commercial code?**
A. Both.
**Q. Is that the same for Riviera as well?**
A. Correct.
**Q. Okay. Is wiring considered installation or service work?**
A. Installation.


**Q. Okay. Did you obtain your master's license while you were employed by E Light Electric?**
A. No.
**Q. Who were you employed by when you obtained the master's license?**
A. Oh, I can't remember. I think I was employed by -- yeah, I don't remember who I was employed by.
**Q. Okay. What was the next electrical-related job that you had after E Light Electric?**
A. I worked for ADK Electric, I believe.
**Q. Where were they located?**
A. Englewood.
**Q. Do you remember when you worked for them for -- from?**
A. I worked for them through, like, 2001 to like -- no; like, 2002 to 2010 or something.
**Q. Okay. Is it fair to say that you were employed by them, then, from pretty much the time after you were employed by E Light Electric, up to around the time you got your master's license?**
A. Close to, yeah.
**Q. Okay. There were no other companies in between there?**
A. Not that I remember.


**Q. Okay. Just trying to go through each one. That's -- since you have been -- since there are a couple, I just want to try and reduce that time frame that way.**
A. Yeah.
**Q. What type of work did you do for AKA Electric?**
A. ADK.
**Q. ADK. Thank you.**
A. I was a foreman and just did commercial work.
**Q. You were responsible for supervising the electricians?**
A. Yup.
**Q. How many people did you supervise?**
A. Anywhere from 1 to 40 guys.
**Q. Did you do any electrical work yourself?**
A. At times, yeah. I like to build electrical rooms.
**Q. I'm sorry. You said you like to build?**
A. The electrical rooms.
**Q. Electrical rooms. Sorry. I just didn't hear what you said. And what do you mean by "build electrical rooms"?**
A. Install the switchgear and panels.


**Q. And can you just explain what that means?**
A. That means you -- you install the electrical panels on the -- inside the electrical room. I mean, I don't --
**Q. Is that like the outlets, the -- you know, the fuse boxes? I'm trying to figure out what you mean by "panels," is what I'm asking, essentially.**
A. Yeah. It's the breaker boxes, yeah.
**Q. Okay.**
A. Yeah.
**Q. So when you install a breaker box and you're doing the wiring, does that mean that you're also doing the wiring that runs from that breaker box to, I guess, any electrical system in the building?**
A. Sometimes, yeah.
**Q. Okay. What's the other possibility?**
A. Someone else do it.
**Q. Oh, okay. But you would still have to run the wiring?**
A. Oh, yes.
**Q. Okay. And does the installation of the breaker boxes require compliance with electrical code?**
A. Correct. Everything we do electrical requires electrical code, everything.
**Q. Did you perform any residential electrical**

Page 34

**jobs while you worked for ADK?**
A. I think so, but I can't remember what, because they did have a residential side. I can't remember.
**Q. When you were at ADK, did you ever provide any estimates to customers as to how much it might cost to upgrade to electrical code?**
A. No.
**Q. And after you left ADK, who were you employed by next?**
A. I believe it was ALL PRO Electric (sic).
**Q. Where are they located?**
A. Missouri.
**Q. Did you move to Missouri?**
A. No. They were doing work at DIA.
**Q. Oh, okay. Was this a contract job?**
A. No. I just -- I worked for them. I was an employee of theirs.
**Q. Did they have an office in Colorado?**
A. Kind of. I mean, they were based -- in the airport they had a little office room, but they pretty much managed everything through -- their office was in Missouri. The foreman of the job was kind of, like, their office.
**Q. Okay. And how did you find this job?**

Page 35

A. I can't remember; word of mouth, probably.
**Q. Were you employed by them solely with respect to the job at Denver International Airport?**
A. Yes.
**Q. Okay.**
A. Yeah, because I wanted to learn controls.
**Q. What are controls?**
A. It's all the local controls that make the -- all the conveyor systems work.
**Q. So that would be the systems that essentially have -- you know, let all the baggage things operate?**
A. Correct, and all the scanners.
**Q. Okay, yeah. And what kind of work did you do with respect to the controls?**
A. Just building -- oh, I did multiple things there. I built -- of course, I did electric room installs; I was a welder there for a little bit, welding on brackets -- or conduit runs. And then I was terminating all the controls in the 90 control panels and motor control panels.
**Q. What did the installation of the electrical room entail?**
A. Just installing breaker boxes.
**Q. Okay. It's just like a big room that they**

Page 36

**have that manages the electrical system for the airport?**
A. Yeah. There's many of them. I mean, it's just whatever area we worked in.
**Q. How long was that job?**
A. A couple years.
**Q. And what did you do after that job ended?**
A. I went to Alaska halfway through that job, and then I worked out there for a bit. And then I -- oh, then I went to Wyoming.
**Q. When you were in Alaska, did you perform any electrical work?**
A. Yes.
**Q. What type of electrical work did you perform up there?**
A. Industrial installations, which -- it was a gold mine refinery factory.
**Q. Okay. And why did you go to Alaska?**
A. Because the airport had a -- we were waiting for government funds to start the new project up, so we were out of work for about three months. And someone told me about a job in Alaska, and I went to Alaska to get the experience.
**Q. Did you perform any residential electrical work in Alaska?**

Page 37

A. I didn't even see one house when I was there. I was in the mountains in a gold mine.
**Q. Oh, that's pretty cool.**
A. Yeah, it was cold, very cold.
**Q. I can imagine.**
A. 30 below every day.
**Q. Man. Okay. How long were you in Alaska for?**
A. Three months.
**Q. And did you go to Wyoming directly from Alaska?**
A. No. I went back to the airport, because the funds came in. And then after we finished up the airport -- I'm trying to think of what exactly I did after the airport. I'm pretty sure I went to -- I mean, I got on with Greiner Electric. And then I think I worked at the Colorado School of Mines for a little bit on a project, and then -- and then I became foreman right away. And then I went to Alaska and ran a really large project at the University of Wyoming.
**Q. Okay. And who was the project in Alaska for?**
A. TIC.
**Q. Do you know what that abbreviation stands for?**

Page 38

A. The Industrial Company.
**Q. Thank you. Were they the company that was running the gold mine?**
A. Yeah, yup.
**Q. Okay. I'm going to jump -- before I get to Wyoming, just very briefly, could you tell me what you did when you were employed by Greiner Electric?**
A. I just -- I started with them, and I went on to a project at the Colorado School of Mines to help out one of the foreman. And I ended up -- I have a knack for taking over jobs. So I ended up going on the job, seeing things weren't running right, so I kind of started leading it my own way. And they noticed it within a week, and they said, "Hey, about how you go work for us?"
And I said, "Yeah, for sure." Then they offered me compensation to go to Alaska -- or go to Wyoming and start a new project there for them.
**Q. Okay. So the project in Wyoming was for Greiner.**
A. Yeah.
**Q. What type of job was the Colorado School of Mines project?**
A. It was a commercial job.
**Q. What was your involvement in it?**

Page 39

A. I just was doing install, running conduit or something.
**Q. Were you a foreman?**
A. No.
**Q. How long was that job?**
A. Oh, I was there for like maybe a week or two.
**Q. Okay. And what was the project in Wyoming?**
A. It was a -- I can't think of the name of it off the top of my head, but it was just an addition to the college.
**Q. Do you remember what type of work the job entailed?**
A. It was all commercial.
**Q. Installation?**
A. Yes. It was a ground-up building.
**Q. So that would have essentially required all -- essentially, installation of the new electrical system?**
A. Yes. And I was a superintendent to that job, so I wasn't -- I didn't work in the field.
**Q. What were your responsibilities as a superintendent?**
A. I designed the electrical system to get --

Page 40

have it built. I mean, you have an electrical engineer who designs the job, and you have the superintendent that designs the way things are going to be installed. So I designed, and then I managed five foremen, internally managed. I had, like, 50 guys there.
**Q. So this is essentially determining -- you know, let me rephrase that.**
**So, I guess, would your role have been to essentially instruct the foremen as to how to implement the plans for the system, to install the system?**
A. Yup.
**Q. Okay. How long was this job?**
A. A couple years.
**Q. Did you move to Wyoming for the job, or were you handling it from Denver?**
A. I stayed there, Monday -- let's see -- Monday through Thursday.
**Q. Okay. And after that job was completed, what did you do next as an electrician?**
A. I started my own company.
**Q. Okay. And that company is Promise Electric, LLC?**
A. Correct.
**Q. What year did you start Promise?**
A. 2011.

Page 41

**Q. I'm sorry. Actually, just to jump back real quick, prior to starting Promise, were there any other jobs where you gained residential electric experience?**
A. Just through my schooling. I mean, at that point, I mean, I've already been in the trade 20 years, so I probably had a couple years of residential experience, for sure.
**Q. That just would have been jobs throughout the years?**
A. Yeah. It takes two years to become a residential licensed wireman.
**Q. Do you have that license?**
A. No. There's no need for it. Once you become a journeyman, it over -- it bypasses that.
**Q. Okay. That's what I was going to ask. Does the master's license or the journeyman's license supersede that license?**
A. Yes.
**Q. And when you first formed Promise Electric, did you have any employees?**
A. I did.
**Q. How many?**
A. One.
**Q. At the time you were involved in**

Page 42

Mr. Diem's claim, how many employees did Promise have?
A. I don't remember.
Q. Do you remember how many employees Promise had in July of 2020?
A. I don't remember.
Q. Is there anyone from Promise that would have performed work or services with respect to Mr. Diem's claim, besides yourself?
A. It's -- I don't remember. I could have been the one installing.
Q. Okay. And when you formed Promise Electric in 2011, what was the purpose of the business? Was it to perform residential, commercial jobs, or both?
A. Both.
Q. How much of Promise's business would you say is derived from residential electric work?
A. 97 percent residential.
Q. And the remainder is commercial?
A. Yeah. We do little, little commercial work.
Q. How many employees do you have right now?
A. Seven.
Q. Are they all electricians?
A. No.

Page 43

Q. How many of them are electricians?
A. Six.
Q. And the -- what's the one other person?
A. Office manager.
Q. Were any of the six -- let me rephrase.
Are any of the six electricians that you currently employ employed by you in July of 2020?
A. Maybe a couple of them.
Q. Who would have been employed by you back then?
A. Anthony Kelley and Danny Guerra; kind of, I guess. He was still in school.
Q. Are all their last names Guerra?
A. No, no. I was sitting here kind of thinking back with Danny. He probably wouldn't have been, because he was still in high school, I think.
Q. Is Danny your son?
A. Yeah.
Q. What's Anthony's full name?
A. Anthony Kelley. I forgot his middle name.
Q. Oh, his full name is Anthony Kelley?
A. Yes.
Q. I apologize. I thought you said Anthony Kelley is two separate people?
A. Oh, no. Anthony Kelley.

Page 44

Q. Okay. Sorry about that. And do you recall if Mr. Kelley had any involvement with Mr. Diem's claim?
A. No, he didn't. I just went there one day, and that was it.
Q. And, I guess, you know, that's a good segue. Have you -- before that, actually -- give me one second -- do you recall meeting the plaintiff in this lawsuit, Jeff Diem?
A. I think that's the name of the guy that I talked to.
Q. Do you recall how you came into contact with him?
A. How I met him?
Q. Yeah.
A. Through one of the superintendents on a job that I was working for.
Q. Did that person refer Mr. Diem to you?
A. Yup. They were -- they were, I don't know, good friends or something.
Q. Who was that superintendent?
A. Mario Mendoza.
Q. What company is he affiliated with?
A. I don't know anymore. He was working for Lex Builders at the time.

Page 45

Q. Do you know if he was involved with a company named Singletrack Electric?
A. I have no idea.
Q. Are you familiar with that company?
A. No.
Q. Did you call Mr. Diem, or did he call you?
A. He had to have -- well, I don't remember.
Q. Okay. And the first time you spoke to Mr. Diem, what did you talk about?
A. Just giving him a price on electrical work.
Q. Did he ask you for a quote?
A. Yeah.
Q. Do you remember when you first spoke with him?
A. No.
Q. Did you agree to provide him with a quote?
A. Yeah.
Q. Did you ever visit Mr. Diem's property in person?
A. You're talking about the property that I gave the quote to?
Q. Yes.
A. Yeah. I walked the job.
Q. How long after you spoke with Mr. Diem did

you visit the property?
A. That's where I spoke to him, there.
Q. Oh, okay. Well, I guess, prior to that, though, did he ever reach out to you and inquire about your availability for the job? Was there an initial conversation that got you to his house?
A. I don't remember. I'm assuming -- just assuming that it was a text of, "Hey, can you meet me at this address," and that's where we met.
Q. Did you know Mr. Diem prior to this lawsuit?
A. No.
Q. Okay. How many times have you visited Mr. Diem's property?
A. That one time.
Q. Who else was present at the property when you visited it?
A. Just me and him -- oh, wait a second. There might have been another contractor there, that one that was supposed to do an estimate, I think, yeah.
Q. Do you remember who that contractor was?
A. No, no.
Q. Do you remember what type of --
A. I don't remember. A plumber, or an HVAC guy, or something. I don't know. All I know is there



was another guy waiting there with a notepad to give an estimate after me.
Q. Did you speak to the other contractor at all?
A. No, that I remember. I might have, I guess.
Q. And what did you do at Mr. Diem's property?
A. Just walked around, took measurements, looked at everything, and left. I wasn't there long.
Q. How long were you there for?
A. An estimate usually takes -- a walk-through usually takes around -- no more than 30 minutes.
Q. Did Mr. Diem ask you to do anything during your walk-through?
A. Not that I remember.
Q. And what did you observe during your walk-through -- sorry. Let me rephrase that.
What did you observe regarding the house's electrical system during your walk-through?
A. That -- damn. You've got to understand. I have to try and really think about it, because I do hundreds.
Q. Understood.



A. I can't really remember any of the upstairs at all. The only thing I really remember is the basement living -- family -- living room that needed -- that had, like, brick walls. I remember explaining to him that it would have to be surface mount. And then there was a bathroom down there that was framed in. And then I do remember the electrical panels were in the stairwell.
And usually -- I mean, knowing me, whenever I run into a job like that, I don't usually like to tap into any of the existing wiring, so I would usually bid it out as a full rewire; so that way I know everything is properly done.
Q. Why don't you like to tap into existing wiring?
A. I just don't want the responsibility of somebody else's work on my hands.
Q. Can it be done?
A. Oh, yeah. People do it all the time, and you can do it legally.
Q. And can you repair the existing wiring and still comply with the code?
A. Yup.
Q. Did Mr. Diem ever explain to you how -- did Mr. Diem ever explain to you what caused -- let me



rephrase that.
Did Mr. Diem ever tell you about an incident involving a cracked pipe in his house?
A. No.
Q. So when you performed the inspection, Mr. Diem did not inform you that he had suffered a loss due to a cracked drain-waste-vent pipe in his basement?
A. No. From my understanding, he just -- from my understanding, he was just remodeling the basement or something -- or a bathroom and the living room or something.
Q. Did you ever discuss any code upgrades with Mr. Diem?
A. I can't remember what our conversation was at all.
Q. Do you remember if Mr. Diem ever told you that he thought the electrical system needed to be upgraded to comply with code?
A. I don't remember.
Q. Did Mr. Diem ever tell you that he had obtained a bid from another electrician prior to you?
A. No.
Q. Did he ever show you any bids or estimates obtained from other electricians?
A. No.

**Q. And based on your observations of Mr. Diem's property, what electrical repairs did you think needed to be made?**

A. I can't really remember. I'd have to read my estimate to see what I wrote down at the time.

MR. DENBY: Okay. In that case, let's -- I was about to show you that. So I'm now going to be introducing what has been premarked (sic) as Exhibit 28 from plaintiff's deposition. I'm dropping the document into the chat box. You should see a PDF pop up on your screen that you can open. If that doesn't work, I can open it up on my end and share my screen. Were you able to see the document?

THE DEPONENT: No.

MR. DENBY: I think where you see "Chat," if you hit that little box underneath the video screen, at the very bottom there should be a line that says, "Participant," "Chat," "Share Screen." If you hit the chat button, a box should pop up on the right side of your screen and you should see the PDF there.

THE DEPONENT: I see -- I see a panel to the right where a PDF is.

MR. DENBY: Yup, That's it.

THE DEPONENT: Hold on one second.

MR. DENBY: Sure.



THE REPORTER: Do you want me to go off the record for a minute?

MR. DENBY: Yeah, let's go off the record. Thank you.

(Pause in the proceedings.)

MR. DENBY: Back on the record, please.

**Q. (BY MR. DENBY) So I'm showing you what has been previously marked as Exhibit 28 from plaintiff's deposition. This is a six-page document that consists of an estimate; six-page document. Do you recognize this document?**

A. Yeah. It looks like all of my estimates back in that time.

**Q. Okay.**

A. It looks familiar to, like, all of them.

**Q. Is this something that you prepared?**

A. Oh, yeah. It looks like something I did.

**Q. And would that have been based on your observation of Mr. Diem's property on the date that we're talking about?**

A. Yup.

**Q. Okay. So if I could just briefly go through this estimate with you. Do you remember about how long after you observed the property that you prepared this estimate?**



A. I don't remember that stuff.

**Q. In the course of your business, how long would you typically prepare an estimate, after observing a property?**

A. It all varies. It matters on the importance of the estimate at the time, really. I mean, on this one here, if he told me at the time that he needed to be done by a certain date, then a lot of times it will happen closer to the date that it needs to be done by. If they need it right away, I'll do it right that night. But I don't remember at all.

**Q. Okay. And I guess --**

A. This is a fairly long one, so I spent a little bit of time on this, for sure. They're usually not this long anymore. This is a full detail.

**Q. Okay. And I'd like to just briefly go through it. But before I do so, I just want to clarify. So Mr. Diem did not give you any information about what -- Mr. Diem did not provide you any information indicating that his property had suffered a loss due to a crack in a drain-waste-vent pipe?**

A. No. I never heard nothing like that.

**Q. If I could -- take a look at your estimate now. You start off on -- I'm looking at page 1 of it. The second line says, "Complete rewire of house which will include." Why did you determine that a complete rewire of the house was necessary?**



A. Probably because it had old wiring, and I didn't want to have nothing to do with the old wiring. And if I was to do the work for him, I would go in there and rewire the entire house.

**Q. Okay. Is that -- that's similar to what you just testified earlier, then, though? You could still repair that wiring?**

A. Well, it's not a matter of repairing, because there really probably -- I mean, there may have been nothing needed to be repaired. This is just stuff that apparently he wanted in the house. So this is the stuff that would have been installed. It would have been installed. So when if we were to install this stuff and use the existing wiring, it's not really a repair. It's just, like, adding.

**Q. So it's more of an upgrade?**

A. Yeah, it's an upgrade.

**Q. In your opinion, would any of the work detailed on page 1 of this estimate be required due to a crack in a drain-waste-vent pipe that runs to the basement?**

MR. QUISENBERRY: Object to form. You can answer.

Page 54

A. A crack in a waste pipe, like a --
**Q. (BY MR. DENBY) Yeah. So if there was a crack in a drain-waste-vent pipe that caused an incident, would you say that this work on the first page here was necessary because of that?**
A. I don't think any electrical work is based on having anything to do with a cracked waste pipe. In all my years of experience, it has nothing to do with that. It's not even in the same chase or anything.
**Q. So is it fair to say that a lot of the electrical issues that are documented with -- is it fair to say that the electrical work that is documented on here was necessary to upgrade the house -- to upgrade pre-existing issues with the house's electrical system?**
A. Yeah, just to bring it up to the convenience of a new buyer, or a new tenant, or whatever the case may be; to have more lighting or to have, you know, here is this multi- -- so, life safety, smoke detectors; switches may just be old, so replacing switching. Just making it look nice and new again.
**Q. Okay. And there's a couple notations about drywall needing to be removed. Do you recall why that was necessary?**
A. I put that in all mine, because

Page 55

sometimes -- especially in a house like this -- we have to cut walls open in order to put wiring in. And I don't replace any kind of drywall repair.
**Q. Were the walls in the house cut open when you opened the property?**
A. I don't remember. I don't remember the upstairs at all; just, the basement was framed, the bathroom was framed. I do remember the basement.
**Q. Was there exposed wiring?**
A. Yeah, in the mechanical room, which is common on all houses.
**Q. In your opinion, were you able to ascertain about how old the house's electrical systems were?**
A. Yeah, I'm sure I did. I always ask that question. I just don't remember what the answer would have been.
**Q. Based on the description of the work noted on page 1 of your estimate, would it be fair to say that the house had an older electrical system?**
A. Yes.
**Q. And do you have any knowledge if this house was ever converted from a single-family residence into a duplex?**
A. Oh, let me think about this. If I was to

Page 56

think -- hard to say. It looked like a duplex, because we entered through the door on the bottom -- oh, no. We entered -- we entered and it had a stairway going down into a door, which is usually very uncommon for a residential single-family house. Usually, you have a front door and then your stairway going into the basement was inside the house, but this stairway was built right there on the front of the street, going down.
**Q. Based on the electrical issues that you observed, is it possible that they existed as a result of a change in occupancy from a single-family residence to a duplex?**
A. Well, I guess at the time when I looked at the house, it didn't look like it was a duplex at all. I mean, so, like I just said, when you walk up to the house, it looked like a duplex because of the stairwells going down. But once you got into the house, it looked like just a single-family home; because when you walked in that door, it was just one big room with a bedroom in the back and the bathroom, but there was no kitchen, that I remember.
**Q. Okay. I guess I'll phrase it -- I'll ask it another way. Based on the -- were the electrical systems that you observed appropriate for a duplex?**

Page 57

A. I can't remember.
**Q. Okay.**
A. I do remember that the electrical panel was in a stairwell, which was a -- like, way against code.
**Q. Okay. Why is that against code?**
A. If they're in the stairwell, can't reach them. You literally could hardly reach the panels, because it was in the stairwell, from what I remember. I'm sure if that's the case, I wrote it in here somewhere.
**Q. And the issue with the panel in the stairwell, that wouldn't be related to a crack in the drain-waste-vent pipe, correct?**
A. No, no, it's not even near it.
**Q. Okay. And did you ever perform any of the work detailed on this -- in this estimate?**
A. You mean, on the house?
**Q. Yeah.**
A. No. I never went back after I walked it the first time.
**Q. Do you know why?**
A. Because I didn't never hear back to get the job. If he would have said, "Come back and do the job," then I would have been back and done the job.

Q. Do you know if the work was ever completed?
A. I have no idea. Usually, I send out estimates, and if I don't hear from them, I don't hear from them. I'll follow up, maybe, but sometimes I won't. A job like this, I usually won't follow up on.
Q. And why is that?
A. Because it's something that I don't want to do. It's a mess. It's just a mess. It's really not worth my time. I do big, new custom homes, and we like to stick to those.
MR. DENBY: Okay. I apologize, everyone. Just give me one second. There's some landscapers that started working outside. I just want to close my window here in hopes that that will reduce the noise. Sorry about that. Hopefully, this is a little better.
Q. (BY MR. DENBY) I'm now going to go to page 2, just briefly going through this. What do you mean by, "Saw cut exterior walls to make counter receptacle flush mounted?
A. If a builder decides that they don't want to frame in a wall, well, we have to get power in that wall, so we have to cut the brick or -- it's usually brick. It's never -- we don't cut no foundations. So if it was a foundation, they would have to frame it.



So apparently on this one there was no foundation. But you'd have to cut the power in the wall.
Q. Okay. Is that essentially -- when you say, ". . . make counter receptacle flush mounted," is that, essentially, to help install -- to help with the installation of a kitchen appliance?
A. Well, not appliance; but, like, your countertop receptacles in your kitchen, if you don't make them flush mount, well, then you have J boxes sticking out of the walls.
Q. So is that the receptacle for, you know, the drain -- for the drain?
A. No. It's the receptacles for the countertop; you know how, like, you plug your coffeemaker in and stuff like that.
Q. Gotcha. So that wouldn't have any relation to a crack in a drain-waste-vent pipe, correct?
A. Yeah -- no, it won't.
Q. Okay. And just at the bottom, the third line from the bottom, what do you mean with respect to the mechanical room by, "Tie in all mechanical equipment"?
A. That means, like, if they put a new furnace in, then I put the power into the furnace.



Q. Okay. Was there any equipment that needed to be tied in, that you observed?
A. I don't remember.
Q. Okay.
A. Everything was on. I don't know.
Q. Similar, I'm now looking at where it says, "MAIN FLOOR," on page 3. On this one, I know you testified that you put the drywall on your estimates. I just note for this one, it says, "done by others." Is that typically -- would the drywall typically be done by others, or is there a reason --
A. Yeah. Typically, what I would do is I would mark out everywhere that needs to be removed. And it's up to the contractor or the -- or the owner to have it open by the time I get there; so that way we can just run our wires in it.
Q. For this particular estimate, was there any particular reason why you phrased this part of the drywall work differently than the drywall work on the first two pages?
A. It's possibly because -- I'm just assuming -- is because there was no -- there was no damage at all to any of the upstairs main floor. So I wanted to make sure that if it wasn't drywall, it might have been lath and plaster. And if it's lath and



plaster, then it's a whole different animal.
Q. Why is that?
A. Because it breaks, it's brittle. And you can't really cut open just a section, because it's so fragile it just falls apart.
Q. Okay. And when you observed the main floor -- do you recall when you observed the main floor if there were -- any of the drywall walls were cut open?
A. I don't even remember the main floor.
Q. And then, again, just looking at this estimate for the main floor here, would any of this work have anything to do with the crack in the drain-waste-vent pipe?
A. No. No electrical has anything to do with the waste drainpipe.
Q. Okay. And that would be the same, then, on page 4 here? None of this work that's detailed has anything to do with respect to the crack in the drain-waste-vent pipe?
A. No.
Q. Would any of this work have been required by code?
A. Oh, yeah. All of this work would be required.

**Q. That code wouldn't have anything to do with the crack in the drain-waste-vent pipe, correct?**
A. Correct.
MR. QUISENBERRY: Object to form. You can answer.
A. Correct.
**Q. (BY MR. DENBY) I'm just also going to note here, about two-thirds of the way down, your reference with respect to the exterior. Did Mr. Diem ask you to examine the electrical systems on the exterior of the property as well?**
A. Well, when I did the interior, the exterior -- everything -- it's everything from the power company through the entire house.
**Q. Okay.**
A. I look at it all. So -- because you can't upgrade anything unless the existing power is sufficient to be able to supply the power requirements. So in this case, it says two new service meters, which is telling me it's a duplex; because, I mean, you have two meters now, which is two different services. So I don't know if it had two there, or if I was going from one to two, or what.
**Q. If it only had one at the time, but the house was a duplex, would that be a code violation?**


A. I don't know about that. I don't know. I don't know how building codes are. But as for electrical, I don't think so, because we do new houses to where we have one service, and they have ADUs or they have rentals on part of the house --
**Q. So you could have -- I'm sorry.**
A. -- and then an ADU -- you know, an assisted dwelling unit -- above the garage. We have one service that feeds the entire house, including the ADU, and it's one meter.
**Q. Okay. So it's possible?**
A. So it's possible, yeah.
**Q. If you only had one service meter in place and you wanted to upgrade to two, would that be something that's driven by code?**
A. Well, it would have to -- you would have to -- the builder or the owner would have to submit a new address.
**Q. And what work would be necessary to upgrade the property so that the electrical systems would be run onto two meters instead of one?**
A. Just installing another meter can and a new riser and another panel.
**Q. I guess I'm trying to figure out, like, how the meter can now pick up an electric output by one**


**versus the other. Do you have rewire -- would you have to rewire the electricity from, say, the main floor to that service meter so it can now track how much is being spent?**
A. Correct. I would have to separate it, for sure.
**Q. Okay. And would that rewiring work be some of the work that's detailed on the prior pages of your estimate?**
A. Yes.
**Q. Okay. And would any of that work have anything to do with a crack in a drain-waste-vent pipe?**
A. No.
**Q. And if those upgrades were required by code, would those upgrades be affected by a crack in a drain-waste-vent pipe?**
A. Say that again.
**Q. If those upgrades were necessary due to code issues, that would have nothing to do with the crack in the drain-waste-vent pipe?**
A. Correct.
**Q. Okay. And I'm just going to note here, "Start up payment," you note $10,000 and no cents. As you testified earlier, you have not been paid any money for this job, correct?**


A. Correct.
**Q. Okay. And then, finally, I'm going to just the bottom on page 5 here. "Every place drywall needs to be removed is for correct strapping of wire." Could you just tell me what you mean by that?**
A. Oh, that way -- that way, you know, wherever the drywall is removed, we have to have it all out so we can staple our wires to the studs. It's a strapping of the wiring.
**Q. So that's just essentially like restating that the drywall needs to be done to do that?**
A. Yeah.
**Q. And why was it necessary to remove the insulation from the attic?**
A. Because -- I mean, it's not necessary. It's just a requirement for me, because I don't want myself or the guys inhaling any of that insulation. Even though you have masks on, sometimes the particles get -- you can feel it when you're in an attic. I don't know if there was -- how dangerous it is.
**Q. And do you think that the amount of this estimate, $23,000, accurately reflects the price to do the electrical upgrades to the property?**
A. Back then; not now.
**Q. Is that a result of COVID and inflation?**

A. That's for sure. I wouldn't even touch that house right now.
**Q. Why not?**
A. Just because I don't do that kind of work anymore.
**Q. Okay. If you had to estimate --**
A. They're too much of a pain in the butt.
**Q. Gotcha. How much do you think the cost to perform the job would have increased to today?**
A. I don't know. Probably -- I'm wondering what the square footage was.
**Q. If it's possible for you to give an accurate answer right now. If that's not something you can do --**
A. I wouldn't know. I'd guess maybe around 30; over 30, for sure.
**Q. Okay. Thank you. And when you visited the property that one time -- I think you said this, I apologize -- you went by yourself?**
A. Yes.
**Q. And you've never returned to Mr. Diem's property since that date?**
A. Correct.
**Q. Have you -- and you haven't spoken to Mr. Diem again since that date?**



A. Not that I remember.
**Q. Do you remember ever having a discussion with Mr. Diem about any -- about code?**
A. Not that I remember. I mean, I do mention to everybody that everything we install is per code. I make sure that's clear to everybody.
**Q. And did Mr. Diem ever say anything about -- did Mr. Diem ever talk to you about his discussions with Travelers about this claim?**
A. What's Travelers?
**Q. Travelers is the insurance company, Mr. Diem's insurance company.**
A. Oh, no, no.
**Q. Okay. I'm going to briefly, just very quickly, show you what has been marked as -- this is Exhibit 39.**
MR. DENBY: I'm going to drop it into the box here. It's still uploading on my end. It says it went through. So if everyone could let me know if they have any issues.
THE DEPONENT: All right.
**Q. (BY MR. DENBY) Okay. So this is what has been previously marked as Exhibit 39 from plaintiff's deposition. This is an estimate that Mr. Diem has prepared. Have you ever seen this document?**



A. So you're not looking at the other estimate for mine?
**Q. No. I'm now jumping to Exhibit 39. This is an estimate that Mr. Diem prepared.**
A. I didn't open that one. I thought you were going to my estimate. I'm sorry.
**Q. No. It's okay.**
THE DEPONENT: Let me get Paul back in here, because I don't really know how to operate all this stuff that well. Hold on one second.
MR. DENBY: No problem.
(At this time the deponent left the room and then returned.)
MR. DENBY: Off the record.
(Pause in the proceedings.)
MR. DENBY: Back on the record, please.
**Q. (BY MR. DENBY) I'm showing you what has been marked as Exhibit 39 from plaintiff's deposition. This is an estimate that Mr. Diem prepared. Have you ever seen this document?**
A. No.
**Q. Okay. I'd like to just briefly draw your attention to page 2. If you could look down to the line item 7.**
A. Okay.



**Q. You see that's your electrical bid reflected on there?**
A. Okay.
**Q. He says that the electrical must be brought up to code. Do you know why he would say that?**
A. Maybe he wanted it up to code. I have no idea why he did that.
**Q. The electrical work that was the subject of your estimate, would any of those code upgrades have anything to do with the cracked drain-waste-vent pipe?**
A. No.
**Q. And if you look at the replacement cost, $23,000 accurately reflects the amount of your estimate, correct?**
A. Yup.
**Q. Do you know why he would include an additional $4,830 for overhead and profit?**
A. I have no idea.
**Q. Would your estimate have included any overhead and profit that you would have incurred on the job?**
A. My estimate is the 23,000 only.
**Q. So that would have been your final price, and any profit you would have made would have been included in that price?**

A. Correct.
Q. Okay. Thank you. Well, I guess, lastly, do you have any -- do you think that amount of overhead and profit is reasonable for the work that's listed in your estimate?
A. Yeah. I mean, I don't know why it's on top of that; but, yeah.
Q. But you would also agree that, as you stated, the estimate you prepared factored in profit in the $23,000?
A. Correct.
Q. Okay. Thank you. Next, I'm going to now show you -- I just want to see if I have this premarked already. I apologize. I don't believe this has been marked already, so we're going to -- so I'm dropping another thing into the box right now. That one went through already.
THE REPORTER: Is this going to be Exhibit 53?
MR. DENBY: I believe so. I'm trying to look through my notes from last Wednesday to see.
THE REPORTER: It will be 53, unless you have had a deposition since Mr. Napolitan's.
MR. DENBY: No. Thank you.
THE REPORTER: Okay. It's 53.



(Deposition Exhibit 53, remotely introduced and provided electronically to the court reporter.)
Q. (BY MR. DENBY) And are you able to view the document?
A. Yup.
Q. Okay. Have you ever seen this document before?
A. No.
Q. And I think you testified earlier you have not heard of Singletrack Electric before?
A. No, I've never heard of them.
Q. If you could just take a quick look at this estimate. This was an estimate that was originally provided to Mr. Diem with respect to the property.
A. Okay.
Q. If you would just look at the -- I guess the five single lines regarding the work that's on the quote.
A. Okay.
Q. It says, "Demo and refeed of existing circuitry damaged due to flooding." Do you have any knowledge of any damaged circuitry due to flooding?
A. No.



Q. Did any of the circuitry that you observed at the property appear damaged due to flooding?
A. No.
Q. Okay. This second one says, "New dedicated circuit locations for bathroom and kitchen countertops per NEC." The NEC is the code that you referenced previously, correct?
A. Correct.
Q. And that's the National Electric Code?
A. Correct.
Q. Would new circuit locations in the bathroom and kitchen countertops have been necessary due to a crack in a drain-waste-vent pipe?
A. No.
Q. Just jumping to the next line, "New Arc-fault circuit per NEC," do you know what a "New Arc-fault circuit" is?
A. Yeah. It's just a circuit -- like, let's just say your refrigerator, that's one circuit. It doesn't share nothing else. It's a circuit. So you put an arc fault breaker, is what you would put on it. It looks like they're only going to add one new arc fault breaker.
Q. Based on your observations of the property, do you have any indication as to where in the



house that may have been necessary?
A. I have no -- well, no; I mean, any of the circuits.
Q. Okay.
A. I don't know what one he would be referring to.
Q. Based on your observations of the property, were any new arc fault circuits required -- Sorry. Let me rephrase that.
Based on your observations of the property, do you think that any new arc fault circuits would have been required as a result of a cracked drain-waste-vent pipe?
A. No. The only time you need the arc fault circuit requirement is if you add -- like if you extend a circuit more than 5 feet or you add a new circuit, then you have to put in an arc fault.
Q. And lastly, "Reinstallation of existing light fixtures, GFI receptacles, and range circuit," would that have anything to do with a crack in a drain-waste-vent pipe?
A. No.
Q. Okay. Thank you. I'm now going to show you what has -- let me drop it in, actually. I apologize. I'm getting ahead of myself. This one is a

little bigger, so it's taking some time to go through. Okay. It should have gone through. Please let me know when you've had a chance to take a look at the document. It's a long document, so once you have it open, I'll just first ask you if you've ever seen it before?

A. No.

Q. Okay. So the first question, I'm just going to ask -- this is a letter that was sent to Travelers by the plaintiff's public adjuster providing documentation in support of the claim. I'd first like to draw your attention to the picture on page 4.

A. Okay.

Q. So that top picture that says, "All Electrical Must be Brought up to Code," do you know what that picture shows?

A. Yeah. That picture shows -- it is an existing panel that turned into a J box, a splice box.

Q. So someone would have had to do -- would someone have had to do previous work to turn it into a J box?

A. Correct.

Q. Is there any way to tell when that work may have been done?

A. No.



Q. Do you recall seeing the panel in that condition when you were at the property?

A. I don't remember it, but I'm sure I seen it.

Q. And what work would be necessary to this electrical panel to bring it up to code, in your opinion?

A. I believe that's the stairwell I was talking about, but maybe not.

Q. Is that because of the height issue?

A. Yeah.

Q. If it was this panel box in the stairwell and the code upgrade was due to the height issue, would that have anything to do with respect to a crack in a drain-waste-vent pipe, in your opinion?

A. No.

Q. Okay. I'm now going to draw your attention to -- this is page 9 of the PDF.

A. Okay.

Q. This is just the same. I'm looking at line item 8. That line item refers to your estimate, correct?

A. It looks like it.

Q. Do you have any opinion as to why the overhead and profit on this estimate would be $7,417.50



versus the $4,000 that was on the estimate prepared by Mr. Diem?

A. I have no idea.

Q. Is there any -- in your opinion, is there anything that could justify the difference in overhead and profit?

A. No.

Q. Okay. That's it for that exhibit. I'm now going to show you -- so this is going to be Exhibit 54.

(Deposition Exhibit 54, remotely introduced and provided electronically to the court reporter.)

Q. So Exhibit 54 is a 68-page document. This is a final demand letter that was sent by Bellator Claims to Travelers. Have you ever seen this document before?

A. No.

Q. Okay. I'd like to just particularly ask you if you could jump to page 3, please, the bottom of page 3.

A. Okay. I'm there.

Q. At the section denoted "ELECTRICAL," there are two sections of code cited on this page, there's one section on the next page. If you could just



briefly review those code sections, please.

A. (Deponent examined document.) Okay.

Q. And are you familiar with those code sections?

A. Not -- not, like, going into them.

Q. Okay. Just --

A. I mean -- let me see. Yeah, I'm familiar with them, I guess.

Q. In your opinion, is there any reason that the first code section, E3401.4, would be applicable to the electrical upgrades claimed in your estimate?

A. Yes.

Q. What reason would that be?

A. Just because, like, the bathroom, it needed to be -- it was new framing, so it had to be back up to code. As for the rest of the house, if it's -- if it's not messed with at all, you don't have to bring nothing up to code. It's grandfathered in to the original. As for working spaces and clearance, once you start doing any work inside a panel at all -- like, say, for instance, the bathroom I just mentioned -- and you have to run a circuit to that panel, well, then, yes, you have to remove the panel and put it to where you have your 3-foot-by-30-inch clearance.

Page 78

Q. Would any of those upgrades have been necessary or required due to a crack in a drain-waste-vent pipe?
A. No.
Q. Okay. Looking at the next code section, E3405.1, do you have any opinion as to why that code section may be applicable to this electrical updates claimed in your estimate?
A. Yeah; probably because of the location that it's at.
Q. Would this be the type of code section applicable to, say, the panel box?
A. Correct.
Q. And the panel box had nothing to do with the crack in the drain-waste-vent location --
A. No.
Q. -- pipe, rather? Okay. And then, finally, if we could just go to the next page. Looking at the E3403.2, are you familiar with that code?
A. Correct, yes.
Q. What does that code require?
A. Just for it to be inspected by inspectors, by a city inspector.
Q. And would that have been required for the type of work detailed in your estimate?

Page 79

A. Yes.
Q. How come?
A. Because I pull a permit through the City of Denver, so then I have to -- in order for me to go from one step to another step, they have to inspect and sign off on an inspection form.
Q. Okay. So that code section would be triggered by the application for a permit to do the work?
A. Correct.
Q. Did you apply for any permits with respect to the work that was detailed in your estimate?
A. No.
Q. Do you know if anyone else ever applied for any estimate plumbing -- sorry -- any electrical permits with respect to the work detailed in your estimate?
A. Not that I know of. I never heard nothing.
Q. If no permits were ever applied for or issued, would any inspection be required?
A. Well, no work should be done. You can't do the work until the permit is pulled. So if you do any work before that, then you're going against the code and just that in itself.

Page 80

Q. And would a permit for the type of -- would the permit for this electrical work have anything to do with a crack in the drain-waste-vent pipe?
A. No.
Q. And any of the code upgrades that would have been required by this permit wouldn't have anything to do with the crack in the drain-waste-vent pipe?
A. No.
Q. Have you ever seen any documents from anyone -- any building inspectors or anyone employed by the City stating that these code upgrades were required for Mr. Diem's property?
A. No.
Q. Are you aware of any code enforcement actions against Mr. Diem's property with respect to the electrical systems?
A. No.
Q. Did anyone ever tell you that the City was forcing Mr. Diem to require -- to update his electrical systems in compliance with the code?
A. No.
Q. Have you ever spoken with someone named Frank Gonzalez at the City Building Department?
A. No.

Page 81

Q. Have you ever spoken with anyone else at the City Building Department regarding the electrical work that's the subject of your estimate?
A. No.
Q. What is your opinion as to why the electrical systems in the house needed to be upgraded due to code?
A. Just because it's old. I mean, if you're going to go do it -- you know, everything he wanted to do, in my opinion, with the extent of work my estimate shows, it doesn't seem quality to use the existing wiring for the age of it.
Q. Okay. So is it fair to say that none of these upgrades would be required due to the crack in the drain-waste-vent pipe?
A. That's correct. It's all a matter of a want, not a need.
MR. DENBY: Okay. I guess, you want to take a five-minute break? Because I'm just going to take a quick look to see what else I might need to go through, but I think we're pretty much getting kind of to the end of anything that I may have. So if I could just kind of recap and make sure I haven't missed anything. Obviously, Drew, then if you want to take over, but --

MR. QUISENBERRY: Yes. Off the record. A quick break is good.
MR. DENBY: Yeah, sorry. I forgot to take us off the record.
(Recess, 11:25 a.m. to 11:32 a.m. MDT.)
MR. DENBY: If we could go back on the record, please.
**Q. (BY MR. DENBY) I'm now going to show you -- this will be Exhibit 55 here.**
(Deposition Exhibit 55, remotely introduced and provided electronically to the court reporter.)
**Q. Okay. So Exhibit 55 is a 15-page PDF. This is consisting of a subpoena response that was received from Singletrack Electric to a subpoena that our office issued and the corresponding disclosure that we made in this lawsuit, which is Bates-labeled as Singletrack_-2 through -16. I'd first just like to draw your attention to page 4 of the PDF, please.**
A. Okay. I'm there.
**Q. Okay. If you'd just take a look at the description of this invoice.**
A. Okay.
**Q. The first thing is that this -- Singletrack notes that it, "Found multiple issues with**


**wiring in both panels (criss-crossed wires)." Do you know what they would be referring to by that?**
A. No. I wasn't in the panel.
**Q. Okay. The next line says, "All illegal and exposed wiring in basement." Did you observe any illegal and exposed wiring in the basement?**
A. I seen exposed, but I really didn't even look into the -- I didn't look at how everything was wired.
**Q. How come?**
A. Just because I was already -- I wasn't bidding it for that. I was bidding it for just running my own new wire. It wasn't -- you know, the way -- when everything -- any existing wiring, I wasn't there for that. I was there just to measure the house and give a price of new stuff.
**Q. Would that existing wiring have been factored into your estimate where you stated that full rewiring of the house was required?**
A. Yeah. I would have removed any -- any existing wire and put the new wire in.
**Q. Okay. Do you recall seeing any illegal wiring in the basement?**
A. No.
**Q. Do you recall seeing any illegal wiring**


**anywhere else in the house?**
A. No.
**Q. Do you recall seeing any exposed wiring anywhere, other than the basement?**
A. No.
**Q. Okay. Now, just jump to page 6 of the PDF. This is an email to the plaintiff from Singletrack Electric. If you'd just take a moment to read that, first.**
A. (Deponent examined document.) Okay.
**Q. Okay. Well, you know what? Actually, have a full look at it before I ask you a few questions. You might want to take a look at just the pictures first, because the question I'm going to ask you is about the language in that email, but the language also relates to the pictures. So if you want to just briefly scroll through those before -- and obviously, you're welcome to look at them as I ask the question as well.**
A. Okay.
**Q. So my first question is going to be, which of the pictures of those -- do any of those photos show illegal meters with no bypass?**
A. Well, it shows two meters there. I wouldn't say it's illegal, because at the time of that


installation, it was legal. Xcel Energy didn't come up with their code to put a meter bypass until later -- way later than this was built.
**Q. Do you know when they put that code into place?**
A. I don't know.
**Q. And are you looking at --**
A. If I was to guess, it would be -- I think we'd been doing it for around ten years or something.
**Q. Okay. And which photograph are you looking at?**
A. I'm looking at page 10.
**Q. Is that the one Bates-labeled as Singletrack_000011 in the right-hand corner?**
A. Correct.
**Q. Okay. If you go to the next page, page 11, does that photo show any code violations or illegal wiring?**
A. I can't tell you about illegal wiring, but a code violation is right above the stairs there.
**Q. And that's what we talked about before with respect to the location of the panels?**
A. Correct. So those panels there are directly on the other side of that meter, on the picture.

**Q. The previous picture?**
A. Yes.
**Q. Okay. And what does the photo on page 7 of the PDF depict, in your opinion?**
A. Just an open J box with the wire sticking out of there.
**Q. Are you able to tell where that may be located in the house?**
A. Well, that looks like it is somewhere in the bathroom, because that's a drain cleanout right there.
**Q. And is that J box compliant with code?**
A. No.
**Q. Why not?**
A. Just because it's hanging off the stud. It needs to be mounted to the stud and wires tucked in and cover plate on.
**Q. So all the stuff that's kind of coming out of it would need to be pushed back in, set into place, and attached to something?**
A. Well, the box needs to be attached to the stud or supported properly. And then -- yeah, then the wires go back in and the cover plate put on it.
**Q. Would the condition of that J box be caused by a crack in the drain-waste-vent pipe, in your**



**opinion?**
A. No.
**Q. Would any code violations that exist with respect to that J box be caused by the crack in the drain-waste-vent pipe?**
A. No.
**Q. Okay. The email also notes that, "90 percent of wiring is ran illegally in plumbing pipe, concrete and stapled on exterior walls, which is illegal as well." Do you agree with that opinion --**
A. Hold on one second. I got to go back.
**Q. -- based on anything that's depicted in these photos or your objections of the property?**
A. Where does it say that?
**Q. In the email, the last sentence -- no, sorry. In the first paragraph, it says, midway through, "90 percent of wiring is ran illegally in plumbing pipe, concrete and stapled on exterior walls, which is illegal as well."**
A. Yup; I mean, depending on the wiring. See, if you go to page 7 again and you see the metal sheath wire right there, it looks like a corrugated -- the corrugated wire is one in the center, and then there's two little black wires on each side of it.
**Q. Yes.**



A. Well, that metal one, you can nail it to exposed, anywhere you want it, except for outside. But you can go on the outside of the stud, outside of a wall, whatever. And then the other two, the black ones, they have to be stapled within the wall and, you know, within -- or an inch and an eighth from the exterior of the wood face. But you can't put those on the exterior of the wall.
**Q. Do you know if the condition of that J box was caused by the crack in the drain-waste-vent pipe?**
A. No, I don't know that.
**Q. Did anyone ever tell you if it was removed and remediated as a result of the crack in the drain-waste-vent pipe?**
A. No.
**Q. If you could just jump to page 8. Could you please just describe, in your opinion, what, if anything, that picture may show.**
A. It shows MC cable, which is that corrugated steel-looking stuff. And then it does show a piece of plumbing pipe there with a wire or something in it. I don't know what that is. I don't know if that's electrical wiring or what that is.
**Q. Okay. Is there anything else regarding the electrical system that you can discern?**



A. No.
**Q. If you could just please take a look at page 12. In your opinion, what does that photograph show, if anything, about the condition of the electrical system?**
A. It shows that both of those -- it shows that they have just wires coming out of the wall, which is not the correct application.
**Q. That would be a code violation?**
A. Yes. I don't know what it's going into, what kind of wall that is.
**Q. Okay. Do you know where that's located in the house, based on your -- your recollection of your observations of the property?**
A. No.
**Q. If you could also now look at page 13. Please just tell me what, if anything, you can observe from that picture about the electrical systems.**
A. I mean, just like we mentioned before, it's just the same. I mean, you have MC going across the ground there, which that could all just be due to demoing. Just because it's like that doesn't mean it was like that; because that's all new framing. So, I mean, if they demoed it, of course, it's laying there. Granted, the piece of white PVC -- I think that's

white -- I can't tell what kind of PVC that is. It looks white, and it does look like a plumbing pipe, but I can't confirm that.

**Q. Do you recall if the property looked like that when you visited it?**

A. No, it didn't, no. It was all cleaned out.

**Q. Okay. All right. Thank you. I'm now going to show you what has been previously marked as Exhibit 47. It's going to take a few seconds to go through, due to the size.**

THE DEPONENT: How much longer are we going to do this? Is this going to take awhile, still?

MR. DENBY: I've probably got, I think, like, five to ten minutes on me. That's why I just needed to make sure I wasn't missing anything. I'm going through the last of my documents right now --

THE DEPONENT: Okay.

MR. DENBY: -- and then Mr. Quisenberry, if he wants to ask you any questions. But I'm getting to the end here.

THE DEPONENT: Okay.

**Q. (BY MR. DENBY) Once you have the document open, just let me know, because it's a 43-page document, but I'm only going to be directing your**



**attention to a certain section.**

A. Is this Exhibit 47?

**Q. Yup, Exhibit 47. It should be a 43-page PDF.**

A. All right. I'm here.

**Q. Okay. If you could please jump to page 24 of the PDF.**

A. Okay.

**Q. So this is an inspection report that was completed in July of 2011 with respect to plaintiff's property.**

A. Okay.

**Q. Page 24 is detailing the inspection on the electrical systems. If you'd please just take a moment to review that page, as well as the page that follows it -- the two pages that follow it.**

A. (Deponent examined document.)

**Q. So whenever you're ready, I'm just going to ask a few questions about this report's findings.**

A. Okay. Go ahead.

**Q. So starting on page 24 of the PDF, the first page of the "ELECTRICAL" section, the first page notes, "One or more breakers in the right panel box are serving two circuits which could create a fire hazard." Would that be a code violation, in your opinion?**



A. Yes.

**Q. And did any of the work that you suggested in your estimate relate to fixing that code violation?**

A. Yes.

**Q. Which work was that?**

A. It would be replacing the panel or adding a subpanel.

**Q. So you would then agree that that work was related to a system that was existing when the plaintiff bought the property?**

A. Say that again.

**Q. Let me rephrase that. Based on this report being dated in July of 2011, you would then agree that the issue with the breaker existed prior to the crack in the drain-waste-vent pipe?**

A. I don't -- no. I don't know when the crack happened.

**Q. Well, if the --**

A. But it had nothing to do with the crack in the waste pipe, for sure.

**Q. Essentially, I'm just asking, this issue existed prior to the crack happening?**

A. I don't know. I don't know when they double-lugged it. That could have been somebody going in there at any time and adding another wire in there,



at any time.

**Q. Okay. I guess, based on this report as of July 2011, there were issues with the breakers, however, correct?**

A. Yes.

**Q. Okay. And those are the same issues that you included in your estimate?**

A. Yes.

**Q. Okay. So just jumping to the next page, please.**

A. All right.

**Q. Would anything related to the exterior lighting have anything to do with -- would any violations with respect to the exterior lighting be related to the plaintiff's claim for a drain-waste-vent pipe?**

A. No.

**Q. For wire protection and routing, they recommended installing conduit to protect exposed wires below 8 feet in the garage and laundry area. Did you have an opportunity to inspect the garage?**

A. No.

**Q. Did you have an opportunity to inspect the laundry room?**

A. I'm sure I did, but I don't remember

anything about it.
Q. Based on your recollection, do you agree with this statement with respect to the installation of conduit in the laundry area?
A. It depends on the walls. Like, if it was -- I'm assuming the reason why they're saying that is because it was brick wall or something.
Q. Okay. Was the installation --
A. That's why (inaudible) need to be.
Q. Was the installation of any conduit in the laundry area included in your estimate?
A. Yes.
Q. And what part of the estimate would that have been included in?
A. It would have just been in general wiring. When we go in there, I put general wiring. We do whatever it takes, per code, for the application of whatever room we're in.
Q. Okay. So that part of your estimate that talks about the rewiring, in general, that would have been applicable to anything that you might not have specifically identified it that way?
A. Correct.
Q. Okay. Would three-prong outlets being ungrounded be a code violation?



A. Yes.
Q. Did any of the work in your estimate include grounding the three-prong outlets?
A. Yes.
Q. What part of your estimate would have covered that?
A. Just general wiring.
Q. Okay. Did your estimate include any work for the repair of dead outlets in the basement, bedroom, kitchen, and utility room?
A. Yes.
Q. What part of the estimate would have included that?
A. General wiring.
Q. Did your estimate include any work for the missing -- the junction box, the installation of the missing cover on the junction box?
A. Yes.
Q. And what part of the estimate would that have been in?
A. General wiring.
Q. Okay.
A. All that stuff would be gone in my estimate. There would be no existing wiring.
Q. You would have just taken it out?



A. It would have been all removed.
Q. I'm just trying to make sure that the work that they're talking about with respect to these issues would have been part of the work that you would have done at the property?
A. Correct.
Q. Did your estimate include any work with relation to the installation of ground fault circuit interrupt outlets in the kitchen?
A. Yes.
Q. Would that also have just been under the general wiring?
A. Yup.
Q. And would the reversal of the east -- the wiring in the east wall outlets in the kitchen be included in your estimate?
A. Yes.
Q. Is that also just general wiring?
A. Correct.
Q. With respect to the laundry room, the report notes that an outlet on the west wall has the hot and neutral wires reversed. Was that work included in your estimate?
A. Correct, yes.
Q. Also, general wiring?



A. Correct.
Q. And finally, with respect to the northeast bedroom, an outlet is damaged. Was that work included in your estimate?
A. Yes.
Q. And also as general wiring?
A. Correct.
Q. Okay. And when you observed the house, do you have any recollection of whether the circuits in the house were shared?
A. I don't know.
Q. If the circuits were shared, would that require a code upgrade?
A. I would have to see on how they're shared.
Q. I guess, if circuits --
A. The word "shared" is kind of a broad statement.
Q. If the plaintiff were to say that circuits were shared and tied together, how would you interpret that?
A. Well, I guess it would be like the double-lugging of the breaker there; which means, yes, it would need to be on its own breaker.
Q. And could that have been something related to the change in occupancy from, say, a single-family

residence to a duplex?
A. Yes.
Q. And did you ever take any photos when you were at the property?
A. Probably. I'm sure I don't have them anymore, because I clean my folders out.
Q. Okay. That would be one thing that I would just ask, following this deposition, if you do have an opportunity, to just check to see if those still exist, because none of them were produced in this lawsuit. So if you do have them, you know, our office can send you a link, you can upload them to the link -- have someone upload them to the link and just send it back to me and Mr. Quisenberry, if there is anything.
A. Okay.
Q. Did you ever tell -- I'm sorry. Did you ever tell Mr. Diem that there were too many runs on different circuits and the panels are backfeeding and that some have reversed polarity?
A. No, because I didn't check them. I wouldn't know that.
Q. Is it possible that that statement may have been made by someone from Singletrack, then?
A. Yes, it's possible. Sounds like they were already in this, so they would know.



Q. I'm just trying to figure out if you ever made any statements about the code, to plaintiff.
A. No.
Q. Did you ever tell the plaintiff that you couldn't find a correct grounding system when you were inspecting the property?
A. I don't remember.
Q. Do you recall if the property had a correct grounding system?
A. I don't remember. That's something that I would have installed all new.
Q. Is that something that would have been preexisting and related to the age of the house?
A. Kind of. You still got to ground your -- you still have to have proper grounding, whether it's old or not.
Q. Could the crack in the drain-waste-vent pipe have caused any issues with the incorrect grounding?
A. No, not that I can think of. So I guess it depends on where the crack is.
Q. As far as you are aware --
A. If the crack was underneath the foundation of where the panel is, well, your ground rod can always go through a pipe.



Q. As far as you're aware, did you observe any damage along those lines?
A. No. I didn't even look at none of the ground rods or anything, that I remember; because ground rods are 8 feet, and we pound those in the ground.
Q. Okay. This is just going to be my last exhibit, very quickly. This is Exhibit 47.
THE REPORTER: Oh, we just did 47.
MR. DENBY: I'm sorry. 46. I misspoke. I was looking at the line underneath in my folder. I apologize.
Q. (BY MR. DENBY) Okay. I'd like to just draw your attention starting at page 5 of the PDF.
A. Okay.
Q. I believe I already asked you about the first section. The second section listed there, E3405.1, are you familiar with that code section? Withdraw. We actually talked about that one already. I apologize. If you could actually jump to page 7.
A. Okay.
Q. Are you familiar with that code section, E3402.2?
A. Yes.
Q. Do you have any opinion as to whether it



applies to this claim?
A. No.
Q. You don't have an opinion, or it does not apply?
A. It doesn't apply, to me.
Q. Why do you believe that it doesn't apply?
A. Because you're talking about a claim of a broken conduit -- or a pipe, right?
Q. Yeah.
A. So then I want to know why this would have anything to do with that?
Q. Do you think that any work related to the fire systems or ventilation or air handling ducts was related to the crack in the drain-waste-vent?
A. I wouldn't know why that would occur.
Q. Okay. I believe we already talked about the next section, so let's skip to E3605.6. Are you familiar with that code?
A. Yes.
Q. Do you have any opinion as to whether it's applicable here?
A. No, I don't know why --
Q. Why not?
A. Because -- because it's talking about exterior wiring, and I don't know why that would have

anything to do with it.
**Q. Okay. Looking at the next section, E3- -- sorry. Withdrawn.**
**The next section, 3608.1, are you familiar with that code section?**
A. Yeah.
**Q. Do you have any opinion as to whether it's applicable to Mr. Diem's claim?**
A. Just like I mentioned before, depending on where the drain was cracked, I mean, I guess a ground rod can always crack a pipe.
**Q. Do you have -- did you observe any damage to the grounding system from sewage from a drain-waste-vent pipe?**
A. No.
**Q. Okay. Jumping to the next section, please, E3702.3, are you familiar with that code section?**
A. Yeah.
**Q. Do you have any opinion as to whether it applies here?**
A. No, it doesn't apply.
**Q. Why not?**
A. Because this is talking about the amount of equipment per branch circuit, and that doesn't have



anything to do with plumbing framing.
**Q. Is that something that would likely be a preexisting condition in the house?**
A. Yes.
**Q. Okay. Looking at the next section, please, E3703.2, are you familiar with that code section?**
A. Yes.
**Q. Do you have any opinion as to whether it applies here?**
A. It doesn't.
**Q. Why not?**
A. Because that circuit is there running along on the countertop of the kitchen and the walls in the dining room; which, again, are nowhere in the vicinity of a drainpipe.
**Q. Okay. Now, looking at the next section, E3703.4, are you familiar with that code section?**
A. Yes.
**Q. And do you have any opinion as to whether it applies here?**
A. It's the same as the kitchen.
**Q. The same reason that it doesn't apply?**
A. Yeah. This is just talking about, you know, your branch circuit, the wiring of the branch



circuits, even the timing of the two circuits. I mean, none of that has anything to do with the drainpipe.
**Q. Are those electrical issues that likely would have existed independently of anything going on with the drain-waste-vent pipe?**
A. Yeah. It shouldn't have anything to do with it.
**Q. Okay. And then, I guess, the same section, E3703.6, are you familiar with that code section?**
A. Yes.
**Q. Do you think that that applies to this claim?**
A. No.
**Q. Why not?**
A. Just because it has nothing to do with the drain.
**Q. And if you notice, there's a comment there about, ". . . exposed 220v cable in basement that is partially run inside PVC pipe which is not an approved conduit." Is that something that likely would have been wired that way, prior to the crack in the drain-waste-vent pipe?**
A. Possibly. It's hard to say. I wouldn't know, unless I see the type of wire.



**Q. Do you think that that has any relation to a drain-waste-vent pipe?**
A. No.
**Q. And the same question, pretty much, as we're going to go through. Are you familiar with the next code section, E3901.2?**
A. Yes.
**Q. Do you have any opinion as to whether that's applicable to this claim?**
A. No.
**Q. Why not?**
A. Because this is talking about the locations of the boxes.
**Q. And an independent -- I'm sorry.**
A. It has nothing to do with the waste drain.
**Q. And an independent violation in the kitchen wouldn't be related to the drain-waste-vent pipe, correct?**
A. Correct.
**Q. Okay. Next section, E3901.7, are you familiar with that one -- that code section?**
A. Yeah.
**Q. And do you think that applies to Mr. Diem's claim?**
A. No.

Page 106

**Q. Why not?**
A. The same reasoning as all the rest. It just doesn't have nothing to do with the drainpipe.
**Q. And is that because it's with respect to outdoors outlets?**
A. Yes.
**Q. Okay. The next section, E3902.5, basement receptacles, are you familiar with that?**
A. Yes.
**Q. What -- do you know what Mr. Diem means by, "No GFCI protection"?**
A. It's just the device. Instead of a receptacle, it's either a breaker or a device.
**Q. Would this code section have any application to Mr. Diem's claim?**
A. No.
**Q. Why not?**
A. Because it's a device. It does not have anything to do with it.
**Q. When you say "device," do you mean like a junction box or --**
A. No; like a receptacle.
**Q. Okay.**
A. A switch.
**Q. And are you familiar with the section**

Page 107

**immediately under, a similar section, E3902.9?**
A. Yes. Same exact reason as the one before.
**Q. It does not apply for the same reason?**
A. Yes.
**Q. How about the next section, E3902.11?**
A. Yes.
**Q. Are you familiar with that code section?**
A. Yes.
**Q. And why -- does that code section apply?**
A. No.
**Q. And why does that code section not apply to Mr. Diem's claim, in your opinion?**
A. The same reason as the first two prior, before that. They're just devices.
**Q. Finally, the next section, E3902.17, "Arc-fault circuit-interrupter protection." Are you familiar with that code section?**
A. Yes.
**Q. And is there any -- do you believe that this code section would have applied to this claim?**
A. No.
**Q. Why not?**
A. Because that's also a device. It's a breaker.
**Q. And what does this code section require?**

Page 108

A. It just requires an arc fault breaker if if you extend more than 5 feet or add a new line to the power source.
**Q. So not having one present in the property would be a violation of code?**
A. Not only -- well, unless they added wire; then, yes, it would be required. But if they -- the time that I was there, no AFCI was required.
**Q. How come?**
A. Because nothing was done when I was there, not that I know of.
**Q. Would the lack of arc fault -- is it possible that the lack of arc fault protection existed independently of the issues with the drain-waste-vent system?**
A. No.
**Q. Why not?**
A. Because it's a device.
**Q. So it would have nothing to do with the drain-waste-vent system, correct?**
A. Nothing to do with the drain-waste system.
**Q. Okay. Thank you. I just wanted to clarify.**
MR. DENBY: Could you just read back my prior -- two sentences -- the two questions ago?

Page 109

A. What do you want me to do?
**Q. (BY MR. DENBY) I'm asking Ms. Reporter just to read back my question; because I think the way I phrased it, the first time you had answered it opposite of the way, but you just cleared it up. So I just want to make sure.**
(The question and answer beginning on page 108, lines 12 through 16, were read back as follows:
"Question: Would the lack of arc fault -- is it possible that the lack of arc fault protection existed independently of the issues with the drain-waste-vent system?
"Answer: No.")
MR. DENBY: Okay. Thanks.
**Q. (BY MR. DENBY) So, just to clarify. The arc fault system would have been independent of the issues with the drain-waste-vent, correct?**
A. Correct.
**Q. It would not have been related to it?**
A. Correct.
**Q. Okay. Thanks. And finally, just looking at that last section cited at the bottom, E3902.18, are you familiar with that code section?**
A. Yes.

Q. And is there any requirement that an arc fault be added any time there's a modification?
A. Yes.
Q. Would that -- would an arc fault -- would the addition of an arc fault have been required with respect to the crack in the drain-waste-vent pipe, or was it unrelated to that?
A. It was unrelated.
Q. How come?
A. Just because this is electrical devicing (sic) and additional wiring, and that's plumbing.
MR. DENBY: Okay. Give me 30 seconds, but I think that's everything that I have.
Q. (BY MR. DENBY) And aside from the person who was at the scene at the inspection when you went to Mr. Diem's house, have you talked to any of his other contractors regarding this claim?
A. No. I don't know any of his contractors.
Q. Are you aware if Mr. Diem had any prior electrical issues with the house?
A. No.
Q. And, just lastly, what does one need to do to get the city to perform an inspection?
A. You just go online and schedule it.
Q. And is that -- but that's after you



apply -- you have to apply for the permit first, correct?
A. Yeah, you have to pay for a permit.
Q. And were you -- sorry. I apologize if I already asked this. Lastly, are you aware of any prior upgrades to the electrical system in the property?
A. No.
Q. And have you ever heard of Bellator Claims before?
A. No.
Q. Has anyone paid you any money to provide expert testimony in this case?
A. No -- well, I mean, what's this check (indicating)? I don't know what that is.
Q. Can you hold it -- is that from my office? Oh, okay. That check is for you. That's a fee for your attendance at this deposition today, as required by statute. So that's what you get for your time with me this morning.
A. That's for the cup of coffee.
Q. You're welcome. Maybe half a cup these days.
A. Yeah, right.
Q. So, okay. And have you ever been disclosed as an expert witness by any law firm before?



A. No.
Q. And I believe you said this is the first time you've provided a deposition?
A. Correct.
Q. And lastly, does the electrical code allow for existing wiring equipment to be repaired or replaced with like material?
A. With proper material.
Q. Okay.
A. With like -- I mean, comparing it in a house that old, there's really no like material to it. So, I mean, yes, kind of.
Q. And are there any other documents, other than your estimate, that you've prepared with respect to your work on Mr. Diem's claim?
A. No.
MR. DENBY: Okay. I think that concludes my questions.
MR. QUISENBERRY: Just one quick question here, or maybe a couple, Mr. Guerra.

EXAMINATION

BY MR. QUISENBERRY:
Q. Based on your experience, if a wall is opened up due to mitigation efforts that exposes wires that are not up to code, are code upgrades then



required for that wiring to get it through the permitting process?
MR. DENBY: Objection to form. You can answer.
A. Yes and no, depending on if they're damaged or not. If they're not damaged, then, no.
MR. QUISENBERRY: No additional questions.
MR. DENBY: I would just like to ask one other question, then, I guess.

EXAMINATION

BY MR. DENBY:
Q. So if mitigation efforts were undertaken and the electrical components were not damaged as a result of the drain-waste-vent pipe, then any upgrades related to those would be unrelated to loss, in your opinion, correct?
MR. QUISENBERRY: Object to form. You can answer.
A. Correct.
MR. DENBY: Okay. No further questions. Thank you very much for your time, Mr. Guerra. Appreciate it.
THE DEPONENT: Thank you, guys.
MR. DENBY: Thank you, Ms. Obermeyer. Drew, thank you very much.

THE REPORTER: Mr. Quisenberry, would you like the deponent to read and sign his transcript?

MR. QUISENBERRY: Yeah, we can handle that. You can send it to us. Mr. Guerra, we'll get that over to you. If you don't want to read it or anything like that, and you don't sign it, then it's enforceable the way it is today.

THE DEPONENT: Okay.

THE REPORTER: Same orders as last week, etrans and the new exhibits?

MR. QUISENBERRY: Yes.

MR. DENBY: Yes, I believe so.

WHEREUPON, the within proceedings were concluded at the approximate hour of 12:15 p.m. MDT on the 3rd day of October, 2022.

* * * * *



I, MARCUS GUERRA, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached ( ) Yes ( ) No

______________________________
MARCUS GUERRA

The signature above of MARCUS GUERRA was subscribed and sworn to or affirmed before me in the county of ____________, state of Colorado, this _____ day of ____________, 2022.

____________________________
Notary Public
My commission expires

Jeff Diem, 10/3/22 (go)



REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, GAIL OBERMEYER, Registered Professional Reporter and Notary Public ID 19994012647, State of Colorado, do hereby certify that previous to the commencement of the examination, the said MARCUS GUERRA verbally declared his testimony in this matter is under penalty of perjury; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 11th day of October, 2022.

My commission expires May 20, 2023.



Gail Obermeyer, RPR
Registered Professional Reporter
Notary Public, State of Colorado

__X__ Reading and Signing was requested.
_____ Reading and Signing was waived.
_____ Reading and Signing is not required.



Errata Sheet

NAME OF CASE: JEFF DIEM vs TRAVELERS PERSONAL INSURANCE
DATE OF DEPOSITION: 10/03/2022
NAME OF WITNESS: Marcus Guerra
Reason Codes:
1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
Page _____ Line ______ Reason ______
From ____________________ to ____________________

_______________________